IN THE UNITED STATES DISTICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
| Reese Brothers, Inc. | |
| 925 Penn Avenue | |
| Pittsburgh, PA 15222 | |
| PLAINTIFF, | |
| | |
| versus | Civil Action No. _____ |
| | |
| United States Postal Service | |
| 475 L'Enfant Plaza, S.W. | |
| Washington, DC 20260 | |
| DEFENDANT. | |

## COMPLAINT

### Parties

1.   Plaintiff Reese Brothers, Inc. ("RBI") is a corporation organized under the laws of the Commonwealth of Pennsylvania and located at 925 Penn Avenue, Pittsburgh, PA 15222.

2.   Defendant United States Postal Service ("USPS") is an independent agency of the executive branch of government of the United States with its headquarters office located at 475 L'Enfant Plaza, S.W., Washington, D.C.

### Jurisdiction

3.   This Court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1339 as well as Title 39 U.S.C. § 409(a) to determine whether the USPS promulgated regulations inconsistent with Congressional intent, whether the USPS promulgated regulations violating the Constitution both facially and as applied to Plaintiff and Plaintiff's clients, whether the USPS applied regulations erroneously in general and with specific reference to Plaintiff, and whether the USPS followed improper procedures.

**Facts**

*A.  Constitutional, Statutory, and Regulatory Background*

4.  The Supreme Court has consistently recognized that charitable solicitations are speech fully protected by the First Amendment.  <u>Riley v. National Federation of the Blind of North Carolina, Inc.</u>, 487 U.S. 781 (1988); <u>Secretary of State of Maryland v. Joseph H. Munson Company, Inc.</u>, 467 U.S. 947 (1984); <u>Village of Schaumburg v. Citizens for a Better Environment</u>, 444 U.S. 620 (1980).  Charitable solicitations are fully protected by the First Amendment whether a nonprofit conducts the solicitation itself or whether the nonprofit engages a fundraising professional to assist in producing and disseminating the solicitation material. <u>Riley</u>, 487 U.S. at 796.

5.  While charitable solicitations are considered fully protected free speech, certain regulations are permissible.  The several States, exercising their police power, regulate charitable solicitations with a view toward preventing fraud.  Among the many regulations the States impose is the requirement that professional fundraisers make a minimum guarantee to a nonprofit client ("minimum fundraising guarantee").  Generally speaking, these statutory provisions mandate that when a nonprofit engages a fundraiser, the contract must state the amount that the fundraiser has minimally guaranteed as a net return to the nonprofit, and in some states there is a requirement that the nonprofit receive some stated minimum percentage of the funds raised.  See, e.g., Ohio Stat. § 1716.08(A).  These state-mandated minimum guarantee requirements apply to the whole contract and the entire scope of services in the contract.  In other words, if a nonprofit engages a fundraiser to provide both telemarketing solicitation services and direct mail consulting services, the minimum guarantee applies to the gross amount of all the funds raised by both methods.

6.   Congress has mandated that the USPS charge nonprofits a discounted postage rate called the Nonprofit Standard Mail rate ("nonprofit rate").  39 U.S.C. § 3626(a)(6)(A).  However, access to the nonprofit rate is subject to various restrictions.  Domestic Mail Manual ("DMM") § E610.  The restrictions relevant to this case are collectively referred to as the "cooperative mailing rule" ("CMR").  Title 39 U.S.C. § 3626(j)(1), the statutory foundation of the CMR, restricts access to the nonprofit rate based on the content of the mailpiece in question. Nonprofits are not allowed to post any material at the nonprofit rate that improperly promotes or advertises certain products and services.  Specifically, the CMR prohibits entry at the nonprofit rate of mail matter that promotes or advertises: credit cards and other financial instruments, insurance that is not otherwise commercially available, travel packages not substantially related to the nonprofit's mission, and other products and services that are not substantially related to the nonprofit's mission.  The common theme, of course, is that nonprofits are not allowed to use the nonprofit rate to improperly promote or advertise products or services.

7.   Pursuant to Congress' statutory authorization at 39 U.S.C. § 3626(j)(1)(D)(ii), the USPS has promulgated regulations defining cooperative mailings ineligible for entry at the nonprofit rate because they promote or advertise products or services unrelated to the nonprofit's mission. These regulations can be found at DMM § E670.5 and USPS Customer Support Ruling PS-138.

8.   However, the USPS also promulgated other cooperative mailing regulations.  These regulations restrict access to the nonprofit rate not based on whether the mailpiece in question improperly promotes or advertises products or services, but instead based on the relationship between the nonprofit organization and a for-profit entity.  These regulations, found at Chapter 5 of USPS Publication 417, USPS Customer Support Ruling PS-209, and USPS Customer Support Ruling PS-233, direct the USPS to review various factors to evaluate the relationship between a

nonprofit entity and a for-profit entity to determine if the relationship is a valid principal-agent relationship (in which case the mail matter is eligible for the nonprofit rate) or a joint venture (in which case the mail matter is not eligible for the nonprofit rate). These regulations are hereinafter collectively referred to as the "relationship test cooperative mailing regulations" ("RTCMR").

### B.  The USPS Assesses a Postal Deficiency against RBI

9.  RBI today is a moribund company with no clients and one employee. It liquidated its operational assets in 2002 to pay off bank debt and other creditors, has minimal cash assets remaining, and is unlikely to realize income in the future. RBI's principal asset is the chose in action represented by this lawsuit. In early 1998, however, RBI was a fundraising company with approximately thirty-five nonprofit clients, approximately 2,028 employees, and $59 million in gross annual revenue. At the time, RBI performed both telemarketing solicitations and direct mail consulting services for its nonprofit clients.

10. Reduced to its simplest terms, the operation consisted of RBI, acting as the nonprofit's registered agent, contacting people through telemarketing to promulgate a particular nonprofit's mission and to seek pledges to donate to that particular nonprofit-client. Payments for pledges were not accepted on the telephone, except to a *de minimus* extent. If a pledge was made, the nonprofit would send a series of follow-up mailings to the pledgor. These mailings consisted of a letter requesting the donor to send payment to fulfill his pledge (a "pledge fulfillment letter"), and a changing variety of materials regarding the nonprofit and its mission ("information kits"). The information kits could be educational, such as a brochure, or action-oriented, such as a packet of red ribbons printed with the nonprofit's name to affix to a car during the nonprofit's annual red ribbon awareness campaign. If the donor did not respond to the first pledge

fulfillment mailing, the nonprofit would send out additional pledge fulfillment mailings.  In all cases, the first mailing was posted at the first class postage rate.  Subsequent mailings, sometimes beginning with the second mailing, sometimes beginning with the third or fourth mailing depending on the contract, were posted at the nonprofit rate. Additionally, more detailed information kits were typically mailed at the nonprofit rate to new prospective donors at almost the same time as the first mailing.  Some campaigns mailed similar informational kits to existing donors at the nonprofit rate to update them on the nonprofit.  Mailings were produced and mailed by RBI, acting as the nonprofit's agent and within the scope of contract services.

11. At no time did any of these mailings or information kits promote RBI's own products or services to the addressees.  Nor did the mailings or information kits promote the products or services of any entity other than the appropriate nonprofit-client.

12. RBI's contracts with its clients included certain minimum guarantees to the nonprofits, as required by various state statutes.  All of RBI's competitors had materially identical clauses in their contracts, because they were also complying with the same state laws.

13. On behalf of its clients, RBI posted millions of pieces of pledge fulfillment mail at the nonprofit rate between January 1, 1993 and June 1, 1998.  RBI's competitors throughout the fundraising industry, who also were operating and continue to operate under contracts containing minimum guarantees, were also posting millions of pieces of pledge fulfillment mail at the nonprofit rate.  At no time prior to June 1, 1998 did the USPS refuse to accept a mailpiece produced under an RBI contract, or any other similar fundraising contract containing the state-mandated minimum guarantee clauses, for delivery at the nonprofit rate merely because the contract under which the mailpiece was produced contained state-mandated minimum guarantees.  Nor did the USPS ever indicate before June 1, 1998 that such mail matter could not

be entered at the nonprofit rate for this reason.  The USPS was well aware that state statutes required fundraisers to make minimum guarantees to their clients.

14. By letter dated June 1, 1998 ("the First Deficiency Letter") the USPS assessed a postal deficiency for "ineligible mailings entered at the nonprofit rates from January 1, 1993 through December 31, 1997" in the amount of $3,223,580.99, which was "the difference between the nonprofit rate claimed and the regular rate."  (Tab A)

15. When it made this determination, the USPS stated that it had reviewed postal receipts (PS Forms 3602), copies of contracts between RBI and its clients (these contracts had been subpoenaed earlier), and USPS regulations.  (Tab A)

16. The USPS justified the deficiency saying

> there appears a relationship exists between Reese Brothers, Inc. and certain nonprofit organizations that would make nonprofit mailings presented by Reese Brothers, Inc. ineligible for the nonprofit rates claimed … The common characteristic within the contracts is the fact that there is 'no risk' to the nonprofit organization should the fundraising campaign fail to generate sufficient revenues. (Tab A)

17. The USPS did not premise the deficiency on any allegation that the mailpieces improperly promote or advertise products or services as contemplated by 39 U.S.C. § 3626(j)(1).

18. The First Deficiency Letter did not include thirty-two computer spreadsheets listed as exhibits to the letter.  After several requests to provide those spreadsheets (one was made as early as July 6, 1998, see Tab L), the USPS finally provided paper copies on April 1, 1999.

19. In an attempt to independently verify the deficiency, RBI has requested copies of the individual postal receipts upon which the USPS based this deficiency.  A request was made as early as July 6, 1998.  (Tab L) To date the USPS has failed to produce this information or even a statistically valid random sampling of the postal receipts.  This has caused several problems for RBI, including, but not limited to, the following: (A)  RBI cannot independently verify that the

postal receipts upon which the deficiency is based are properly included in the deficiency calculation because they have never been produced.  (B)  The USPS included in the deficiency calculation mailings that RBI entered for Trustmark, Inc., but RBI's records indicate that the only mail matter it posted for Trustmark, Inc. was not entered at the nonprofit rate.  Without the appropriate postal receipts, this issue cannot be resolved.  (C)  Nearly thirty-eight thousand dollars of the deficiency was attributed to "unidentified miscellaneous" by the USPS.  Without the appropriate postal receipts upon which the USPS relied to calculate the deficiency, RBI cannot even begin to verify, confirm, or dispute this portion of the deficiency.  (D)  The USPS based part of its deficiency calculation on "average postage."  The USPS has not explained how it calculated average postage or why this is superior to using actual postage rates in the calculation.  (Tab O)

20. By letter dated August 20, 1998 ("the Second Deficiency Letter") the USPS supplemented the First Deficiency Letter with a deficiency calculation "for the time period of January 1, 1998 through June 1, 1998."  The supplemental deficiency amount was $376,487.24. (Tab B)

21. RBI sought to resolve this matter by pursuing an administrative appeal and informal negotiations with the USPS concurrently.

## C.  The Administrative Appeal

22. By letter dated August 27, 1998 ("First Administrative Appeal") RBI, through its counsel, appealed the deficiency assessment on various grounds and reserved its right to supplement to the appeal, since the USPS had not yet provided all the requested documentation. (Tab C)

23. By letter dated October 21, 1998, and pursuant to DMM § G020.3.3, RBI requested a "deposit arrangement."  This notified the USPS that the additional postage that RBI was then obligated to pay because of the First Deficiency Letter should be held by the USPS in trust, so that it could be refunded in the event that RBI ultimately prevailed in its appeal.  (Tab M)

24. By letter dated March 1, 1999 the Northern Virginia Rates and Classifications Service Center (the "Intermediate Administrative Decision" – Tab D) denied RBI's appeal of the deficiency assessment.  This decision essentially affirmed the earlier decision on the same basis saying "[a]ll of the contracts furnished to us by Reese Brothers relating to this revenue deficiency bear evidence of the type of cooperative venture which is not authorized to mail at the Nonprofit Standard Mail (A) rate. … All of the contracts contain some form of a so-called 'break-even guaranty.'"

25. On November 19, 1999, RBI, through its counsel, filed its "Second Administrative Appeal" in this case.  (Tab E)  Although this appeal was filed quite some time after the Intermediate Administrative Decision, it was necessarily incomplete because the USPS had insisted that RBI file its appeal before the USPS had provided numerous documents RBI needed to perfect its appeal. (Tab P)

26. By letter dated March 13, 2000, the USPS again affirmed the deficiency assessment ("Final Administrative Decision").  As grounds, the Final Administrative Decision noted that "[e]ach contract contains some form of 'break-even guaranty.'"  (Tab F)

27. Having rendered a final decision on the merits of the deficiency, the process moved to the "forbearance" phase which is akin to a damages determination in which the USPS entertains arguments as to whether the deficiency figure should be abated and by how much.

28. However, three days after rendering the Final Administrative Decision and before RBI's counsel could even begin to draft a forbearance request and memorandum, the USPS denied any abatement on March 17, 2000 (the "Preemptive Forbearance Decision").  (Tab G)

29. After a vigorous protest, the USPS allowed RBI to submit a memorandum supporting forbearance.  The "First Forbearance Memorandum" was submitted on April 28, 2000.  (Tab H) This document was assigned for consideration to the same individual who wrote the Preemptive Forbearance Decision.  The February 15, 2001 "Forbearance Decision" reduced the revenue deficiency to $1,646,277.95.  (Tab I)

30. On March 7, 2001, RBI asked the USPS to reconsider the Forbearance Decision on the grounds that the decision maker was partial and the decision itself was arbitrary and capricious. (the "Second Forbearance Memorandum" – Tab J)  No response was made to this request.

31. On October 9, 2003, the USPS promulgated new regulations that insured that only RBI would be assessed under the USPS's interpretation of the cooperative mailing rule.  At 68 Fed. Reg. 58273 the USPS amended its regulations to state that the cooperative mailing rule "no longer applies to mailings by an organization authorized to mail at the Nonprofit Standard Mail rates soliciting monetary donations to the authorized mailer and not promoting or otherwise facilitating the sale or lease of any goods or service."  (Tab K)  The new regulation became effective on November 13, 2003.  The regulation was not retroactive.

32. Because this new regulation would have resolved this dispute in RBI's favor had it been promulgated on or before January 1, 1993, RBI asked the USPS to reconsider its decisions regarding the deficiencies it had assessed against RBI.  RBI's request reiterated the arguments it had made earlier and also requested relief as a matter of fundamental fairness.  (Tab R)  The USPS declined this request.  (Tab S)

*D. Informal Negotiations with the USPS*

33. Since the First Deficiency Letter, RBI was unable to post any of its clients' pledge fulfillment mail at the nonprofit rate. Given the higher postage costs, RBI was finding it economically impossible to continue its relationships with its nonprofit clients. In an effort to resolve the problem prospectively, RBI began negotiating with the USPS in the Autumn of 1998 to agree on new contract language that would salvage as much of the nonprofits' fundraising program and as much of RBI's remaining business as possible. The parties ultimately reached an agreement in principle in early 1999 in which RBI would cease its mailing operations, lay off the related employees, and all mail that was previously posted by RBI at the nonprofit rate would be handled by an unrelated, third-party lettershop (which was a direct mail printing, assembly, and mailing specialist) under a separate contract. RBI shut down its printing and mailing operations and laid off the related employees. The USPS honored this agreement for less than one week. Shortly after the lettershop began posting material for RBI clients under the new arrangement, entry at the nonprofit rate was again denied. (Tab N)

34. Because the USPS was not allowing RBI's clients to post their pledge fulfillment mailings at the nonprofit rate, these clients began seeking out other fundraising professionals to help them raise money. Over the course of several years, RBI lost almost every client.

35. These clients went to other fundraising professionals and simply set up virtually the same fundraising programs. Their mailpieces and appeals were materially identical (the nonprofits owned the copyrights to their fundraising materials), and their new fundraising contracts contained the same state-mandated minimum guarantees contained in the RBI contracts. Yet the USPS took no action against either these former RBI clients or their new fundraising agents. Essentially the USPS was allowing RBI's former clients, every other nonprofit in the United

States, and RBI's competitors to post pledge fulfillment mailings at the nonprofit rate, even if they had a state-mandated minimum guarantee in their contract. The USPS policy was, in effect, that nonprofits contracting with RBI were the only entities in the United States that were prohibited from using the nonprofit rate for pledge fulfillment mailings produced under contracts containing state-mandated minimum guarantees.

36. RBI brought this disparity to the USPS's attention. RBI even provided the USPS with samples of mailings done by former clients with their new fundraisers and copies of contracts, which are freely available as public records from various state regulators, proving that other fundraisers routinely include the state-mandated minimum guarantee in their contracts. (Tab Q) Yet the USPS never took any action – either assessing a postal deficiency or denying entry at the nonprofit rate – against any fundraising professional other than RBI.

### Causes of Action

37. Each of the preceding paragraphs is incorporated into each of the succeeding "Causes of Action" paragraphs as if set forth therein. RBI alleges the following causes of action singly, collectively, and in any combination.

38. There are seventeen reasons why this Court should invalidate the USPS's deficiency assessment levied against RBI, and they fall into four broad categories. A reviewing court shall hold unlawful and set aside agency action, findings, and conclusions of law found to be (A) contrary to constitutional right, (B) in excess of the agency's statutory jurisdiction, authority, or limitations, (C) contrary to statute and Congressional intent, or (D) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*A. The USPS CMR regulations and their application*
*to RBI and its clients are unconstitutional*

**COUNT I:  VAGUENESS**

39. The USPS's RTCMR are unconstitutionally vague under the First Amendment and the Due Process Clause. The USPS's RTCMR merely set forth various factors to be considered in determining whether mail matter is eligible for entry at the nonprofit rate. The USPS does not indicate which factors are given the most weight. The USPS does not indicate how the factors interact to ultimately determine eligibility. The USPS does not define the factors or even indicate how any individual factor analysis, when applied to the facts of a given case, would tend toward any particular final eligibility determination by itself. In short, the USPS has unfettered discretion to make eligibility determinations and persons of common intelligence must necessarily guess at the meaning of the RTCMR and differ as to their application. As a result, no mailer has fair notice as to the nature of the eligibility rules that will ultimately, and retroactively, be applied to its mail matter. This inherent vagueness generates an unconstitutional chilling effect on the speech of all mailers.

## COUNT II: OVERBREADTH / SWEEPS PROTECTED SPEECH INTO COMMERCIAL CLASSIFICATION

40. The USPS's RTCMR are unconstitutionally overbroad because they sweep protected solicitation speech into a commercial classification without proper justification. The RTCMR provide that mailings produced under joint ventures between non-profit and for-profit entities, particularly joint ventures that improperly promote products and services, cannot be posted at the nonprofit rate. This is as it should be. However, the RTCMR also forbid posting solicitation mailings, which are fully protected under the First Amendment, at the nonprofit rate when the nonprofit exercises its right to engage fundraising professionals. This proscription produces a chilling effect on nonprofits' solicitation speech and makes the RTCMR highly vulnerable to selective enforcement by the USPS. Indeed, the USPS has used the RTCMR to selectively enforce the CMR regulations against RBI and its nonprofit clients, but not against other

fundraising professionals and their nonprofit clients even though their contractual relationships are all materially identical.

## COUNT III:  OVERBREADTH / REGULATES
## CONTRARY TO CONGRESSIONAL INTENT

41. The USPS's RTCMR are unconstitutionally overbroad because they unconstitutionally regulate speech that Congress did not intend to regulate in this manner.  In the plain language of 39 U.S.C. § 3626(j) and in the legislative history, Congress expressed a desire to exclude from entry at the nonprofit rate only mail matter that improperly promotes or advertises products or services.  The USPS's CMR regulations at Domestic Mail Manual ("DMM") § E670.5.4 and PS-138 are largely consistent with that purpose.  However, in promulgating regulations at Publication 417, Chapter 5, Customer Support Rulings PS-209 and PS-233 and elsewhere (the "RTCMR"), the USPS did not limit the application of the CMR to mail matter improperly promoting or advertising products and services.  Rather, these regulations considered only the relationship between parties involved in producing a particular mailing.  In doing so, these RTCMR swept nonprofits' solicitation mail, speech that is fully protected by the First Amendment, under its ambit.  Before their application was limited on November 13, 2003, the RTCMR were overbroad, had a chilling effect on nonprofits' solicitation speech, and were used by the USPS to selectively enforce its regulations selectively against RBI.

## COUNT IV:  PRIOR RESTRAINT

42. The USPS's withdrawal of RBI's clients' nonprofit mailing permits was an unconstitutional prior restraint of speech.  When the USPS notified RBI that it would no longer be able to post solicitation fulfillment mailings on behalf of its clients, it was essentially rescinding the nonprofits' nonprofit mailing permits that allowed them to communicate with a broad audience through the postal system.  This rescission was not conducted according to

narrowly drawn, reasonable, and definite standards so as to protect the nonprofits' free speech rights. Further, before restraining the nonprofits' speech the USPS failed to bear the burden of showing that the speech was unprotected, obtain a prompt and final judicial determination of the validity of the restraint, and secure an injunction.

**COUNT V:  FACIALLY UNCONSTITUTIONAL
CONTENT-BASED REGULATION OF SPEECH**

43. The USPS's RTCMR are a facially unconstitutional content-based regulation of speech. Charitable solicitations are fully protected by the First Amendment. The Supreme Court has recognized that smaller and less popular nonprofits are often compelled to engage fundraising professionals to assist them in disseminating their message and soliciting support. If a nonprofit chooses to so engage a fundraising professional, the nonprofit's speech remains fully protected under the First Amendment. Yet the RTCMR discriminate between nonprofits producing their own solicitation materials and nonprofits that engage fundraisers. Nonprofits which produce their own solicitation mail can enter the mailpieces at the nonprofit rate with no difficulty. But the USPS, acting under the RTCMR, can deny entry at the nonprofit rate to a materially identical mailpiece simply because the mailing nonprofit engaged a fundraiser. This amounts to viewpoint discrimination against the smaller, less popular, and less well-funded nonprofits that are compelled to engage fundraising professionals to communicate with the public and solicit donations. The RTCMR are unconstitutional because they are not necessary nor narrowly drawn to achieve a compelling government interest.

**COUNT VI:  UNCONSTITUTIONAL CONTENT-BASED
REGULATION OF SPEECH AS APPLIED IN THIS CASE**

44. The USPS's application of the RTCMR to RBI amounts to an unconstitutional content-based regulation. The USPS routinely allows nonprofits that produce their own solicitation mail

to post their mailpieces at the nonprofit rate.  But the USPS applied the RTCMR to RBI and its clients to deny entry at the nonprofit rate to materially identical mailpieces simply because of the relationships between RBI and the nonprofits.  In this manner, the USPS discriminated between nonprofits that produce their own solicitation mail (which nonprofits tend to be larger, more popular, and thus better funded) and nonprofits that must engage outsiders to assist in fundraising (which nonprofits tend to be smaller, less popular, and thus less well funded).  The RTCMR are unconstitutional because they are not necessary nor narrowly drawn to achieve a compelling government interest.

## COUNT VII:  FACIALLY UNCONSTITUTIONAL
## TIME, PLACE, OR MANNER RESTRICTION OF SPEECH

45. The USPS's RTCMR are a facially unconstitutional "time, place, or manner" regulation of speech.  The mail stream is indisputably a public forum (Greenberg v. Bolger, 497 F.Supp.756, 776 (E.D.N.Y. 1980)) and any regulation that restricts a nonprofit's access to the nonprofit rate because it engages a fundraising professional disproportionately burdens the speech of smaller, less popular, and thus less-well funded nonprofits and causes.  Thus, the USPS created a licensing scheme restraining speech based on the economic status of mailers. The RTCMR are unconstitutional in this context because they are unnecessary restrictions that are not narrowly tailored to achieve a significant government interest.  Additionally, by denying access to the nonprofit rate the RTCMR closes off the widest channel of communication available for smaller, less popular, and less well-funded nonprofits.

## COUNT VIII:  UNCONSTITUTIONAL TIME, PLACE, OR MANNER
## RESTRICTION OF SPEECH AS APPLIED IN THIS CASE

46. The USPS's application of the RTCMR to RBI amounts to an unconstitutional "time, place, or manner" regulation of speech.  The USPS has applied the RTCMR in such a way that

smaller, less popular, and less well-funded nonprofits are denied access to the nonprofit rate simply because they engage a fundraising professional.  At the same time, larger nonprofits which produce their own materially identical solicitation materials have free access to the nonprofit rate.  This application of the RTCMR is unconstitutional because it is an unnecessary restriction that is not narrowly tailored to achieve a significant government interest and it denies access to the widest channel of communication available for smaller, less popular, and less well-funded nonprofits.

### COUNT IX:  FACIALLY UNCONSTITUTIONAL VIOLATION OF EQUAL PROTECTION  CLAUSE

47. The USPS's RTCMR are facially unconstitutional under Fifth Amendment's Due Process Clause equal protection jurisprudence, because they burden a fundamental right of nonprofits that employ fundraising professionals.  Nonprofits that produce their own solicitation mail can enter the mailpieces at the nonprofit rate with no difficulty.  But the USPS, acting under the RTCMR, may deny entry at the nonprofit rate to a materially identical mailpiece simply because the mailing nonprofit engaged a fundraising professional or because of the nature of that agreement.  Classifying nonprofits based upon whether or how they engage a fundraising professional thus burdens these disproportionately less popular and smaller nonprofits' fundamental right to free speech.  The very text of the RTCMR erects this discriminatory classification and imposes this burden.  The RTCMR are, therefore, unconstitutional, because they are not necessary to achieve a compelling government interest.

### COUNT X:  UNCONSTITUTIONAL VIOLATION OF EQUAL PROTECTION CLAUSE AS APPLIED IN THIS CASE

48. The USPS applied the RTCMR to deny RBI and RBI's clients their equal protection rights guaranteed by the Fifth Amendment.  The USPS applied the RTCMR to distinguish

between nonprofits that produce their own solicitation material and nonprofits that engaged RBI to produce solicitation material. This latter group's fundamental right to free speech was burdened by this application simply because of the relationship between the nonprofits and RBI. This application of the RTCMR is unconstitutional under the Fifth Amendment's Due Process Clause equal protection jurisprudence because it was not necessary to achieve a compelling government interest.

*B. The USPS acted in excess of statutory jurisdiction and authority*

**COUNT XI: *ULTRA VIRES***

49. The USPS exceeded its statutory authority in applying the RTCMR to RBI and its clients. RBI essentially contracted to provide telemarketing services and mail services to its clients. To the extent that RBI assumed any actual risk in performing its contracts, it only did so while conducting telemarketing. RBI emphatically assumed <u>no risk</u> on behalf of its clients while providing direct mail advice and services. In fact, RBI billed its clients on a fee-for-service basis for direct mail services and, with only *de minimus* exceptions, was fully paid for all of these services. However, the USPS has construed the arguable assumption of risk in one aspect of the transaction to apply to the <u>entire contract</u>. The USPS is thereby leveraging its regulation of postal matters into regulation of telemarketing and charitable fundraising. When the USPS deprives a nonprofit of its nonprofit mail permit merely because it has contracted with a telemarketer (who is compelled by various state laws to make minimum fundraising guarantees to its nonprofit-clients) the USPS essentially regulates telecommunications and charitable solicitation, both of which are beyond its statutory authority and are *ultra vires*.

*C. The USPS erred in promulgating its RTCMR regulations*

**COUNT XII: CONTRARY TO CONGRESSIONAL INTENT**

50. The USPS improperly interpreted 39 U.S.C. § 3626(j) to apply to solicitation mailings. In promulgating the RTCMR, the USPS contravened Congressional intent and the plain meaning of the statue.  The clear text and legislative history of 39 U.S.C. § 3626(j) shows that Congress sought only to exclude mail matter that <u>improperly advertised or promoted certain products and services</u> to the addressee from entry at the nonprofit rate.  Congress never expressed an intent, either in the statute or in the legislative history, to exclude from entry at the nonprofit rate mail matter that <u>only solicited charitable donations</u> to a permit holder.  Rather, Congress sought only to end abuse of the nonprofit rate for commercial purposes and preserve it for legitimate, nonprofit uses, including solicitations of charitable donations.  The regulations prohibiting entry of a permit holder's fundraising solicitation mail from entry at the nonprofit rate exceed the USPS's statutory authority, contravene the plain meaning of the statute as evidenced by the text itself and by the legislative history, are not reasonably tailored to effect Congress' objectives, and are an unreasonable interpretation of the statute and of Congressional intent and objectives. In tacit admission of this point, the USPS has now promulgated further regulations clarifying its CMR regulations and prohibiting their application to mail matter that only solicits donations. Had these clarifying regulations been promulgated or even informally understood by the USPS *ab initio,* this dispute would have never arisen.

> D.  *The USPS decision was arbitrary, capricious, an abuse of discretion,*
> *or otherwise not in accordance with law*

## COUNT XIII:  ARBITRARY AND CAPRICIOUS /
## UNSUPPORTED BY THE FACTS

51. In its final agency determination, the USPS acted in an arbitrary and capricious manner and abused its discretion when it offered an explanation for its action that runs counter to the evidence before it and is so implausible that it cannot be ascribed to a difference in view or the

product of agency expertise.  The central issue in this case is whether the relationships between RBI and its clients were joint ventures or principal-agent relationships.  After conducting its analysis of RBI's contracts in light of the various relevant factors, the USPS concluded that RBI's contracts established joint ventures.  A proper interpretation of the contracts reveals that RBI had contracted only to act as an agent for its clients.  Further, the USPS fundamentally mischaracterized the nature and significance of minimum guarantees in the contracts between RBI and its clients.  These clauses, rather than allocating risk so as to place RBI in joint ventures with its clients, were imposed upon RBI and its clients by States exercising their constitutionally recognized police powers to regulate charitable fundraising and did nothing to alter the principal-agent relationship between RBI and its clients.  The USPS had previously held that it is possible that a for-profit entity could incur risk in a mailing venture and that "would <u>not</u> prohibit the [mail] matter from being mailed at the special [nonprofit] rates." (56 Fed. Reg. 46,552 (1991) (emphasis supplied) – Tab T).  Yet the USPS held that RBI's arguable assumption of the <u>minimum risk required by law</u> was sufficient to disqualify RBI's clients' mail from entry at the nonprofit rates.

### COUNT XIV:  ARBITRARY AND CAPRICIOUS / INCONSISTENT WITH PAST PRACTICE

52. In making its final agency determination, the USPS acted in an arbitrary and capricious manner and abused its discretion when it acted inconsistently with past practice.  Over recent years, the USPS has accepted for mailing at the nonprofit rate millions, perhaps billions, of mailpieces produced under contracts materially identical to those at issue in this case.  Only some of those mailpieces were posted by RBI's clients.  During that time, the USPS did not once indicate that contracts such as the ones at issue in this case – which are a matter of public record, are freely available, and of which the USPS had specific notice – precluded entering such mail at

the nonprofit rate.  In 1998, when the USPS abruptly reversed this policy retroactively and
without warning, it acted in an arbitrary and capricious manner and abused its discretion.

## COUNT XV:  ARBITRARY AND CAPRICIOUS /
## UNEXPLAINED DISCRIMINATION

53. In making its final agency determination, the USPS acted in an arbitrary and capricious
manner and abused its discretion when it failed to avoid unexplained discrimination.  Not only
did the USPS accept RBI's clients' mail for entry at the nonprofit rate for years before abruptly
reversing this policy retroactively and without warning, but it applied this policy only to RBI.
The contracts between RBI and its clients are materially identical to hundreds of contracts
between other fundraisers and nonprofits.  More specifically, these other contracts contain
clauses that are materially identical to the contract clauses that the USPS cited in its final agency
determination to justify the deficiency assessment.  However, the USPS never took similar action
to enforce the RTCMR against any other fundraising professional.  Worse, the USPS failed to
apply these standards to any other fundraising agency or nonprofit even though RBI alerted the
USPS to this discriminatory action and its impact and even though RBI counsel provided
publicly-available copies of such contracts to the USPS, as well as sample mailings.

## COUNT XVII:  ARBITRARY AND CAPRICIOUS /
## IMPROPER DOCUMENTATION OF THE DEFICIENCY

54. In making its final agency determination, the USPS acted in an arbitrary and capricious
manner and abused its discretion when it failed to properly document the claimed deficiency.
There are numerous irregularities in the documentation of the deficiency, including, but not
limited to: the USPS's failure to produce the postal receipts and rate tables used in calculating
the deficiency (once these receipts and tables are produced, more irregularities may be
discovered as RBI evaluates the receipts to determine if they are properly included in the

deficiency assessments and if the assessment itself is properly calculated); the USPS's inclusion in the total deficiency figure of postage relating to mailings that were not handled by RBI;  the USPS's inclusion in the total deficiency figure of postage relating to mailings not a part of any contracts included in the administrative record; the USPS's inclusion in the total deficiency figure of postage related to mailings that were not entered at the nonprofit rate; the USPS's use of improper postage rates in calculating the deficiency; the USPS's failure to provide any useful or comprehensible spreadsheet or tally breaking the deficiency down into the mailings of which it is alleged to be composed; the USPS's failure to identify with any specificity the contractual provisions that allegedly violate the RTCMR; the USPS's failure to link any mailings included in the deficiency assessment with contracts allegedly violating the RTCMR; and the USPS's arbitrary reduction of the deficiency amount in its forbearance decision.

### COUNT XVII:  ARBITRARY AND CAPRICIOUS / IMPROPER PROCEDURE AND UNSUPPORTABLE CONCLUSIONS IN FORBEARANCE

55. The USPS acted arbitrarily and capriciously and abused its discretion when it failed to follow proper procedure and came to erroneous and unsupportable conclusions in the forbearance proceeding.  First, the USPS ruled on RBI's forbearance request before even receiving RBI's brief supporting forbearance.  Second, the USPS allowed the same individual to reconsider the forbearance issue after receiving RBI's forbearance memorandum.  Third, the USPS failed to properly apply the appropriate management instruction which required a consideration of financial hardship.  Fourth, the USPS erroneously claimed that RBI had been notified that its contracts violated the RTCMR prior to the First Deficiency Letter.  Fifth, the USPS arbitrarily reduced the deficiency to two years and supplied no rational, comprehensible basis for doing so.  Sixth, the USPS has never responded in any fashion to RBI's request to reconsider the forbearance decision which was filed nearly five years ago.

## Prayer for Relief

WHEREFORE, the premises considered, Plaintiff RBI prays for judgment against Defendant USPS as follows:

56. Enter a judgment to require USPS to refund to Plaintiff an amount to be proven which represents all excess postage paid into the "deposit arrangement" pending resolution of this matter.

57. Enter a judgment against USPS and in favor of RBI in an amount to be proven which represents damages to RBI for RBI's lost business and other injuries and costs incurred because of the USPS's conduct.

58. Enter a judgment against USPS and in favor of RBI in an amount to be proven which represents prejudgment interest on the deposit arrangement and damages suffered by RBI.

59. Set aside the Defendant's final agency determination affirming the postal deficiency and forbearance decision to the extent that they contravene constitutional limitations, statutory authorization, reasonable interpretation of relevant statutes, fundamental fairness, or any other law.

60. Award costs, reasonable attorneys' fees, and such other relief to RBI as this Court may deem proper.


Respectfully submitted,


_/s/ Charles Nave_____    March 10, 2006_____
Charles H. Nave, Esq.                 Date
Charles H. Nave, P.C.
1225 Third Street SW
Roanoke, VA 24016
D.C. Bar #484501

Tel: 540 345 8848
Fax: 540 345 8849
Email: charlie@nave-law.com

## Attachments

A.   6/1/98 – First Deficiency Letter with Preliminary Investigative Summary Report
B.   8/20/98 – Second Deficiency Letter with Supplementary Investigative Summary Report
C.   8/27/98 – First Administrative Appeal (Copilevitz & Canter, P.C.)
D.   3/1/99 – Intermediate Administrative Decision – appeal denied by Northern Virginia Rates and Classifications Service Center
E.   11/19/99 – Second Administrative Appeal (Nonprofit Service Group)
F.   3/13/00 – Final Administrative Decision
G.   3/17/00 – Preemptive Forbearance Decision
H.   4/28/00 – First Forbearance Memorandum
I.   2/15/01 – Forbearance Decision
J.   3/7/01 – Second Forbearance Memorandum
K.   10/9/03 – 68 Fed. Reg. 58,273-76
L.   7/6/98 – RBI letter requesting postal receipts and other evidence and documentation supporting the USPS's deficiency determination.
M.   10/21/98 – RBI's deposit arrangement letter
N.   Various letters seeking a prospective solution through a modified contract
O.   11/1/99 & 11/5/99 – NSG letters seeking clarifications and records from USPS
P.   1/21/00 – NSG letter following up on requests for documents/evidence from USPS
Q.   2/4/02 – NSG letter accompanying contracts showing other nonprofits and fundraisers using minimum state-mandated guarantee clauses
R.   11/13/03 – Reconsideration letter
S.   1/14/04 – Response to reconsideration letter
T.   56 Fed. Reg. 46,551-55