# COPILEVITZ & CANTER, P.C.
### ATTORNEYS AT LAW

423 W. EIGHTH STREET
SUITE 400
KANSAS CITY, MISSOURI 64105
(816) 472-9000 • FAX (816) 472-5000
E-MAIL cckc@aol.com

3 LAFAYETTE CENTER, SUITE 330
1155 21ST STREET, N.W.
WASHINGTON, D.C. 20036-3308
(202) 861-0740 • FAX (202) 331-9841
E-MAIL copcandc@us.net

PLEASE REPLY TO THE MISSOURI OFFICE

August 27, 1998

**VIA FACSIMILE
AND EXPRESS MAIL**

Ms. Thelma L. Arneson
Manager, Business Mail Entry
United States Postal Service
1001 California Avenue, Rm. 2049
Pittsburgh, PA 15290-9651

Re: **Reese Brothers**
    Case No. 384-1233408-RI(1)

Dear Ms. Arneson:

Please be advised that this firm has been retained by Reese Brothers, Inc. to appeal the postal deficiency assessment in the above-referenced matter as originally reported on May 28, 1998 and as supplemented on August 20, 1998.

Since we have only had the opportunity to review limited portions of the books and records that serve as the basis of this alleged deficiency, we must reserve the right to supplement our appeal following complete review of the documents.

In order to protect the record and make the appeal without waiving the right to assert denial of due process in a further appeal, administrative or judicial, we hereby appeal the assessment on the grounds set forth herein.

DMM E 670.5.3 prohibits the mailing of any matter <u>on behalf of</u> or <u>produced for</u> an organization not itself authorized to mail at the Nonprofit Standard Mail rate. The mail at issue was not produced for or on behalf of Reese Brothers; rather, it was produced for and on behalf of qualified nonprofit organizations, which held nonprofit mailing permits pursuant to DMM E 670.1.2.

DMM E670.5.1 provides, in pertinent part: "An organization authorized to mail at the [nonprofit rates] may mail only its own matter at such rates."

Ms. Thelma L. Arneson
August 27, 1998
Page 2

There has been no assertion that the mailings in issued contained any extraneous "matter." To the contrary, the mailings contained exclusively information, subject in form and content to the exclusive and final editorial control of the nonprofit organizations which were holders in good standing of nonprofit mail permits. (Hereafter, for brevity, the nonprofit organizations which are the clients of appellant, Reese Brothers, shall be referred to as the "nonprofits" or "the permit-holders.") All common law right, title and interest in and to the form and content of the mailings were solely owned by the nonprofits which alone held the right to apply for federal trademark and copyright registrations. Not only did the nonprofits own the "matter" mailed, the contracts between the nonprofits and appellant explicitly vested the nonprofits with absolute and exclusive editorial control over the "matter," which control was exercised to ensure that the "matter" served the respective missions of the nonprofits.

The point is obvious: the "matter" which was mailed at the nonprofit rate was owned and, of course, controlled by the permit-holders. DMM E670.5.1 remains the essential principle underlying the "cooperative mailing" doctrine. If the permit-holder mails its "own matter" at the nonprofit rate, there is no "cooperative mailing."

At all times, Reese Brothers was acting in a ministerial capacity, as the agent of its clients, in carrying out such tasks as making payment for postage, etc. It is "black letter" law that a principal may vest (by delegation) power in an agent to execute discrete functions. It is for this reason that a principal is liable for the acts of its agent. The agent is deemed to be, in effect, the "alter-ego" of the principal because the power by which the agent acts is derived from the principal via delegation.

As noted, permit-holders exercised control over the form and content of the mailings (which contained their "own matter.") Implicit in this control is the power to assign tasks to appellant as their agent. The assignment of such tasks (along with limited power appropriate to the execution thereof) does not alter that relationship of principal (nonprofits) and agent (appellant). To the contrary, the assignment is <u>indicative</u> of the relationship, *viz*: the principal empowers the agent to execute tasks for the <u>benefit</u> of the principal.

These points are, of course, so obvious as hardly to deserve statement. However, out of an abundance of caution, we wish respectfully to assert the basic point that a permit-holder does not lose its status as principal (which status is consistent with the right to use its nonprofit permit) merely because it engages an agent (fund raiser) to assist in it making an appeal to the public. If this were not so, the following ironic (indeed, absurd) result would ensure: the nonprofit would be permitted to mail its own matter at the nonprofit rate, but would be compelled to pay commercial rate postage if the nonprofit utilized the assistance of an agent in connection with mailing the identical matter.

Subject to this preface, we wish in the following paragraphs to clarify certain points.

Ms. Thelma L. Arneson
August 27, 1998
Page 3

### 1. The nonprofit permit holders paid all costs related to the mailings in issue.

As a matter of law, all monies received though charitable solicitations were at all times the property of the nonprofit organization, <u>not Reese Brothers</u>.

The laws of a number of states define the status of "fund raiser" as that of a fiduciary of the nonprofit. Receipts of solicitation campaigns are to be placed in accounts under the sole control of the nonprofit. Thus, donations received are <u>never in the custody of Reese Brothers</u> and, a *fortiori*, never the property of Reese Brothers.

The contracts between Reese Brothers and its nonprofit clients require all costs of the mailings <u>to be paid from the donations</u>, i.e., with the funds of the nonprofit. The course of practice of the parties is entirely consistent with the contracts.

The proceeds received are deposited into an escrow account contracted for by the nonprofit client of Reese Brothers. Checks for services and expenses are made out in the name of the nonprofit by the nonprofit's agent ("the escrow"). In the case of Mothers Against Drunk Drivers ("MADD"), it appears the checks for postage were written directly by MADD to the United States Post Office.

In essence, the nonprofit actually contracted for two separate services. First, with Reese Brothers to make appeals and fulfill pledges; and, secondly, with an independent escrow agent to manage the proceeds received and disburse them as directed by the nonprofit.

The campaigns conducted by Reese Brothers generated sufficient proceeds to pay costs of said campaigns. If the initial results did not produce sufficient income to cover contracted expenses, Reese Brothers would provide a credit until results produced sufficient revenue. Generally, this would be for a period of either thirty or sixty days. Thereafter, sufficient proceeds would be available to pay costs.

All materials were either created by the nonprofit or prepared at the direction of the nonprofit. The contracts clearly provide that all printed materials are the property of the nonprofit client.

During the 1980's, the United States Supreme Court repeatedly ruled that appeals for support by nonprofit organizations are a form of fully protected speech, which does not lose that quality merely because the nonprofit organization utilizes the services of a professional in conjunction with its appeals to the public. *See: Riley v. National Federal of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988); *Secretary of State of Maryland v. Joseph H. Munson Company*, 467 U.S. 947 (1984); and *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 1980.

Ms. Thelma L. Arneson
August 27, 1998
Page 4

2. **The permit holder alone paid the postage on the mailings.**

The contracts provided to the USPS clearly state that postage is paid from the donations received from the solicitations. Because these donations are, for the reasons noted above, the property of the nonprofit, the permit-holder alone pays for postage.

Although Reese Brothers may tender payment for postage, this is merely a ministerial function delegated to Reese Brothers (as <u>agent</u> of the nonprofit). The contracts clearly designate the nonprofit as the principal and party who bears all expenses, including postage.

3. **Only the permit holder's own material is mailed.**

As stated above, the only "matter" contained in the mailings was the "matter" of the permit-holder. There has been no allegation that the coupons or advertisements of a third party were inserted in the envelopes. To the contrary, the form and content of the mailings served one purpose: that of the permit-holder.

The sole purpose of the mailings at issue is a charitable appeal. Reese Brothers has not contracted with nonprofits to further a profit-making enterprise. Rather, the nonprofits have contracted with Reese Brothers to act as their agent to deliver a charitable solicitation.

Profits are not shared; the nonprofits pay Reese Brothers according to the contracts. <u>The contract is a "fee for services" agreement</u>.

4. **State laws require a "minimum guarantee" to protect nonprofit organizations.**

The contracts provide for a minimum guarantee to the nonprofit organizations in order to comply with state laws. Such laws have been enacted to: (1) protect the nonprofit organizations, and (2) ensure that nonprofit organizations have the means to carry out their missions, which benefit the public.

The following states mandate that contracts between charities and telemarketing service bureaus contain a provision guaranteeing the nonprofits a minimum return: Connecticut, § 21a-190f(d); Georgia, § 43-17-3(e)(3); Indiana, § 23-7-8-2(e); Maryland, § 6-616(2); Massachusetts, C.68 § 22(b)(2); New Hampshire, § 7:28-c IV(a); North Carolina, § 131F-16(g)(3); Ohio, § 1716.08(A); Pennsylvania, § 162.9(f)(4); South Dakota, § 37-30-7; Utah, § 13-22-9(1)(b)(vii)(D); Vermont T.9 § 2472(a)1; and Wisconsin, § 440.44(4)(a).

Additionally, most of the states listed herein have taken the position that a guarantee of zero percent is in violation of state law (*e.g., see* copy of letter from Ohio, attached hereto as

Ms. Thelma L. Arneson
August 27, 1998
Page 5

Exhibit A).

The position taken by the USPS regarding national contracts Reese Brother has with its nonprofit clients, which must comply with state laws, will disqualify the nonprofits from using the nonprofit postal rate. Such a position is ill conceived and operates disproportionately to the detriment of smaller, newer, less popular nonprofits who must rely upon the expertise of professionals. If the nonprofit was the entity compensating the individual to deliver the same appeal the only difference would be the employer. This distinction was at the core of *Riley* decision, wherein the US. Supreme Court ruled that the challenged regulation acted as a prior restraint upon the nonprofits.

The interpretation of the cooperative mailing rule as applied by the USPS would disqualify a nonprofit which, by choice or necessity, used the services of a telemarketing company to make a national appeal; ergo, this application has no basis in the rule. The courts have uniformly held that it is the nonprofit's right to freedom of expression which must be protected. In *Munson, supra* and *Riley, supra*, the Court held that the right of the nonprofit to fully protected speech is not lost by using a professional representative to deliver its message.

The contracts at issue do not depart from the venerable common law precept imputing liability to the principal. The statutes of the states identified herein may have altered the common law in the limited respect of mandating a "minimum guarantee." However, this does not abrogate the balance of the common law applicable to contracts, the principal-agent relationship, and imputed liability *(respondent superior)*.

5.  **The permit holders make all managerial decisions about the content of the mailing and the use of the donations.**

The content of mail piece is the message of the nonprofit, which has final and exclusive editorial control. The entire purpose of the activity is to deliver the message of the nonprofit in conjunction with its appeal for support.

All decisions regarding the form and content of the mailing are vested solely in the nonprofits which review and edit all drafts and, of course, have the right to reject them. This review has been exercised repeatedly by Reese Brothers's nonprofit clients.

6.  **The participants' intentions and interests are consistent with Reese Brothers serving as agent of the nonprofits who are principals.**

The parties did not intend to be joint venturers or partners. It is clear from the contracts and course of dealing that the parties are exclusively principal and agent. The nonprofit principal

Ms. Thelma L. Arneson
August 27, 1998
Page 6

contracted with Reese Brothers as agent to deliver its message to potential supporters. This relationship is clearly set forth in the contracts. The parties have acted at all times in accord with those contracts.

Further, state laws require that Reese Brothers act as a fiduciary to its nonprofit clients. This role is clearly set forth in the cases applicable to charitable solicitations and fund raisers. The fund raiser is nothing more than the medium for the nonprofits' speech. Its involvement (i.e., assisting the nonprofit) does not change the character of that speech.

The intention of the nonprofit is to deliver this speech in the most effective means possible. Choices include producing mail pieces in house or contracting with experts to produce identical pieces.

The position taken by the USPS results in an identical mail piece being allowed to be mailed at the nonprofit rate if sent directly by the permit holder, but disallowed if sent by a telemarketing service bureau acting as agent for the permit holder. In both cases, the only enterprise is the message and request for support by the nonprofit itself.

The USPS cannot apply a higher rate of postage for mail produced with the aid of a professional representative than that which it applies to mail produced entirely "in house" (i.e., without professional assistance by a third party). Such an irrational and arbitrary distinction would violate First and Fourteenth Amendments to the Constitution of the United States. *See Riley, supra.*

In summary, but with a reservation of right to amend based upon continuing analysis and calculations, the grounds for appeal are as follows:

1. The assessment dated June 1, 1998 fails to state the legal basis that allegedly supports it. This results in the assessment being arbitrary and, thus, depriving Reese Brothers of due process of law guaranteed by the United States Constitution.

2. Reese Brothers was not afforded due process of law in that: (a) the assessment is presumably based upon an interpretation of DMM E670.5.3, *et. seq.*, which is vague and overbroad, and\or as applied; and (b) the interpretation was made without prior notice and is retroactive.

3. The assessment relates to mail pieces sent by the nonprofit rate which contained only the nonprofits' "own matter" as required by DMM E670.5.1, *et seq*. The proposed application misconstrues that which it provides.

4. By contract and operation of law, the relationship between Reese Brothers and its

nonprofit clients is exclusively one of agent and principal. The USPS is estopped from asserting to the contrary.

5. No extraneous products were included. The entire content of the mail pieces were the message of the nonprofits, which alone owned the "matter" that was mailed in accordance with DMM E670.5.1 *et. seq*.

6. The contracts between Reese Brothers (as agent) and its nonprofit clients (principals) are "fee for services" agreements. Therefore the relationships are not "cooperative."

7. The contracts alleged to be the basis for a finding of "cooperative" mailings are written to comply with the laws of the states.

8. The assessment is incorrect because it is contrary to established policy of the USPS that allows vendors, in certain circumstances, to share or absorb risk.

9. The assessment is incorrect because it includes mail pieces mailed by the permit holder directly.

10. The assessment is incorrect because in each agreement the nonprofit paid the costs and expenses with checks issued in the name of the nonprofit.

11. The assessment relative to the mail pieces of MADD is incorrect because the costs of the same was paid directly by MADD to the USPS.

12. The assessment is incorrect because it includes mail pieces sent by other parties.

13. The assessment is incorrect because it is based on calculations using an improper postal rate.

14. The assessment is incorrect because the mail pieces belonged only to the permit holders, to-wit: the nonprofit clients of appellant.

15. The calculations presented are incorrect as a matter of fact.

16. The application of the cooperative mailing rule represented by this assessment constitutes a prior restraint. *See Riley, supra*

17. The application of the cooperative mailing rule represented by this assessment violates both the Due Process and Equal Protection Clauses of the Constitution of the United States. *See Riley, supra*.

Ms. Thelma L. Arneson
August 27, 1998
Page 8

18. The application of the cooperative mailing rule represented by this assessment improperly disqualifies mailings by any nonprofit using a telemarketing service bureau for a national campaign.

19. The assessment is improper because its covers a period of time in excess of two years in violation of USPS policy.

20. The assessment is prohibited by the doctrine of *laches* and\or *estoppel*.

21. The position of the USPS is incorrect as a matter of law.

For all the above and foregoing reasons, Reese Brothers respectfully appeals the assessment with leave reserved to supplement this appeal for the reasons stated above.

Very truly yours,

Errol Copilevitz
For the Firm

EC:nas

Enclosure

c: Scott Hamel and P. Bohall (via facsimile and U.S. Mail)

**Attorney General**
**Lee Fisher**

EXHIBIT "A"

September 26, 1994

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Bruce R. McBrearty
TRANSAMERICA MARKETING SERVICES, INC.
8130 Boone Boulevard, Suite 350
Vienna, VA 22182

      Re:    Solicitation Registration No. 94-0233

Dear Mr. McBrearty:

      Thank you for filing your charitable solicitation registration materials with our Office. Upon our review, we have determined that the materials are inaccurate or incomplete in several significant ways, which we have outlined below.

      A serious problem arises in connection with the contracts between TransAmerica and several charitable organizations, including Muscular Dystrophy Association, United Service Organizations, Inc., National Wildlife Federation, Prison Fellowship Ministries and MedicAlert Foundation International. O.R.C. Chapter 1716, a copy of which is enclosed, and in particular § 1716.08, provides that every contract between a professional solicitor and a charity must contain either a fixed or estimated percentage of the gross revenues that the charity will receive, and, if estimated, a guarantee that the charity will receive 90% of the estimated amount. None of the contracts submitted to this Office by TransAmerica contains these provisions.

      We notice that your contracts sometimes include addenda to comply with state law requirements. An addendum to the contracts would be an acceptable way to comply with the law. However, please be aware that the "zero" percent guarantee that TransAmerica has offered the charities under some of these addenda would not be acceptable in Ohio. A contract that guarantees "zero" percent to the charity is no longer a charitable solicitation; it is strictly a for profit transaction. To represent to donors that their donations are for charitable purposes under these circumstances is a misrepresentation, which violates O.R.C. § 1716.14. Your contracts have, in some of the addenda, given an acceptable estimate to the charity of the gross revenue to be expected. Simply repeating this estimate and guaranteeing the charity 90% of that figure would comply with Ohio's law. Please be advised that this Office will be carefully scrutinizing those estimates, and if TransAmerica suddenly sharply reduces those estimates because it is required to guarantee 90% thereof, then this Office may view the previous estimates to have been deceptive to the charities. Also, the estimates should set forth the assumptions upon which they were based, which is to include the <u>past performance</u> of TransAmerica's campaigns. See O.R.C. § 1716.08(A)(2)(a).

Page 3
September 26, 1994

In addition, there are several minor matters which also must be corrected in your materials. The residence address of the individuals to direct the solicitation campaigns is omitted in response to Question 10 on some of your solicitation notices. Also, on its Registration Form for a Professional Solicitor, only four (4) individuals are listed as being officers or employees of the company. See the requirements in the second paragraph on page 1 of the Form, and in the attachments requested on page 3 of the Form. Given the size of the contracts contemplated with the Muscular Dystrophy Association, The United Service Organizations, Inc., National Wildlife Federation and MedicAlert Foundation International, it seems unlikely that only four individuals are employed and conducting solicitation campaigns. Please clarify.

This Office views these omissions, misrepresentations and improper contracts very seriously. Please mail the documents and information requested within fifteen (15) days of receipt of this letter. Amended contracts with the charitable organizations should be executed and mailed to this Office within thirty (30) days of receipt of this letter. If you have any questions, please feel free to contact the undersigned at (614) 466-3180.

Very truly yours,

LEE FISHER
Attorney General

Sherry M. Phillips
Assistant Attorney General
Charitable Foundations Section
101 East Town Street, 4th Floor
Columbus, Ohio 43215-5148

SMP/s

f:\charitab\sherry\transam1.ltr