# Reese Brothers, Inc.

———————————————

## Appeal from the decision of the Northern Virginia Rates and Classification Service Center, March 1, 1999

———————————————

Nonprofit Service Group
Washington, DC
November 19, 1999

## Table of Contents

A.  The 1998 NOVA RCSC decision from which this brief appeals contradicts its earlier 1995 ruling to RBI client organizations on which RBI relied.   .   .   .   .   .   .   .   .   1

B.  Analysis of five contract provisions   .   .   8

(1)  The prior transaction (the telephone solicitation) is covered by a "break-even guaranty," "an explicit division of [revenue raised]," or "a minimum guaranteed amount to be paid to the authorized party."   .   .   .   .   12

(a)  Group I   .   .   .   .   .   .   .   .   12

    (i)  Contract performance:  The parties performed as principal and agent.   .   .   12

    (ii)  MADD   .   .   .   .   .   .   .   16

(b)  Group II   .   .   .   .   .   .   .   18

    (i)  Compensation to RBI   .   .   .   .   19

        (A)  The subsequent mail pieces   .   .   20

        (B)  The initial solicitation:  Sliding scale and financing .   .   .   .   20

    (ii)  Nonprofit's financial controls   .   .   22

    (iii) Risk   .   .   .   .   .   .   .   24

    (iv)  Financial records   .   .   .   .   .   27

(c)  Group III   .   .   .   .   .   .   .   .   28

    (i)   Group III as distinguished from Groups I and II   .   .   .   .   .   .   28

    (ii)  Group III organizations performed as principals; RBI performed as agent.   .   .   .   .   .   .   .   .   29

- ii -

(iii) The Postal Service's cooperative
mailing rule is insufficiently tai-
lored to accommodate the degree of
freedom that the First Amendment
guarantees to charities when they
enter into arrangements to solicit
donations or disseminate information.        30

(2)    "the parties are required to cooperate and
agree on changes to the materials which the
cooperative venture prepares" .    .    .        33

(3)    "the caging agent . . . is subject to approval
by the parties [the professional solicitor as
well as the client organization]" .    .    .        37

(4)    "Reese Brothers' right to continue collecting
on pledges after the period of contract
performance" .    .    .    .    .    .    .        40

(5)    "Reese Brothers has and/or retains rights to
the donor files/lists compiled and used in
the solicitation efforts" .    .    .    .        42

(6)  Conclusion:  Contract Provisions (1) – (5)  .        45

C.  Constitutional problems with the Nagla decision        47

(1)  Constitutional underpinnings .    .    .    .        47

(2)  Unconstitutional conditions:  The Nagla de-
cision suffers multiple fatal defects when
analyzed under the First Amendment microscope.        49

(3)  Unconstitutional Conditions:  Conclusion    .        57

D.  Group IV    .    .    .    .    .    .    .    .        60

Exhibits 1 - 13

A. <u>The 1998 NOVA RCSC decision from which this brief
appeals contradicts its 1995 ruling to RBI client
organizations and even earlier USPS pronouncements
on which RBI relied.</u>

On April 21, 1995, the Manager of the Northern Vir-
ginia Rates and Classification Service Center ("NOVA RCSC")
advised Mr. Lee Cassidy, Executive Director, National Fed-
eration of Nonprofits ("NFN"), concerning a mail piece that
Reese Brothers Inc. ("RBI") had prepared for one of its
clients, the Multiple Sclerosis Association of American
("MSAA").    MSAA is one of RBI's clients for which Business
Mail Entry ("BME") Pittsburgh, PA and the NOVA RCSC claim
that RBI is obligated to pay a revenue deficiency.

In 1995, the Manager of Pittsburgh-BME had ruled that
a pledge collection mail piece must pay First Class postal
rates unless it contains " . . . a new request for addi-
tional funds." [1]

The issue at that time was the conditions under which
a mail piece that serves the purpose to collect a pledge to
contribute in response to an earlier telephone solicitation
is eligible to be mailed at the then-Third Class or Bulk
mail rate as opposed to the much more costly First Class
rate.  Many persons decline to pledge during the telephone
conversation but offer to think about giving and ask the
solicitor to forward more information about the charity and
its programs or cause.

In response the NFN's appeal from the Pittsburgh-BME
decision, the NOVA RCSC responded with a practical and
sensible rule that was easy and inexpensive for mailers and
postal personnel to understand and implement:

If a solicitation for donations is added,
such as '*your continued contributions* would help
more people with MS cope with . . . ,' the mail-
piece would then qualify for third-class rates.
*** To be sure that the solicitation for dona-
tions is clear, I suggest that it clearly be dis-
tinguished from the prior pledge information . . .

<u>Id.</u> (emphases in original).

---

[1]  Letter from Scott Hamel, Manager, NOVA RCSC, to Lee
Cassidy, Executive Director, NFN of 4/21/95.

Because the new rule was concise and cogent, MSAA's professional solicitor, who is the appellant in the instant case, knew how to implement the new rule, and it was easy for Pittsburgh-BME to administer. They simply had to determine whether the reformulated mail piece merely ". . . follow[ed] up on the pledge made in a prior telephone conversation," or whether ". . . a new request for additional funds . . ." ". . . is clearly distinguished from the prior pledge information . . . ." Id.

The 1995 ruling also suggested actual language to separate the mail piece from the earlier telephone transaction, namely "your continued contributions," so postal acceptance knew what to look for in the mail piece that separated it from the prior telephone transaction.

For three years, Pittsburgh-BME saw the mail piece as clearly distinguished from the prior telephone transaction. Then, in 1998, Pittsburgh-BME and Mssrs. Phil Bohall and John Nagla of NOVA RCSC reasoned that the mail piece was part of the telephone solicitation and, therefore, subject to the cooperative mailing rules. Pittsburgh-BME claimed a deficiency of $3.2 million, calculated as the difference between the Nonprofit and Regular Standard (A) rates.

It is inconsistent to say that the mail piece constitutes Bulk rather than First Class mail because it is separate from the prior transaction, but it must pay the commercial rather than the nonprofit bulk rate because it is part of the prior transaction or "enterprise," to use the words of the Postal Service's cooperative mailing regulation.

Either the mail piece is separate from the prior transaction or it is part of it, but the mail piece cannot be both simultaneously. That makes the 1998 ruling an irrational policy position. Worse, to use it as the basis to assess postage retroactively is unfair to the mail preparer who was following the 1995 prescription articulated by the same agency, the NOVA RCSC..

It is one thing for Pittsburgh-BME and the NOVA RCSC in 1998 to put the mailer and its professional solicitor on notice and, in essence, say: We changed our minds relative to the April 21, 1995 ruling; henceforth, we will deem the mail piece to be part of the earlier telephone transaction

even if it contains the language we prescribed in 1995 to
separate the solicitation in the mail piece from the
earlier telephone solicitation.

In contrast, it would be unfair to assess a postage
deficiency retroactively when the NOVA RCSC's policy since
1995 has been that the mail piece is separate from the
prior telephone transaction as long as it contained the
prescribed words or words to that effect.

Of the alternative approaches available, the course
that Pittsburgh-BME selected is not rational.  Under the
standard of review that the U.S. Supreme Court imposed on
the lower courts, they must uphold an agency decision when
it selected an approach to resolve an issue that is ra-
tional.  The courts must overturn the agency, however, if
the approach the agency selected is irrational.

While the mailer bears the burden to prove that it
meets the statutory requirements to mail a piece at the
Nonprofit Standard A rate of postage, the agency bears the
burden to show that its application of the statute is
reasonable.  Otherwise, the agency will fail to meet the
standard of review to which the U.S. Supreme Court holds
federal agencies.  <u>Chevron, Inc. v. Natural Resources
Defense Council</u>, 467 U.S. 837 (1984)

The Court explains its two-part standard of review for
agency decisions as follows:

> When a court reviews an agency's construction
> of the statute which it administers, it is con-
> fronted with two questions.  First, always is
> the question whether Congress has directly spoken
> to the precise question at issue.  If the intent
> of Congress is clear, that is the end of the
> matter; for the Court, as well as the agency,
> must give effect to the unambiguously expressed
> intent of Congress. . .  [I]f the statute is
> silent or ambiguous with respect to the specific
> issue, the question for the court is whether the
> agency's answer is based on a permissible con-
> struction of the statute.

<u>Id</u>. at 842-43.

Thus, if the intent of Congress is unambiguous, the court should apply the statute itself. If it is ambiguous, the court will be able to determine if the agency's construction is permissible only if the agency has articulated a reason in the administrative record for the court to review.

Therefore, the courts could not uphold the Pittsburgh-Nagla decision: It is irrational to rule that the mail piece is separate from the prior telephone transaction for the purpose of determining whether the mail piece is eligible for Bulk or First Class rates, but it is part of the telephone transaction when it comes to determining whether the mail piece should pay the commercial or nonprofit bulk rate.

If the Nagla decision in 1998 has changed the policy of the NOVA RCSC in effect since April, 1995, and if postal headquarters were to uphold Nagla, then it violates due process standards to assess postage retroactively on RBI or any of the client organizations. Likewise it would be unfair if reversal of the 1995 rule led to a deficiency assessment based on the First Class rate.

If the government decides to make up the rules as it goes, thereby creating a standard that is little more than a moving target, without proper notice or an opportunity to comment, then it is confiscatory to take postage at a higher rate retroactively at the time when a different policy was in effect.

The position articulated in the Nagla decision is that the mail pieces and the initial telephone call are part of the same "enterprise" notwithstanding the language that RBI and the authorized organizations inserted so that the mail pieces would constitute a new and separate solicitation, as prescribed by the NOVA RCSC in 1995. Further, Nagla argues, ownership of the mail pieces was transferred from the client organizations to RBI because of the existence of five provisions in most of the contracts that the RCSC submitted to RBI as part of this case.

The NOVA RCSC submitted 138 contracts between RBI and client organizations. Sixty percent of the contracts that the NOVA RCSC submitted to RBI were entered into prior to 1995, yet the RCSC didn't give any indication to the client

organizations that they might have entered into an
unauthorized cooperative mailing.

During the pre-1995 period, the Office of Rates and
Classification Administration and the U.S. Postal In-
spection Service were examining charitable fund raising
mail pieces with regard to compliance with cooperative mail
regulations.  In particular, postal officials scrutinized
mail pieces that contained sweepstakes and what is called a
"straight appeal," that is a solicitation only.  A straight
appeal does not contain a sale or offer for a product or
service.  The Postal Service also examined the contracts
pursuant to which the mail pieces had been prepared.

Also during this period, at least one postal inspector
attended the annual meetings of state officials that reg-
ulate charitable solicitations.  (Exhibit 2)  During the
public sessions of these meetings--and presumably the
private sessions (limited to state regulators and federal
government officials only), there was much discussion of
telemarketing on behalf of charities.

State officials expressed deep concern that charities
receive some net revenue as a result of their telemarketing
solicitation programs.  Officials were present from states
that had adopted, or whose legislatures were contemplating,
legislation to require professional solicitors to disclose
in contracts the percentage of funds raised that would be
guaranteed to the charity client as net revenue.

Officials were also present from states with laws that
require disclosure of the percentage, if any, of revenue
raised that the charity would receive as a result of its
telemarketing program.  The concept was that charities
would demand remuneration of a minimum percentage in their
contracts with professional solicitors in order to avoid
disclosing "0 percent."

If the Postal Service deemed break-even or percentage
guarantees to violate its cooperative mail regulations, it
would have been irrational for their enforcement represen-
tative to be silent during those meetings.  It was not
until 1998 that the Postal Service took enforcement action
against a professional solicitor because of a guarantee in
the contract for which the charity client had bargained.
By that time, eighteen states had enacted laws that govern

professional solicitors and revenue guarantees to their charity clients.

The effective dates of the 138 contracts that the NOVA RCSC submitted to RBI in this case run from 1990 (one contract) to 1997 (six contracts). About forty states require the professional solicitor and the charity client to file their contracts with the state for public inspection. In addition, most of those states require the professional solicitor to file a campaign report annually that shows expenses, gross revenue, and net revenue, if any, to the charity client.

Thus, the five contract provisions that the NOVA RCSC recently deemed to violate the cooperative mailing rules were established practice long before 1998. The contracts and campaign reports were easily accessible to anyone to review. The RCSC could have applied the enterprise theory to telemarketing and the subsequent mail pieces at any time prior to 1998.

The point is that prior to 1998 neither the Pittsburgh-BME, the NOVA RCSC, nor postal headquarters gave any indication to RBI or their charity clients, either informally at industry-government conferences or formally, that the enterprise theory encompassed telephone calls and subsequent mail pieces that contained straight fund raising appeals.

If postal headquarters were to embrace the Nagla decision, the record would put the Postal Service in the position of being guilty of laches and acting in violation of the due process clause of the Fourteenth Amendment because it failed to give proper notice that it changed the rules. Thus, in judicial review, the Postal Service would be estopped from enforcing its 1998 re-interpretation retroactively to those 138 contracts.

Part B, the next section of this brief, analyzes these contracts by groups that are defined according to how the parties actually performed in practice. Part B describes the three groups of contracts that account for 98 percent of the assessed deficiency. Then, for each group, it analyzes how the parties conducted themselves such that the client organization functioned as principal and owner of the mail piece, and how RBI functioned as the organization's agent and professional solicitor. That analysis

addresses the first four contract provisions that the Nagla decision cited.

Part B also analyzes the fifth provision and shows how the practice of client organizations to pool the names of persons who contribute to charity in response to either a telephone or mail solicitation preserves the organization's ownership rights in the names of its own donors.  It shows further how the contracts so limit RBI's use of those names that the pool of names becomes a consortium of nonprofits sharing information with each other rather than conferring an ownership interest to RBI in any client-organization's donor file.

B.  **Analysis of five contract provisions**

The position of the NOVA RCSC is that the mail piece is part of the prior telephone transaction (in contradiction of its 1995 ruling), and it is part of an unauthorized cooperative mailing because the contract contains the following five provisions:

(1)  the prior transaction (the telephone solicitation) is covered by a "break-even guaranty," "an explicit division of [revenue raised]," or "a minimum guaranteed amount to be paid to the [authorized party];" [2]

(2)  "the parties are required to cooperate and agree on changes to the materials which the cooperative venture prepares;" [3]

(3)  "the caging agent . . . is subject to approval by [the professional solicitor as well as the authorized party];" [4]

(4)  "Reese Brothers' right to continue collecting on pledges after the period of contract performance;" [5] and

(5)  "Reese Brothers has and/or retains rights to the donor files/lists compiled and used in the solicitation efforts." [6]

Before analyzing each of the contract provisions that Mr. Nagla cited in his letter, the analysis will be more coherent if the 34 entries on Enclosure A (Exhibit I) are organized into discrete groups. [7]  The groups are identified by RBI client in Table 1 p. 10.

---

[2]  Letter from John Nagla, Acting Manager, NOVA RCSC, to Errol Copilevitz, Counsel for Reese Brothers, Inc., of 3/1/99 at 2-3 (hereinafter referred to as "Nagla Letter").
[3]  Id. at 3.
[4]  Id.
[5]  Id.
[6]  Id.
[7]  Enclosure A contains 36 entries.  The last two entries don't have any deficiency claim associated with them.  The last entry, National Caregiving Foundation, is

The bulk of the clients fall within Groups II (14 organizations) and III (10 organizations). These are organizations that wanted to determine if they could build a base of donors via telemarketing. Generally, organizations find that the effort is more successful if they use a professional solicitor.

RBI offers a two-part program to such groups. First, RBI proposes to test in order to determine whether it is likely that the organization can build a donor base in a relatively short period, eighteen to 24 months. The rule of thumb in the industry is three to five years.

If the test results are positive, then RBI finances the telephone solicitation (not the subsequent solicitations via the mail) for the relatively short period that it takes the organization to build a donor base that generates sufficient contributions for the entire program to break even including interest. Those are the organizations in Group II. If the test results are negative, RBI declines to proceed. Those are the organizations in Group III.

In contrast, the organizations in Group I didn't require any financing. One of these organizations is MADD. When MADD engaged RBI as its professional solicitor, MADD already had a base of donors that had contributed in response to a telephone solicitation. Therefore, the economics of the MADD program were such that it already generated sufficient funds to break even.

The other four organizations in Group I engaged RBI to try to reactivate "lapsed" donors only. These are persons whose last donation was at least one year earlier. All five organizations paid invoices in full as RBI presented them.

Groups IV - VI represent special cases. RBI needs the mail statements in order to re-construct the mailings that RBI prepared for each of the organizations in Groups IV, V, and VI. RBI requested those mail statements from the NOVA RCSC, but as of the date of filing this appeal brief, the RCSC had yet to supply them.

---

listed earlier as "Alzheimers" where it is associated with a deficiency claim is $142,103.81.

Table 1

## USPS Deficiency Claimed Against RBI by Group

| Group | Client |
| ----- | ------ |
| I | MADD |
| | Priests of the Sacred Heart |
| | Marianist Mission |
| | Maryknoll Fathers and Bros. |
| | St. Joseph's Indian School |
| II | Angel Planes |
| | Children's Wish Foundation |
| | "Just Say No" |
| | Multiple Sclerosis Assn. |
| | Prevent Child Abuse |
| | American Cancer Society |
| | American Red Cross |
| | Christian Appalachian Project |
| | KidsPeace |
| | The Salvation Army |
| | Vanished Children |
| | Alzheimers |
| | SADD |
| | Homeless Veterans |
| III | Atlanta Union |
| | Olive Branch |
| | Toys for Tots |
| | YWCA |
| | Good Samaritan |
| | Diabetes Trust |
| | Project Cure |
| | Boston Rescue |
| | Veterans of Foreign Wars |
| | Vietnam Veterans Memorial |
| IV | American Forests |
| | Alumni Phon-A-Thon |
| | AAIM |
| | Trustmark |
| | Unidentified organizations |

The purpose of the separate analysis of each of the five provisions is to examine the following issues:

(1)  whether financial controls imposed on RBI and expressed in terms of revenue raised, whether operation of the fund raising program as a separate cost and profit center, and whether start-up financing disqualify RBI as the client-organization's agent;

(2)  whether the timeliness and cooperation condition on the client-organization's right to approve all copy prior to either the initial or subsequent solicitations imposes any restraint on the client organization to function as principal with respect to control of the copy;

(3)  whether the condition of mutuality with regard to the entity responsible to count, record, and deposit donations (the "cage") so undermines the client organization's control of donations raised that the organization cannot fulfill its control function as principal;

(4)  whether a client organization still functions as principal during the wind down period when it no longer uses RBI as professional solicitor but only as fund raising counsel to prepare the final solicitations via the mail; and

(5)  whether a client-organization's pooling of names of persons that contribute to charity through the auspices of RBI transfers an ownership interest to RBI in a client organization's donor file such that mail pieces that contain subsequent requests for funds, even if they are mailed to a name other than one in the pool, belong to RBI rather than the authorized party.

With respect to each group of contracts, this brief analyzes how the parties conduct themselves such that the client organization functions as principal and owner of the mail piece, and RBI functions as the organization's agent and professional solicitor and fund raising counsel.  That analysis addresses the first four contract provisions that the Nagla letter cited.

This brief also analyzes the fifth provision and shows how the practice of client organizations to pool the names of persons who contribute to charity in response to either a telephone or mail solicitation preserves the organi-

zation's ownership rights in the names of its own donors
and so limits RBI's use of those names that the pool of
names becomes a community service to nonprofits rather than
conferring an ownership interest to RBI in any client-
organization's donor file.

(1)    **The prior transaction (the telephone solicitation) is
covered by a "break-even guaranty," "an explicit di-
vision of [revenue raised]," or "a minimum guaranteed
amount to be paid to the authorized party**."

(a)    **Group I**

(i)    **Contract performance:    The parties performed as
principal and agent.**

Of the 34 entries on Enclosure A (Exhibit 1), five
represent calling programs where the client paid the full
fee to RBI as set forth in the schedule of fees and charges
in the contract for both the initial telephone solicitation
and the subsequent request for funds via the mail.   The
names of these clients are listed in Table 1 p. 10 under
"Group I."

To understand how the parties in Group I actually
performed in practice, it is necessary to analyze the
budget mechanism with respect to the initial telephone
solicitation.   In telemarketing, it is extremely important
that an organization communicate with its professional
solicitor in terms of the fundamental trade-off:   more new
donors and less net revenue versus fewer new donors and
more net revenue.

If an organization's priority goal were to maximize
the number of new donors, it will sacrifice net revenue to
pay for more calling.   Nonetheless, the organization will
still impose a limit on calling.   It's a form of budgeting.
Without a limit on calling, the difference between contri-
butions generated and calling expense would be too narrow
given an organization's requirements for net revenue.

The easiest way to articulate a budget and monitor
compliance is to express the budget in terms of net contri-
butions.   In a simple scenario, for an organization that
sets the number of new donors as its goal——that is, it
wants to grow the donor base as fast as possible, it would
re-invest all net revenue into more prospect calling.   The

budget would be expressed as:  Incur expense up to the amount of funds raised.

For an organization that wants to generate net revenue to spend for purposes other than telemarketing, it would re-invest all net revenue into calling after it transfers into its general checking account the amount of money it wants to spend for other purposes.

Actual budgeting is a bit more complicated because some states require that a certain percentage of funds raised be transferred to an organization's general account. Thus, an organization that solicits in one of those states must adjust the amount of money that it wants to re-invest in calling so that it will comply with state law.

In Group I, each organization set its own budget and paid the invoices that RBI presented in full up to the budget limit.  If RBI were to keep calling beyond the amount of net revenue that the organization indicated it wanted to spend for prospecting, who should be responsible?

We urge the Postal Service to think about the answer to this question carefully.  Our position is that the calling program still belongs to the nonprofit organization even though it refuses to indemnify RBI if the latter were to exceed the budget limits that the organization imposed on RBI.

Similarly, many property owners who engage a contractor to build a house impose a budget on the contractor, who then is responsible for cost overruns.  That common contractual practice does not change the ownership of the property.

The economics of the transaction dictate that RBI observe the client's budget limits.  If RBI were to call in excess of the budget, all contributions generated from that extra-budget calling still belong to the organization. Thus, as a practical matter, RBI will observe the budget limits that an organization imposes because RBI could not obtain financing to cover a calling overrun for which there isn't any hope of reimbursement.  Further, if RBI failed to observe its clients' budget limits, RBI would remain in business only as long as it has capital, and that wouldn't be long without financing.

-14-

Contrary to the suggestion in the Nagla decision, the client organization does not "share" revenue with RBI. All donations are solicited in the name of the organization; donors make their checks payable to the organization; and for all of RBI clients, all contributions are deposited into a bank account that is in the name of the organization. Thus, the organization controls the contributions generated as a result of its calling program.

As a result, if RBI were to call in excess of an organization's budget, the client would not be obligated to pay RBI for that extra-budget calling. Thus, RBI would have to finance all of the additional expense. How would it do that? RBI would either withdraw funds from its bank account or borrow. It would be irrational for RBI to get itself into that predicament. RBI would be unable to obtain bank financing for such an uneconomic proposition, nor could it survive for long trying to absorb such a loss for its many clients.

The only risk in the Group I transaction is that RBI would so mismanage an organization's calling program that RBI would incur solicitation expense beyond the budget limit that the organization set. This is normal commercial risk that any vendor must bear when it serves nonprofits as well as for-profits.

A properly managed nonprofit organization will set budget limits on a vendor, and vendors accept the risk of their estimates everyday in normal commercial transactions. If a vendor mismanages its work for the organization, it will penalize itself in the form of absorbing the cost overrun. That's the financial obligation of the vendor.

If a printer overruns the printing budget that an organization sets, the printer must bear the cost overrun. That does not make the printing a cooperative venture. The fact that RBI, like other vendors, must manage the fund raising program of a Group I organization within the confines of the organization's budget does not by itself constitute a cooperative venture. Otherwise, the Postal Service could construe almost every transaction in which an authorized party engages to be cooperative. That result would be irrational, and the courts would overturn such a rule on judicial review.

The way a contract actually works--that is, the

parties' "course of performance"--is dispositive in com-
mercial law where the issue in a case is the intent of the
parties relative to a contract.   The Uniform Commercial
Code ("UCC") relies on course of performance.   The Comments
to the UCC advise:   "The parties themselves know best what
they have meant by their words of agreement, and their
action under that agreement is the best indication of what
that meaning was." [8]

The courts follow the UCC in adjudication of com-
mercial disputes.   In Nanakuli Paving and Rock Co. v. Shell
Oil Co., 664 F.2d 772 (9th Cir.1981), the court noted that
"[t]he Code considers actual performance of a contract as
the most relevant evidence of how the parties interpreted
the terms of the contract." Id. at 785.   The Nanakuli
Court reasoned as follows:

> A commercial agreement, then, is broader than
> the written paper and its meaning is to be deter-
> mined not just by the language used by them in the
> written contract but 'by their action, read and in-
> terpreted in the light of commercial practices and
> other surrounding circumstances.   The measure and
> background for interpretation are set by the com-
> mercial context, which may explain and supplement
> even the language of a formal or final writing.'
> [§1-205 U.C.C.], Comment 1.

Nanakuli at 795.

The commercial context for RBI and the Group I client
organizations is that the latter engaged RBI qua profes-
sional solicitor to call, in the case of MADD, donors,
prospects, and lapsed donors, and, in the case of the other
four organizations in Group I, to call lapsed donors.   Each
organization imposed a budget limit on solicitation expense
expressed in terms of funds donated.

RBI submitted invoices in accordance with the schedule
of fees and charges set forth in the contract.   The client
organizations paid RBI's invoices.   The amount that RBI was
paid in each case covered all of its out-of-pocket expense
plus a return on its capital.   The risk that RBI would
incur fund raising expense beyond the budget limit is a

---

[8] Comment 1 to §2-208 U.C.C.

risk inherent in most commercial transactions in our so-
ciety and does not a cooperative venture make.

    (ii)   <u>MADD</u>

    In terms of the deficiency assessment, the single
largest authorized organization in Group I is MADD.  At-
tached as exhibits are documents that describe quantita-
tively how the program worked financially.  Because of the
enormous volume of records in RBI's archives and the tight
timeframe to file this appeal, RBI drew records randomly
over the period that the contracts between RBI and MADD
covered.  RBI would be pleased to search for any particular
type of record or records from a particular period, if
postal headquarters so requests.

    Exhibit 3 shows the detail of postage records by
mailing by state chapter.  MADD sent a check made payable
to the U.S. Postal Service to RBI for postage.  RBI kept a
record of postage consumed.  It would report to MADD
monthly on the amount of postage consumed.  MADD would then
send a check to replenish its postage account.

    Exhibit 4 are examples of annual financial reports by
chapter that RBI kept.  These happen to be for 1994 for
Alaska and Wyoming chapters.  Such a report shows total RBI
charges for the year, total contributions, and total
payments.  This report substantiates the amount of the
final invoice for the year, which is the difference between
total RBI charges and total payments made to date.

    Exhibit 5 is an example of the reconciliation that RBI
would do for one chapter over the lifetime of the RBI-MADD
contract.  The chapter drawn was Hawaii.  It document
labeled Exhibit 5 shows total revenue raised, total
payments MADD-Hawaii had paid to RBI through the end of the
last contract period, and by subtraction the amount of the
final payment to settle up.

    Exhibit 6 is a monthly invoice for acknowledgments.
It shows that MADD mailed 23,196 thank you mail pieces for
the month the invoice covers.  It happens to be September,
1995.  It shows the total postage ($2,783.52) and the total
bill ($8,443.36).

    In the right margin is a date stamp when MADD paid the
invoice and the number on MADD's check.  Attached to the

invoice is a copy of MADD's check stub.  However it is that postal headquarters ends up ruling on the other arguments in this appeal brief, the acknowledgment mail pieces clearly belong to the authorized organization.  The authorized organization paid the postage and a fee-for-service to RBI to prepare and mail them.  It was incorrect for Pittsburgh-BME and Nagla to include postage for MADD's acknowledgments in the deficiency assessment.

Exhibit 7 is an example of the invoices that RBI would prepare for MADD chapters that retained RBI to print and mail their respective newsletters.  The invoice that is Exhibit 7 was prepared for the July, 1995 newsletter of the Ohio chapter.  It shows all the back up documentation, including a copy of the official mail statement for that newsletter mailing.  On the invoice is the date stamp when RBI received the check for payment, the check number, and the amount of the check.

Again, the newsletter mailings unequivocally belong to the authorized organizations.  They paid the postage and a fee-for-service to RBI to prepare and mail the newsletters. It was incorrect for Pittsburgh-BME and Nagla to include postage for MADD chapters' newsletters in the deficiency assessment.

Exhibit 8 is an invoice for the lapsed donor program for four MADD chapters for October, 1995.  It includes all costs, including postage.  It also bears the date stamp when RBI received the check for payment and the number on MADD's check.  Mailings to lapsed donors is a third category of mail piece that cannot be construed as belonging to any entity other than MADD, which paid a fee-for-service to RBI as well as the postage.

Exhibit 9 is the print out of the inventory of material and supplies that RBI had on hand at the time MADD terminated the contract.  Under the terms of the contract, MADD agreed to pay the full cost of the materials and supplies that RBI inventoried pursuant to MADD work orders. Note that MADD also paid a carrying charge.

The financial records that Exhibits 3-9 represent demonstrate that MADD owned its calling and mail programs and maintained control.  MADD imposed a budget and executed work orders pursuant to its budget.  MADD paid all costs for work it ordered, including all postage.  RBI agreed to

act as professional solicitor and fund raising counsel
pursuant to the budget.  Material and supplies that MADD
ordered but did not use because it cancelled the contract
MADD paid for; RBI was responsible for any cost that
exceeded the budget and corresponding work order.  That
paper trail describes a principal-agent relationship.

(b)  **Group II**

Many authorized nonprofit organizations find it nec-
essary to determine if they can build a base of donors via
telemarketing.  Generally, organizations find the effort
more successful if they use a professional solicitor.

Whether an organization uses in-house volunteers or
outside professionals, a major obstacle is that it takes
between three and five years before the organization has
located a sufficient number of supporters to generate net
revenue after paying the cost to prospect.  Three to five
years is the industry rule of thumb.

The problem is that the cost to find a donor inter-
ested in a particular cause almost always exceeds the
amount he or she contributes in response to the initial
telephone solicitation or the subsequent request for a
contribution via the mail.  The economics of telemarketing
works because once an organization locates a donor he or
she is likely to contribute to the organization at least
once a year for five to seven years-—another industry rule
of thumb.

Prospecting for new supporters is never ending; how-
ever, once an organization builds a donor base, renewal
contributions should be sufficient to pay for prospecting
and leave funds for the organization's other programs.  The
difficulty is to get through the three to five years when
an organization is building a base of donor support.

Thus, an organization that is just beginning to build
a base of donors via telemarketing needs to find a way in
the early years both to reduce the cost to solicit and fi-
nance the shortfall between revenue (contributions) and
solicitation expense.  That is why nonprofit organizations
need an arrangement where the cost to locate donors (pro-
specting) is commensurate with funds raised.

This is not easy.  First, the nonprofit needs to find

a professional solicitor who is willing to be compensated on the basis of a sliding scale. Second, the nonprofit must obtain financing until it has located a sufficient number of supporters to generate net revenue after paying the cost to prospect.

The Nagla decision suggests that RBI reached into its own pocket to pay solicitation costs when an authorized organization didn't receive sufficient donations to pay its expenses. The arrangement with respect to Group II worked quite differently in practice.

It is important to bear in mind that Group II organizations are self-selecting. For each organization in Group II, RBI had performed tests that indicated reliably that in two years or sooner the organization could locate a sufficient number of supporters to generate net revenue after paying the cost to prospect. Thus, these were organizations whose appeals were strong enough relative to the available pool of prospects to build a donor base in a significantly shorter period than the industry rule of thumb.

Again, as with Group I, the client organizations in Group II paid all costs for the mail piece at the rate set forth in the schedule of fees and charges in the contract. With respect to the initial telephone solicitation, RBI offered a sliding scale and financing until the program generated sufficient funds to the organization to dispense with financing.

From that point, the organization's fund raising program generated sufficient revenue to reach the target return to RBI of between ten and twenty percent for the remainder of the life of the contract. That compensated RBI for all its of out-of-pocket expenses, including interest during the period that RBI used bank financing, and it produced a reasonable return on capital.

(i)  Compensation to RBI

Client organizations compensated RBI separately for the initial telephone solicitation and subsequent solicitations via a mail piece.

(A)  **The subsequent mail pieces**

If a test projected that an organization could cover
fund raising costs after two years or less and yield net
revenue to the organization thereafter, RBI would commence
a calling program on behalf of the organization.  Although
a Group II client would finance the cost of calling during
the first two years, it always paid the full fee to RBI for
the mail piece as set forth on the schedule of fees and
charges that is part of the contract.

It is important to note that RBI never made any guar-
antees relative to the mail pieces, nor did it reduce its
fees to produce the subsequent mail pieces to a sliding
scale.  Each organization in Group II paid the postage and
production expense to prepare and mail all the pieces.

The full charge for the mail pieces included the cost
to produce the mail piece, to prepare it for mailing, the
cost of postage, and RBI's fee.  In some contracts, RBI was
required to invoice the nonprofits separately for postage.
After each solicitation mailing, RBI prepared an invoice,
and the organization paid RBI by check.

(B)  **The initial solicitation:  Sliding scale and**
     **financing**

Subject to the provision in the contract that the
Nagla decision referred to as a "so-called 'break-even
guaranty'," the nonprofit client paid the balance of the
funds raised to RBI.  Over the period of eighteen months to
two years when the nonprofit was growing its donor base,
this arrangement created a sliding compensation scale for
RBI and extended financing to the nonprofit.

After eighteen months to two years, revenue raised was
sufficient for the organization to pay a fee to RBI that
gradually approached its full calling fee as set forth on
the schedule of fees and charges that is part of the
contract.  Long before the fee that the organization paid
reached that point, it was large enough to cover all of
RBI's out-of-pocket telephone solicitation costs.

As the donor base grew, the fee the organization paid
to RBI began to generate a small profit for RBI which grew
with the program.  Telemarketing for clients in Group II,
those for whom RBI served as a professional solicitor

beyond the test phase, normally generated a rate of return
in the target range of between ten and twenty percent.
Once the organization was paying the full contract fee to
RBI for its professional solicitor service, the organi-
zation spent the balance of the revenue donated for other
program functions.

The full contract fee included long distance calling
charges, labor (telephone solicitors plus management),
bookkeeping, file maintenance, and an imputed interest
charge to cover the cost to finance calling during the
period that the organization was building its telemarketing
donor base.

With respect to financing, RBI arranged for financing
through an independent entity, usually a bank, on the
strength of the telemarketing tests that RBI conducted for
the client organization.  The organization repaid RBI
through the sliding scale fee arrangement.  For organi-
zations in Group II, the contract period ranged from three
to six years with the exception of The Salvation Army
chapters.

Financing is a normal commercial function.  Vendors
routinely extend credit to customers and clients.  Fi-
nancing does not by itself convey any ownership rights.

In the cooperative mailing context, the critical
consideration is whether the parties treat financing as a
commercial transaction or whether it confers an ownership
interest to the unauthorized party.  In the case of the
organizations in Group II, RBI expected that each organi-
zation's calling program would generate sufficient funds to
pay all of its fund raising costs plus interest during the
start-up period and preclude any need for financing
thereafter.

There is precedent that, when an unauthorized entity
extends credit to an authorized client, the Postal Service
does not view that as per se cooperative mailing. [9]  The
case involved one of the largest nonprofit mailers,
actually 39 of its departments and auxiliaries, and a large

---

[9] Letter from Donald D. Dillman, Director, Office of
Rates and Classification Administration, USPS, to Jim
Finch, Counsel for Brick Mills Studios, Inc. of March 23,
1992 and appellants' briefs.

for-profit fund raiser where the organization offered a product and solicited a contribution.

As in the instant case, the for-profit fund raiser extended credit until the nonprofit accumulated sufficient donations in a segregated bank account to pay the vendor's charges and fees. The average length of time that the fund raiser had to extend credit was 55 days, although it took some of the chapters and auxiliaries more than 100 days before donations received were sufficient to pay the fund raiser's invoices in full.

Fourteen entries on Enclosure A represent calling programs where the clients paid fees to RBI on a sliding scale--always sufficient to cover RBI's out-of-pocket so- licitation costs. After eighteen months to two years, rev- enues were sufficient to generate a rate of return for RBI. These organizations are listed on Table 1 as Group II on p. 10.

### (ii)  <u>Nonprofit's financial controls</u>

During the period that the client organization is building a donor base, it is in the interest of both the organization and RBI to grow the donor file to the point where it is sufficiently large to generate net revenue after costs <u>as soon as possible</u>. The organization needs revenue to spend on program activity other than fund raising, and RBI wants the telemarketing program to become self-financing and generate a return to RBI.

Group II organizations achieved that goal by re- investing net revenue into more prospect calling. Despite the affinity of interest, the organization still imposed a limit on calling. It's a form of budgeting. Without a limit on calling, the shortfall between contributions gen- erated and calling expense would be too large to finance.

An easy way to articulate a budget and monitor com- pliance is to express the budget in terms of net contri- butions. For an organization that sets the number of new donors as its goal--that is, it wants to build the donor base as quickly as possible, it would re-invest all net revenue into more prospect calling. The budget would be expressed as: Incur costs up to the amount of funds raised.

-23-

A minimum guarantee works similarly. The major difference is that the charity receives its net revenue in small monthly installments from the outset instead of waiting for eighteen months to two years until the base of donors is sufficient to cover costs and produce net revenue. As a result, RBI may extend more credit during the start-up period than it does under the break-even guarantee; however, over the lifetime of the contract, all Group II organizations paid their total bill plus interest

Actual budgeting is a bit more complicated because some states require that a certain percentage of funds raised be transferred to an organization's general account. Thus, an organization that solicits in one of those states must adjust the amount of money that it wants to re-invest in calling so that it will comply with state law.

In Group II, the budget for each organization in the early years of the its contract with RBI was determined by funds raised. The budget limit was the amount of revenue raised. The organization paid the invoices that RBI presented up to the budget limit. If RBI were to keep calling beyond the amount of funds contributed, who should be responsible?

The client-organizations, as principals, were unanimous that RBI, as agent, should operate within the organizations' budget limits. It was the organizations' fund raising program. If they wanted to conduct it on a scale where funds raised equaled fund raising expense, that was their prerogative. Our position is that the calling program still belonged to the nonprofit organization even though it refused to indemnify RBI if the latter were to exceed the budget limits that the organization imposed on RBI and that RBI agreed to observe.

This is analogous to a property owner and contractor who is responsible for cost overruns. That common contractual practice does not change the ownership of the property.

As a practical matter, RBI will observe the budget limits that an organization imposes because RBI cannot obtain financing to cover the calling overrun. If RBI were to call in excess of the budget, all contributions generated from that extra-budget calling still belong to the organization.

-24-

Contrary to the suggestion in the Nagla letter, the organizations in Group II did not "share" revenue with RBI. All donations were solicited in the name of the organization; donors made their checks payable to the organization; and for all RBI clients, all contributions are deposited into a bank account that is in the name of the organization.  That is, the organization alone decides how to spend the contributions generated as a result of its calling program and subsequent mail pieces.

Thus, if RBI were to call in excess of the budget, it would not be entitled to any of the contributions generated from that extra-budget calling, but RBI would have to finance all of the extra expense.  It would be irrational for RBI to get itself into that predicament.  RBI would be unable to obtain bank financing for such an uneconomic proposition, nor could it survive for long trying to absorb such a loss for its many Group II clients.

As discussed with respect to Group I, it is normal commercial practice for vendors to bear the risk of cost overruns.  When that situation occurs, to absorb the cost overrun is a penalty for poor management, not a cooperative venture.

(iii)    **Risk**

Beyond the risk inherent in almost every commercial transaction, namely that a vendor will mismanage a job and incur a cost overrun that the customer is not obligated to pay, about the only other risk in Group II is the risk that the test fails to predict accurately that the solicitation program can be managed for the life of the contract within the organization's budget limits.  That is, it takes so much longer than eighteen months to two years to build an organization's donor base that RBI cannot recover all of its expenses and earn a profit during the term of the contract.

The tests that RBI conducts are about the most sophisticated in the industry.  One of RBI's areas of expertise is the quality of the tests it designs.  To appreciate the quality of its tests, a brief description and analysis follows.

First, RBI identifies common demographic factors, such as age, income, and presence of children in a household,

that it determines are relevant to the test organization. RBI uses these demographic factors to select a list of names to call.

RBI maintains a Master File of names of persons who are known to contribute to charity. RBI also uses outside lists, such as Equifax's "geocode clusters," which group all households by a variety of factors to build "like groups." Using the demographic factors, RBI pulls a subset of names from the Master File and from other lists that it has solicited recently.

Then RBI compares the results of the initial set of test calls to the response that resulted when it solicited a subset of the Master File or another list earlier for another client organization using the same demographic factors. RBI already knows how much it was able to improve those initial results for the second organization through such sophisticated techniques as improved modeling, script testing, and scalability. RBI also conducts surveys about the test organization and its mission and constructs test scripts.

RBI uses the results of the benchmark tests to project the results after two years of calling. RBI's finance department looks for results that yield a profit that exceeds ten percent after the two-year period. When a client organization passes this screen, RBI engages in even more sophisticated and complicated testing.

For example, RBI selects names randomly and calls a relatively large sample, typically 20,000 to 50,000 names. Using responses to the calls and data overlays, it builds a statistical scoring model that is usually logistic regression. The model can be two-stage (response and collection) and quite complex. The scoring algorithm is then applied to every household in the country.

RBI is able to rank households from those that are most likely to contribute to the test organization to the least likely. With that ranking in hand, RBI statisticians can project response rate and profit from the order that households would be called. RBI also adapts existing regression models based on experience.

The reliability of RBI's benchmark tests, improved modeling, script testing, and scaling is so good that RBI

secures bank financing for a start-up calling program based
on its test results and projections. A lender would extend
credit based on a projected future stream of revenue only
if it deemed the projections to be reliable.

Further evidence that RBI's testing methods produce
reliable projections is the existence of Group III. There
are ten organizations in Group III. These are the organi-
zations for which RBI did testing but the results could not
support financing a two-year, start-up calling program.

Of the 24 organizations in Groups II and III, the
tests predicted correctly the fourteen organizations that
would generate sufficient revenue to pay their financial
obligations to RBI up to the budget limits that each orga-
nization set. The tests culled the other ten organizations
as calling programs that would not be self-supporting in
two years or less.

Thus, while there is a risk that test results might be
a poor predictor of the value of a two-year calling
program, that risk is so small that every client organi-
zation in Group II paid all of RBI's out-of-pocket calling
expenses, all costs of the subsequent mail solicitations,
and yielded a profit of between ten and twenty percent over
the life of the contract. The amount of profit that RBI
earned depended on the schedule of fees and charges in the
contract. The organizations spent the remainder of the
revenue to conduct other program activity.

Postal headquarters itself recognizes that a trans-
action, venture, or enterprise is not per se cooperative
merely because a for-profit entity incurs risk when it
performs under contract for an authorized organization.
The Office of Classification and Rates Administration, the
predecessor office to Business Mail Entry, advised:

> . . . any understanding that the Postal Service
> would invariably consider a mailing ineligible
> for special rates if a for-profit entity incurs
> any of the 'risk' in a venture supported by the
> mailing improperly interprets past postal rulings.
> The allocation of commercial or financial 'risk'
> in a venture is an extremely useful, but not nec-
> essarily a fool-proof, way to distinguish between
> a mailing which promotes a nonprofit organiza-
> tion's own activity, and one which is merely

sent on behalf of a for-profit enterprise . . . .
It is conceivable, depending upon the circum-
stances of a case, that a finding that a for-
profit entity incurs 'risk' in a venture would
not prohibit matter from being mailed at the
special rates. [10]

With respect to Group II, the de minimus amount of
risk that RBI bore would seem to be insufficient to in-
dicate a cooperative relationship under the long-standing
Postal Service risk standard and precedent cases between
RBI and any of the fourteen Group II organizations.

### (iv)  Financial records

Exhibit 10 contains financial records for six of the
fourteen organizations in Group II drawn randomly.  These
records show donations and program expense for the most
recent twelve months and back to 1997 for two organi-
zations, MSAA and KidsPeace.  These are the type of reports
that prove that organizations in Group II generated suf-
ficient donations through their calling and mail programs
to pay RBI its charges plus generate net revenue for the
charity to spend on its other programs.

Exhibit 11 shows that RBI also prepared newsletters to
be mailed on behalf of Group II organizations.  This is a
copy of the work order and newsletter copy that Prevent
Child Abuse-North Carolina directed RBI to print and
prepare to mail.

This exhibit exemplifies of the work order that an
authorized entity would send to RBI, and pursuant to which
RBI performed such work for a fee-for-service.  RBI then
billed the ordering organization for the work and postage.
The authorized organization paid by check.

It is another pure fee-for-service arrangement.  Thus,
postage for newsletters produced under this financial ar-
rangement should be deducted from any revenue deficiency
that may ultimately be assessed.

---

[10] "Eligibility Requirements for Certain Special Bulk
Rate Third Class Mail," Final Rule, 56 Fed. Reg. 46551,
46552(September 13, 1991).

(c)  <u>Group III</u>

This group contains ten organizations each of which
sought to develop the telephone as a media to raise funds
and deliver the organizations' respective messages.  They
entered into contract with RBI as professional solicitor
and fund raising counsel for at least two common reasons:
First, RBI was amenable to conducting the calling within a
tight budget as with Groups I and II.

Second, if test results were such that RBI declined to
go forward and institute a calling program for the organi-
zation, RBI would absorb any shortfall if, during the ini-
tial testing, the charity did not raise sufficient funds to
pay all the costs.

(i)  <u>Group III as distinguished from Groups I and II</u>

Group III, then, is different from Groups I and II.  In
Groups I and II, the authorized organizations paid all the
costs of both the calling program (up to the limits of the
budget that each organization imposed on RBI and which RBI
accepted).  Authorized organizations in Group I also paid
all the costs of the subsequent mail solicitations,
including postage.

The difference between Groups I and II is that organi-
zations in Group II needed to finance their respective
calling programs for a certain initial period, between
eighteen months and two years.  During that start-up
period, each organization built its base of support to the
point that it could pay all current costs and what amounted
to interest on the funds that RBI financed during the
start-up period.  In contrast to Group II, organizations in
Group I paid their RBI bills both for calling and the sub-
sequent mail pieces as RBI presented its invoices for work
performed.

With respect to the organizations in Group III, RBI
conducted tests and determined that, for each of the ten
organizations, the start-up period would extend too far
into the future for RBI to be able to arrange financing.
Had the tests turned out differently for any of the ten, it
would have become a Group II organization and in relatively
short order repaid the initial shortfall.

(ii)    Group III organizations performed as prin-
cipals; RBI performed as agent.

In exchange for RBI bearing the shortfall, if the test
put the organization's calling program outside of RBI's
service parameters, the organization gave consideration.
It agreed to retain RBI as its professional solicitor and
fund raising counsel should the test indicate that the
organization was a Group II organization.  The value of the
consideration varied by organization; however, each com-
mitted to retain RBI for a period between three and five
years.

The position of the Nagla decision is that the mail
pieces are unauthorized cooperative mailings.  Its rea-
soning is that RBI assumed the risk that the funds the
authorized organizations in Group III would raise during
testing would be insufficient to pay all the calling costs.
The organizations raised sufficient donations during the
testing for each to pay all costs of the subsequent mail
pieces.  By assuming risk, the Nagla decision reasons, RBI
acted as a partner in a joint venture would.

This reasoning doesn't give any weight to the fact that
each organization in Group III paid consideration to RBI,
nor does it take into account that the authorized
organizations in Group III remained firmly in control of
the content.  Exhibit 12 evidences their role as principal.

Exhibit 12 is a copy of a letter from RBI to the
Secretary-Treasurer of the Vietnam Veterans Memorial Fund
("VVMF") to obtain authorization to conduct a survey.  RBI
uses surveys to learn more about a client organization so
that RBI may maximize its ability to speak effectively for
the charity as its professional solicitor.

Two officers of the authorized organization have
executed the work order; however, they qualified the
agreement with the condition that is  handwritten at the
bottom of the page as follows:  "VVMF shall approve all
telemarketing scripts, information, and instructions that
RB provides to its TSRs [Telephone Service Represen-
tatives]."

The condition leaves no doubt as to whose program it
is and who controls the content of all materials that RBI
uses to prepare its professional solicitors to speak on

behalf of the charity.  The authorized organization was
acting as principal with regard to the ciritcal question of
which party had final authority over the content of the
speech activity that was conducted.

> (iii)  <u>The Postal Service's cooperative mailing rule
> is insufficiently tailored to accommodate the
> degree of freedom that the First Amendment
> guarantees to charities when they enter into
> arrangements to solicit donations or dissem-
> inate information</u>.

Another problem with the Nagla decision with regard to
Group III is that it failed to take into account that the
content of the calling program and subsequent mail pieces
are fully protected speech under the First Amendment.  As
such, the government is precluded from regulating the
speech of authorized organizations on the basis of what
they spend or don't spend to raise those funds or deliver
their message.

Group III raises the issue head on:  May the Postal
Service apply its cooperative mailing indicia to fully pro-
tected speech of authorized organizations?  After reviewing
case law, RBI's answer seems to be correct.

Referring to <u>Village of Schaumburg v. Citizens for a
Better Environment</u>, 444 U.S. 947 (1980), the Court in <u>Riley
v. National Federation of the Blind of North Carolina,
Inc</u>., 487 U.S. 781 (1988), re-stated the government's po-
sition in <u>Schaumburg</u> as follows:  "The village argued that
charitable solicitation is akin to a business proposition,
and therefore constitutes merely commercial speech."  <u>Riley</u>
at 787.

Writing for the majority, Justice Brennan then re-
stated the Court's holding in <u>Schaumburg</u>:

> We rejected that approach and squarely held, on
> the basis of considerable precedent, that chari-
> table solicitations 'involve a variety of speech
> interests . . . that are within the protection
> of the First Amendment,' and therefore have not
> been dealt with as 'purely commercial speech.'

<u>Id.</u> at 787-88 (footnote omitted).

The Riley Court went on to articulate the rule that,
when applied to the instant case, places the content of the
calling as well as the subsequent mail pieces clearly under
the umbrella of fully protected speech.  Referring to
Schaumburg and Secretary of State of Maryland v. Joseph H.
Munson Company, Inc., 467 U.S. 947 (1984), the Riley Court
advised:

> . . . we refused to separate the component parts
> of charitable solicitation from the fully pro-
> tected whole.  Regulation of solicitations 'must
> be undertaken with due regard for the reality
> that solicitation is characteristically inter-
> twined with informative and perhaps persuasive
> speech . . . and for the reality that without
> solicitation the flow of such information and
> advocacy would likely cease.'  (citations omit-
> ted)  Thus, where, as here, the component
> parts of a single speech are inextricably inr-
> tertwined, we cannot parcel out the speech,
> applying one test to  one phrase and another
> to another phrase.  Such an endeavor would be
> both artificial and impractical.  Therefore, we
> apply our test for fully protected expression.

Riley at 796.

Referring to the above quoted passages, the Riley
Court broached the subject of the cost to use professional
fundraisers and control of donations:

> . . . where the solicitation is combined with
> advocacy and dissemination of information, the
> charity reaps a substantial benefit from the
> act of solicitation itself.  (citations omitted)
> Thus, a significant portion of the fundraiser's
> 'fee' may well go toward achieving the charity's
> objectives even though it is not turned over to
> the charity in cash.

Id. at 798-99.

At this point, the Court included the following
observation as a footnote:

> In addition, the net 'fee' itself benefits
> the charity in the same way that an attorney's

fee benefits the charity, or the purchase of
any other professional service benefits the
charity.  That the fundraiser's fee does not
first pass through the charity's hand is of
small import.

Id. at 799.

Concurring in part and concurring in judgment, Justice
Scalia began his separate remarks as follows:  "We have
held the solicitation of money by charities to be fully
protected as the dissemination of ideas."  (citations
omitted)  Id. at 803.

Thus, it is well settled:  When the Postal Service
applies its cooperative mailing rule to the calling
programs and subsequent mail pieces of the organizations in
Group III, it is regulating fully protected speech.

Ironically, in Schaumburg, Munson, and Riley, the
Court struck down government regulations that were mo-
tivated by a desire that charities spend less than a
certain percentage of funds raised on its solicitors and
solicitations.  Here, the Nagla decision regulates use of
the nonprofit mail rate because the charity didn't pay more
to RBI.

The Court held that the decision as to how much a
charity spends to solicit funds and disseminate information
is its prerogative when speech is fully protected.  The
government may not presume to know best how much the
charity should pay or the terms of its contract.

In referring to the Schaumburg, Munson, and Riley
trilogy, the Riley Court noted that the subject matter was
"  .  .  .  laws regulating the financial aspects of charitable
solicitations."  Id. at 787.  The Court advised that
"[t]here is no reason to believe that charities  .  .  . con-
sider the contracts in which they enter to be anything less
than equitable."  Id. at 790.  The Court continued as
follows:

The First Amendment mandates that we presume
that speakers, not the government, know best
both what they want to say and how to say it.
(citations omitted)  'The very purpose of the
First Amendment is to foreclose public autho-

rity from assuming a guardianship of the public
mind through regulating the press, speech, and
religion.' (citations omitted)  To this end,
the government, even with the purest of motives,
may not substitute its judgment as to how best
to speak for that of speakers and listeners;
free and robust debate cannot thrive if di-
rected by the government.  We perceive no rea-
son to engraft an exception to this settled
rule for charities.

Id. at 790-91.

Applied to the instant case, the Court prescribes that
government should look to the message, not the messenger.
It is the message, not the messenger, that determines the
rate of postage.

A rule will not pass constitutional muster if it
treats a fully protected message differently depending on
which party sustains the risk that funds raised will be
insufficient to pay all costs.  The financial arrangements
to deliver the message are the purview of the charity.

The Court focused on the message; it is immaterial how
the message is delivered, that is, whether the charity de-
livers it or whether the charity retains a professional
speaker, and it is immaterial how the charity arranges to
pay to have the message delivered.  What may abe very
important for the Postal Service to appreciate at this
juncture in the case is that the Court's holdings in the
the trilogy apply to Groups I and II as well.

(2)   "the parties are required to cooperate and agree on
      changes to the materials which the cooperative
      venture prepares"

In any operation that consists of an assembly line of
tasks, each needs to be completed in a timely manner in
order to achieve efficiency, that means keeping a lid on
expenses.  This is no less true when it comes to telephone
solicitation than mail processing and delivery, for
example.

One of the tasks along the telephone solicitation

assembly line is copy approval. In the three groups where individual client organizations can be identified, each contract provides unequivocally that the client organization must approve all copy before RBI may solicit on behalf of the organization.

There is much copy to approve before telephone solicitation may begin. RBI conducts extensive script testing and surveying during the test phase of calling. Even in the second phase, when RBI begins to build a donor file, script testing continues. In telemarketing, a good professional solicitor is always testing scripts in order to determine how best to speaker on behalf of the charity.

Copy for materials to train individual solicitors must be prepared in addition to model responses to frequently asked questions. Again, this copy needs to be continually updated and upgraded as the organization develops its telemarketing fund raising program. Additionally, copy for subsequent solicitations via the mail needs to be written.

Copy approval is carved out as the exclusive prerogative of the client organizations because the consequences of misspeaking are so grave. In the initial telephone solicitation and in the subsequent separate mail solicitations, a client organization speaks publicly about itself—its mission or cause and its programs. In addition to the request for funds and the purpose for which the organization seeks to raise funds, many RBI client organizations paid RBI to convey or disseminate the client organization's message or to conduct public education or advocacy.

With so much copy to be approved at all phases in the program, it translated into a great deal of wordsmithing between the outside expert copywriters and the organization's top managers and programmatic staff. Given the importance to meet deadlines along the assembly line of tasks, one would expect the contract that covers such activity to recite timeliness as important to copy approval.

Of the eleven contracts in Group I, all contain a provision that affirms that the authorized organization approves all copy, but only seven name a time period for approval. The shortest period is three business days (one

contract), and the longest period is ten days (one contract).   The others name five days.

In Group II, there are 112 contracts, all of which give final copy approval authority to the nonprofit. Thirty-two of the contracts are silent with regard to a time period for the authorized organization to inform RBI of disapproval.   The time periods in the other eighty contracts range from three to ten days.  Most specify five business days.

In Group III, there are thirteen contracts, again all of which designate the authorized entity as the final de- cision maker of copy.  Two don't name any time period within which the charity must register disapproval.   The remaining eleven range from three to ten days.

It is important to remember that the specified time period is merely the period within which the authorized entity has to indicate disapproval.  Once it signaled dis- approval, none of the contracts imposed a time limit on the client organization to approve revised copy; the provision only reminds that expenses are incurred and opportunities lost when copy approval is delayed, and production dead- lines missed.

First, this provision explicitly recognizes that the client organization is the principal.  Nothing in the pro- vision transfers any copy approval functions to the un- authorized party.

On the contrary, the requirement for mutual agreement with respect to copy changes ensures the client organi- zation that RBI may not begin to speak for the organization unless and until they agree a priori to the precise words that the professional spokespeople will utter.  While this provision keeps the client organization unequivocally in control of the professional solicitor's speech, it does not make the exercise to craft the solicitor's words any easier.

Copywriters who are professionals are experts at com- municating effectively; some specialize in crafting scripts, others fashion mail copy.  Charities and nonprofit advocacy organizations need the services of professional copywriters because it is difficult to draft copy that will attract the attention of the listener or reader immedi-

ately and in very short order persuade him or her to give
money or take some action, such as write a Member of
Congress or advocate a certain position.

It can be a delicate exercise to keep the motivational
language strong and the nuances of the institutional
message clear and true without offending the professional
copywriter.  Nonetheless, all parties have to be involved
in order to accomplish the client organization's objective.

The agents, the professional solicitor and copywriter,
are involved as is the client organization-principal but
not as equals—-the authorized party has the final approval.
The authorized party must provide input and approval
guidance; the professional copywriter must transform the
principal's vision and programs into motivational messages
that produce certain actions; and the professional solic-
itor must speak the words and appreciate why the script,
model responses, or training material were written the way
they were.

Second, the copy approval contract provision serves to
put both RBI and the client organization on notice that
timely copy turnaround and approval is a major factor in
the success of the program both to raise funds and dissem-
inate the organization's message.  Note that the provision
puts both parties on notice without imposing any deadlines
or penalties to reach agreement other than the consequences
that will occur if approval is delayed.

Thus, far from undermining the authorized organi-
zation's control of copy that is its prerogative as prin-
cipal, this provision underscores that copy approval
resides exclusively with the nonprofit organization.  The
provision serves as another rein on the professional solic-
itor-agent, and it puts both parties on notice to respect
timely copy turnaround.

It is common to find contracts between an authorized
organization and its professional solicitor or fund raising
counsel that emphasize timely approval of scripts or mail
pieces for the foregoing reasons.  This provision in the
RBI contracts at issue in this case is typical of the
direct response industry that specializes in conveying the
speech of noncommercial organizations.

-37-

To rule that a contract with a timely copy approval
provision makes the mail piece a cooperative venture would
require the Postal Service to assess back postage on most
every authorized entity or its for-profit solicitor or fund
raising consultant.  It would be arbitrary and grossly
unfair for the Postal Service to single out the contracts
between authorized organizations and RBI to assess back
postage and ignore the remainder of the community.

(3)    "the caging agent . . . is subject to approval by
       the parties [the professional solicitor as well as
       the client organization]"

The job of a cage is to open the mail, record do-
nations by donor, count and deposit donations, and prepare
a tape or computer file for the organization's data
processor that maintains the organization's donor file.

These functions are extremely important.  The number
of donors or donations caged should match the number of
entries that the data processor makes to the organization's
donor file.  In the start-up period of building a base of
donors, the quality or accuracy of the cage is extremely
important because the number of new donors and the size of
their gifts determines the stream of future revenue to pay
fund raising invoices.

A little known fact is the number of donors who send
cash as opposed to a check in response to an organization's
solicitations.  The industry rule of thumb is that between
ten and twenty percent of donations caged are cash.

The quality or effectiveness of a cage's system of
internal controls is crucial when it comes to the autho-
rized organization getting credit for all cash donations.
Cash is relatively easy to steal in the process of caging
reply mail pieces.

Other considerations in selecting a cage are the speed
with which the cage opens the mail and deposits donations
and the accuracy of data entry—-does the cage require its
data entry employees to double key stroke, for example?

When a vendor is extending credit and compensated on a
sliding scale and its client wants to pay the vendor's
invoices from funds donated via the mail in response to
solicitations, it is natural that the vendor wants con-

fidence in the cage.  Confidence is a function of the cage's system of internal controls.

Because the authorized organization is the party that enters into a contract with the cage and pays its invoices and because the funds that the cage handles belong to the organization, it is natural that the organization should select the cage.  Nonetheless, RBI needs accurate data from the cage:  number of donors, amount of gift by donor, aggregate donations (revenue), requests for additional information, any address updates for acknowledgment letters.

Because financial controls on RBI are expressed in terms of revenue raised, it is essential that the cage perform its functions accurately and convey the data on a timely basis.  Thus, it is extremely important that the cage maintain an effective system of internal controls.

RBI does not object to whatever cage a client organization desires as long as RBI is unaware of any problems the cage may have had relative to cash donations, accuracy, or timeliness of reports.  If such a problem develops, mutuality gives a little more leverage to RBI than it would otherwise have to work with the cage to rectify the problems or work with the client organization to select a different cage.

Mutuality does <u>not</u> give any access to RBI to donations caged or deposited.  Donations conveyed in the form of a check are made payable to the client organization.  The cage deposits them and all cash in a bank account in the name of the authorized organization who alone controls withdrawal.

Mutuality does not wrest control from the authorized organization.  Mutuality relates to the speed with which a client organization will address problems that RBI may encounter with the authorized organization's cage should problems arise that impede RBI's mandate from the  organization to perform the tasks of professional solicitor and fund raising counsel efficiently.

An argument might be attempted along these lines:  The solicitor may control the choice of cage simply by refusing to agree to any cage that the client organization selects.  In practice, such an eventuality is highly unlikely.

First, the program would never get underway if the professional solicitor or fund raising counsel refused to accept any cage that the authorized organization selected. For RBI to haggle over the cage merely delays start-up. It's not the way that an agent builds confidence.

Second, once the fund raising program is ongoing, if the professional solicitor or fund raising counsel were to withdraw approval of the cage and haggle over the re-placement cage that the client organization selected, that would bring the program to a standstill. That is not in the agent's interest any more than it is in the interest of the authorized entity.

Especially under the RBI contracts in this case, RBI would place itself in a most difficult situation: RBI accepts to operate under tight financial controls expressed in terms of revenue raised. If RBI were to shut the program down because the client organization refused to accept the cage that RBI backed, then RBI would have to disrupt its calling because the authorized entity controls solicitation expense on the basis of revenue raised. To disrupt the calling operation, lay off solicitors and other staff, and engender ill-will within its client base would be irrational.

Thus, it is extremely difficult even for a disingen-uous professional solicitor or fund raising counsel to foist its cage nominee on an authorized entity. The mu-tuality provision exists in the event that a cage turns out to be managed poorly or otherwise generates unreliable or untimely reports that are critical to the success of the authorized entity's program.

That's why, in the direct response industry that spe-cializes in conveying the speech of noncommercial organi-zations, the condition of mutuality with regard to se-lection of the cage is common. If the authorized orga-nization were concerned that its solicitor or fund raising counsel could use this provision to wrest ownership, then few if any nonprofits would sign such a contract.

We urge postal headquarters to think through the im-plications of Mr. Nagla's ruling with regard to this one contract provision. If headquarters were to ratify Mr. Nagla's proposition, then to be consistent, it would have to assess back postage on all authorized organizations and

their solicitors and fund raising counsel whose contracts
contain such a mutuality condition.

(4)  "Reese Brothers' right to continue collecting on
     pledges after the period of contract performance"

There are many instances in a principal-agent rela-
tionship where the two parties must continue to work with
each other on some aspect of the contracted program after
the contract expires or one of the party's terminates the
contract.  In such cases, well drafted contracts ac-
knowledge that some provisions survive termination and
spell out the obligations of the parties during the wind
down period.

There are many contracts between RBI and authorized
organizations listed on Enclosure A that are silent rel-
ative to the obligations of the parties during wind down.
For example, of the fourteen client organizations listed on
Enclosure A that fall within Group II, five are silent with
regard to RBI's obligation to act as fund raising counsel
and prepare solicitations for the client organization to
mail during the wind down period.

Two of these client organizations represent a signif-
icant number of contracts.  Sixteen chapters or affiliates
of the national charity, Prevent Child Abuse, engaged RBI.
With the exception of the Virginia Chapter contract, none
of the remaining fifteen contracts authorizes RBI to
prepare a mail solicitation during the wind down period.

Thirty-one chapters or affiliates of The Salvation
Army engaged RBI to act as their professional solicitor and
fund raising counsel.  None of those contracts has a pro-
vision that authorizes RBI to prepare solicitations via the
mail after its role as professional solicitor expires or
terminates.

The reason why some client organizations include a
provision that authorizes RBI to prepare mail solicitations
during the wind down period is economics.  A telephone so-
licitation without subsequent mail solicitations means that
the client organization would incur the expense of the
former and forego the revenue that it would otherwise
derive from the latter.

-41-

It is a wind down period because the client organization has terminated RBI as the organization's professional solicitor.  Calling on behalf of the organization has ceased.  Further, the organization has authorized RBI to prepare mail pieces to solicit only those persons who responded favorably to RBI's initial solicitation via the telephone.

All the controls that the organization instituted during the term of the contract in which it engaged RBI as professional solicitor continue during the wind down period.  The organization's fund raising program using the services of RBI is still a separate cost and profit center, so that it continues to be relatively easy for the authorized organization to track the program's expenses and revenue and monitor RBI's actions relative to the authorized organization's program.

Second, nothing in the wind down provision enables RBI to escape the organization's requirement that it approve all copy prior to mailing.  Thus, the authorized organization stays in total control of all solicitation materials.

Third, the financial controls that the authorized organization imposed at the outset of the contract persist during the wind down period.  For those contracts where the amount of revenue raised is the organization's brake on calling expense, the client settles up with RBI only after revenue from the last mail solicitation is deposited into the organization's bank account.  Thus, RBI must operate under strict expense controls until the very last day of wind down.  Fourth, the client organization continues to control withdrawals from its bank account.

Thus, for those contracts that contain a provision that authorizes RBI to prepare mail solicitations during the wind down period, after RBI has terminated its service as professional solicitor, the authorized organization remains firmly entrenched as the principal.  Nothing in the wind down provision or elsewhere in the contract undermines the ability of the authorized organization to act as principal and control its fund raising program.

(5)    "<u>Reese Brothers has and/or retains rights to the donor
       files/lists compiled and used in the solicitation
       efforts</u>"

     For each client organization, there are two basic sets
of "donor files/lists compiled and used in the solicitation
efforts:"  (a) its own file or database of donors and sup-
porters and (b) the gigantic pool of names of persons that
contribute to charity that RBI administers and uses to
begin to build a client organization's own donor file.

     First, each client organization has its own list of
donors.  Most of the organizations in Groups II and III did
not have a file of donors that had responded to a telephone
solicitation at the time they engaged RBI.  That's why such
organizations were attracted to RBI services in the first
place.  The client organizations in Group II built a base
of donors and, therefore, gained a file of names and ad-
dresses of supporters as a result.

     In Group I, all eleven contracts contain a provision
that specifies unequivocally that the authorized organi-
zation owns its own donor file and precludes RBI from any
ownership interest.  Thus, the authorized organization
retains total control of its own donor file.  Although all
the contracts expressly prohibit RBI from exercising or
gaining a right to the organization's donor file, some
contracts like MADD's take more of a belt and suspenders
approach to ensure that RBI will not gain any ownership
right whatsoever.

     In Group II, 63 of the 80 contracts contain a
provision that specifies that the authorized organization
is the exclusive owner of those names of persons that
contributed to the organization.  The NOVA RCSC submitted
another two of the contracts in Group II with the page
missing that might contain such a provision, so we cannot
determine at this sitting whether those two contracts
contain such a provision.  It is important to note that
none of the contracts places exclusive list ownership in
RBI.

     In Group III, twelve of the thirteen contracts contain
a provision that recognizes the authorized organization as
the sole owner of its donor names.  The thirteenth might
contain such a provision as well; however, the RCSC
submitted that contract with the relevant page missing.

The second list used in the solicitation effort is the co-called "Master File" referred to in the contracts. This file exists in order to solve a problem that every organization faces when it tries to diversify its sources of donors and support: Who to call when the organization is trying to build a donor file?

In direct mail fund raising, there are many affinity lists of donors and persons that have transacted business through the mail that charities may rent or exchange in order to build their own file of direct mail donors. Few such specialized affinity lists exist for telemarketing. It is prohibitively expensive to call names selected randomly from a telephone book.

To address this lacuna, RBI has compiled the Master File with the support of its clients over the years. The organizations donate for a limited purpose names of donors that the organization acquired during the period that it engaged RBI as its professional solicitor.

Not every organization has donated names to the Master File; however, in most cases, the authorized organization imposed tight controls on use of its names. For example, in pulling a sample of names from the Master File for a client organization to test or solicit to, RBI may not flag or in any way designate to which organization the person contributed.

The Master File contains names of persons that donate to charity other than those names that client organizations contributed. RBI acquires these other names from a variety of sources. The net result is that once a name is in the pool it is impossible to trace it to the source that contributed it.

The Master File is for the exclusive use of RBI client organizations to prospect to; RBI does not rent or exchange the Master File in the open market. Thus, RBI does not realize a pecuniary gain from the Master File.

Some contracts nonetheless explicitly provide that if RBI were to rent or exchange the Master File, RBI may not flag or in any way identify the origin of donors. See, for example, the confidentiality provision in the MADD contract.

The cooperative mailing issue is whether pooling of names of donors by authorized organizations through the auspices of RBI transfers an ownership interest to RBI in an organization's donor file such that mail pieces that contain subsequent requests for funds, even if they are mailed to a name other than one in the pool, belong to RBI rather than the authorized party.

RBI's position is that when its clients pool names of persons that contribute to charity, they do not transfer any ownership interest to RBI. In the contract, the list owner, the client organization, specifically declines to grant any ownership interest in the organization's donor file to RBI.

Nor are there other indicators of ownership. For example, the authorized organizations do not share any list rental income with RBI when one of them may rent its own donor file. The client organizations do not look to RBI to even up any of their respective exchange balances with a third party.

RBI neither acts as though it has an ownership interest in a client organization's donor file nor legally does it. When RBI draws a subset from the Master File for a client to prospect to by telephone, RBI is ignorant as to the origin of the name.

Likewise, RBI has no idea when it arranges for a client to send a subsequent solicitation by mail whether the addressee even originated from one of its current or former client organizations. As handy as the Master File may be, it is not sufficient for prospecting. RBI needs to arrange for many names other than those in the Master File in order for client organizations to have sufficient number of names to prospect to.

Because RBI is ignorant of the origin or the source list from whence the addressee's name came, RBI cannot argue that somehow the mail piece belongs to it because the name of the addressee came or even might have come from the Master File. The cause and effect links between the Master File and the addressee on a subsequent mail piece are too disjointed to support an ownership theory.

The practice of authorized organizations to pool the names of persons who contribute to charity in response to

either a telephone or mail solicitation preserves the organization's ownership rights in the names of its own donors and so limits RBI's use of those names that the pool of names is more like a consortium of nonprofits sharing information with each other rather than conferring an ownership interest to RBI in any client organization's donor file.

(6)    Conclusion:    Contract Provisions (1) - (5)

The five contract provisions that the Nagla decision cited actually enhanced the financial control that the authorized organization exerted over its telephone and mail solicitations while RBI served as professional solicitor or fund raising counsel.    The contract provisions preserved the authorized organization's ownership rights with regard to content, donations, and donors acquired.

In addition, the provision in question enabled the authorized entity to maximize the exposure it gained with persons RBI called for a limited period after the contract with RBI expired or was terminated without sacrificing control or ownership.    Finally, they enabled organizations that so desired to participate in a consortium of non-profits sharing names of person that contribute to charity.

In the order that the contract provision was named in the Nagla decision, the following summarizes their effect.

(1)    The authorized organization imposed tight financial controls by linking calling expense to revenue raised and requiring its direct response program to be accounted for as a separate cost and profit center so it was easy for the authorized entity to monitor expenses paid to RBI, donors acquired, and donations received.    (2)    The authorized entity controlled content of calls and mail pieces even when timeliness of turnaround was essential.

(3)    Nothing in the provision that acknowledged RBI's interest in the quality of internal controls that a cage maintained granted any right or access to donations caged and deposited to RBI.    Control of donations remained firmly and exclusively with the authorized entity.

(4)    By keeping RBI performing as fund raising counsel

after terminating RBI as professional solicitor, the
authorized organization kept its name and message before
persons who fairly recently expressed an interest in its
message.

(5)  Each client organization benefited directly from
the Master File that RBI maintained in that there was a
ready pool of known donors to charity that a new client
could prospect to even before it contributed any names to
the pool.  The organization's agreement to contribute to
the prospect pool once its program located donors in no way
gave rights to RBI regarding the organization's own donor
file.  The arrangement worked like a consortium of
nonprofits sharing information with each other.

C. <u>Constitutional problems with the Nagla decision</u>

(1)  <u>Constitutional underpinnings</u>

The position taken in the Nagla decision has unde-
niable constitutional implications.  A review of the de-
cision cannot take place without an analysis to determine
whether the result is a violation of the First and Four-
teenth Amendments to the Constitution of the United States.

There can be no doubt that the mail is a First
Amendment forum.  In <u>LaMonte v. Postmaster General</u>, 381
U.S. 301 (1965), the Court adopted the dissent of Justice
Holmes in <u>Milwaukee Pub. Co. v. Burleson</u>, 255 U.S. 407,
437.

Three times in the decade of the 1980s, the U.S.
Supreme Court found the appeal for support by a charitable
organization was a form of fully protected speech.  <u>Riley</u>,
<u>Munson</u>, and <u>Schaumburg</u>.

These court decisions stand for the proposition that
it is the message--not the messenger--which is the focal
point for review of government imposed limitations to the
exercise of a guaranteed right to engage in protected
speech.  This was made evident in both Riley and <u>Munson</u>,
which involved limitations on the commercial entities that
were providing services to authorized organizations.

In <u>Riley</u>, the issue was raised as to whether the
simple asking for money by a nonprofit organization was a
form of fully protected speech.  The Court answered with a
resounding "Yes."  The mail pieces at issue in the instant
case are, therefore, a form of fully protected speech.

The Nagla ruling, if allowed to stand, would limit
access to the nonprofit Standard A postal rate thereby
greatly handicapping smaller charities when they try to
disseminate their messages more widely.  The denial of the
nonprofit mail rate in this case is based in large part on
the terms of a contract which charities were able to
negotiate.  Had the same activity been conducted, at the
same cost, with the same appeal using direct employees of
the charity instead of the services of RBI, Pittsburgh and
Nagla would have permitted full use of the nonprofit postal
rate.  The fact that the government would treat two
speakers presenting the same message at the same cost dif-

ferently creates a situation which is inherently suspect, when it applies to the exercise of First Amendment expression.

Attached hereto and marked Exhibit 13 and made a part hereof is a Memorandum, prepared just after the initial ruling, to Jeff Zelkowitz, Esq. As noted in the Memorandum at Paragraph 5, the ruling creates a discrimination against speakers, which cannot constitutionally stand.

The regulation also constitutes a prior restraint of protected speech. Courts have consistently ruled, viz: "[A]ny system of prior restraints of expression comes to this court bearing a heavy presumption against its constitu-tional validity." Freedman v. State of Maryland, 380 U.S. 51, 57 (1965), quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58 at 70; FW/PBS, Inc. v. Dallas, 493 U.S. 215, 225 (1989). See also Davis v. East Baton Rouge Parish School Bd., 78 F.3d 920, 928 (5th Cir. 1996). See also Zook v. Brown, 865 F.2d 887, 890 (7th Cir. 1989).

It is well settled that the government may not pro-spectively silence speech except in extremely limited circumstances. Near v. Minnesota, 283 U.S. 697, 716 (1931). It is further a settled rule of constitutional jurisprudence that government may not do indirectly what it is forbidden to do directly:

> As we have often noted '[c]onstitutional rights would be of little value if they could be . . . indirectly denied.' Harman v. Forssenius, 380 U.S. 528, 540 (1965) quoting Smith v., Allwright, 321 U.S. 649, 664 (1944). The Constitution 'nullifies sophisticated as well as simple-minded modes' of infringing on Constitutional protections. Lane v. Wilson, 307 U.S. 268, 275 (1939); Harman v. Forssenius, 380 U.S. at 540-541.

U.S. Term Limits v. Thornton, 115 S.Ct. 1842, 1867 (1995).

(2)  Unconstitutional conditions:  The Nagla decision
     suffers multiple fatal defects when analyzed under the
     First Amendment microscope.

     If postal headquarters rules that any of the five
contract provisions that the Nagla decision cited or a
combination of them renders the mail pieces at issue in
this case to be unauthorized cooperative mailings, RBI's
position is that such a rule constitutes an unconsti-
utional condition imposed on eligibility for nonprofit
rates.

     The odds are so unlikely that any or all of these five
provisions operated at any time over the period when they
were in effect to render the client organization incapable
of performing as principal or that gave an ownership in-
terest to RBI in a client organization's donor file that so
burdening the client organization's protected speech via
the telephone is unjustified.

     The government's interest is that mail sent at the
nonprofit rate should belong to the authorized entity.
Congress did not want mail that belongs to an unauthorized
entity to pay the lower rates reserved for organizations
that operate primarily to promote an educational, philan-
thropic, religious, or any of the other five purposes that
Congress specified in the federal statute.

     This government objective is certainly legitimate.
Nonetheless, the Nagla decision raises a constitutional
problem.  In practice, none of the five contract provisions
that the Nagla letter singles out caused ownership of the
mail pieces or the fund raising program to shift from the
authorized organization to RBI.

     On the contrary, the five provisions enhanced the
authorized entity's financial controls vis-à-vis RBI and
preserved the entity's ownership of content, donations, and
donors acquired.  In addition, they enabled the organi-
zation to terminate the contact with RBI yet still maximize
exposure for the charity's message with persons that RBI
called immediately prior to termination and retain all the
controls during the wind down period.

     Therefore, the unconstitutional condition is not nec-
essary to accomplish the government's interest, nor is it
rational.  None of the five provisions caused ownership of

either the mail pieces or the organization's fund raising
program to transfer from the authorized entity to the
unauthorized.

The Nagla decision is unclear whether it would des-
ignate as a cooperative venture only those contracts that
contain all five provisions, contracts that contain at
least one of the five provisions, or contracts that contain
any combination of two or more or the provisions. This
raises another constitutional problem.

Because charitable solicitation and dissemination of
views and ideas lie at the heart of First Amendment pro-
tection, the courts must be especially careful in weighing
the interests that Pittsburgh-Nagla assert in support of
the restriction and in assessing the precision with which
they crafted the restriction. A ruling that leaves it to
the agency's discretion to decide whether one or a certain
combination of the five provisions undermines the gov-
ernment's interest suggests that Nagla decision failed to
tailor its ruling narrowly.

For example, in the first contract provision that
Nagla cited is the concept of controlling telephone calling
expense by linking it to donations contributed. The
control is that expense may not exceed donations raised.
This subjects RBI's fee-for-service to a sliding scale.

How the first contract provision worked out in
practice varies by group. In Group I, the lion's share of
the deficiency assessed derives from the RBI-MADD contract.
MADD was liable up to amount it wanted to spend on calling
to acquire a donor; MADD paid that bill in full plus the
bill to produce and mail the subsequent mail solicitations.
If RBI failed to manage its calling well and exceeded the
amount that MADD set in advance, RBI was penalized.

If MADD's subsequent mail pieces are unauthorized
cooperative mailings as a result of the financial controls
it imposed on RBI's calling, then the government is saying:
Only authorized organizations with deep enough pockets to
absorb a professional solicitor's cost overruns may qualify
to use the nonprofit postal rate for its subsequent mail
pieces.

The authorized organizations in Group II also imposed
financial controls on RBI, namely RBI's calling expense was

limited to revenue raised after full payment of postage and expenses to produce the subsequent mail pieces. In practice, RBI's fee-for-service was computed on a sliding scale. RBI also arranged for financing for an authorized organization's calling program in Group II until it located a sufficient number of supporters that it no longer needed financing.

Notwithstanding the sliding scale, the fee that each authorized entity in Group II paid to RBI was sufficient to cover RBI's out-of-pocket expenses. Over the life of the contract, the organization paid an amount to RBI to cover all its costs plus generate the target rate of return.

Overlaying the Nagla decision on the facts, it would hold that the subsequent mail pieces of Group II organizations are unauthorized cooperative mailings because (a) the financial controls imposed on RBI's calling were linked to revenue raised, (b) RBI's fee-for-service was computed on a sliding scale, and (c) RBI financed the initial phase of building a donor base, notwithstanding that the authorized organization's payment to RBI made RBI whole.

If postal headquarters were to uphold the Nagla decision, the government would be saying: Only authorized organizations with deep enough pockets to absorb a professional solicitor's cost overruns and finance growth of their respective donor bases until they are self-sustaining and who contract with a professional solicitor that charges a fixed fee-for-service may qualify to use the nonprofit postal rate for their subsequent mail pieces.

Such a rule would penalize authorized organizations like those in Groups I and II that seek to use the telephone to conduct protected speech activity and subsequently conduct a separate solicitation via the mail relative to other authorized organizations that have deep enough pockets to absorb a professional solicitor's cost overruns or to finance building a base of supporters via the telephone internally.

Persons who receive only a mail piece would be the only ones that could hear the protected speech message of authorized organizations like those in Groups I and II. Those organizations would be economically precluded from conducting their protected speech activities via the telephone prior to sending a written message.

Thus, the effect of the Nagla decision would be to en-
ourage some forms of solicitation and discourage others.
Under Riley, a government rule that has that effect is
impermissible.  Riley, n. 5 at 790.

In its appeal from the decision of the Manager,
Business Mail Entry, Pittsburgh, PA, RBI asserted the First
Amendment rights of its client organizations.  Mr. Nagla's
only response to RBI was that the Postal Service has
" . . . never denied [RBI] access to mail.  It is merely
being assessed the lawful rate for mail generated by its
business ventures . . ."  Nagla Decision at 3.

Analytically, this is the wrong point of departure.
By definition a for-profit entity is engaged in a "business
venture" even if its client is not.  The authorized organi-
zations in Groups I, II, and III are engaged in protected
speech activities.

In Schaumburg, the Supreme Court held that " . . .
charitable appeals for funds . . . involve a variety of
speech interests--communication of information, the
dissemination and propagation of views and ideas, and the
advocacy of causes--that are within the protection of the
First Amendment."  Id. at 632.

If the Postal Service were to look only at what the
for-profit vendor does in any transaction with an autho-
rized organization (other than to donate a gift), then the
activity would always be a "business venture."  The touch-
stone must be whether the authorized organization is en-
gaged in a "business venture" with the unauthorized organi-
zation.

The authorized organizations in this case were all
engaged in protected speech activity, namely " . . . char-
itable appeals for funds . . . communication of infor-
mation, the dissemination and propagation of views and
ideas, and the advocacy of causes . . . "  Id.  Even the
authorized organizations in Group III were engaged in
protected speech activity, not a business venture.  The
fact that RBI deemed Group III organizations to be poor
clients does not alter the fact that the authorized organi-
zations were engaged in noncommercial First Amendment ac-
tivity.

As post-new Deal constitutional law recognizes, government determines the distribution of wealth both by regulatory action and inaction. Here the conditions that the Nagla rule would attach to use of the nonprofit mail rate coerce authorized organizations like those in Groups I and II to use only the mail medium to communicate their protected speech messages.

The Nagla rule would have the effect to coerce these organizations to use the very medium over which the Postal Service has a monopoly, delivery of letter mail to a person's residential mail box. The end result is that organizations like those in Groups I and II will raise less funds, communicate with fewer prospective supporters, and educated fewer citizens about the organization's views and ideas.

Just as there are persons that are left handed and those who are right handed, there are persons that learn best through the written word and those who learn best through oral instruction. One such class is not necessarily any more intelligent than the other. Why there are such differences, we do not fully understand. Nonetheless, there are many citizens who will take some action or adopt a point of view after a oral lecture or dialogue but would never read a four page cover letter in a direct mail piece no matter how enticing the copy.

Under the Nagla rule, the class of citizens that are particularly susceptible to appeals and education via the telephone would be the exclusive arena of two relatively small groups of authorized organizations. One group would be those authorized organizations that have the wherewithal to absorb the cost overruns of their professional solicitors. The second group are those organizations that aleady have a base of telephone supporters sufficiently large to cover the cost to call around the country looking for more supporters who respond best when spoken to orally.

The Nagla rule would further advantage those two groups of authorized organizations economically. First, they could continue to mail their subsequent mail solicitations at the nonprofit postal rate. Second, they would have less competition in the telephone arena from organiations like those in Groups I, II, and III for donors' time and dollars.

Not only would the Nagla rule coerce many authorized
organizations to abandon the telephone as a medium to
conduct their protected speech activities, but also the
Nagla rule would affect an interest unrelated to the
benefit.

The conditions that the Nagla rule would impose on an
authorized organization affect its interest to conduct pro-
tected speech via the telephone.   That interest is quite
different from the benefit to mail the subsequent solici-
tation mail piece at the nonprofit postal rate.   The Nagla
rule would say:  If an authorized organization wants to
send its subsequent written material at the nonprofit mail
rate, then the organization must conduct its First
Amendment activity via the telephone under the terms and
conditions prescribed in the Nagla decision.

An authorized organization's interest in using the
telephone medium is quite different from its interest to
use direct mail in at least three major ways.  First, the
telephone and mail are two completely different media.

Second, an authorized organization uses each medium
for a different purpose.  A telephone call is multi-
purpose:  It's a charitable appeal for funds; it commu-
nicates information, disseminates and propagates views and
ideas; and the caller or solicitor advocates causes.  The
purpose of the subsequent mail pieces is to solicit funds.

Third, the authorized organization reaches a different
audience mix with each media.  It sends a subsequent mail
piece to persons who expressed an interest in the organi-
zation and its cause or message over the phone.

The authorized organization engages a professional
solicitor to call a much larger universe of persons.
Although many persons, when called, decline to contribute
and otherwise express a lack of interest in the organi-
zation or its message, the solicitor does have an oppor-
tunity to communicate information, disseminate and prop-
agate views and ideas, and advocate the causes of its
principal, the authorized organization.

Not every person who the solicitor calls listens to
the full script.  Nonetheless, the audience to which the
authorized organization is able to make its case over the
phone is far broader than the audience to which the autho-

rized organization sends a subsequent fund raising piece of
mail. To coerce the authorized organization to abandon the
telecommunications medium denies it the opportunity to
reach a much larger universe of persons with its protected
speech message.

Thus, the Nagla rule or condition burdens the pro-
tected speech of authorized organizations to communicate
with a broad universe of citizens via the telephone using
the services of a professional solicitor, as did those
organizations in Groups I and II, under the same or similar
terms as those organizations negotiated with RBI.

RBI's position is that the Nagla rule is an unconsti-
tutional condition. First, it is coercive. The Nagla rule
would coerce authorized organizations to use the mail media
exclusively, the media over which the Postal Service has a
monopoly. Second, the Nagla rule would affect an interest
of authorized organizations––to conduct protected speech
activities over the telephone––that are quite different
from mail rates over which the Postal Service has juris-
diction.

The courts have long held in numerous contexts that
government action that inhibits freedom but falls short of
coercion infringes constitutional rights. In <u>United States
v. Jackson</u>, 390 U.S. 570 (1968), the Supreme Court inval-
idated a federal statute that authorized only juries to
impose the death penalty in kidnapping cases on the grounds
that this "discourage[d] or deter[red] the exercise of the
fifth and sixth amendment rights." <u>Id.</u> at 581-583.

In <u>Jackson</u>, Justice Stewart pointed out that "[a]
procedure need not be inherently coercive in order that it
be held to impose an impermissible burden upon the as-
sertion of a constitutional right." <u>Id.</u> To be unconsti-
tutional, it is sufficient that the condition exert a
lesser deterrent effect.

The courts have held that speech is burdened when the
speaker is required to obtain a license;[11] reveal his iden-

---

[11]  See <u>City of Lakewood v. Plain Dealer Publishing
Co.</u>, 108 S.Ct.2138, 2143-44 (1988).

tity;[12] or confine his speech to a medium that won't leave
any litter on the public square.[13]

In Baggett v. Bullitt, 377 U.S. 360 (1964), the court
invalidated a loyalty oath for state teachers as vague on
the ground that "[t]hose . . . sensitive to the perils
posed by indefinite language, avoid the risk . . . only by
restricting their conduct to that which is unquestionably
safe.   Free speech may not be so inhibited." Id. at 372.
Through such case law, the Court fashioned the First
Amendment doctrines of vagueness and overbreadth that iden-
tify a mere "chilling effect" as a burden on protected
speech.

The Court has held that government regulation  in-
fringed the right to abortion when it imposed excessive
expense or delay or tried to influence the scope of infor-
mation about reproductive options in favor of the gov-
ernment's bias for childbirth. [14]

The Nagla rule would impose excessive expense on a
charity's right to conduct protected speech activities via
the telephone lines.  In order to benefit from the non-
profit mail rate for its subsequent mail solicitations, the
authorized organization would have to accept a contract
without tight financial controls, for example, that are
easy for the charity to monitor.

Thus, an authorized organization would have to be able
to fund cost overruns in order to conduct protected speech
over the telephone and benefit from nonprofit postal rates
when it sends out subsequent mail pieces.  It is RBI's
position that such a condition is an impermissible burden
on the assertion of a constitutional right, namely to
conduct protected speech activities over the telephone.

---

[12]  Talley v. California, 362 U.S. 60, 64 (1960).
[13]  Schneider v. Irvington, 308 U.S. 147, 162 (1939).
[14]  Thornburgh v. American College of Obstetricians &
Gynecologists, 476 U.S. 747, 758-71 (1986); City of Akron
v. Akron Center for Reproductive Health, Inc., 462 U.S.
416, 442-51 (1983)

(3)  <u>Unconstitutional Conditions:    Conclusion</u>

The government's interest in a cooperative mailing case is to ensure that only authorized organizations <u>mail</u> matter at the nonprofit rate.  That is, they mail only their own mail pieces.

Note that the government's interest is <u>not</u> that authorized organizations alone "<u>benefit</u>" from the nonprofit mail rate.  In a capitalist economy such as ours, non-profits are constrained to purchase goods and services from for-profit entities, and the for-profits must benefit from those transactions (<u>i.e.</u>, cover costs and earn a profit), or they won't remain in that business long.

A detailed analysis of the five provisions cited in the Nagla decision reveal that in practice none of them transferred any ownership of either the initial telephone call or subsequent mail pieces from the authorized organization to RBI.  On the contrary, the first provision that the Nagla decision cites gives greater financial control to the authorized entity.

All five provisions improve the efficiency and internal controls (provisions 1, 2, and 3) of the organization's program and its effectiveness relative to the number of donors acquired and funds raised (provisions 4 and 5).

Thus, in weighing the interest that the Nagla decision is designed to support, this analysis has shown that none of the five provisions in practice has harmed the government's interest.  Moreover, the condition that the Nagla decision imposes was not crafted precisely.

Did Nagla intend to disqualify the subsequent mail pieces if the contract with the professional solicitor includes all five provisions, at least one of the five, any combination of two or more, or the combination of provision 1 plus anyone of the other four provisions?  Due process requires that the Postal Service inform authorized organizations and professional solicitors, prior to their contract negotiations, precisely which set of provisions causes ownership of the subsequent mail pieces to shift from the authorized entity to the unauthorized.

At this sitting, the position of the Nagla decision is that the existence of at least the first provision in a contract is sufficient to transfer ownership of the mail piece from the authorized entity to RBI.  The way that provision works out in practice, however, is not offensive to the statutory mandate that the piece belong to the authorized organization.

On the contrary, by linking calling expense to revenue raised and requiring that the organization's direct response program be accounted for as a separate "cost and profit" center, it is easier for the nonprofit to monitor expenses that it pays to RBI, the number of donors it acquires, and the value of donations received.  The end result is that it is easier for the authorized entity to stay in control.

Rather than give carte blanche to RBI, these tight financial controls place easily enforceable limits on RBI with respect to its agency functions as professional solicitor and fund raising counsel.  If RBI were able to call "prospects" at will, that would be tantamount to a transfer of ownership.

By limiting the total expense to call and mail to revenue raised, the unauthorized entity has an incentive to monitor its effort on behalf of the authorized organization to stay within the budget.  If the unauthorized entity is weak in management skills or otherwise incurs a cost overrun, the authorized organization can easily discover it and enforce the agreement.  That's ownership control.

Given the foregoing analysis of the first provision and the other four that the Nagla decision cites, our position is that the burden that the Nagla condition imposes on the protected speech activities of the authorized organizations via the telephone is unnecessary to preserve the authorized entity's ownership of its direct response program.   The way that the contract works out in practice for Groups I and II is that the authorized organizations not only retain ownership of the direct response program but also the provisions work to entrench the organization more firmly as the principal.

Not only is the Nagla condition unnecessary in order to achieve the government's interest in this case, but also it would have the perverse effect to undermine the autho-

rized organization's control if it were to enter into a contract for telemarketing without effective cost controls that are easy for a layperson to monitor and enforce.

The Nagla condition coerces the organization's choice of media, thereby limiting the audience that the authorized organization can reach with its message. The degree of constraint it imposes on choice is severe because most authorized organizations like those in Groups I and II would be totally precluded from conducting their protected speech activities via the telephone without the financial controls and other provisions that Nagla finds offensive.

Further, the Nagla decision imposes a condition on an activity that is unrelated to the activity that Congress directed the Postal Service to regulate, the nonprofit mail rate. For all these reasons, the Nagala decision represents an impermissible penalty on a right. The Postal Service's interest in deleting any of these five provisons from a fund raising contract is constitutionally invalid and insufficiently related to ownership of the mail piece.

D.  <u>Group IV</u>

At this time, RBI is unable to analyze the programs of the organizations in Group IV relative to the contracts because it needs the mail statements.  RBI has requested that the NOVA RCSC make those mail statements available to counsel, but as yet they have not been forthcoming.

RBI respectfully requests that the record be held to receive its appeal relative to the organizations in Group IV until the RCSC has made the mail statements available and RBI has an opportunity to analyze them and prepare its appeal.

# ENCLOSURE A

Nonprofit organizations for which mailings were made at the Nonprofit Standard (A) Mail rates pursuant to contracts or agreements with Reese Brothers, Inc.

| | | | |
|---|---|---|---|
| American Cancer Society | 2 | 88,431.08 | Corrections |
| American Red Cross | 3 | 15,021.03 | |
| Angel Planes | 4 | 83,846.38 | <———— In Detail |
| Atlanta Union | 5 | 11,212.68 | |
| Children's Wish Foundation | 6 | 428,163.64 | |
| Appalachian Project | 7 | 2,958.14 | |
| Cure | 8 | 246.57 | |
| Homeless Veterans | 9 | 46,078.70 | |
| Just Say No | 10 | 267,625.03 | |
| Kids Peace | 11 | 75,921.96 | |
| Mothers Against Drunk Driving | 12 | 966,232.75 | |
| American Forests | 13 | 7,807.48 | |
| Boston Rescue Mission | 14 | 46.72 | |
| Multiple Sclerosis Association Of America | 15 | 300,565.27 | |
| Alumni Phon-A-Thon | 16 | 403.54 | |
| Olive Branch | 17 | 156.67 | |
| Child Abuse | 18 | 287,914.54 | |
| Priests Of The Sacred Heart | 20 | 22,456.92 | |
| Salvation Army | 21 | 79,520.20 | |
| SADD Students Against Driving Drunk | 23 | 210,606.02 | |
| Marine Toys For Tots Foundation | 24 | 488.76 | |
| Vanished Children | 25 | 99,736.49 | |
| YWCA | 26 | 2,484.75 | |
| Unidentified | 27 | 37,970.52 | |
| Alzheimers | 28 | 142,103.81 | |
| AAIM | 29 | 5,050.35 | |
| Good Samaritan | 30 | 7,326.30 | <———— In Detail |
| Trustmark | 31 | 843.20 | |
| Diabetes | 32 | 1,175.50 | <———— In Detail |
| Marianist Mission | 33 | 14,423.03 | |
| Veterans Of Foreign Wars Of The United States | 34 | 1,508.97 | |
| Vietnam Veterans Memorial Fund | 35 | 146.94 | |
| Maryknoll Fathers & Brothers | 36 | 11,325.32 | |
| St. Joseph's | 37 | 3,781.44 | |
| Spiritual Gift Ministries | 38 | 0 | |
| National Caregiving Foundation | 39 | 0 | |
| | | 3,223,580.7 | |

G-4

# NATIONAL ASSOCIATION of ATTORNEYS GENERAL
presents

*1994 NAAG/NASCO Charitable Trusts and Solicitations Seminar*
Savannah, Georgia

October 31 - November 1, 1994

NATIONAL ASSOCIATION OF ATTORNEYS GENERAL

**MONDAY, OCTOBER 31:**

| | |
|---|---|
| 12:00 p.m. - 1:15 p.m. | **Public Registration - Open Sessions** |
| 1:15 p.m. - 1:45 p.m. | **Welcome**<br>*Michael Bowers, Attorney General, Georgia*<br>*Steven Arter, NASCO President* |
| 1:45 p.m. - 2:30 p.m. | **Panel Discussion**<br>**State regulatory priorities. Where should the focus be? Is there too much regulation?**<br>*Bennett Weiner, Vice President, Better Business Bureau, Philanthropic Advisory Service*<br>*Steven Arter, Senior Financial Investigator, Pennsylvania*<br>*Joanne Hayes, Hayes Briscoe Associates (Former President, American Association of Fundraising Counsel)* |
| 2:30 p.m. - 3:30 p.m. | **Nonprofit Accounting Issues**<br>*Richard Larkin, CPA, Price Waterhouse* |
| 3:30 p.m. - 3:45 p.m. | **Break** |
| 3:45 p.m. - 5:00 p.m. | **Ask the Feds**<br>*Don Kehoe, Chief of Staff to Assistant Commissioner, IRS*<br>*Paul Luehr, Staff Attorney, FTC*<br>*Tim Mahoney, Inspector/Attorney, Postal Inspection Service* |
| 6:00 p.m. | **Reception - Open to all Participants** |

| ORGANIZATION | | JOB | CHARGE ID | QUANTITY | POSTAGE |
|---|---|---|---|---|---|
| 102 Alabama Chapter | AL | 116499 | 10005 | 42 | $4.28 |
| 106 California Chapter | CA | 116511 | 10050 | 12 | $1.22 |
| 107 Colorado Chapter | CO | 116520 | 10064 | 1 | $0.10 |
| 107 Colorado Chapter | CO | 116520 | 10065 | 27 | $2.75 |
| 108 Connecticut Chapter | CT | 116525 | 10081 | 1 | $0.10 |
| 108 Connecticut Chapter | CT | 116525 | 10080 | 38 | $3.88 |
| 113 Delaware Chapter | DE | 116533 | 10110 | 7 | $0.71 |
| 114 Florida Chapter | FL | 116538 | 10124 | 3 | $0.31 |
| 114 Florida Chapter | FL | 116538 | 10125 | 54 | $5.51 |
| 115 Georgia Chapter | GA | 116544 | 10139 | 1 | $0.10 |
| 115 Georgia Chapter | GA | 116544 | 10140 | 56 | $5.71 |
| 117 Illinois Chapter | IL | 116553 | 10171 | 1 | $0.10 |
| 117 Illinois Chapter | IL | 116553 | 10169 | 7 | $0.71 |
| 117 Illinois Chapter | IL | 116553 | 10170 | 295 | $30.09 |
| 118 Indiana Chapter | IN | 116558 | 10185 | 155 | $15.81 |
| 172 Iowa 2 Chapter | IW | 116774 | 5314 | 82 | $8.36 |
| 120 Kentucky Chapter | KY | 116566 | 10214 | 1 | $0.10 |
| 120 Kentucky Chapter | KY | 116566 | 10215 | 56 | $5.71 |
| 122 Louisiana Chapter | LA | 116570 | 10229 | 1 | $0.10 |
| 122 Louisiana Chapter | LA | 116570 | 10230 | 11 | $1.12 |
| 124 Massachusetts Chapter | MA | 116575 | 10245 | 10 | $1.02 |
| 124 Massachusetts Chapter | MA | 116575 | 10244 | 13 | $1.33 |
| 125 Maryland Chapter | MD | 116580 | 10261 | 3 | $0.31 |
| 125 Maryland Chapter | MD | 116580 | 10259 | 6 | $0.61 |
| 168 Maine Chapter | ME | 116695 | 5144 | 24 | $2.45 |
| 127 Minnesota Chapter | MN | 116591 | 10289 | 1 | $0.10 |
| 127 Minnesota Chapter | MN | 116591 | 10290 | 56 | $5.71 |
| 128 Missouri Chapter | MO | 116596 | 10304 | 1 | $0.10 |
| 128 Missouri Chapter | MO | 116596 | 10305 | 8 | $0.82 |
| 129 Mississippi Chapter | MS | 116601 | 10319 | 4 | $0.41 |
| 132 North Carolina Chapter | NC | 116606 | 10334 | 3 | $0.31 |
| 132 North Carolina Chapter | NC | 116606 | 10335 | 88 | $8.98 |
| 170 North Dakota Chapter | ND | 116702 | 5212 | 78 | $7.96 |
| 133 Nebraska Chapter | NE | 116612 | 10349 | 2 | $0.20 |
| 133 Nebraska Chapter | NE | 116612 | 10350 | 27 | $2.75 |
| 176 New Hampshire Chapter | NH | 116714 | 10664 | 2 | $0.20 |
| 176 New Hampshire Chapter | NH | 116714 | 10665 | 15 | $1.53 |
| 134 New Jersey Chapter | NJ | 116618 | 10365 | 52 | $5.30 |
| 136 New York Chapter | NY | 116627 | 10395 | 179 | $18.26 |
| 137 Ohio Chapter | OH | 116632 | 10411 | 2 | $0.20 |
| 137 Ohio Chapter | OH | 116632 | 10409 | 20 | $2.04 |
| 137 Ohio Chapter | OH | 116632 | 10410 | 165 | $16.83 |
| 138 Oklahoma Chapter | OK | 116636 | 10424 | 1 | $0.10 |
| 138 Oklahoma Chapter | OK | 116636 | 10425 | 179 | $18.26 |
| 140 Pennsylvania Chapter | PA | 116643 | 7213 | 1 | $0.10 |
| 140 Pennsylvania Chapter | PA | 116643 | 10454 | 16 | $1.63 |
| 140 Pennsylvania Chapter | PA | 116643 | 10455 | 76 | $7.75 |
| 146 South Carolina Chapter | SC | 116651 | 7245 | 1 | $0.10 |
| 146 South Carolina Chapter | SC | 116651 | 10484 | 2 | $0.20 |
| 146 South Carolina Chapter | SC | 116651 | 10485 | 262 | $26.72 |
| 147 South Dakota Chapter | SD | 116655 | 5246 | 13 | $1.33 |
| 153 Tennessee Chapter | TN | 116660 | 10500 | 56 | $5.71 |
| 154 Texas Chapter | TX | 116665 | 10514 | 9 | $0.92 |
| 154 Texas Chapter | TX | 116665 | 10515 | 32 | $3.26 |
| 155 Utah Chapter | UT | 116669 | 10530 | 104 | $10.61 |

| ORGANIZATION | JOB | CHARGE ID | QUANTITY | POSTAGE |
|---|---|---|---|---|
| 156 Virginia Chapter | VA 116674 | 3680 | 1 | $0.10 |
| 156 Virginia Chapter | VA 116674 | 10545 | 84 | $8.57 |
| 157 Washington Chapter | WA 116677 | 10560 | 32 | $3.26 |
| 158 Wisconsin Chapter | WI 116681 | 10574 | 2 | $0.20 |
| 158 Wisconsin Chapter | WI 116681 | 10575 | 59 | $6.02 |
| 159 West Virginia Chapter | WV 116687 | 10590 | 11 | $1.12 |

Receipt 063095md Totals:                2,551        $260.15

CONSOLIDATED STATEMENT OF MAILING with Meter Postage Affixed

Bulk Third-Class Mail (Regular or Nonprofit Rates)

Entry Point:
Presort:      All

=================================================================================

| Post Office of Mailing | Date | Process Category | Federal Agency Cost Code |
|---|---|---|---|
| Permit No. / Mailing Statement Sequence No. 0001 | | [X] Letter<br>[ ] Flat<br>[ ] Automated Flat<br>[ ] Machinable Parcel<br>[ ] Irregular Parcel<br>[ ] Outside Parcel | USPS Authorized Mailing ID Code(s) |
| Name and Address of Permit Holder | Telephone Number | Receipt No. | |

| | Sacks | Trays 7 | Pallets | Other |
|---|---|---|---|---|
| | Weight of Single Piece | | 0.0625 lbs. | |

| Authorized Nonprofit? [ ] Yes  [ ] No | Total Pieces 2551 | Total Weight 159.4375 lbs. | Sacking based on | [ ] 125 pcs. [ ] 15 lbs. [ ] Both (DMM M300) |

| Name and Address of Individual or Organization for Which Mailing is Prepared | Name and Address of Mailing Agent | Check All That Apply |
|---|---|---|
| | REESE BROS<br>925 Penn Ave<br>Pittsburgh, Pa 15222 | [ ] Centralized Postage Payment<br>[ ] Plant Loaded or<br>[ ] Plant Verified Drop Shipment to<br>[ ] DMM D072 Drop Shipment to<br>[ ] BMAU Entry at<br>[ ] Orig. [ ] Dest. A/O Zip<br>[ ] Orig. [ ] Dest. SCF 3D Zip<br>[ ] Orig. [ ] Dest. BMC |
| Authorized Nonprofit? [X] Yes  [ ] No | | |

| | | |
|---|---|---|
| o For bulk mailings of Automation-compatible letter-size pieces (DMM C810) go to Part A. | Part A | $  260.202 |
| o For bulk mailings of non-automation compatible letter-size pieces (DMM C050), weighing 0.2086 lb. or less, go to Part B. | Part B | $ |
| o For bulk mailings of non letter-size pieces (DMM C050) weighing 0.2086 lb. or less, go to Part C. | Part C | $ |
| o For bulk mailings of all pieces weighing more than 0.2086 lb. but less than 1.0 lb., go to Part D. | Part D | $ |
| Total Postage | | $  260.202 |
| Postage Affixed at [ ] Correct Rate [ ] Lowest Rate [X] Other Rate (DMM P300)   2551 copies x $0.097 = | | $  247.447 |
| Additional Postage Due | | $  12.76 |

=================================================================================

The signature of a mailer certifies that: (1) the mailing does not violate DMM E371; (2) only the mailer's matter is being mailed; (3) this is not a cooperative mailing with other persons or organizations that are not authorized to mail at special bulk third-class rates at this office; (4) this mailing has not been undertaken by the mailer on behalf of or produced for another person or organization not authorized to mail at special bulk third-class rates at this office; and (5) it will be liable for and agrees to pay, subject to appeals prescribed by postal laws and regulations, any revenue deficiencies assessed on this mailing, whether due to a finding that the mailing is cooperative or for other reasons. (If this form is signed by an agent, the agent certifies that it is authorized to sign this statement, that the certification binds the agent and the nonprofit mailer, and that both the nonprofit mailer and the agent will be liable for and agree to pay any deficiencies.)

The submission of a false, fictitious or fraudulent statement may result in imprisonment of up to 5 years and a fine of up to $10,000 (18 USC 1001). In addition, a civil penalty of up to $5,000 and an additional assessment of twice the amount falsely claimed may be imposed (31 USC 3802).

I hereby certify that all information furnished on this form is accurate and truthful, and that this material presented qualifies for the rates of postage claimed.

Signature of Permit Holder or Agent (Both principal and agent are liable for any postage deficiency incurred) | Telephone No.
                                                                                                              | 412-355-0800

| Single Piece Weight _._ _ _ _ lbs. | Are figures at left adjusted from mailer's entries?  [ ] Yes  [ ] No |
|---|---|
| | If "Yes" Reason |

| Check One [ ] Verification Not Scheduled<br>[ ] Verification Performed as Scheduled | Date Mailer Notified | Contact | By (Initials) |
|---|---|---|---|

| I CERTIFY that this mailing has been inspected concerning: 1) eligibility for rate of postage claimed; 2) proper preparation (and presort where required); 3) proper completion of the statement of mailing; and 4) payment of the required annual fee. | Round Stamp (Required) |
|---|---|
| Signature of Weigher | |
| | Time            AM<br>                PM |

PS Form 3602-PC, January 1995 Facsimile

Financial Document - Forward To Finance Office

Job Number: 116774

Postage Type: THIRD CLASS

QTY    RATE
----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)    2551  10²

ORG ID  ORGANIZATION NAME

OUTREACH DONOR LIST TOTAL QTY

172  MADD Iowa 2 Chapter                82        0         82

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | |
| 272 | M395DP | MADD Dot Matrix Invoice | 1557256 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | -738626 |
| 377 | M893L3 | 3,4,5 Letter of Month | 1691676 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 640019 |
| | | | 254547 |

---

COMPUTER DEPARTMENT: _ _ _ (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other _____

BURSTING DEPARTMENT: ___ (Initials)
How many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other

INSERTER/COOKBOOK PACKAGING: ___ (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material
[ ] Excess Consumption _____

INSPECTION BEFORE MAILING:

NAME: _____                [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: ___ (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

Did you have to repack sacks ? _____ (Quantity of sacks)

---

Job Number: 116714
Postage Type: THIRD CLASS

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

   176  MADD New Hampshire Chapter                 17          0         17

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1557340 |
| 272 | M395DP | MADD Dot Matrix Invoice | -738542 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1691760 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254631 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
ow many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material _____
[ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

---

```
DATE ISSUED: 24-Jun-1995 13:49:52                                    QTY      RATE
  Job Number: 116702                                              ----------
Postage Type: THIRD CLASS

       Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

  170  MADD North Dakota Chapter                 78          0          78
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1558432 |
| 272 | M395DP | MADD Dot Matrix Invoice | -737450 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1692852 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254745 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other  _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other  _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material  _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED  [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

```
     DATE ISSUED: 24-Jun-1995 13:47:03                              QTY    RATE
     Job Number: 116695                                           ----------
   Postage Type: THIRD CLASS
```

          Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                 OUTREACH DONOR LIST TOTAL QTY

   168  MADD Maine Chapter                     24        0        24

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1558758 |
| 272 | M395DP | MADD Dot Matrix Invoice | -737124 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1693178 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254824 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other        _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
  ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other        _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
  How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material       _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____    [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights        [ ] Correct          [ ] Incorrect
   Dollar Amount  [ ] Correct          [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

```
                                                                    QTY     RATE
DATE ISSUED: 24-jun-1995 13:43:21                                   ----------
  Job Number: 116687
Postage Type: THIRD CLASS


      Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                      OUTREACH DONOR LIST TOTAL QTY

  159  MADD West Virginia Chapter                  11          0          11
```

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1559196 |
| 272 | M395DP | MADD Dot Matrix Invoice | -736687 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1693616 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254850 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other      _____

RSTING DEPARTMENT:  _ _ _  (Initials)
ow many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other      _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material      _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____     [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights       [ ] Correct      [ ] Incorrect
  Dollar Amount [ ] Correct      [ ] Incorrect

  Did you have to repack sacks ?  _____  (Quantity of sacks)

---

Job Number: 116681
Postage Type: THIRD CLASS

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

  158  MADD Wisconsin Chapter                    61        0        61

ITEMS REDUCED FROM INVENTORY:                      :

STOCK ID    STOCK ITEM       DESCRIPTION                    REM QUANTITY

   224    M894E-R        MADD #7 Reply Envelopes               1559398
   272    M395DP         MADD Dot Matrix Invoice               -736485
   375    M195E2-6       MADD 2-6 Mailing Envelope             1693818
   377    M893L3         3,4,5 Letter of Month                  640101
   865    M195END2-6     MADD 2-6 Entrees Dear Dn w/Ds          254862

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other          _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other          _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material     _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights      [ ] Correct        [ ] Incorrect
   Dollar Amount [ ] Correct       [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

Job Number: 116677
Postage Type: THIRD CLASS

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME

OUTREACH DONOR LIST TOTAL QTY

157  MADD Washington Chapter                 32           0           32

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1560832 |
| 272 | M395DP | MADD Dot Matrix Invoice | -735054 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1695252 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254924 |

---

COMPUTER DEPARTMENT:  _ _ _ (Initials)
 [ ] Bad Cards
 [ ] Bad Forms
 [ ] Other            _____

BURSTING DEPARTMENT:  _ _ _ (Initials)
 ow many were ruined in bursting, if excessive : _____
 [ ] Out of Sequence Forms
 [ ] Missing Forms
 [ ] Printed Badly
 [ ] Zip Register Doesn't Match Job
 [ ] Other            _____

INSERTER/COOKBOOK PACKAGING:  _ _ _ (Initials)
 How many were ruined by you : _____
 [ ] Zips Out of Order
 [ ] Bad Material     _____
 [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____      [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION:
POST OFFICE DELIVERY: _ _ _ (Initials)
 Weights      [ ] Correct         [ ] Incorrect
 Dollar Amount [ ] Correct        [ ] Incorrect

 Did you have to repack sacks ?  _____ (Quantity of sacks)

---

```
DATE ISSUED: 24-Jun-1995 13:27:30                          QTY    RATE
   Job Number: 116674                                      ----------
Postage Type: THIRD CLASS

       Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

 ORG ID  ORGANIZATION NAME            OUTREACH DONOR LIST TOTAL QTY

   156  MADD Virginia Chapter            85         0         85
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1561280 |
| 272 | M395DP | MADD Dot Matrix Invoice | -734606 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1695700 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 254956 |

```
COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other _____

 IRSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _QD_ _ (Initials)
   Weights      [ ] Correct    [ ] Incorrect
   Dollar Amount [ ] Correct   [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)
```

```
DATE ISSUED: 24-Jun-1995 13:26:01                          QTY    RATE
   Job Number: 116669                                      ----------
Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                 OUTREACH DONOR LIST TOTAL QTY

  155  MADD Utah Chapter                    104       0        104
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1562560 |
| 272 | M395DP | MADD Dot Matrix Invoice | -733326 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1696980 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 255216 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other      _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other      _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material      _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____    [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _Q_ _  (Initials)
  Weights       [ ] Correct          [ ] Incorrect
  Dollar Amount [ ] Correct          [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

Job Number: 116665
Postage Type: THIRD CLASS

QTY      RATE
- - - - - - - - - - -

Kit ID: 387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 154 | MADD Texas Chapter | 41 | 0 | 41 |

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1562800 |
| 272 | M395DP | MADD Dot Matrix Invoice | -733086 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1697220 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 255320 |

COMPUTER DEPARTMENT: _ _ _ (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other _____

BURSTING DEPARTMENT: _ _ _ (Initials)
  How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other _____

INSERTER/COOKBOOK PACKAGING: _ _ _ (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _ (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

```
DATE ISSUED: 24-Jun-1995 13:14:38                              QTY    RATE
   Job Number: 116660                                         ----------
Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                 OUTREACH DONOR LIST TOTAL QTY

   153  MADD Tennessee Chapter                 56         0          56
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1564209 |
| 272 | M395DP | MADD Dot Matrix Invoice | -731677 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1698629 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 255603 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other        _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other        _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material    _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights        [ ] Correct      [ ] Incorrect
  Dollar Amount  [ ] Correct      [ ] Incorrect

  Did you have to repack sacks ?  _____  (Quantity of sacks)

DATE ISSUED: 24-Jun-1995 13:13:41
Job Number: 116655
Postage Type: THIRD CLASS

QTY    RATE
-----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME

OUTREACH DONOR LIST TOTAL QTY

147  MADD South Dakota Chapter                    13            0              13

---

ITEMS REDUCED FROM INVENTORY:                         :

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1564799 |
| 272 | M395DP | MADD Dot Matrix Invoice | -731087 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1699219 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 255674 |

---

COMPUTER DEPARTMENT: _ _ _ (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other  _____

BURSTING DEPARTMENT: _ _ _ (Initials)
ow many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other  _____

INSERTER/COOKBOOK PACKAGING: _ _ _ (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material  _____
[ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME:_____  [ ] PASSED  [ ] FAILED :
COMMENTS/ACTION:_____
POST OFFICE DELIVERY: _ _ _ (Initials)
Weights        [ ] Correct        [ ] Incorrect
Dollar Amount  [ ] Correct        [ ] Incorrect

Did you have to repack sacks ? _____ (Quantity of sacks)

```
DATE ISSUED: 24-Jun-1995 13:09:45                        QTY     RATE
  Job Number: 116651                                     ----------
Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                   OUTREACH DONOR LIST TOTAL QTY

  146  MADD South Carolina Chapter             362         0        362
                                                                     47
                                                                    ____
                                                                    265
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1564854 |
| 272 | M395DP | MADD Dot Matrix Invoice | -731032 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1699274 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 255687 |

```
COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other    _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
  How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other    _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material     _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights      [ ] Correct          [ ] Incorrect
  Dollar Amount [ ] Correct         [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)
```

```
DATE ISSUED: 24-jun-1995 12:48:47                          QTY    RATE
 Job Number: 116643                                        ----------
Postage Type: THIRD CLASS
```

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

  140   MADD Pennsylvania Chapter                 93          0         93


ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1566497 |
| 272 | M395DP | MADD Dot Matrix Invoice | -729389 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1700917 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 256164 |


COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other          _____

 ?STING DEPARTMENT:  _ _ _  (Initials)
  w many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other          _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material     _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME:_____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION:_____
POST OFFICE DELIVERY: _O_ _  (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

```
DATE ISSUED: 24-Jun-1995 12:42:06                        QTY    RATE
   Job Number: 116636                                  -----------
Postage Type: THIRD CLASS

         Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                  OUTREACH DONOR LIST TOTAL QTY

   138  MADD Oklahoma Chapter                  180        0        180
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1570434 |
| 272 | M395DP | MADD Dot Matrix Invoice | -725452 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1704854 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 257243 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
   ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
   How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _O_ _ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

DATE ISSUED: 24-Jun-1995 12:26:06
Job Number: 116632
Postage Type: THIRD CLASS

QTY    RATE
----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME

137   MADD Ohio Chapter

| OUTREACH | DONOR LIST | TOTAL QTY |
|----------|-----------|-----------|
| 187 | 0 | 187 |

ITEMS REDUCED FROM INVENTORY:                    :

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1570832 |
| 272 | M395DP | MADD Dot Matrix Invoice | -725054 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1705252 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 257423 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other _____

‾‾RSTING DEPARTMENT:  _ _ _  (Initials)
   ‾w many were ruined in bursting, if excessive : _____
   . ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____    [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights       [ ] Correct      [ ] Incorrect
   Dollar Amount [ ] Correct      [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

```
      DATE ISSUED: 24-jun-1995 12:13:39
      Job Number: 116627                                        QTY     RATE
    Postage Type: THIRD CLASS                                  ----------
```

              Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME
                                               OUTREACH DONOR LIST  TOTAL QTY
    136   MADD New York Chapter                   179        0        179

_____

ITEMS REDUCED FROM INVENTORY:

STOCK ID     STOCK ITEM        DESCRIPTION                 REM QUANTITY

      224    M894E-R           MADD #7 Reply Envelopes          1573497
      272    M395DP            MADD Dot Matrix Invoice          -722395
      375    M195E2-6          MADD 2-6 Mailing Envelope        1707917
      377    M893L3            3,4,5 Letter of Month             640101
      865    M195END2-6        MADD 2-6 Entrees Dear Dn w/Ds     258129

_____

COMPUTER DEPARTMENT:   _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other      _____

BURSTING DEPARTMENT:   _ _ _  (Initials)
   how many were ruined in bursting, if excessive :  _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other      _____

INSERTER/COOKBOOK PACKAGING:   _ _ _  (Initials)
   How many were ruined by you :  _____
   [ ] Zips Out of Order
   [ ] Bad Material    _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ?  _____  (Quantity of sacks)
```

_____

```
DATE ISSUED: 24-Jun-1995 12:01:32
  Job Number: 116618                                    QTY    RATE
Postage Type: THIRD CLASS                              ---------
```

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME
                                         OUTREACH DONOR LIST TOTAL QTY
 134   MADD New Jersey Chapter
                                             52        0         52

---

ITEMS REDUCED FROM INVENTORY:                   :

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1576270 |
| 272 | M395DP | MADD Dot Matrix Invoice | -719622 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1710690 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 258346 |

---

COMPUTER DEPARTMENT:  _ _ _ (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other          _____

BURSTING DEPARTMENT:  _ _ _ (Initials)
  How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other          _____

INSERTER/COOKBOOK PACKAGING:  _ _ _ (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____     [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: ____ (Initials)
  Weights          [ ] Correct        [ ] Incorrect
  Dollar Amount    [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

```
DATE ISSUED: 24-jun-1995 11:59:33                            QTY    RATE
Job Number: 116612                                        -----------
Postage Type: THIRD CLASS
```

Kit ID: 387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|-----------|-----------|
| 133 | MADD Nebraska Chapter | 29 | 0 | 29 |

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1578439 |
| 272 | M395DP | MADD Dot Matrix Invoice | -717453 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1712859 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 258677 |

---

COMPUTER DEPARTMENT: _ _ _ (Initials)
    [ ] Bad Cards
    [ ] Bad Forms
    [ ] Other        _____

BURSTING DEPARTMENT: _ _ _ (Initials)
ow many were ruined in bursting, if excessive : _____
    [ ] Out of Sequence Forms
    [ ] Missing Forms
    [ ] Printed Badly
    [ ] Zip Register Doesn't Match Job
    [ ] Other        _____

INSERTER/COOKBOOK PACKAGING: _ _ _ (Initials)
 How many were ruined by you : _____
    [ ] Zips Out of Order
    [ ] Bad Material    _____
    [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____    [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _ (Initials)
    Weights        [ ] Correct        [ ] Incorrect
    Dollar Amount  [ ] Correct        [ ] Incorrect

    Did you have to repack sacks ? _____ (Quantity of sacks)

---

DATE ISSUED: 24-jun-1995 11:53:42                         QTY    RATE
Job Number: 116606                                        ----------
Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

  132  MADD North Carolina Chapter               91          0         91

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|------------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1578739 |
| 272 | M395DP | MADD Dot Matrix Invoice | -717153 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1713159 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 258708 |

---

COMPUTER DEPARTMENT:  _ _ _ (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other         _____

RSTING DEPARTMENT:  _ _ _ (Initials)
  )w many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other         _____

INSERTER/COOKBOOK PACKAGING:  _ _ _ (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material    _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: AD _ (Initials)
  Weights       [ ] Correct      [ ] Incorrect
  Dollar Amount [ ] Correct      [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

---

```
DATE ISSUED: 24-Jun-1995 11:52:34                      QTY    RATE
   Job Number: 116601                                -----------
   Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

 ORG ID   ORGANIZATION NAME                OUTREACH DONOR LIST TOTAL QTY

   129  MADD Mississippi Chapter              4          0         4
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1579917 |
| 272 | M395DP | MADD Dot Matrix Invoice | -715975 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1714337 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 258979 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other       _____

 BURSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other       _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material     _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights       [ ] Correct      [ ] Incorrect
   Dollar Amount [ ] Correct      [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

```
DATE ISSUED: 24-Jun-1995 11:49:02                                    QTY    RATE
   Job Number: 116596                                              -----------
   Postage Type: THIRD CLASS

        Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                     OUTREACH DONOR LIST TOTAL QTY

  128  MADD Missouri Chapter                       9          0          9
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1580001 |
| 272 | M395DP | MADD Dot Matrix Invoice | -715891 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1714421 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 259019 |

```
COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other          _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
   ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other          _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
  How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material     _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _____  (Initials)
   Weights       [ ] Correct         [ ] Incorrect
   Dollar Amount [ ] Correct         [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)
```

```
DATE ISSUED: 24-Jun-1995 11:37:13                              QTY    RATE
  Job Number: 116591                                          ----------
Postage Type: THIRD CLASS
```

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 127 | MADD Minnesota Chapter | 57 | 0 | 57 |

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|------------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1580672 |
| 272 | M395DP | MADD Dot Matrix Invoice | -715220 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1715092 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 259051 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other    _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
   How many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other    _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
  How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material    _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED  [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ? _____  (Quantity of sacks)

DATE ISSUED: 24-Jun-1995 11:07:05
Job Number: 116580                                                    QTY      RATE
Postage Type: THIRD CLASS                                          -----------

          Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                        OUTREACH DONOR LIST TOTAL QTY

  125  MADD Maryland Chapter                         9          0          9

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|------------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1586710 |
| 272 | M395DP | MADD Dot Matrix Invoice | -709183 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1721130 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260032 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
    [ ] Bad Cards
    [ ] Bad Forms
    [ ] Other    _____

 BURSTING DEPARTMENT:  _ _ _  (Initials)
  w many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other    _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material    _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights       [ ] Correct        [ ] Incorrect
   Dollar Amount [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)

---

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 124 | MADD Massachusetts Chapter | 23 | 0 | 23 |

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1589438 |
| 272 | M395DP | MADD Dot Matrix Invoice | -706455 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1723858 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260107 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
 [ ] Bad Cards
 [ ] Bad Forms
 [ ] Other      _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 ow many were ruined in bursting, if excessive : _____
 [ ] Out of Sequence Forms
 [ ] Missing Forms
 [ ] Printed Badly
 [ ] Zip Register Doesn't Match Job
 [ ] Other      _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
 [ ] Zips Out of Order
 [ ] Bad Material          _____
 [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _____  (Initials)
 Weights      [ ] Correct       [ ] Incorrect
 Dollar Amount [ ] Correct       [ ] Incorrect

 Did you have to repack sacks ? _____ (Quantity of sacks)

---

Job Number: 116570
Postage Type: THIRD CLASS

QTY    RATE
----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME

OUTREACH DONOR LIST TOTAL QTY

  122   MADD Louisiana Chapter

                              12        0        12

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1592412 |
| 272 | M395DP | MADD Dot Matrix Invoice | -703481 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1726832 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260488 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
  How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

---

```
                                                                         QTY    RATE
        Job Number: 116566                                              ----------
        Postage Type: THIRD CLASS

            Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

  ORG ID  ORGANIZATION NAME                      OUTREACH DONOR LIST TOTAL QTY

    120  MADD Kentucky Chapter                      57         0          57
```

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1593138 |
| 272 | M395DP | MADD Dot Matrix Invoice | -702755 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1727558 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260501 |

```
COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other     _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
   ow many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other     _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
   How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material     _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ? _____ (Quantity of sacks)
```

Job Number: 116558
Postage Type: THIRD CLASS

QTY    RATE
----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME

OUTREACH  DONOR LIST  TOTAL QTY

118  MADD Indiana Chapter            155         0         155

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1594345 |
| 272 | M395DP | MADD Dot Matrix Invoice | -701548 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1728765 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260647 |

---

COMPUTER DEPARTMENT: _ _ _ (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other  _____

BURSTING DEPARTMENT: _ _ _ (Initials)
How many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other  _____

INSERTER/COOKBOOK PACKAGING: _ _ _ (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material  _____
[ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED  [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _ (Initials)
Weights        [ ] Correct       [ ] Incorrect
Dollar Amount  [ ] Correct       [ ] Incorrect

Did you have to repack sacks ? _____ (Quantity of sacks)

---

Job Number: 116553
Postage Type: THIRD CLASS
- - - - - - - - - -

Kit ID: 387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME

OUTREACH DONOR LIST TOTAL QTY

117  MADD Illinois Chapter

| | OUTREACH | DONOR LIST | TOTAL QTY |
|---|---|---|---|
| 117 MADD Illinois Chapter | 303 | 0 | 303 |

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1595503 |
| 272 | M395DP | MADD Dot Matrix Invoice | -700391 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1729923 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 260861 |

COMPUTER DEPARTMENT: _ _ _ (Initials)
 [ ] Bad Cards
 [ ] Bad Forms
 [ ] Other _____

BURSTING DEPARTMENT: _ _ _ (Initials)
 ow many were ruined in bursting, if excessive : _____
 [ ] Out of Sequence Forms
 [ ] Missing Forms
 [ ] Printed Badly
 [ ] Zip Register Doesn't Match Job
 [ ] Other _____

INSERTER/COOKBOOK PACKAGING: _ _ _ (Initials)
 How many were ruined by you : _____
 [ ] Zips Out of Order
 [ ] Bad Material _____
 [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____ [ ] PASSED [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _____ (Initials)
 Weights      [ ] Correct      [ ] Incorrect
 Dollar Amount [ ] Correct     [ ] Incorrect

 Did you have to repack sacks ? _____ (Quantity of sacks)

Job Number: 116544
Postage Type: THIRD CLASS
----------

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID  ORGANIZATION NAME                        OUTREACH DONOR LIST TOTAL QTY

115  MADD Georgia Chapter                          57         0        57

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1599940 |
| 272 | M395DP | MADD Dot Matrix Invoice | -695954 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1734360 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 261362 |

COMPUTER DEPARTMENT:  _ _ _ (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other          _____

BURSTING DEPARTMENT:  _ _ _ (Initials)
  'ow many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other          _____

INSERTER/COOKBOOK PACKAGING:  _ _ _ (Initials)
  How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material    _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED  [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _AD_ _ (Initials)
  Weights       [ ] Correct     [ ] Incorrect
  Dollar Amount [ ] Correct     [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

Job Number: 116538
Postage Type: THIRD CLASS

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST  TOTAL QTY

  114   MADD Florida Chapter                     57        0          57

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|---|---|---|---|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1601015 |
| 272 | M395DP | MADD Dot Matrix Invoice | -694879 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1735435 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 261605 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other       _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other       _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material      _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights       [ ] Correct          [ ] Incorrect
  Dollar Amount [ ] Correct          [ ] Incorrect

  Did you have to repack sacks ?  _____  (Quantity of sacks)

```
         Job Number: 116533
      Postage Type: THIRD CLASS

         Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)
```

ORG ID   ORGANIZATION NAME                    OUTREACH DONOR LIST TOTAL QTY

   113   MADD Delaware Chapter                     7           0         7

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1602487 |
| 272 | M395DP | MADD Dot Matrix Invoice | -693410 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1736907 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 261772 |

---

COMPUTER DEPARTMENT:   _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other   _____

BURSTING DEPARTMENT:   _ _ _  (Initials)
How many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other   _____

INSERTER/COOKBOOK PACKAGING:   _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material   _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____   [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _O_ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ? _____  (Quantity of sacks)

---

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 108 | MADD Connecticut Chapter | 39 | 0 | 39 |

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|------------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1603151 |
| 272 | M395DP | MADD Dot Matrix Invoice | -692746 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1737571 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 261931 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
   [ ] Bad Cards
   [ ] Bad Forms
   [ ] Other      _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 How many were ruined in bursting, if excessive : _____
   [ ] Out of Sequence Forms
   [ ] Missing Forms
   [ ] Printed Badly
   [ ] Zip Register Doesn't Match Job
   [ ] Other      _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
   [ ] Zips Out of Order
   [ ] Bad Material      _____
   [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____      [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY:____ _ _  (Initials)
   Weights        [ ] Correct        [ ] Incorrect
   Dollar Amount  [ ] Correct        [ ] Incorrect

   Did you have to repack sacks ?  _____  (Quantity of sacks)

---

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|-----------|-----------|
| 107 | MADD Colorado Chapter | 28 | 0 | 28 |

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1606222 |
| 272 | M395DP | MADD Dot Matrix Invoice | -689675 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1740642 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 262126 |

COMPUTER DEPARTMENT:  _ _ _  (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
How many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material _____
[ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
Weights      [ ] Correct      [ ] Incorrect
Dollar Amount [ ] Correct      [ ] Incorrect

Did you have to repack sacks ? _____ (Quantity of sacks)

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 106 | MADD California Chapter | 12 | 0 | 12 |

---

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|-----------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1606904 |
| 272 | M395DP | MADD Dot Matrix Invoice | -688993 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1741324 |
| 377 | M893L3 | 3,4,5 Letter of Month | 640101 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 262253 |

---

COMPUTER DEPARTMENT:  _ _ _  (Initials)
  [ ] Bad Cards
  [ ] Bad Forms
  [ ] Other _____

BURSTING DEPARTMENT:  _ _ _  (Initials)
 How many were ruined in bursting, if excessive : _____
  [ ] Out of Sequence Forms
  [ ] Missing Forms
  [ ] Printed Badly
  [ ] Zip Register Doesn't Match Job
  [ ] Other _____

INSERTER/COOKBOOK PACKAGING:  _ _ _  (Initials)
 How many were ruined by you : _____
  [ ] Zips Out of Order
  [ ] Bad Material _____
  [ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____  [ ] PASSED   [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY: _ _ _  (Initials)
  Weights        [ ] Correct        [ ] Incorrect
  Dollar Amount  [ ] Correct        [ ] Incorrect

  Did you have to repack sacks ? _____ (Quantity of sacks)

---

QTY    RATE

Kit ID:  387 - MADD 3rd, 4th, 5th Bills (ACQUISITION)

| ORG ID | ORGANIZATION NAME | OUTREACH | DONOR LIST | TOTAL QTY |
|--------|-------------------|----------|------------|-----------|
| 102 | MADD Alabama Chapter | 42 | 0 | 42 |

ITEMS REDUCED FROM INVENTORY:

| STOCK ID | STOCK ITEM | DESCRIPTION | REM QUANTITY |
|----------|------------|-------------|--------------|
| 224 | M894E-R | MADD #7 Reply Envelopes | 1610684 |
| 272 | M395DP | MADD Dot Matrix Invoice | -685217 |
| 375 | M195E2-6 | MADD 2-6 Mailing Envelope | 1745104 |
| 377 | M893L3 | 3,4,5 Letter of Month | 641051 |
| 865 | M195END2-6 | MADD 2-6 Entrees Dear Dn w/Ds | 263065 |

COMPUTER DEPARTMENT:  _ _ _ (Initials)
[ ] Bad Cards
[ ] Bad Forms
[ ] Other        _____

BURSTING DEPARTMENT:  _ _ _ (Initials)
How many were ruined in bursting, if excessive : _____
[ ] Out of Sequence Forms
[ ] Missing Forms
[ ] Printed Badly
[ ] Zip Register Doesn't Match Job
[ ] Other        _____

INSERTER/COOKBOOK PACKAGING:  _ _ _ (Initials)
How many were ruined by you : _____
[ ] Zips Out of Order
[ ] Bad Material        _____
[ ] Excess Consumption_____

INSPECTION BEFORE MAILING:

NAME: _____    [ ] PASSED    [ ] FAILED :
COMMENTS/ACTION: _____
POST OFFICE DELIVERY:__ _ _ (Initials)
Weights        [ ] Correct        [ ] Incorrect
Dollar Amount  [ ] Correct        [ ] Incorrect

Did you have to repack sacks ? _____ (Quantity of sacks)

SOLICITATION
FINANCIAL REPORT

EXHIBIT 4

Solicitor:      Reese Brothers, Inc.
Campaign Dates: 01/01/94 to 12/31/94
Non-Profit:     Mothers Against Drunk Driving      (Alaska Chapter)

| RB Charges | Outreach | Donor List | Totals | | |
|---|---|---|---|---|---|
| Telecommunicating Service | $36,146.34 | $13,948.80 | $50,095.14 | | |
| | | | | Telecommunicating: | $50,095.14 |
| 1 Initial Invoice Inventory | $1,045.78 | $719.63 | $1,765.41 | | |
| 2 Second Invoice Inventory | $319.80 | $694.04 | $1,013.84 | | |
| 2nd Half of 1st Inv Inventory | $920.76 | $29.49 | $950.25 | | |
| 3 Third Invoice Inventory | $200.82 | $75.79 | $276.61 | | |
| 4 Fourth Invoice Inventory | $175.14 | $40.32 | $215.46 | | |
| 5 Fifth Invoice Inventory | $247.56 | $34.95 | $282.51 | | |
| 6 Sixth Invoice Inventory | $579.09 | $25.77 | $604.86 | | |
| | | | | Information Packets: | $5,108.94 |
| Payment Processing Service | $48.65 | $43.77 | $92.42 | | |
| Pledge Processing Service | $405.72 | $288.63 | $694.35 | | |
| | | | | Data Processing: | $786.77 |
| | $40,089.66 | $15,901.19 | $55,990.85 | | |
| | | | | | $55,990.85 |

| Other Costs | Outreach | Donor List | Totals | | |
|---|---|---|---|---|---|
| 1 Initial Invoice Postage | $1,369.60 | $942.87 | $2,312.47 | | |
| Second Invoice Postage | $654.82 | $663.60 | $1,318.42 | | |
| 1d Half of 1st Inv Postage | $366.17 | $28.42 | $394.59 | | |
| 3 Third Invoice Postage | $153.15 | $58.54 | $211.69 | | |
| 4 Fourth Invoice Postage | $144.48 | $30.78 | $175.26 | | |
| 5 Fifth Invoice Postage | $212.24 | $25.88 | $238.12 | | |
| 6 Sixth Invoice Postage | $497.30 | $23.37 | $520.67 | | |
| | | | | Postage: | $5,171.22 |
| Premium Full Inventory | $892.78 | $204.07 | $1,096.85 | | |
| Premium Full Postage | $429.73 | $82.87 | $512.60 | | |
| Premium Half Inventory | $241.89 | $74.35 | $316.24 | | |
| Premium Half Postage | $117.23 | $32.24 | $149.47 | | |
| | | | | Premiums: | $2,075.16 |
| Caging Service | $209.85 | $197.31 | $407.16 | | |
| | | | | Caging: | $407.16 |
| | $5,289.24 | $2,364.30 | $7,653.54 | | |
| | | | | | $7,653.54 |

Contract Summary
------------------------------

Total RB Charges:
Total Non-Profit Charges:

Total Income:
Total Billable:
Total Payments:

| | | |
|---|---|---|
| Gross Income: | | $78,107.23 |
| Total Expense: | | $63,644.39 |
| $55,990.85 | | |
| $7,653.54 | Charity Net: | $14,462.84 |
| $78,107.23 | | |
| $55,990.85 | | |
| $48,712.02 | | |

FINANCIAL REPORT

Solicitor:       Reese Brothers, Inc.
Campaign Dates:  01/01/94 to 12/31/94
Non-Profit:      Mothers Against Drunk Driving     (Wyoming Chapter)

| RB Charges | Outreach | Donor List | Totals | | |
|---|---|---|---|---|---|
| Telecommunicating Service | $34,506.10 | $15,970.43 | $50,476.53 | Telecommunicating: | $50,476.53 |
| 1 Initial Invoice Inventory | $1,586.48 | $801.96 | $2,388.44 | | |
| 2 Second Invoice Inventory | $428.74 | $246.62 | $675.36 | | |
| 2nd Half of 1st Inv Inventory | $929.18 | $17.17 | $946.35 | | |
| 3 Third Invoice Inventory | $261.83 | $101.36 | $363.19 | | |
| 4 Fourth Invoice Inventory | $247.41 | $105.24 | $352.65 | | |
| 5 Fifth Invoice Inventory | $234.68 | $48.15 | $282.83 | | |
| 6 Sixth Invoice Inventory | $219.15 | $41.64 | $260.79 | | |
| Payment Processing Service | $53.79 | $60.37 | $114.16 | Information Packets: | $5,269.61 |
| Pledge Processing Service | $453.25 | $330.52 | $783.77 | | |
| | $38,920.61 | $17,723.46 | $56,644.07 | Data Processing: | $897.93 |
| | | | | | $56,644.07 |

| Other Costs | Outreach | Donor List | Totals | | |
|---|---|---|---|---|---|
| 1 Initial Invoice Postage | $1,544.44 | $1,089.74 | $2,634.18 | | |
| Second Invoice Postage | $802.59 | $410.10 | $1,212.69 | | |
| 2nd Half of 1st Inv Postage | $373.23 | $16.53 | $389.76 | | |
| 3 Third Invoice Postage | $206.90 | $85.98 | $292.88 | | |
| 4 Fourth Invoice Postage | $185.15 | $87.50 | $272.65 | | |
| 5 Fifth Invoice Postage | $189.25 | $38.79 | $228.04 | | |
| 6 Sixth Invoice Postage | $182.29 | $34.04 | $216.33 | | |
| Premium Full Inventory | $575.03 | $539.10 | $1,114.13 | Postage: | $5,246.53 |
| Premium Full Postage | $273.22 | $220.67 | $493.89 | | |
| Premium Half Inventory | $380.75 | $406.76 | $787.51 | | |
| Premium Half Postage | $172.79 | $178.22 | $351.01 | | |
| Caging Service | $231.74 | $271.75 | $503.49 | Premiums: | $2,746.54 |
| | | | | Caging: | $503.49 |
| | $5,117.38 | $3,379.18 | $8,496.56 | | $8,496.56 |

Contract Summary
--------------------------------

Total RB Charges:
Total Non-Profit Charges:

Total Income:
Total Billable:
Total Payments:

Gross Income:     $87,957.00
Total Expense:    $65,140.63

$56,644.07
$8,496.56   Charity Net:   $22,816.37

$87,957.00
$56,644.07
$55,048.87

DONOR LIST HISTORY of INCOME Deposited for
Hawaii Chapter

| Date | Total for Month |
| --- | --- |
| 30 Jun 1996 | 6374.00 |
| 31 May 1996 | 7173.28 |
| 30 Apr 1996 | 7035.00 |
| 31 Mar 1996 | 7215.00 |
| 1 Mar 1996 | 8602.00 |
| 1 Feb 1996 | 13168.00 |
| 1 Jan 1996 | 20276.00 |
| 1 Dec 1995 | 10430.24 |
| 1 Nov 1995 | 2462.00 |
| 30 Sep 1995 | 3616.68 |
| 31 Aug 1995 | 3715.00 |
| 31 Jul 1995 | 13311.50 |
| 30 Jun 1995 | 10372.00 |
| 31 May 1995 | 11188.00 |
| 30 Apr 1995 | 7733.00 |
| 31 Mar 1995 | 8398.50 |
| 1 Mar 1995 | 5904.50 |
| 1 Feb 1995 | 10695.50 |
| 1 Jan 1995 | 22635.00 |
| 1 Dec 1994 | 23671.50 |
| 1 Nov 1994 | 3340.50 |
| 30 Sep 1994 | 5811.00 |
| 31 Aug 1994 | 8943.00 |
| 31 Jul 1994 | 7927.50 |
| 30 Jun 1994 | 28136.06 |
| 31 May 1994 | 16413.88 |
| 30 Apr 1994 | 3420.00 |
| 31 Mar 1994 | 5808.00 |
| 1 Mar 1994 | 3770.00 |
| 1 Feb 1994 | 10263.36 |
| 1 Jan 1994 | 22577.31 |
| 1 Dec 1993 | 19354.00 |
| 1 Nov 1993 | 36421.46 |
| 30 Sep 1993 | 24940.00 |
| 31 Aug 1993 | 25.00 |
| 1 Apr 1993 | 30.00 |
| 1 Feb 1993 | 10.00 |
| 1 Dec 1992 | 45.00 |
| 1 Nov 1992 | 20.00 |

Total Income to Date :       $      401232.77

DONOR LIST HISTORY of PAYMENTS to Reese Brothers for
Hawaii Chapter

| Date | Payment Amount |
| --- | --- |
| 21 May 1996 | 1470.60 |
| 30 Apr 1996 | 4415.89 |
| 28 Mar 1996 | 6117.00 |
| 29 Feb 1996 | 8500.78 |
| 31 Jan 1996 | 6365.51 |
| 19 Dec 1995 | 10512.32 |
| 21 Nov 1995 | 2919.77 |
| 31 Aug 1995 | 2105.13 |
| 31 Jul 1995 | 7513.31 |
| 21 Jun 1995 | 3315.27 |
| 30 Apr 1995 | 4366.60 |
| 3 Mar 1995 | 2747.59 |
| 21 Feb 1995 | 298.24 |
| 24 Jan 1995 | 13803.69 |
| 15 Dec 1994 | 5304.24 |
| 30 Nov 1994 | 6478.56 |
| 27 Oct 1994 | 642.67 |
| 20 Sep 1994 | 240.34 |
| 12 Aug 1994 | 4904.91 |
| 15 Jul 1994 | 2192.34 |
| 22 Jun 1994 | 15165.25 |
| 20 May 1994 | 1183.21 |
| 21 Apr 1994 | 1925.40 |
| 25 Mar 1994 | 1198.70 |
| 16 Feb 1994 | 374.74 |
| 26 Jan 1994 | 14530.43 |
| 30 Nov 1993 | 17468.48 |
| 31 Oct 1993 | 9664.20 |
| 30 Sep 1993 | 10.76 |
| 27 Aug 1993 | 41.71 |
| 28 Jun 1993 | 0.11 |
| 28 May 1993 | 0.11 |
| 30 Apr 1993 | 0.24 |
| 30 Mar 1993 | 0.31 |
| 28 Feb 1993 | 0.11 |
| 31 Jan 1993 | 0.22 |
| 24 Dec 1992 | 0.22 |
| 30 Nov 1992 | 0.33 |
| 31 Oct 1992 | 0.00 |

Total Payments to Date :        $      155779.29

    (BillID 2899)    MADD Current Master Agreement DONOR LIST    Page: 894

Hawaii Chapter

DONOR LIST Cost Summary for period  1 Jun 1996 to 30 Jun 1996

Total Reese Brothers Charges :          $     523.94

Total Other MADD Costs        :          $     308.02

Total All Charges and Costs  :                     $     831.96

Total Income                  :          $    6374.00


DONOR LIST Cost Analysis through 30 Jun 1996


Contract to Date Summary
-----------------------------------

Total RB Charges      : $ 158237.77
Total MADD Costs      : $  28259.45

Total Charges and Costs :          $ 186497.22
Total Income            :          $ 401232.77
Costs/Income Ratio      :              46.48

Reese Brothers has met the guaranteed cost percentage of  50.00
Reese Brothers charges are due in full.

| Total Billable | : | $ 158237.77 |
| Prior Payments | : | $ 155779.29 |
| --- | --- | --- |
| Net Due | : | $    2458.48 |

MADD Bill Summary
Period Ending : 30 Jun 1996

| Organization | Reese Brothers Charges This Month | Other MADD Costs This Month | Total Charges/Costs This Month | Income To MADD This Month | Payments To Reese This Month | Net Currently Due |
|---|---|---|---|---|---|---|
| Alabama Chapter | 695.95 | 411.69 | 1107.64 | 7858.00 | 0.00 | 7568.02 |
| Arizona Chapter | 471.44 | 542.50 | 1013.94 | 14482.00 | 0.00 | 3346.23 |
| Arkansas Chapter | 820.39 | 316.55 | 1136.94 | 5725.00 | 0.00 | 2206.02 |
| California Chapter | 10524.29 | 3571.29 | 14095.58 | 64931.00 | 0.00 | 25229.78 |
| Colorado Chapter | 907.79 | 651.67 | 1559.46 | 14493.00 | 0.00 | 4613.66 |
| Connecticut Chapter | 2789.41 | 2630.71 | 5420.12 | 36238.00 | 0.00 | 16505.29 |
| Delaware Chapter | 1053.93 | 427.07 | 1481.00 | 6990.00 | 0.00 | 2463.89 |
| District of Columbia Chapter | 490.18 | 111.92 | 602.10 | 2275.00 | 0.00 | 828.90 |
| Florida Chapter | 1288.07 | 689.26 | 1977.33 | 17191.00 | 0.00 | 29536.20 |
| Georgia Chapter | 1562.71 | 1487.47 | 3050.18 | 43292.00 | 0.00 | 11471.41 |
| Hawaii Chapter | 523.94 | 308.02 | 831.96 | 6374.00 | 0.00 | 2458.48 |
| Idaho Chapter | 182.96 | 317.99 | 500.95 | 7570.00 | 0.00 | 1826.45 |
| Illinois Chapter | 10094.49 | 4086.01 | 14180.50 | 59394.00 | 0.00 | 32312.48 |
| Indiana Chapter | 2796.07 | 1698.06 | 4494.13 | 28696.00 | 0.00 | 10128.14 |
| Iowa Chapter | 96.21 | 104.83 | 201.04 | 449.00 | 0.00 | 512.29 |
| Kansas Chapter | 736.39 | 794.09 | 1530.48 | 11199.00 | 0.00 | 4770.83 |
| Kentucky Chapter | 876.25 | 934.65 | 1810.90 | 16177.00 | 0.00 | 6211.89 |
| Louisiana Chapter | 2016.41 | 917.01 | 2933.45 | 15554.00 | 0.00 | 6310.67 |
| MADD National | 83877.89 | 169.45 | 84047.34 | 21153.67 | 0.00 | 55747.20 |
| Maryland Chapter | 2453.81 | 2482.89 | 4936.70 | 42219.00 | 0.00 | 13729.46 |
| Massachusetts Chapter | 4117.39 | 3584.59 | 7701.98 | 65419.50 | 0.00 | 21479.60 |
| Michigan Chapter | 6719.80 | 5175.65 | 11895.45 | 88523.25 | 0.00 | 36316.09 |
| Minnesota Chapter | 5497.58 | 3660.54 | 9158.12 | 62722.50 | 0.00 | 21428.22 |
| Mississippi Chapter | 1227.56 | 468.52 | 1696.08 | 7677.00 | 0.00 | 3058.46 |
| Missouri Chapter | 3097.82 | 1568.85 | 4666.67 | 26223.00 | 0.00 | 11530.70 |
| Nebraska Chapter | 724.61 | 712.85 | 1437.46 | 9800.00 | 0.00 | 3536.43 |
| Nevada Chapter | 0.33 | 0.41 | 0.74 | 10.00 | 0.00 | 0.42 |
| New Hampshire Chapter | 979.16 | 388.94 | 1368.10 | 7117.00 | 0.00 | 3599.46 |
| New Jersey Chapter | 3311.09 | 3127.93 | 6439.02 | 51026.50 | 0.00 | 22693.62 |
| New Mexico Chapter | 905.98 | 212.96 | 1118.94 | 3566.00 | 0.00 | 2592.72 |
| New York Chapter | 7484.52 | 4726.80 | 12211.32 | 98308.00 | 0.00 | 40756.10 |
| North Carolina Chapter | 2338.68 | 2123.68 | 4462.36 | 33688.50 | 0.00 | 12757.73 |
| Ohio Chapter | 7942.70 | 5068.93 | 13011.63 | 82302.00 | 0.00 | 33286.04 |
| Oklahoma Chapter | 676.74 | 528.29 | 1205.03 | 8373.00 | 0.00 | 4260.02 |
| Oregon Chapter | 2287.36 | 953.26 | 3240.62 | 21421.50 | 0.00 | 6623.65 |
| Pennsylvania Chapter | 5589.62 | 5032.15 | 10621.77 | 84228.32 | 0.00 | 31429.44 |
| Rhode Island Chapter | 1111.76 | 875.85 | 1987.61 | 14902.00 | 0.00 | 6184.31 |
| South Carolina Chapter | 1259.22 | 956.51 | 2215.73 | 18468.00 | 0.00 | 6459.78 |
| Tennessee Chapter | 846.05 | 836.12 | 1682.17 | 15453.00 | 0.00 | 5163.09 |
| Texas Chapter | 11209.96 | 3027.75 | 14237.71 | 42639.32 | 0.00 | 28627.51 |
| Utah Chapter | 727.67 | 326.90 | 1054.57 | 6203.00 | 0.00 | 5368.50 |
| Virginia Chapter | 2792.62 | 1883.11 | 4675.73 | 38777.00 | 0.00 | 11689.06 |
| Washington Chapter | 3537.11 | 1539.81 | 5076.92 | 32887.00 | 0.00 | 14214.78 |
| West Virginia Chapter | 624.42 | 353.94 | 978.36 | 5027.00 | 0.00 | 2984.49 |
| Wisconsin Chapter | 3331.48 | 1945.50 | 5276.98 | 37961.50 | 0.00 | 12727.09 |
| Wyoming Chapter | 247.64 | 153.87 | 401.51 | 2639.00 | 0.00 | 850.04 |
| Grand Totals : | $ 202847.48 | $ 71886.84 | $ 274734.32 | $1287623.56 | $ 0.00 | $ 587394.64 |

Exhibit 6    KO

**reesebrothers**

Thank You Letter Invoice, 10/3/95

| | 9/5/95 | 9/7/95 | 9/14/95 | 9/28/95 | TOTAL |
|---|---|---|---|---|---|
| Total Postage | $936.72 | $198.96 | $87.00 | $1,560.84 | $2,783.52 |
| Total Pieces | 7,806 | 1,658 | 725 | 13,007 | 23,196 |
| Average per Piece | $.120 | $.120 | $.120 | $.120 | $.120 |

Kit Cost $.244
Postage Cost $.120
TOTAL PER $.364

Amount Due: $8,443.36
Due Date

*Please pay from this invoice.*

**Quantity by State**

| | 9/5/95 | 9/7/95 | 9/14/95 | 9/28/95 | TOTAL | Total Cost |
|---|---|---|---|---|---|---|
| Alabama | 29 | 4 | 0 | 82 | 115 | $41.86 |
| Alaska | 14 | 0 | 0 | 0 | 14 | $5.10 |
| Arkansas | 16 | 14 | 21 | 142 | 193 | $70.25 |
| Arizona | 90 | 20 | 0 | 277 | 387 | $140.87 |
| California | 447 | 107 | 0 | 1,387 | 1,941 | $706.52 |
| Colorado | 126 | 0 | 37 | 138 | 301 | $109.56 |
| Connecticut | 200 | 48 | 0 | 377 | 625 | $227.50 |
| District of Columbia | 12 | 3 | 4 | 14 | 33 | $12.01 |
| Delaware | 21 | 12 | 6 | 108 | 147 | $53.51 |
| Florida | 170 | 43 | 0 | 98 | 311 | $113.20 |
| Georgia | 224 | 81 | 0 | 0 | 305 | $111.02 |
| Hawaii | 24 | 8 | 5 | 8 | 45 | $16.38 |
| Iowa | 72 | 8 | 0 | 25 | 105 | $38.22 |
| Idaho | 40 | 0 | 0 | 127 | 167 | $60.79 |
| Illinois | 414 | 0 | 72 | 243 | 729 | $265.36 |
| Indiana | 134 | 69 | 0 | 198 | 401 | $145.96 |
| Kansas | 89 | 21 | 0 | 187 | 297 | $108.11 |
| Kentucky | 109 | 0 | 32 | 47 | 188 | $68.43 |
| Louisiana | 59 | 12 | 0 | 341 | 412 | $149.97 |
| MADD National | 194 | 19 | 15 | 93 | 321 | $116.84 |
| Maine | 18 | 0 | 14 | 52 | 84 | $30.58 |
| Massachusetts | 496 | 93 | 0 | 3 | 592 | $215.49 |
| Maryland | 318 | 61 | 0 | 322 | 701 | $255.16 |
| Michigan | 561 | 129 | 0 | 279 | 969 | $352.72 |
| Minnesota | 265 | 53 | 58 | 807 | 1,183 | $430.61 |
| Mississippi | 27 | 5 | 0 | 82 | 114 | $41.50 |
| Missouri | 216 | 55 | 0 | 181 | 452 | $164.53 |
| Montana | 17 | 2 | 1 | 8 | 28 | $10.19 |
| North Carolina | 217 | 52 | 49 | 941 | 1,259 | $458.28 |
| Nebraska | 45 | 17 | 1 | 29 | 92 | $33.49 |
| New Hampshire | 9 | 6 | 0 | 11 | 26 | $9.46 |
| New Jersey | 284 | 54 | 0 | 356 | 694 | $252.62 |
| New Mexico | 35 | 11 | 0 | 27 | 73 | $26.57 |
| Nevada | 0 | 0 | 0 | 0 | 0 | $0.00 |
| New York | 330 | 126 | 128 | 1,216 | 1,800 | $655.20 |
| North Dakota | 15 | 2 | 1 | 64 | 82 | $29.85 |
| Ohio | 609 | 114 | 113 | 1,596 | 2,432 | $885.25 |
| Oklahoma | 36 | 15 | 0 | 89 | 140 | $50.96 |
| Oregon | 99 | 13 | 32 | 288 | 432 | $157.25 |
| Pennsylvania | 309 | 98 | 0 | 630 | 1,037 | $377.47 |
| Rhode Island | 75 | 11 | 0 | 203 | 289 | $105.20 |
| South Carolina | 121 | 34 | 28 | 317 | 500 | $182.00 |
| South Dakota | 54 | 0 | 45 | 122 | 221 | $80.44 |
| Tennessee | 163 | 0 | 0 | 0 | 163 | $59.33 |
| Texas | 276 | 80 | 0 | 204 | 560 | $203.84 |
| Utah | 29 | 15 | 0 | 100 | 144 | $52.42 |
| Vermont | 8 | 2 | 0 | 55 | 65 | $23.66 |
| Virginia | 381 | 61 | 0 | 212 | 654 | $238.06 |
| Washington | 94 | 32 | 29 | 259 | 414 | $150.70 |
| Wisconsin | 162 | 35 | 26 | 507 | 730 | $265.72 |
| West Virginia | 23 | 11 | 8 | 111 | 153 | $55.69 |
| Wyoming | 30 | 2 | 0 | 44 | 76 | $27.66 |
| Total | 7,806 | 1,658 | 725 | 13,007 | 23,196 | $8,443.36 |

NOV. 1 4 1996

CPR3519

THAN0995.XLS

DRUNK DRIVING

003519

| INVOICE NUMBER | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT | NET AMOUNT PAID |
|---|---|---|---|---|---|
| THANKYOU 4099-0 | 10/03/95 09/30/95 | 8,443.36 236.16 | 8,443.36 236.16 | 0.00 0.00 | 8,443.36 236.16 |

$8,679.52

Reese Brothers, Inc.
925 Penn Avenue, Sixth Floor
Pittsburgh, PA 15222-3883
412-355-0800  800-365-3500
Fax 800-365-3500 x265

# reesebrothers

*Ok 5925*

*NOV. 28 1995*

*F 518974*

Martha McKillop
MADD, Ohio State Office
471 E. Broad Street, Suite 1308
Columbus, OH 43215

## Invoice

Invoice Date: 10/30/95

Invoice Number: 3634

Date Shipped: 07/27/95

Item Ordered: Newsletter, 12 pages

Shipping Address
471 E. Broad Street, Suite 1308
Columbus, OH 43215

Format:  12" Tabloid - Fall 1995

| Qty | Description | Price | Total |
|---|---|---|---|
| | Black & White Photos | $15.00 | |
| | Color Separations (image area up to 4" x 5") | $50.00 | |
| | Color Separations (image area up to 5" x 7") | $60.00 | |
| | Line Art | $6.00 | |
| 1.00 | Author's Alterations per hour | $25.00 | $25.00 |
| 21,000 | 30# Newsprint | | $2,755.19 |
| 1,500 | Additional -30# Newsprint | | $60.20 |
| | Additional addresses or permits printed | $16.00 | |

| | |
|---|---|
| Sub-Total | $2,840.39 |
| Non Profit Bulk Postage | $2,330.65 |
| UPS Shipping | $18.70 |
| Truck Shipping | |
| Less Prior | |
| Balance | $5,189.74 |

## Instructions

1. Make checks payable to: Reese Brothers, Inc.
2. Enclose a copy of this invoice with payment.
For questions, call Karen Zovko in the Finance Department at extension 370.



Blue

_al Service_

**Mailing With Permit Imprints**
**s Mail (Nonprofit Rates Only)**

omplete all items by typewriter, pen, or indelible pencil. Prepare in duplicate if you need a receipt.

| | | |
|---|---|---|
| Office of Mailing  Pgh PA 15290 | Date 10-5-95 | Processing Category |

USPS Authorized Mailin

310 -

MADO

Newsl

Permit No. 1749

Mailing Statement Seq. No.

☐ Letters (DMM C050)
☐ Flats (DMM C050)
☐ Automation-Compatible Flats (DMM C820)
☐ Machinable Parcels (DMM C050)
☐ Irregular Parcels (DMM C050)
☐ Outside Parcels (DMM C050)

**Mailer's Information**

Permit Holder's Name & Address (Include ZIP Code)

Telephone Number 321-9449

Receipt No.

Reese Bros. Inc
935 Penn Ave
Pgh PA 15__

| No. Sacks 77 | No. Trays | No. Pallets | No. Other |
|---|---|---|---|

Auth. to use nonprofit rates? (DMM E370)*
☐ Yes    ☐ No

CTAS Cust. Ref. ID

Weight of a Single Piece    **0.0587**    pounds

Name & Address of Individual or Organization for Which Mailing Is Prepared (If other than the permit holder)

MADO Processing ctr
c/o 935 Penn Ave
Pgh PA 152__

| Total Pieces in Mailing  20,946 | Total Weight of Mailing  1,229.5302 |
|---|---|

Name and Address of Mailing Agent* (If other than the permit holder)

Sacking Based On (DMM
☐ 125 pcs.    ☐ 15 lb

Check All That Apply

☐ Centralized Postage P:
☐ Plant Loaded to
☐ Plant-Verified Drop Ship
☐ Entered at
☐ Orig. ☐ Dest. A / O ZIP
☐ Orig. ☐ Dest. SCF 3D
☐ Orig. ☐ Dest. BMC

Authorized to use nonprofit rates? (DMM E370)*
☑ Yes    ☐ No

**Postage Computation**

- For bulk mailings of **automation-compatible letter-size pieces** (see DMM C810), go to Part A on the reverse of this form.
- For bulk mailings of **non-automation compatible letter-size pieces** (see DMM C050) weighing .2149 lb. (3.4383 oz.) or less, go to Part B on the reverse of this form.
- For bulk mailings of **nonletter-size pieces** (see DMM C050) weighing .2149 lb. (3.4383 oz.) or less, go to Part C on the reverse of this form.
- For bulk mailings of **pieces weighing more than .2149 lb. (3.4383 oz.) but less than 1.0 lb. (16.0 oz.)**, go to Part D on the reverse of this form.

Postage (From Reverse Side) ▶

| Part A | $ |
|---|---|
| Part B | $ |
| Part C | $ |
| Part D | $ |

Additional Postage Payment (State reasons)
☐ Single-Piece Rate    ☐ Nonstandard Surcharge    ☐ Special Service (Specify)

| No. Pieces | Rate/Fee Per Pc. $ | = $ |
|---|---|---|

Is applicable bulk-per-piece rate affixed to each piece? (Form 3602-PC required)
☐ Yes    ☐ No

**Total Postage ⟶** $

**Certification**

*The signature of a mailer certifies that: (1) the mailing does not violate DMM E370; (2) only the mailer's matter is being mailed; (3) this is not a cooperati other persons or organizations that are not authorized to mail at special bulk third-class rates at this office; (4) this mailing has not been undertaken by behalf of or produced for another person or organization not authorized to mail at special bulk third-class rates at this office; (5) the mailing, if ma registration official, is required or authorized by the National Voter Registration Act of 1993; and (6) it will be liable for and agrees to pay, subject to appe by postal laws and regulations, any revenue deficiencies assessed on this mailing, whether due to a finding that the mailing is cooperative or for other re form is signed by an agent, the agent certifies that it is authorized to sign this statement, that the certification binds the agent and the nonprofit mailer, an nonprofit mailer and the agent will be liable for and agree to pay any deficiencies.

The submission of a false, fictitious, or fraudulent statement may result in imprisonment of up to 5 years and a fine of up to $10,000 (18 USC 1001). In addi penalty of up to $5,000 and an additional assessment of twice the amount falsely claimed may be imposed (31 USC 3802).

I hereby certify that all information furnished on this form is accurate and truthful, that this mailing meets all applicable CASS/ standards for address and barcode accuracy, and that the material presented qualifies for the rates of postage claimed.

* Signature of Permit Holder or Agent (Both printed and agent are liable for any postage deficiency incurred)

_[signature]_ MADO Ohio N.L. PO.5249

Telephone Numb 321-

**USPS Use Only**

Single-Piece Weight _____._____ pounds

Are the figures at left adjusted from mailer's entries?    ☐ Yes    ☐ No

| Total Pieces | Total Weight |
|---|---|

If "Yes," Reason

Total Postage

Check One
☐ Verif. Not Scheduled.    ☐ Per- formed as Scheduled

Date Mailer Notified

Contact

By (Initials)

I CERTIFY that this mailing has been inspected concerning: (1) eligibility for the rate of postage claimed; (2) proper preparation (and presort where required); (3) proper completion of the statement of mailing; and (4) payment of the required annual fee.

Round Stamp (R

725 Penn Avenue, Sixth Floor
Pittsburgh, PA 15222-3808
412-355-0800  800-365-3500
Fax 800-365-3500 x265

# reesebrothers

## Purchase Order

Show Purchase Order Number on all correspondence, invoices and shipping papers.

No. _____     Date _____

To _____     Ship to _____

_____     _____

_____     _____

| Quantity | Description | | Price |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Authorized by _____

© Copyright 1990, Reese Brothers, Inc.

Purchase Order

POSTAL SERVICE PERMIT SYSTEM    TRANS# 19006276790030
STATEMENT OF MAILING/BMEU WEIGHING AND DISPATCH CERTIFICATE

OF THE UNITED STATES POSTAGE                                COMPANY PERMIT USING N
APPLD NUMBER : 41-8002                                      PERMIT NO: 0174

                    RUESS BROTHERS INC
                    700 PENN AVE
                    PITTSBURGH PA 15222-3704

| DATE OF MAILING | CLASS | PROC CAT | TYPE |
|---|---|---|---|
| 10/05/05 | THIRD | STANDARD | BULK NONPROFIT |

| | UNIT WEIGHT | NO. PIECES | NO. PIECE |
| | 0 | 0 | 0 |

| WEIGHT OF SINGLE PIECE (LBS) | TOTAL WEIGHT | TOTAL POUNDS |
| 0.0505 | 28,941 | 1,245.5570 |

| MAILED FOR | POSTAGE | |
| RUESS BROTHERS INC | PART A | |
| PERMIT NUMBER: 00434 P | PART B | $2,336.5570 |
| CHICAGO IL 60604 | PART C | |
| 10/05/05   28,941. | PART D | |

| *DROP: | ADDITIONAL POSTAGE: |
| STANDARD  CLASS | SPECIAL SERVICES |
| | VERIFICATION |
| | TOTAL POSTAGE:    $2,336.56 |

I CERTIFY that this mailing has been inspected concerning:
1)eligibility for the rate of postage claimed; 2)proper preparation
(and placement where required; 3)proper completion of the statement or
mailing; and 4)payment of the required annual fee.



ROUND STAMP REQUIRED                     ROUND STAMP REQUIRED
TIME:    AM / PM                          TIME:    AM / PM

SIGNATURE OF WEIGHER                     RECEIVED FOR PRODUCTION BY

PRIORITY                CURRENT BALANCE:    $17,335.96
                                           CLK INIT: RSB

PROMOTION: MASS ohio Newslette                    DATE: 6-5-93

# UNITED PARCEL SERVICE

| DESTINATION | # PKGS | RATE | TOTALS |
|---|---|---|---|
| | 1 | 3.97 | 3.97 |
| Columbus ohio | 1 | 3.90 | 3.90 |
| | 1 | 3.14 | 3.14 |
| | 1 | 3.80 | 3.80 |
| | 4 | — | 14.81 |

REESE BROTHERS, INC   925 PENN AVENUE   PITTSBURGH, PA   15222

PROMOTION: MAon ohio N.L.                    DATE: 10-5-95

# UNITED PARCEL SERVICE

| DESTINATION | # PKGS | RATE | TOTALS |
|---|---|---|---|
| Columbus | 7 | 9.35 per 100 LBS | 18,70 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

REESE BROTHERS, INC    925 PENN AVENUE   PITTSBURGH, PA  15222

OCTo  1995  *FINAL INVOICE #7*

*MADD:* Lapsed Program
California, Georgia, Maryland, and Ohio

REESE BROTHERS, INC   925 PENN AVENUE   PITTSBURGH, PA   15222

| SERVICE | COST | 10/1/95-10/31/95 | TOTALS | YTD |
|---|---|---|---|---|
| Calling Hours-Quantity | n/a | 0 | 0 | 1181.5 |
| Tele-Services Cost/Hour | $34.74 | $0.00 | $0.00 | $41,045.31 |
| Initial Packages-Quantity Mailed | n/a | 0 | 0 | 4534 |
| Initial Packages-Cost | $0.21 | $0.00 | $0.00 | $952.14 |
| Initial Packages-Postage | 1st class | $0.00 | $0.00 | $1,450.88 |
| Info Packet-Quantity Mailed | n/a | 0 | 0 | 971 |
| Info Packet-Cost | $0.13 | $0.00 | $0.00 | $126.23 |
| Info Packet-Postage | 1st class | $0.00 | $0.00 | $10.72 |
| 1st Reminders-Quantity Mailed | n/a | 0 | 0 | 4418 |
| 1st Reminders, Red Ribbon Enclosure Cost | $0.30 | $0.00 | $0.00 | $1,324.80 |
| 1st Reminders-Postage | 1st class | $0.00 | $0.00 | $1,413.12 |
| 2nd Reminders-Quantity Mailed | n/a | 0 | 0 | 2620 |
| 2nd Reminders-Cost | $0.13 | $0.00 | $0.00 | $341.84 |
| 2nd Reminders-Postage | bulk | $0.00 | $0.00 | $315.36 |
| 3rd Reminders-Quantity Mailed | n/a | 0 | 0 | 1902 |
| 3rd Reminders-Cost | $0.13 | $0.00 | $0.00 | $247.26 |
| 3rd Reminders-Postage | bulk | $0.00 | $0.00 | $228.24 |
| 4th Reminders-Quantity Mailed | n/a | 0 | 0 | $0.00 |
| 4th Reminders-Cost | $0.13 | $0.00 | $0.00 | $0.00 |
| 4th Reminders-Postage | bulk | $0.00 | $0.00 | $0.00 |
| 6th Reminders-Quantity Mailed | n/a | 0 | 0 | $0.00 |
| 5th Reminders-Cost | $0.13 | $0.00 | $0.00 | $0.00 |
| 5b Reminders-Postage | bulk | $0.00 | $0.00 | $0.00 |
| Thank You Packet | n/a | 0 | 0 | 0 |
| Thank You Packet-Cost | $0.13 | $0.00 | $0.00 | $0.00 |
| Thank You Packet-Postage | bulk | $0.00 | $0.00 | $0.00 |
| Data Entry: Yes/Info-Quantity | n/a | 0 | 0 | 5726 |
| Data Entry: Yes/Info Cost | $0.09 | $0.00 | $0.00 | $515.34 |
| Data Entry: Payments-Quantity | n/a | 3 | 3 | 2465 |
| Data Entry: Payments-Cost | $0.02 | $0.06 | $0.06 | $49.30 |
| TOTAL COSTS | | $0.06 | $0.06 | $48,320.34 |

| | |
|---|---|
| Donations received as of 10/31/95 | $41,862.44 |
| Payments received as of 10/31/95 | $41,547.68 |
| Amount due to Reese Brothers | $314.76 |

NOV 28 1995
Ck 3548

MD1095.XLS

Date: 5/31/96

| Adv Cd | SK ID | Item | | Print Date | Total Printed Qty | Total In-Stock Quantity | Printing Costs per Piece Prod. | Printing Costs per Piece Mat'l | Total Inv'y Cost | Carrying Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **1st Pledge Packets** | | | | | | | | |
| | 355 | 1st Letter    4-up | M1295L1 | 3/31/96 | 61,400 | 15,000 | 0.0056 | 0.0068 | $186.00 | $1.92 |
| | 161 | 1st Broch (Adams)  2-up | M396B1 | 5/31/96 | 70,000 | 57,500 | 0.0110 | 0.0101 | $1,213.25 | $0.00 |
| | 884 | 1st Appetizers DD   4-up | M296APD1 | 3/31/96 | 101,000 | 70,000 | 0.0034 | 0.0065 | $693.00 | $7.16 |
| | 906 | 1st Entrees DD - LA  8-up | M495ENLAD1 | 5/31/95 | 3,600 | 0 | 0.0296 | 0.0130 | $0.00 | $0.00 |
| | 874 | 1st Pasta DD    6-up | M196P&NDR1 | 5/31/96 | 100,000 | 30,000 | 0.0018 | 0.0042 | $180.00 | $0.00 |
| | 272 | 1-6 Dot Matrix | M895DP | 3/31/96 | 480,000 | 480,000 | 0.0000 | 0.0258 | $12,384.00 | $127.97 |
| | 224 | Reply Envelope | M195E-R | 3/31/96 | 50,000 | 1,025,000 | 0.0000 | 0.0142 | $14,534.50 | $150.19 |
| | 375 | 2-6 Envelope | M195E2-6 | 1/31/96 | 40,000 | 730,000 | 0.0091 | 0.0100 | $13,943.00 | $422.94 |
| | 184 | 1st Envelope | M195E1 | 4/30/96 | 516,000 | 563,000 | 0.0000 | 0.0222 | $12,498.60 | $4.17 |
| | | **2nd 1st Pledge Packets** | | | | | | | | |
| | 302 | Smashed Booklet 1-up | M196B1A | 3/31/96 | 152,000 | 63,000 | 0.0214 | 0.0230 | $2,797.20 | $28.90 |
| | 356 | 2nd 1st Letter   2-up | M1295L1A | 2/28/96 | 50,000 | 25,000 | 0.0359 | 0.0133 | $1,230.00 | $25.83 |
| | 175 | Dot Matrix | M895DP1A | 8/31/95 | | 320,000 | 0.0000 | 0.0150 | $4,800.00 | $390.40 |
| | 333 | 2nd 1st Envelope | M195E1A | 7/31/95 | | 330,000 | 0.0000 | 0.0204 | $6,732.00 | $617.10 |
| | | **2nd - 6th and Acknowledgement Pledge Packets** | | | | | | | | |
| | 251 | 2nd Letter (Sikora) 4-up | M196SIKORA | 3/31/96 | 50,000 | 115,000 | 0.0225 | 0.0240 | $5,347.50 | $55.26 |
| | 252 | 3,4,5 Letter (Brandi) 3-up | M296BRANDI | 2/28/96 | 200,600 | 100,000 | 0.0196 | 0.0075 | $2,710.00 | $56.91 |
| | 133 | 3,4,5 Let. (People) 4-up | M1294WTP | 9/30/95 | 250,000 | 233,000 | 0.0049 | 0.0057 | $2,469.80 | $176.18 |
| | 903 | 3,4,5 Letter (Rod) 4-up | M395ROD | 5/31/96 | 60,000 | 15,000 | 0.0050 | 0.0057 | $160.50 | $0.00 |
| | 277 | 3,4,5 Letter (Bus) 4-up | M694BUS | 8/31/94 | 300,000 | 60,000 | 0.0040 | 0.0046 | $516.00 | $104.75 |
| | 158 | 6th Letter (Lisa) 4-up | M992LISA | 3/31/96 | 55,500 | 50,000 | 0.0115 | 0.0075 | $950.00 | $9.82 |
| | 301 | Ack. Letter  2-up | M1195ACKL | 4/30/96 | 50,000 | 47,600 | 0.0041 | 0.0116 | $747.32 | $0.25 |
| | 353 | Ack. Booklet (STOP) 1-up | M794ACKB | 5/31/96 | 200,000 | 36,000 | 0.0145 | 0.0237 | $1,375.20 | $154.02 |
| | | 1-up      then: | M995ACKB | | 0 | | | | $0.00 | $0.00 |
| | | 4th Letter PNP (Taylor) | M496TAYLOR | 4/30/96 | 100,000 | 78,900 | 0.0000 | 0.0221 | $1,743.69 | $0.58 |
| | 865 | 2-6 Appet DD  8-up Acq. | M296APD2-6 | 5/31/96 | 200,000 | 200,000 | 0.0012 | 0.0028 | $800.00 | $0.00 |
| | 902 | 2-6 Pasta DD  8-up Ren. | M196P&ND2-6 | 4/30/96 | 100,000 | 50,000 | 0.0772 | 0.0138 | $4,550.00 | $1.52 |
| | | 2-6 Entrees DD  (LA) 6-up | M795ENLADR1-6 | 7/31/95 | 6,000 | 0 | 0.0249 | 0.0112 | $0.00 | $0.00 |
| | | Disclaimer LA only  9-up | LOS296DIS | 5/31/96 | 5,000 | 5,000 | 0.0063 | 0.0055 | $59.00 | $0.00 |
| | 303 | #11 Window Envelope | M694ACKE | 2/28/96 | 102,000 | 33,600 | 0.0000 | 0.0377 | $1,266.72 | $26.60 |

| | |
|---|---|
| Total Cost Inventory (In House Material): | $38,181.26 |
| Total Cost Inventory (Out of House Material): | $52,215.82 |
| Total Carrying Cost Material: | $1,134.31 |
| Total Carrying Cost Envelopes: | $1,220.99 |

## MADD Inventory Numbers for 596

| | |
|---|---|
| Inventory Costs - Material Printed In House | $70,613.24 |
| Inventory Costs - Material Printed Out of House | $86,093.18 |
| **Total Costs** | **$156,706.42** |

Children's Wish Foundation
Campaign Analysis

| Billing | Acquisition | | Renewal | | |
|---------|-------------|---|---------|---|---|
| Month | Cash Collected | RBI Charges | Cash Collected | RBI Charges | |
| | | | | | |
| Oct-98 | $1,637,667.19 | $1,464,611.44 | $512,603.73 | $86,334.04 | |
| Nov-98 | $1,077,222.87 | $2,344,254.82 | $353,649.70 | $602,899.92 | |
| Dec-98 | $1,060,778.22 | $1,451,687.63 | $806,875.62 | $578,378.24 | |
| Jan-99 | $635,405.14 | $393,020.28 | $778,423.09 | $340,818.70 | |
| Feb-99 | $450,173.32 | $85,324.25 | $807,949.00 | $572,063.91 | |
| Mar-99 | $180,509.86 | $63,268.89 | $1,300,838.59 | $609,196.17 | |
| Apr-99 | $263,416.11 | $138,352.83 | $702,595.67 | $269,750.40 | |
| May-99 | $134,206.80 | $143,983.27 | $655,921.31 | $443,246.13 | |
| Jun-99 | $132,444.88 | $543,812.80 | $703,984.83 | $806,617.79 | |
| Jul-99 | $322,322.75 | $570,105.88 | $1,204,498.17 | $304,642.41 | |
| Aug-99 | $323,234.55 | $340,977.32 | $630,323.47 | $439,292.70 | |
| Sep-99 | $155,071.84 | $107,585.70 | $558,620.18 | $509,918.15 | |
| Oct-99 | $93,965.15 | $51,134.85 | $667,618.00 | $362,320.32 | |
| | | | | | |
| Total | $6,466,418.68 | $7,698,119.96 | $9,683,901.36 | $5,925,478.88 | |

| | | Billing | Total | | |
|---|---|---------|-------|---|---|
| | | Month | Cash Collected | RBI Charges | Surplus)Deferral) |
| | | | | | |
| | | Oct-98 | $2,150,270.92 | $1,550,945.48 | $599,325.44 |
| | | Nov-98 | $1,430,872.57 | $2,947,154.74 | ($1,516,282.17) |
| | | Dec-98 | $1,867,653.84 | $2,030,065.87 | ($162,412.03) |
| | | Jan-99 | $1,413,828.23 | $733,838.98 | $679,989.25 |
| | | Feb-99 | $1,258,122.32 | $657,388.16 | $600,734.16 |
| | | Mar-99 | $1,481,348.45 | $672,465.06 | $808,883.39 |
| | | Apr-99 | $966,011.78 | $408,103.23 | $557,908.55 |
| | | May-99 | $790,128.11 | $587,229.40 | $202,898.71 |
| | | Jun-99 | $836,429.71 | $1,350,430.59 | ($514,000.88) |
| | | Jul-99 | $1,526,820.92 | $874,748.29 | $652,072.63 |
| | | Aug-99 | $953,558.02 | $780,270.02 | $173,288.00 |
| | | Sep-99 | $713,692.02 | $617,503.85 | $96,188.17 |
| | | Oct-99 | $761,583.15 | $413,455.17 | $348,127.98 |
| | | | | | |
| | | Total | $16,150,320.04 | $13,623,598.84 | $2,526,721.20 |

## Children's Wish Foundation
## Campaign Analysis

| Billing Month | Acquisition | | | Renewal | | Total | | | | | Surplus |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash Collected | RBI Charges | Ratio cash:expenses | Cash Collected | RBI Charges | Cash Collected | RBI Charges | Surplus(Deferral) | Ratio cash:expenses | Client Guarantee | after Guarantee |
| Jan-99 | $635,405.14 | $393,020.28 | 162% | $778,423.09 | $340,818.70 | $1,413,828.23 | $733,838.98 | $679,989.25 | 193% | $194,605.77 | $485,383.48 |
| Feb-99 | $450,173.32 | $85,324.25 | 528% | $807,949.00 | $572,063.91 | $1,258,122.32 | $657,388.16 | $600,734.16 | 191% | $201,987.25 | $398,746.91 |
| Mar-99 | $180,509.86 | $63,268.89 | 285% | $1,300,838.59 | $609,196.17 | $1,481,348.45 | $672,465.06 | $808,883.39 | 220% | $325,209.65 | $483,673.74 |
| Apr-99 | $263,416.11 | $138,352.83 | 190% | $702,595.67 | $269,750.40 | $966,011.78 | $408,103.23 | $557,908.55 | 237% | $175,648.92 | $382,259.63 |
| May-99 | $134,206.80 | $143,983.27 | 93% | $655,921.31 | $443,246.13 | $790,128.11 | $587,229.40 | $202,898.71 | 135% | $162,980.33 | $38,918.38 |
| Jun-99 | $132,444.88 | $543,812.80 | 24% | $703,984.83 | $806,617.79 | $836,429.71 | $1,350,430.59 | ($514,000.88) | 62% | $18,918.38 | ($689,097.09) |
| Jul-99 | $322,322.75 | $570,105.88 | 57% | $1,204,498.17 | $304,642.41 | $1,526,820.92 | $874,748.29 | $652,072.63 | 175% | $173,996.21 | $350,948.09 |
| Aug-99 | $323,234.55 | $340,977.32 | 95% | $630,323.47 | $439,292.70 | $953,558.02 | $780,270.02 | $173,288.00 | 122% | $301,124.54 | $15,707.13 |
| Sep-99 | $155,071.84 | $107,585.70 | 144% | $558,620.18 | $509,918.15 | $713,692.02 | $617,503.85 | $96,188.17 | 116% | $157,580.87 | ($43,466.88) |
| Oct-99 | $93,965.15 | $51,134.85 | 184% | $667,618.00 | $362,320.32 | $761,583.15 | $413,455.17 | $348,127.98 | 184% | $139,655.05 | $181,223.48 |
| | | | | | | $0.00 | $0.00 | | | $166,904.50 | |
| Total | $2,690,750.40 | $2,437,566.07 | 110% | $8,010,772.31 | $4,657,866.68 | $10,701,522.71 | $7,095,432.75 | $3,606,089.96 | 151% | $2,002,693.08 | $1,603,396.88 |

## KidsPeace Campaign Analysis

| Date | Acquisition Cash Collected | Acquisition Total Campaign costs including Postage | Renewal Cash Collected | Renewal Total Campaign costs including Postage | Total Cash Collected | Total Campaign costs including Postage | Surplus/(Deferral) | cash:expenses ratio |
|---|---|---|---|---|---|---|---|---|
| May-97 | $85 | $2 | $57,094 | $23,859 | $57,179 | $23,861 | $33,318 | |
| Jun-97 | $25 | $0 | $32,884 | $21,349 | $32,909 | $21,349 | $11,560 | |
| Jul-97 | $0 | $0 | $25,347 | $8,410 | $25,347 | $8,410 | $16,937 | |
| Aug-97 | $5 | $0 | $16,424 | $25,270 | $16,429 | $25,270 | ($8,841) | |
| Sep-97 | $0 | $0 | $25,962 | $4,522 | $25,962 | $4,522 | $21,441 | |
| Oct-97 | $0 | $0 | $35,303 | $55,133 | $35,303 | $55,133 | ($19,829) | |
| Nov-97 | $15 | $0 | $3,074 | $7,109 | $3,089 | $7,109 | ($4,020) | |
| Dec-97 | $25 | $0 | $29,004 | $17,780 | $29,029 | $17,781 | $11,248 | |
| Jan-98 | $10 | $1 | $29,212 | $15,205 | $29,222 | $15,205 | $14,017 | 192% |
| Feb-98 | $0 | $1 | $15,059 | $3,208 | $15,059 | $3,209 | $11,850 | 469% |
| Mar-98 | $0 | $0 | $25,248 | $50,233 | $25,258 | $50,233 | ($24,975) | 50% |
| Apr-98 | $15 | $0 | $25,017 | $4,216 | $25,032 | $4,216 | $20,816 | 594% |
| May-98 | $0 | $0 | $6,564 | $1,455 | $6,564 | $1,455 | $5,109 | 451% |
| Jun-98 | $0 | $0 | $3,707 | $913 | $3,707 | $913 | $2,794 | 406% |
| Jul-98 | $0 | $0 | $37,755 | $51,697 | $37,755 | $51,697 | ($13,941) | 73% |
| Aug-98 | $30 | $0 | $17,727 | $5,520 | $17,757 | $5,520 | $12,237 | 322% |
| Sep-98 | $30 | $0 | $6,902 | $4,004 | $6,932 | $4,004 | $2,927 | 173% |
| Oct-98 | $0 | $0 | $14,036 | $19,911 | $14,036 | $19,911 | ($35,875) | 70% |
| Nov-98 | $0 | $0 | $15,356 | $2,576 | $15,356 | $2,576 | $12,779 | 596% |
| Dec-98 | $0 | $0 | $5,678 | $1,912 | $5,678 | $1,912 | $3,766 | 297% |
| Jan-99 | $25 | $0 | $3,315 | $731 | $3,340 | $731 | $2,609 | 457% |
| Feb-99 | $20 | $0 | $1,327 | $348 | $1,347 | $348 | $999 | 387% |
| Mar-99 | $20 | $0 | $1,245 | $342 | $1,245 | $342 | $903 | 364% |
| Apr-99 | $0 | $0 | $461 | $46 | $481 | $47 | $434 | 1034% |
| **Totals** | $315 | $6 | $433,699 | $325,745 | $434,014 | $325,751 | $108,263 | 133% |

# Multiple Sclerosis Association
## Campaign Analysis

| Date | Acquisition Calling Hours | Acquisition Cash Collected | Acquisition $ per hr | Renewal Calling Hours | Renewal Cash Collected | Renewal $ per hr | Total Calling Hours | Total Cash Collected | Total $ per hr | Client minimum guarantee | $ per hr, after guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov-97 | 5,933.75 | $791,877.83 | $133.45 | 2,200.25 | $218,127.55 | $99.14 | 8,134.00 | $1,010,005.38 | $124.17 | $38,616.84 | $119.42 |
| Dec-97 | 1,833.25 | $440,068.65 | $240.05 | 2,016.00 | $233,376.88 | $115.76 | 3,849.25 | $673,445.53 | $174.95 | $40,478.09 | $164.44 |
| Jan-98 | 2,426.00 | $295,888.40 | $121.97 | 2,015.50 | $222,047.82 | $110.17 | 4,441.50 | $517,936.22 | $116.61 | $39,728.81 | $107.67 |
| Feb-98 | 1,262.75 | $256,028.06 | $202.75 | 56.50 | $210,709.50 | ######### | 1,319.25 | $466,737.56 | $353.79 | $37,474.20 | $325.38 |
| Mar-98 | 0.00 | $153,401.07 | #DIV/0! | 1,942.50 | $143,247.93 | $73.74 | 1,942.50 | $296,649.00 | $152.72 | $25,711.86 | $139.48 |
| Apr-98 | 10,934.75 | $72,254.71 | $6.61 | 2,681.25 | $159,519.74 | $59.49 | 13,616.00 | $231,774.45 | $17.02 | $30,561.01 | $14.78 |
| May-98 | 14,526.75 | $351,845.90 | $24.22 | 5,295.75 | $198,334.30 | $37.45 | 19,822.50 | $550,180.20 | $27.76 | $36,950.98 | $25.89 |
| Jun-98 | 7,030.75 | $458,381.99 | $65.20 | 2,540.00 | $231,859.22 | $91.28 | 9,570.75 | $690,241.21 | $72.12 | $45,285.46 | $67.39 |
| Jul-98 | 2,872.50 | $344,834.89 | $120.05 | 3,938.25 | $248,542.27 | $63.11 | 6,810.75 | $593,377.16 | $87.12 | $47,830.97 | $80.10 |
| Aug-98 | 2,053.25 | $164,781.82 | $80.25 | 1,043.25 | $327,857.46 | $314.27 | 3,096.50 | $492,639.28 | $159.10 | $60,139.18 | $139.67 |
| Sep-98 | 484.00 | $99,001.52 | $204.55 | 3,252.00 | $162,114.99 | $49.85 | 3,736.00 | $261,116.45 | $69.89 | $29,528.88 | $61.99 |
| Oct-98 | 245.00 | $94,063.93 | $383.93 | 2,754.25 | $237,762.84 | $86.33 | 2,999.25 | $331,826.77 | $110.64 | $43,933.61 | $95.99 |
| Nov-98 | 354.25 | $48,260.08 | $136.23 | 1,542.05 | $196,687.78 | $127.55 | 1,896.30 | $244,948.66 | $129.17 | $37,306.95 | $109.50 |
| Dec-98 | 6,717.97 | $41,011.56 | $6.10 | 1,259.15 | $247,192.06 | $196.32 | 7,977.12 | $288,203.62 | $36.13 | $52,828.19 | $29.51 |
| Jan-99 | 5,766.89 | $259,393.00 | $44.98 | 6,831.62 | $147,514.23 | $21.59 | 12,598.51 | $406,907.23 | $32.30 | $32,106.87 | $29.75 |
| Feb-99 | 2,713.91 | $210,286.78 | $77.48 | 1,995.36 | $401,077.24 | $201.00 | 4,709.27 | $611,364.00 | $129.82 | $80,805.57 | $112.66 |
| Mar-99 | 1,931.13 | $187,827.92 | $97.26 | 524.56 | $302,420.00 | $576.52 | 2,455.69 | $490,247.92 | $199.64 | $59,641.10 | $175.35 |
| Apr-99 | 137.79 | $119,422.22 | $866.70 | 1,487.88 | $117,351.42 | $78.87 | 1,625.67 | $236,773.64 | $145.65 | $23,828.09 | $130.99 |
| May-99 | 0.00 | $44,822.45 | #DIV/0! | 4,105.29 | $189,067.93 | $46.05 | 4,105.29 | $233,890.38 | $56.97 | $39,839.67 | $47.27 |
| Jun-99 | 450.86 | $24,503.24 | $54.35 | 5,272.53 | $282,420.50 | $53.56 | 5,723.39 | $306,923.74 | $53.63 | $51,899.37 | $44.56 |
| Jul-99 | 3,475.40 | $29,525.51 | $8.50 | 2,894.47 | $351,822.72 | $121.55 | 6,369.87 | $381,348.23 | $59.87 | $72,066.61 | $48.55 |
| Aug-99 | 1,002.13 | $143,822.93 | $143.52 | 682.77 | $311,457.63 | $456.17 | 1,684.90 | $455,280.56 | $270.21 | $63,952.30 | $232.26 |
| Sep-99 | 2,169.60 | $56,759.00 | $26.16 | 2,838.27 | $128,687.00 | $45.34 | 5,007.87 | $185,446.00 | $37.03 | $27,071.11 | $31.63 |
| Oct-99 | 10,570.46 | $79,348.35 | $7.51 | 1,259.18 | $195,672.98 | $155.40 | 11,829.64 | $275,021.33 | $23.25 | $37,506.30 | $20.08 |
| **Totals** | 84,893.14 | $4,767,412.61 | $56.16 | 60,428.63 | $5,464,871.93 | $90.44 | 145,321.77 | $10,232,284.54 | $70.41 | $1,055,092.02 | $63.15 |

# Youth Power
## Campaign Analysis

*Youth Power = Just Say No's new name*

| Billing Month | Acquisition Cash Collected | Acquisition Expenses | Renewal Cash Collected | Renewal Expenses | Total Cash Collected | Total Expenses | Total Surplus/(Deferral) | Ratio Cash:expenses | Min Guarantee | Ratio after guarantee |
|---|---|---|---|---|---|---|---|---|---|---|
| May-98 | $10,858.9 | $13,895.67 | $35,486.00 | $11,356.70 | $46,344.94 | $25,252.37 | $21,092.57 | 184% | $24,881.69 | 92% |
| Jun-98 | $9,952.0 | $887.94 | $27,666.12 | $7,969.63 | $37,618.12 | $8,857.57 | $28,760.55 | 425% | $7,514.45 | 229% |
| Jul-98 | $3,646.0 | $25.98 | $24,076.00 | $6,950.39 | $27,722.47 | $6,976.37 | $20,746.10 | 397% | $6,304.56 | 207% |
| Aug-98 | $849.1 | $1,817.90 | $21,722.50 | $37,439.54 | $22,571.61 | $39,257.44 | ($16,685.80) | 57% | $0.00 | 57% |
| Sep-98 | $608.3 | $297.48 | $47,820.64 | $27,169.69 | $48,429.00 | $27,467.17 | $20,961.83 | 176% | $35,000.00 | 78% |
| Oct-98 | $452.0 | $46.15 | $68,001.00 | $11,585.78 | $68,453.00 | $11,631.93 | $56,821.07 | 588% | $18,592.49 | 226% |
| Nov-98 | $342.0 | $22.69 | $18,324.00 | $4,262.61 | $18,666.00 | $4,285.21 | $14,380.79 | 436% | $12,873.94 | 109% |
| Dec-98 | $331.0 | $25.67 | $12,499.00 | $1,775.30 | $13,030.00 | $1,801.17 | $11,228.83 | 723% | $9,740.54 | 113% |
| Jan-99 | $160.0 | $28.34 | $6,698.59 | $875.14 | $6,858.59 | $903.48 | $5,955.11 | 759% | $4,695.57 | 124% |
| Feb-99 | $0.0 | $4.66 | $6,797.00 | $133,803.88 | $6,797.00 | $133,808.54 | ($127,011.54) | 5% | $0.00 | 5% |
| Mar-99 | $0.0 | $2.55 | $164,781.87 | $88,132.52 | $164,781.87 | $88,135.07 | $76,646.80 | 187% | $25,000.00 | 146% |
| Apr-99 | $0.0 | $0.10 | $131,526.00 | $7,125.47 | $131,526.00 | $7,125.57 | $124,400.43 | 279% | $15,000.00 | 212% |
| May-99 | $0.0 | $1.53 | $87,509.19 | $30,991.20 | $87,509.19 | $30,992.73 | $56,516.46 | 282% | $34,000.00 | 135% |
| Jun-99 | $0.0 | $0.05 | $42,606.63 | $11,405.93 | $42,606.63 | $11,405.98 | $31,200.65 | 374% | $17,000.00 | 150% |
| Jul-99 | $0.0 | $0.05 | $34,245.00 | $7,260.43 | $34,245.00 | $7,260.48 | $26,984.52 | 472% | $13,000.00 | 169% |
| Aug-99 | $0.0 | $1.53 | $92,115.00 | $69,719.23 | $92,115.00 | $69,720.76 | $22,394.24 | 132% | $21,210.69 | 101% |
| Sep-99 | $0.0 | $0.05 | $42,385.10 | $6,631.92 | $42,385.10 | $6,631.97 | $35,753.13 | 639% | $20,501.53 | 156% |
| Oct-99 | $0.0 | $0.00 | $14,642.65 | $2,995.85 | $14,642.65 | $2,995.85 | $11,646.80 | 489% | $10,847.64 | 106% |
| Totals | $27,599.5 | $17,058.25 | $878,702.29 | $509,451.41 | $906,302.20 | $526,509.66 | $379,792.54 | 172% | $276,183.10 | 113% |

## National Caregiving Foundation
## Campaign Analysis

| Billing | | Total | | | ratio cash: charges | Surplus Year to date | ratio cash: charges | Client Min Guarantee | surplus after guarantee |
|---|---|---|---|---|---|---|---|---|---|
| Month (Most recent fiscal year) | | Cash Collected | All expenses | Surplus (Deferral) Mo. | | | | | |
| Jul-98 | | $148,644.65 | $87,433.96 | $61,210.69 | 170% | $61,210.69 | 170% | $ 33,075 | $28,135.69 |
| Aug-98 | | $134,099.21 | $81,685.91 | $52,413.30 | 164% | $113,623.99 | 167% | $ 33,075 | $19,338.30 |
| Sep-98 | | $142,563.87 | $70,955.70 | $71,608.17 | 201% | $185,232.16 | 177% | $ 33,075 | $38,533.17 |
| Oct-98 | | $126,324.50 | $153,624.40 | ($27,299.90) | 82% | $157,932.26 | 140% | $ 33,075 | ($60,374.90) |
| Nov-98 | | $149,975.86 | $187,441.69 | ($37,465.83) | 80% | $120,466.43 | 121% | $ 33,075 | ($70,540.83) |
| Dec-98 | | $170,985.79 | $87,120.93 | $83,864.86 | 196% | $204,331.29 | 131% | $ 33,075 | $50,789.86 |
| Jan-99 | | $90,844.31 | $35,877.63 | $54,966.68 | 253% | $259,297.97 | 137% | $ 33,075 | $21,891.68 |
| Feb-99 | | $62,762.20 | $20,631.24 | $42,130.96 | 304% | $301,428.93 | 142% | $ 33,075 | $9,055.96 |
| Mar-99 | | $32,806.50 | $7,166.12 | $25,640.38 | 458% | $327,069.31 | 145% | $ 33,075 | ($7,434.62) |
| Apr-99 | | $233,406.00 | $231,736.72 | $1,669.28 | 101% | $328,738.59 | 134% | $ 33,075 | ($31,405.72) |
| May-99 | | $233,510.80 | $45,274.55 | $188,236.25 | 519% | $516,974.84 | 151% | $ 33,075 | $155,161.25 |
| Jun-99 | | $105,148.44 | $23,362.37 | $81,786.07 | 450% | $598,760.91 | 158% | $ 33,075 | $48,711.07 |
| Total | | $1,631,072.13 | $1,032,311.22 | $598,760.91 | 158% | | 158% | $ 396,900 | $201,860.91 |

All bills and postage paid in full, plus guarantee, plus still a surplus to "repay" carryover amounts.

Note that the above includes Prospecting calling, which continues.

# SADD
## Campaign Analysis

| Billing Month | Acquisition Cash Collected | Acquisition Total Campaign costs including Postage | Renewal Cash Collected | Renewal RBI Charges | Total Cash Collected | Total Campaign costs including Postage | Total Surplus/(Deferral) | cash: expenses ratio | ratio renewal only | Surplus Min Guarantee | Surplus after guarantee | Surplus After Guarantee, Renewals only |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-98 | $104,377.78 | $203,133.30 | $253,008.80 | $151,603.01 | $357,386.58 | $354,737.31 | $202,649.27 | 157% | 167% | $45,541.58 | $152,107.69 | $106,062.43 |
| Nov-98 | $105,135.16 | $26,889.42 | $161,426.04 | $95,482.92 | $266,561.20 | $128,372.34 | $138,188.86 | 208% | 162% | $29,056.60 | $109,132.17 | $70,426.23 |
| Dec-98 | $41,393.34 | $10,313.66 | $204,421.44 | $225,559.75 | $245,814.78 | $235,873.41 | $9,941.37 | 104% | 91% | $36,795.86 | $(26,834.49) | $188,763.89 |
| Jan-99 | $41,617.07 | $6,661.67 | $190,886.36 | $21,214.72 | $232,503.43 | $27,876.39 | $204,627.04 | 834% | 900% | $34,359.54 | $170,267.50 | $156,526.97 |
| Feb-99 | $14,159.01 | $5,229.22 | $77,573.67 | $115,214.96 | $91,732.74 | $120,444.18 | $(28,711.44) | 76% | 67% | $34,359.53 | $(13,144.82) | $101,251.70 |
| Mar-99 | $24,219.62 | $394,911.04 | $302,419.28 | $259,519.36 | $326,638.90 | $654,430.40 | $(327,791.50) | 50% | 117% | $13,963.26 | $(42,674.70) | $205,083.89 |
| Apr-99 | $176,549.60 | $69,716.91 | $212,031.77 | $58,390.27 | $388,581.37 | $128,127.18 | $260,454.19 | 303% | 363% | $54,435.47 | $(382,226.07) | $205,083.89 |
| May-99 | $72,241.99 | $212,031.77 | $154,794.39 | $59,732.20 | $388,581.37 | $260,454.19 | $135,407.42 | 240% | 259% | $38,165.72 | $222,268.47 | $10,224.55 |
| Jun-99 | $43,089.68 | $36,896.76 | $153,752.76 | $248,997.22 | $96,628.96 | $135,407.42 | $(202,189.36) | 50% | 363% | $27,862.99 | $107,544.43 | $31,869.21 |
| Jul-99 | $116,233.51 | $153,034.58 | $156,752.76 | $232,016.38 | $199,842.44 | $402,031.80 | $(57,265.77) | 90% | 259% | $28,215.50 | $222,268.47 | $220,781.72 |
| Aug-99 | $123,155.62 | $156,008.06 | $381,032.85 | $198,524.07 | $497,266.36 | $554,532.13 | $(237,183.45) | 316% | 63% | $68,585.91 | $(230,404.86) | $(58,235.08) |
| Sep-99 | $100,910.86 | $77,773.96 | $223,861.84 | $12,060.05 | $147,017.46 | $109,834.01 | $30,021.65 | 116% | 192% | $40,295.11 | $(125,851.68) | $429,938.16 |
| Oct-99 | $31,381.16 | $36,091.84 | $199,036.55 | $153,833.91 | $219,947.41 | $189,925.76 | $73,889.00 | 144% | 698% | $21,426.58 | $196,888.32 | $(58,235.08) |
| | | $6,136.81 | $209,193.22 | $160,548.57 | $240,574.38 | $166,685.38 | | 130% | 77% | $37,654.78 | $8,595.07 | $132,407.34 |
| Final | $1,199,464.46 | $1,384,817.23 | $2,646,438.97 | $1,784,682.02 | $3,845,903.43 | $3,169,499.25 | $676,404.18 | 121% | 148% | $476,359.01 | $ 200,045.17 | $1,308,323.01 |

Note 1:   Renewal is generating large surplus.
Note 2:   Prospecting is running close to generating full rate.
Note 3:   All costs and guarantees are paid, and an additional surplus is generated.

# **Facsimile Cover Sheet**

**To:** Carmel Whitfield
**Company:** Prevent Child Abuse, North Carolina
**Phone:** (919) 829-8009
**Fax:** (919) 832-0308

**From:** Sharon Wigginton
**Company:** Reese Brothers, Inc.
**Phone:** (412) 355-0800 x431
**Fax:** (412) 355-0800 x265

**Date:** June 6, 1994
**Pages including this cover page:** 2

The following is your authorization to print newsletter form.
Please fill it out and return it with your newsletter proof. We
can not print your newsletters until we receive this form
back from you.

925 Penn Avenue, Sixth Floor
412-355-0800   800-365-3500
Fax 800-365-3500 x265

JUN 1 7 1994

# reesebrothers

## Authorization To Print Newsletter

Please fill out and return this authorization with your proof. We cannot print until we receive this authorization. Please note that you are responsible for postage to mail the newsletters.

*If you make Author's Alterations on your proof totaling more than 3 hours work (this includes both layout and type changes) that are not Reese Brothers fault, your newsletter will have to go to the back of the production line. If the changes are minimal they will be done ASAP.*

Newsletter ___SUMMER 1994___

Chapter name ___NC-NCPCA___          Contact ___Jennifer Tolle___

Street address ___3344 Hillsborough St. Suite 100-D___

City ___Raleigh___          State ___NC___   Zip ___27607___

Day phone ( ___919___ ) ___829 8009___

1. Do you wish to receive another proof before we print your newsletter? ☐ Yes  ☐ No
   *Note:* If you chose to receive another proof, an additional charge will be added to your total newsletter cost.

2. Do you wish to mail the newsletter to the mailing list acquired through our fundraising promotion? These newsletters will be printed on _____  ☐ Yes  ☐ No

   There are approximately ___11,615___ names on the list. We will mail this list at the nonprofit rate (11.3 cents) each. The mailing will cost about $ ___1,312.50___

   This list contains current donors and people who have pledged support.
   If yes, do you wish to mail to everyone on the list or just a portion of the list?
   ☒ Everyone   ☐ Portion

   If portion of list please describe. _____

3. Do you wish to mail copies to all the State Offices? At this time the list has 16 names.
   ☐ Yes      ☒ No

4. If you have your own mailing list maintenance (personal chapter members, media people, etc.) on our computer system, do you wish us to mail them copies?
   ☐ Yes      ☐ No      Number of names ___0___
   *Please note:* All postage is paid by your chapter, not Reese Brothers.

5. How many newsletters would you like printed for your own use? Be sure you order enough newsletters for your own use. *You will have to pay for any reprints.* Please include total number for all your chapters. ___6000___ Newsletters

   These newsletters will be shipped via *Ground United Parcel Service.* It will cost you approximately $ ___6.50___ to ship ___250___ newsletters UPS.
   ☒ Send all newsletters to the above address.
   ☐ Send newsletters to attached list of chapters. (List must include chapter name, street address, city, state, zip code and quantity to be sent to each chapter). UPS cannot deliver to a Post Office Box. We can only bill to one address.

6. How do you want your newsletter folded? ☐ Front page out ☒ Xerox not folded

   5000                                      1600 not folded

   Authorized by ___[signature]___          Date ___6/3/94___

© Copyright 1994 Reese Brothers, Inc.                    C Authoriz. To Print 0194

# NORTH CAROLINA CARES

Published by the North Carolina Chapter of the National Committee for Prevention of Child Abuse
Hartwell Plaza, Suite 215, 1027 Hwy. 70, Garner, North Carolina 27529 • 919-772-5765 or 1-800-354-KIDS

Editor—Angela G. Burgess          Volume 13, No. 1          Winter 1992

## NC/NCPCA Plans 13th Annual Statewide Conference

*Abused Children*
*"Diamonds in the Rough"*
*Facets of Prevention and Healing*
*March 16th and 17th, 1992*
*Adam's Mark Hotel*
*Charlotte, North Carolina*

In a collaborative effort with the North Carolina Association for Children of Alcoholics, the 13th annual conference promises to offer an exciting and unique presentation of the relationship between child abuse and substance abuse. This two-day event will feature two nationally known keynote speakers, Marilyn Van Derbur Atler and Dr. Robert J. Ackerman.

Mrs. Atler, former Miss America 1958, broke her fearful silence of 30 painful years when she announced to the world that her father had sexually abused her from the age of five until she left for college at age 18. Her courage to come forward opened the floodgates of people who were victims of incest. Not only is Mrs. Atler remarkable for her courage in her admission of abuse, but she is also an accomplished speaker and television and radio personality. She has appeared on the Maria Shriver Show and has written about her story in major magazines such as *McCalls*. She has been hostess of 23 network television specials, has spoken to thousands of business and educational groups, and has released 8 motivational films through her company, the Marilyn Van Derbur Motivational Institute, Inc.

Dr. Ackerman is known for his work in the areas of alcoholism and the family and especially its effects on the children of alcoholics. He is a professor of sociology at Indiana University of Pennsylvania, Director of the Mid-Atlantic Addiction Train-

Marilyn Van Derbur Atler

ing Institute, Clinical Services Consultant to the Livengrin Foundation, Consultant to the Suzanne Somer's Institute and a co-founder of the National Association for Children of Alcoholics. He has published numerous articles, research findings and books. He wrote the first book in the United States on children of alcoholics and wrote the first book on women raised in alcoholic families. Currently he is conducting research on adult sons from dysfunctional families.


*Dr. Robert J. Ackerman*

In addition to Mrs. Atler and Dr. Ackerman, experts from across the state will provide over 10 hours of training. Topics will include the Welcome Baby Program, School-based Dispute Resolution, Fetal Alcohol Syndrome, Art Therapy with Children, Working with Children of Cocaine Addicted Mothers, School-based Prevention Programs, Multi-disciplinary Teams, Sexual Abuse and much more.

Approximately 300 people from the areas of DSS, public education, child abuse prevention, substance abuse prevention, law enforcement and mental health are expected to attend.

*For registration information please call the state office.*

### In this issue...

News From The Chapter ............................ 3-4
News From The Affiliates ........................... 5
News From North Carolina ........................ 6
News From The National Committee .............. 7
Parent's Corner ...................................... 8

# From The Executive Director

No problem has surfaced over the past decade more pervasive throughout society than child abuse. When we think of childhood, we like to think of the happy, healthy child in our family. Unfortunately for many children, this time can be a nightmare filled with bruises, broken bones, loneliness, neglect or molestation. In the United States, over two and a half million children were reported abused or neglected last year. In North Carolina alone, that number was over 70,000. These children live in our own communities and are the children of neighbors, friends and even relatives.

There is an encouraging message that can be given out as we begin 1992 however, and that is the message of prevention. With our increased awareness in the area of prevention we are no longer turning our back on our children, nor do we have to wait for a crisis to happen before help can be given to a child.

April is Child Abuse Prevention Month, and it provides a wonderful opportunity for everyone to become involved in the solution. One such idea is the Blue Ribbon Campaign, which was begun by Bonnie Finney, a grandmother in Virginia who's grandson died due to injuries inflicted by his mother. The campaign involves wearing a blue ribbon, tying blue ribbons on every antenna, placing blue ribbons in every business, in every church and synagogue, in every school, in every hospital and in every home...

Exercise your power to make a difference in the lives of thousands of children by deciding to do at least one thing now. Volunteer; advocate to eliminate corporal punishment in schools; get others involved; plan now to participate in child abuse prevention activities in April; become better informed on the subject of abuse; write a check. Do something. You can make a difference. It shouldn't hurt to be a child.

Jennifer Tolle

*"Your children are not your children. They are the sons and daughters of life's longing for itself. They come through you, but not from you; and though they are with you, yet they belong not to you. You may give them your love, but not your thoughts; for they have their own thoughts. You may house their bodies, but not their souls, for their souls dwell in the house of tomorrow, which you cannot visit; not even in your dreams. You may strive to be like them, but seek not to make them like you."*

— Kahlil Gibran

## NC/NCPCA Staff

| | |
|---|---|
| Executive Director | *Jennifer Tolle* |
| Executive Assistant | *Angela G. Burgess* |
| Clerical Assistant | *Ginny McCotter* |

# Mark Your Calendar!

✔ The Eighth National Symposium on Child Sexual Abuse will be held February 17th -21st, 1992 at the Von Braun Civic Center in Huntsville, Alabama. The conference will offer topics such as investigative interviewing, play therapy, cross-cultural sensitivity, prevention issues and much more. For additional information call Marilyn Grundy at (205) 533-5437.

✔ For the first time ever, the 9th International Congress on Child Abuse will be held in the United States. Over 2500 participants from 80 countries are expected to attend the Congress, which will be conducted from August 30th - September 2, 1992 at the Hyatt Regency Hotel in Chicago, Illinois. The Congress, sponsored by the International Society for Prevention of Child Abuse and Neglect and hosted by NCPCA, will address issues of child labor, children in war zones, homeless children, and children in poverty.

For more information write to:

Leslie Mitchell, Congress Coordinator
332 South Michigan Avenue
Suite 950
Chicago, Illinois 60604-4357

# North Carolina Council of Shopping Centers Update

by Cari Williamson
Service Chairman

I am proud to announce that the North Carolina Council of Shopping Centers (NCCSC) was honored with a 1991 International Council of Shopping Centers Merit Award for Marketing Excellence. The award was given in recognition of the NCCSC's fund-raising and awareness program done to benefit the NC/NCPCA. Out of 680 entries throughout the world, only 80 were selected as award winning marketing efforts.

We are thrilled to be the first statewide council in the 20-year history of this ICSC marketing awards program to receive international recognition for an outstanding marketing effort. However, at our recent NCCSC meeting in Wrightsville Beach, NC, it was agreed upon by the council that our finest reward and gratification comes from knowing that our efforts have helped the NC/NCPCA prevent child abuse in the state of North Carolina.

The NCCSC also agreed that we would like to continue our work with the NC/NCPCA. New officers were elected at our last meeting, and I will now be serving as the NCCSC Vice-President for the 1992-1993 term. A new Service Chairman will be appointed in January to work on the NC/NCPCA project. We look forward to exploring new and exciting ways that we can work together in 1992!

# Reasons We Abuse And Neglect Our Children

1. Unrealistic expectations of our children which create disappointment, conflict, power struggles, nonacceptance.

2. Lack of knowledge about different methods of discipline. Over-reliance on one method such as physical discipline.

3. Lack of knowledge about child development.

4. Unmet needs in ourselves lead to attempts to obtain gratification from our children in unrealistic proportions. We look to our children to meet our needs rather than we meeting theirs. Role reversal. Parent depends on child.

5. Social isolation. Support systems are often lacking. Superficial relationships.

6. Overly stressed. Inability to properly handle stress.

7. Inability to cope with feelings such as anger, guilt, etc. constructively.

8. Low self-esteem.

9. Depression.

10. Not getting enough enjoyment out of life.

11. Unsatisfying marriages.

12. The child is seen as "different" or "special". Often the child is the immediate source of external stress and is an easy target on which to unleash feelings.

13. Inability to accept child as unique and different. Our "self" may not dovetail with the child "self".

14. Socially scripted which promote abuse. Examples: "Children should be seen — not heard", myth of the "Gerber baby", "parental ownership".

15. Personal history of abuse.

16. Cultural support for corporal punishment.

## Wish List

NC/NCPCA would love to accept tax-deductible donations of the following items:

- Dorm-size refrigerator
- Two-drawer filing cabinet
- Book shelves
- Answering machine
- VCR and TV
- 40 mega-byte IBM Compatible Computer
- Hand trucks

## Focusing on Support Programs...

*continued from page 7*

needs; demonstrated ability to care for the child's physical and developmental needs; fewer subsequent pregnancies; more consistent use of health care services and job training opportunities; lower welfare use; higher school completion rates for teen parents; and higher employment rates.

NCPCA and the National Parent Aide Association (NPAA) have joined forces in calling for renewed efforts to provide more uniform support to parents following the birth of a child.

A comprehensive survey by NPAA identified over 600 parent aide programs and estimates that at least 800 of these programs exist nationwide.

Findings from an NCPCA survey of a random sample of hospitals, school districts, and community-based agencies across the country confirm the popularity of support programs for new parents. For example, one-quarter of hospitals with maternity wards now provide follow-up home visits to new parents at risk; almost 30% of these hospitals sponsor parent support groups; and over one-third of community-based agencies working with families now offer in-home parent aide services.

While such statistics indicate a willingness on the part of agencies to support new parents, a more uniform and consistent effort is warranted. NCPCA and NPAA believe that current efforts are insufficient to meet growing demands.

*Source: NCPCA Fact Sheet #3.*

## Parent Quiz

Questions

1. You're tired and stressed. You're about to lose your temper with your children. Do you ...
   a. talk to a friend
   b. go in another room and shut the door
   c. take some slow, deep breaths
   d. any of the above

2. Children are at a greater average risk of using alcohol and other drugs if...
   a. their parents or grandparents do
   b. their friends do
   c. their brothers and sisters do
   d. all of the above

3. The best way to teach your children about alcohol and other drugs is to...
   a. have a clear family position on alcohol and other drug use
   b. look for "teachable moments" to talk to children
   c. be a positive role model for them
   d. all of the above

4. Children learn more easily if you...
   a. encourage them
   b. criticize them
   c. punish them

5. Your child is extremely angry with you. How do you handle the situation?...
   a. ignore him/her
   b. tell your child they have no reason to feel that way
   c. encourage your child to talk about their angry feelings

Answers

1. d. Any of the above. All parents get stressed out at times. Before you lose your temper give yourself a "timeout" and separate yourself from your children while you cool off.

2. d. All of the above. Research shows that children are much more likely to use alcohol and other drugs if family members or others around them do.

3. d. All of the above. Set a clear family position what is and isn't OK for grown-ups and children. Use "teachable moments" to talk to children. These are everyday opportunities to teach, such as seeing a beer commercial or a young person smoking. Remember, the very best way to teach is with your own positive behavior.

4. a. Encourage your children's efforts, not just the results. Compliment them when they do something well.

5. c. Encourage your child to talk about their angry feelings. Let your child know that it's OK to feel angry; everyone does. Help your child talk about it so they can learn there are safe, non-violent ways to show anger.

*Source: The National Parent Quiz.*

11

Case: 06-cv-00424-RMU    Document 1-6    Filed 03/09/2006    Page 135 of 151

☐ Please enroll me as a member of NC/NCPCA
at the category listed below.

☐ $500 Sustainer

☐ $250 Patron

☐ $100 Organization

☐ $50 Friend

☐ $25 Family

☐ $15 Individual

Name _____

Address _____

City_____ State _____

County_____ Zip _____

Home Telephone _____

Work Telephone _____

Organization _____

Return this form with your check or money
order to: NC/NCPCA, 1027 Highway 70 West,
Suite 215, Garner, NC 27529

## Member Of NC/NCPCA Or To Renew Your Membership

As a member of NC/NCPCA you will be participating in a statewide network of individuals and organizations committed to the prevention of child abuse. Your membership will help support this newsletter, our annual conference, local workshops and the Lending Library.

As a member of NC/NCPCA you will receive this quarterly newsletter, a personalized membership card, use of the Lending Library, reduced conference fees and the knowledge that you are playing an important role in the prevention of child abuse.

## Facts About Vaccinations

continued from page 6

For those parents who wish to protect their children from these dread diseases, but do not know how, here are the facts:

In North Carolina, every child must be vaccinated before they will be allowed into a public school or a state licensed day-care facility.

There is an entire scheduling of shots, beginning at two months which must be followed — to be properly immunized (protected from the disease) you have to have booster shots at different intervals until age five. Many parents get the first shot and never go back, which leaves the child just as vulnerable as if he had not received any shots at all.

If you cannot afford a pediatrician, you can get the vaccines free at your local health department ... call ahead, as you may need an appointment.

North Carolina Chapter
NCPCA
Hartwell Plaza, Suite 215
1027 Highway 70
Garner, NC 27529

Nonprofit Org.
U.S. Postage
PAID
Pittsburgh, PA
Permit No. 1749

# Take time out.
# Don't take it out on your kid.

Reese Brothers
925 Penn Avenue, Sixth Floor
Pittsburgh, PA 15222-3883
412-355-0800  800-365-3500
Fax 800-365-3500 x265

# reesebrothers

December 27, 1991

Bob Frank
Frank & Company, p.c.
1360 Beverly Road, Suite 300
McLean, Virginia 22101

Dear Bob,

We will conduct a survey at no cost to the Vietnam Veterans Memorial Fund to determine whether an acquisition telemarkcting campaign would be feasible for the Vietnam Veterans Memorial Fund. There will be no more than 5,000 calls made and no money collected.

This survey will be conducted during January and February of 1992. Please sign below to indicate to us that the organization wishes us to conduct the survey. ①

Sincerely,

Barry S. Reese
President

Vietnam Veterans Memorial Fund (VVMF)

Name _____  Title Sec/Trea  Date 1/7/92

Name _____  Title Pres  Date 1/17/92

① VVMF shall approve all telemarketing scripts, information, and instructions that RB provides its TSR's. /AB

FRAN1227 GS

MEMORANDUM

To:    Jeff Zelkowitz, Esq.

From:  Errol Copilevitz, William Raney and George Miller, Esqs.

Date:  October 6, 1998

Re:    First Amendment Challenge Talking Points

Question: Why can't the Post Office deny charities the ability to use nonprofit mailing rates when using telemarketing service bureaus as agents to send mail fully compliant with state law when the same mail if sent in house would be entitled to the nonprofit rate?

Answer:

        Solicitation of the public for support by nonprofit organizations is speech fully protected by the First and Fourteenth Amendments to the Constitution. As such, charitable solicitations may only be regulated using "sensitive tools" which do not unduly infringe upon the rights of the speaker to choose both what it says and how it says it. Courts have held that postal rates and classifications can infringe upon these speech rights and do not necessarily constitute "mere economic" regulations subject to a lesser standard of scrutiny. The Supreme Court, moreover, has held that regulations which restrict the ability of nonprofit organizations to use professional representatives in their fundraising necessarily discriminate against small or unpopular charities which must usually rely on professional fundraisers. The denial of similar mailing rates to charities which use professional fundraisers to mail material identical to that sent by organizations which do not use professional fundraisers necessarily discriminates against smaller or more unpopular groups, constitutes a prior restraint, violates equal protection, is overbroad and lacks a compelling government purpose such that these infringements would be constitutional.

**1. Solicitations for support by charitable organizations delivered through any medium are fully protected speech.**

        It has been well-established by the Supreme Court that the solicitation of donations by charitable organizations is speech fully protected by the First Amendment to the United States Constitution. Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781 (1988); Secretary of State of Maryland v. Joseph H. Munson Company, Inc., 467 U.S. 947 (1984); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980). In Schaumburg the Supreme Court held that:

        . . . charitable appeals for funds . . . involve a variety of speech interests-

1

communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment.

444 U.S. at 632.

The involvement of a professional to aid in delivery of that message, furthermore, does not change the fully-protected nature of the speech. The Supreme Court has concluded that any commercial speech aspect this aid may have is "inextricably intertwined with otherwise fully protected speech. ... Therefore, we apply our test for fully protected expression" to this type of regulation. Riley, 487 U.S. at 796.

**2. In this context, mail rates classifications are more than "mere economic" regulations.**

Nor can the USPS argue that mailing rate classifications are "mere economic" regulations with only incidental effect on free speech. The Supreme Court has rejected the proposition that regulations of the relationship between charities and professional fundraisers have no speech implications. Riley, 487 U.S. at 788-9, and has explicitly rejected the notion that mailing classifications for rate purposes can be made without regard to the First Amendment.

In 1946, the Supreme Court considered the question of whether the postal service could revoke a magazine's second class mailing permit based on the content of the publication. In Hannegan v. Esquire, 327 U.S. 146 (1946), the Court ruled that this was constitutionally impermissible. The Court ruled that the USPS could not require users of the permit to prove how their publications served the public good prior to using the permits. Id. at 156. Justice Douglas, writing for the Court, noted that:

> . . . grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever [citations omitted]. Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated.

Id.

It was therefore constitutionally impermissible for the USPS to require that Esquire magazine prove that its content was contributing to the public good and welfare to use the second class mailing rate. The Court did not hold that the regime was acceptable under the Constitution because Esquire was free to use a more expensive, unsubsidized, rate.

The issue of subsidized mailing rates has more recently been addressed by lower courts which have reaffirmed the Supreme Court's analysis. In Greenberg v. Bolger, the United States District Court in New York addressed the question of whether the USPS may subsidize some speakers and deny the subsidy to others based solely on the size of the organization. Greenberg v. Bolger, 497 F.Supp. 756 (D.C. N.Y. 1980).

In Greenberg, the U.S. District Court for the Eastern District of New York addressed the constitutionality of a postal regulation which gave preferential postage rates to the two major political parties but denied those rates to a host of smaller parties. The Court struck down the preferential treatment for several reasons.

First, the Court held that:

Government burdens speech by either 1) directly regulating the expression of ideas or information or 2) regulating noncommunicative activity in a way that restricts communication.

Id. at 774.

The Court found that a subsidy of mailing rates for some political parties, and a denial of that subsidized rate to others was a content-based infringement of free speech in violation of the First Amendment. Id. at 775.

The Court noted that protection of new or unpopular ideas:

Is the very essence of the first amendment. . . . To suggest that a regulation that confers benefits on the basis of popularity is not content-based would require the court to draw on [sic] artificial distinction between the popularity and the substance of an idea.

Id.

The Court also held that:

The preservation of scarce financial resources has not provided a rationale for government activity that favors certain persons or groups and disfavors others on the basis of the content of the speech or the popularity of the speaker.

Id. at 776.

Spencer v. United States Postal Service, 613 F.Supp. 990 (S.D. Ohio, W.D., 1985), addressed a federal statute with similar effect: denial of preferential mailing rates to a political organization, in this case because the political organization did not have a state-wide presence. Id. at 991. Citing Regan v. Taxation with Representation of Washington, 461 U.S. 540 (1983), the USPS argued that the statute was not a violation of the United States Constitution because government has no obligation to subsidize an organization's exercise of its First Amendment rights. Id. at 992.

The Court rejected this argument. It noted that free speech is a fundamental right, therefore, applied strict scrutiny to the statute which mandated denial of the subsidized rate to some organizations but allowed other organizations to use it for similar activities. The Court

3

held the statute could not withstand such scrutiny. Id. at 994.

> The trial court had previously enjoined the statute holding that:

>> [w]e doubt that under these circumstances that the Postal Service can demonstrate that its interests in administrative efficiency and the saving of revenues outweigh [the plaintiff's] interest in communicating its ideas and the public's interest in being informed . . .

Spencer v. Hardesty, 571 F.Supp. 444, 454 (S.D. Ohio, W.D., 1983).

> The effect of denial of subsidy, furthermore, was irreparable harm.

>> It is not the Court's business to make sure that each political party has access to the same resources, but it is the Court's business to recognize that in the final analysis financial resources determine a party's power to communicate its political beliefs. For the government to make resources available to one party but not to another for campaign purposes by subsidizing the mailings of one party and not of the other subjects the unsubsidized party to irreparable injury where an election is imminent.

Id. at 453-4.

> Greenberg and Spencer clearly protect smaller or unpopular groups from being discriminated against with regard to mailing rates.

> It is clear, therefore, that the charitable solicitations are fully protected speech and that postal rate classifications can only regulate that activity in compliance with the Constitution.

## 3. The percentage guarantees in these contracts are required by state law.

> The specific test applied by the USPS to determine if a mailing enjoys nonprofit rates or is "cooperative" and thus subject to commercial rates includes the question of "What risks are entailed with the mailing or with an enterprise it supports and who bears these risks?" USPS, Pub. 417, Ch. 5-2.1.

> In this situation, the Service has concluded that the percentage guarantees in the contracts between the nonprofits and their professional fundraiser cause the nonprofit to have no risk, thus causing the mailings to be "cooperative".

> These percentage requirements, however, are required by state law.

> As set forth in Riley, states may regulate certain financial aspects of charitable solicitations and the relationship between charities and their agents retained to assist in the fundraising process. Riley, 487 U.S. at 800.

4

One requirement by many states has been that contracts between charities and fundraisers must disclose the minimum percentage of the funds received from pursuant to the contract which the charity will receive after all expenses and fees have been deducted.

Connecticut, for example, requires that

A contract between a paid solicitor and a charitable organization shall be in writing, shall clearly state the respective obligations of the paid solicitor and the charitable organization and shall state the minium amount which the charitable organization will receive from the campaign, which minimum amount shall be stated as a percentage of the gross revenue, such minimum amount shall not include any amount which the charitable organization is to pay as expenses of the solicitation campaign.

Conn. Stat. §21a-190f(d), see also Georgia Stat. §43-17-3(e)(3), Indiana Stat. §23-7-8-2(e), Maryland Stat. §6-616(2), Massachusetts Stat. 68 §22(b)(2), New Hampshire Stat. §7:28-c(IV)(a), North Carolina Stat. §131F-16(g)(3), Ohio Stat. §1716.08(A), Pennsylvania Stat. §162.9(f)(4), South Dakota Stat. §37-30-7, Utah Stat. §13-22-9(1)(b)(vii)(D), Vermont Stat. T.9 §2472(a)(1), Wisconsin Stat. §440.44(4)(a).

Some state regulators have taken the additional position that this guaranteed percentage cannot be zero arguing that the fundraising would no longer be charitable if the charity was not guaranteed a minimum percentage of the funds raised. For example, the Attorney General of the State of Ohio has indicated that

[Ohio law] provides that every contract between a professional solicitor and a charity must contain either a fixed or estimated percentage of the gross revenues that the charity will receive, and, if estimated, a guarantee that the charity will receive 90% of the estimated amount. . . . [P]lease be aware that the "zero" percent guarantee that [the solicitor] has offered the charities under some of the addenda would not be acceptable in Ohio. A contract that guarantees "zero" percent to the charity is no longer a charitable solicitation; it is strictly a for profit transaction. To represent to donors that their donations are for charitable purposes in these circumstances is a misrepresentation . . .

Letter, September 26, 1994 from Sherry M. Phillips, Assistant Attorney General to Bruce R. McBrearty, Transamerica Marketing Services, Inc.

Thus the state law requirements, coupled with the application of the cooperative mailing test, result in a situation where a nonprofit using a professional fundraiser cannot use the nonprofit rate without violating either the cooperative mailing rule or state law. A similar nonprofit organization, however, sending identical mail but using its own employees can use the nonprofit rate and enjoys a favored position with regard to this speech.

**4. The Supreme Court has forbidden the use of percentage breakdowns of funds raised to**

separate legitimate from illegitimate fundraising.

The Supreme Court, however, has rejected the use of how the funds received from a fundraising campaign are divided to determine if the speech is commercial or fully protected.

Specifically, in Schaumburg, 444 U.S. at 637, the Court considered a municipal ordinance which prohibited nonprofit organizations from spending more than 25% of the receipts from a charitable campaign on fundraising, salaries and overhead. The Village of Schaumburg justified this prohibition by arguing that the restriction was designed to prevent fraud; specifically, if a nonprofit spent more than 25% of is charitable receipts on fundraising, salaries and overhead it was a commercial organization, not a nonprofit, and to solicit funds for an expressly nonprofit purpose was fraudulent. Id. at 636.

The Supreme Court disagreed:

> The Village, consistently with the First Amendment, may not label such groups "fraudulent" and bar them from canvassing on the streets and house to house. Nor may the Village lump such organizations with those that in fact are using the charitable label as a cloak for profitmaking and refuse to employ more precise measures to separate one kind from the other.

Id. at 637 (emphasis added). Thus, it is improper to determine whether speech is fully-protected nonprofit or commercial based simply on how monies are divided between a nonprofit and its fundraisers. This measure is too imprecise in the First Amendment context. The Supreme Court later used this ruling to hold that there is no relationship between this percentage and fraud in general. Munson, 467 U.S. at 961. Riley, 487 U.S. at 793.

The later two cases of the trilogy also stand for the proposition that a "sliding scale" of classification based on percentages is no more acceptable than the set percentage found in Schaumburg. See Riley 487 U.S. at 793 and Munson, 467 U.S. at 961. The USPS may not, then, distinguish Schaumburg on the basis that it does not consider the percentage itself, rather it uses the percentage to determine risk. This is simply a percentage is disguise, rejected by Riley and Munson.

The classification of these mailings as "cooperative" or at least partially commercial in nature and thus subject to commercial mailing rates uses percentage breakdowns in exactly this forbidden manner.

As previously set forth, the Supreme Court has held that the involvement of a professional fundraiser in delivering a charitable solicitation does not change the fundamentally protected nature of the speech. Riley, 487 U.S. at 796. Nor can the post office determine the nature of a nonprofit's mailing based on how the funds raised will be divided.

5. This Postal classification results in discrimination among speakers.

6

Thus it is firmly established that the speech involved here is fully protected by the Constitution and the involvement of a professional fundraiser does not alter the nature of the speech.

The application of the cooperative mailings rule to this speech results in inequity because a charity which mails its solicitations without the aid of an outside professional using its own paid staff enjoys the nonprofit rate while a similar organization sending identical mail with the aid of a professional must pay a higher rate. The forum is more open for the first group though the content and cost of producing the mailing (exclusive of postage) to both groups could be identical. The classification results in discrimination against the second group based on how it chooses to exercise its right to speech.

The Constitution, further, does not protect nonprofit's right to be free of direct discrimination and allow government to indirectly infringe on speech with impunity. It is a settled rule of constitutional jurisprudence that government may not do indirectly what it is forbidden from doing directly:

> As we have often noted, "'[c]onstitutional rights would be of little value if they could be . . . indirectly denied.'" Harman v. Forssenius, 380 U.S. 528, 540 (1965), quoting Smith v. Allwright, 321 U.S. 649, 664 (1944). The Constitution "nullifies sophisticated as well as simple-minded modes" of infringing on Constitutional protections. Lane v. Wilson, 307 U.S. 268, 275 (1939); Harman v. Forssenius, 380 U.S. at 540-541.

U.S. Term Limits v. Thornton, 115 S.Ct. 1842, 1867 (1995). Harman and its progeny recognized that government may not attempt to indirectly accomplish a goal which it is forbidden to attempt to achieve directly.

Thus, just as the postal service could not deny the right to mail to a charitable organization altogether while allowing other organizations to continue to use the mails, it cannot raise the postal rates on some organization's mail resulting in it favoring others' speech in comparison.

The use of professionals by nonprofit organizations in their solicitations for support is, in some circumstances, an economic necessity. Riley, 487 U.S. at 799. In Riley, the Supreme Court noted that a restriction applicable solely to charities which used professional fundraisers

> necessarily discriminates against small or unpopular charities, which usually must rely on professional fundraisers. Campaigns with high costs and expenses carried out by professional fundraisers must make unfavorable disclosures, with the predictable result that such solicitations will prove unsuccessful. Yet the identical solicitation with its high costs and expenses, if carried out by the employees of the charity or volunteers, results in no compelled disclosure, and therefore greater success.

7

Id. (emphasis added).

The situation of higher mailing rates for cooperative mailings of nonprofit advocacy and solicitation of support is an exactly analogous situation. Small or unpopular charities are forced by economic necessity to rely upon a professional to aid in the delivery of their mailings to potential donors and are subjected to additional burdens, i.e. higher postage rates, than larger or more economically sound organizations sending mail of identical content.

By applying a more expensive postal rate to mailings sent by these charities, the USPS is engaging in viewpoint discrimination against these speakers. That is, these speakers, by necessity smaller or unpopular charities lacking the economic means to conduct their own mailings, are forced to pay a higher postage rate than larger charities for mailing exactly the same content.

The doctrine of viewpoint discrimination was recently explored by the Supreme Court in Rosenberger v. Rector and Visitors of Univ. of Va., 115 S.Ct. 2510 (1996). In that case, the University of Virginia denied a subsidy to a student newspaper based on the religious nature of the organization which printed the paper. The Court held that:

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. . . . In the realm of private speech or expression, government regulation may not favor one speaker over another. . . . These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. . . . When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. . . . Viewpoint discrimination is thus an egregious form of content discrimination.

Id. at 2516.

The Court went on the hold that scarcity of public resources was not an appropriate justification for such discrimination. Id. at 2519; see also Greenberg, supra. at 776.

It is not necessary to analogize from Rosenberger directly to the present cooperative mailings question because another court has answered the question of whether the Post Office may subsidize some speakers and deny the subsidy to others based on the size of the organization. Greenberg v. Bolger, 497 F. Supp. at 756.

As set forth above, the U.S. District Court in Greenberg addressed the constitutionality of a postal regulation which gave preferential postage rates to the two major political parties but denied those rates to a host of smaller parties. The Court struck down the classification because it discriminated against the smaller or more unpopular political parties.

Thus it is established precedent that the government may not justify a viewpoint discrimination based on scarcity of government resources. Specifically, the Postal Service may

8

not grant postage subsidies to larger organizations engaging in fully-protected speech to the detriment of their smaller or unpopular competitors.

Thus, the application of the cooperative mailing rule in this circumstance acts as viewpoint discrimination against the smaller or unpopular charities which the Supreme Court has found are forced to rely on professionals to aid in the delivery of their speech.

The application of the cooperative mailing rule in this circumstance necessarily discriminates against small or unpopular charities.

## 6. This postal regulation is a prior restraint of protected speech.

The classification also results in these organizations' speech being at least partially silenced, as they cannot reach as many potential supporters due to the higher cost of sending each piece of mail.

By applying a higher postage rate to the mailings of these smaller or unpopular charities, the Postal Service placing such a burden on their speech that it is likely that they must cease some their solicitations. Imposed directly or indirectly, such compelled silence is a prior restraint on those organizations' speech.

The added economic burden, furthermore, will undoubtedly cause some charitable organizations to not solicit using this medium or at all, "chilling" their speech and silencing them despite the fully-protected nature of their speech.

Prior restraints of speech are permissible under the Constitution in very limited circumstances and bear a heavy presumption against their validity. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963). The Supreme Court has held that prior restraints must be accompanied by procedural safeguards to prevent the silencing of protected speech. Freedman v. Maryland, 380 U.S. 51, 58 (1965). First, the burden of proving the speech is unprotected must lie on the censor. Second, the restraint may only be imposed after a prompt adversarial hearing in a court of law. Id.

This classification lacks the procedural protections mandated by the First Amendment by allowing the postal service to determine if the speech is nonprofit or "cooperative" rather than a court, and placing the burden of persuasion on the speaker to prove his or her speech is not cooperative.

Recent decisions have affirmed that the procedural safeguards required by Freedman and the First Amendment and other constitutional protections bind the USPS just like any other government agency.

In Lamont v. Postmaster General, 381 U.S. 301 (1965), for example, the Court struck down a USPS regulation which required recipients of "communist political propaganda" to affirmatively state their desire to receive such material prior to it being delivered. Id. at 302.

9

The majority opinion, written again by Justice Douglas, held that:

> . . . the Act as construed and applied is unconstitutional because it requires an
> official act (viz., returning the reply card) as a limitation on the unfettered exercise
> of the addressees First Amendment rights. As stated by Mr. Justice Holmes in
> Milwaukee Pub. Co. v. Burleson, 255 U.S. 407, 437 (dissenting): 'The United
> States may give up the Post Office when it sees fit, but while it carries on the use
> of the mails is almost as much a part of free speech as the right to use out tongues
> . . .'

Id. at 305.

Similarly, in Blount v. Rizzi, 400 U.S. 410 (1971), the Court considered a statute which
allowed the Postmaster General to return mails which he determined were obscene to their
sender. Id. at 412. Postal regulations set forth the procedure whereby a sender of mail could
appeal the Postmaster General's decision to an administrative panel. During the pendency of this
administrative action, the Postmaster General had the right to seek an injunction from District
Court, preventing the mail in question from being sent which was to be granted upon showing of
"probable cause" that the statute was violated. Id. at 413-15.

Justice Brennan, writing for the majority, noted that the use of the mails is a crucial part
of free speech, and that the challenged regulatory scheme constituted a prior restraint lacking
required procedural safeguards. Id. at 416-17.

> To avoid constitutional infirmity a scheme of administrative censorship must:
> place the burdens of initiating judicial review and of proving that the material is
> unprotected expression on the censor; require 'prompt judicial review'- a final
> judicial determination on the merits within a specified brief period- to prevent the
> administrative decision of the censor from achieving the effect of finality; and
> limit to preservation of the status quo for the shortest, fixed period compatible
> with sound judicial resolution, any restraint imposed in advance of the final
> judicial determination.

Id. at 417.

> These procedural safeguards are the required because:

> The line between speech unconditionally guaranteed and speech which may be
> legitimately regulated . . . is finely drawn . . . [t]he separation of legitimate from
> illegitimate speech calls for . . . sensitive tools . . . Speiser v. Randall, 357 U.S.
> 513, 525 (1958). The procedure established by [the statute] and the implementing
> regulations omit those 'sensitive tools' essential to satisfy the requirements of the
> First Amendment. The three-judge courts correctly held in these cases that our
> decision in Freedman v. Maryland, 380 U.S. 51 (1965) compels this conclusion.

10

Id.

The USPS, then, is bound to the same procedural safeguards applied to other government actions with regard to prior restraints.  See Freedman, 380 U.S. at 58.

The cooperative mailing rule lacks the requisite sensitivity resulting in mailings of identical content and similar origin being classified differently with the higher burden falling on smaller or more unpopular nonprofit groups.

## 7. The classification also infringes upon the nonprofits' rights to Equal Protection.

It is also well-settled that speakers are protected by the Equal Protection clause of the Constitution because their exercise of free speech is a fundamental right. Police Department of Chicago v. Mosley, 408 U.S. 92, 94 (1971); Church of Scientology v. City of Clearwater, 756 F.Supp. 1498, 1512 (M.D. Fla. 1991).

In Mosley, the City of Chicago passed an ordinance prohibiting certain types of picketing within 150 feet of schools.  Peaceful labor picketing was exempted from the ban. Mosley, 408 U.S. at 93.  The statute was struck down by the Court which reasoned that:

> . . . under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. . . . Guided by these principles, we have frequently condemned such discrimination among different users of the same medium of expression.

Id. at 96.

The classification of these mailings as cooperative denies these organizations an "equal opportunity to be heard" by making them pay more to deliver their message.  A similar organization using in house paid employees to conduct an identical fundraising campaign would have an advantage financially over nonprofits forced to use professional fundraisers.

Because the postal service treats discriminates financially against some speakers it has denied those speakers an equal opportunity to be heard.  The classification must therefore be narrowly tailored to further an appropriate government interest.  Mosley, 408 U.S. at 95, 99.

As set forth below, the cooperative mailings test lacks a legitimate governmental concern as well as narrow tailoring to further that concern.

## 8. The application of the cooperative mailings test to these mailings is overbroad and violates the First Amendment.

11

While the USPS has an undeniable economic concern that mailers properly classify their mail, the application of the cooperative mailings test to charitable solicitations improperly sweeps protected speech into the commerical classification without proper justification.

As important as the restrictions against prior restraint and viewpoint discrimination to the marketplace of ideas guaranteed by the First Amendment is the prohibition against overbroad regulations-- those which, while constitutionally applicable to some activity, bring protected speech within their restrictions thereby creating a chilling effect on persons who refrain from the conduct fearing potential prosecution. Cantwell v. Connecticut, 310 U.S. 296, 308 (1940). In the context of charitable solicitations, the Supreme Court has held that:

> [e]ven where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

Munson, 467 U.S. at 956.

Perhaps the seminal treatment of the overbreadth doctrine was an article by Professor Henry Monaghan found in the Harvard Law Review. Monaghan, "The First Amendment Overbreadth Doctrine," 83 Harv. L. Rev. 844 (1970). Monaghan began his treatment as follows:

> In theory, legislatures are as much the guardians of first amendment rights as are the courts. Precision in the drafting of statutory provisions to avoid applications which conflict with the first amendment is no doubt a goal to which all conscientious legislators would subscribe. It is, however, a goal that is often not achieved. Most laws affecting expressive activity comprehend at least some unconstitutional application. Many are so broadly drafted that the range of possible applications violating the first amendment is substantial. The principal responsibility for attacking the constitutional defect of overbroad coverage rest with the courts.

Id.

In the same article, Monaghan notes:

> It is virtually undisputed that legislation must fall if a court is convinced that its promotion of valid government interests is outweighed by its damage to expressive and associational interests . . . Rather than excise particular invalid applications one by one as they arise, the Court has employed the first amendment overbreadth doctrine to short circuit the process by invalidating the statute and putting it up to the legislature for redrafting. The doctrine focuses directly on the

12

need for precision in drafting to avoid conflict with first amendment rights.

Id. at 845 (emphasis added).

The First Amendment contemplates and indeed demands equal access to the marketplace of ideas. When statutes prohibit an activity and in doing so prohibit otherwise protected speech, the statute creates a "chilling effect" on the free speech rights of parties perhaps not even before the court. The overbreadth doctrine exists to eliminate this chilling effect. See e.g. Cantwell v. Connecticut, 310 U.S. at 308.

If the Act reaches a substantial amount of constitutionally-protected conduct, then, it may not be enforced against anyone, including the party before the court, until the statute is narrowed to reach only unprotected activity. This narrowing can be achieved in three ways: legislative action, judicial construction or judicial partial invalidation. Brockett v. Spokane Arcades, Inc., 472 U.S. 491 (1985).

The USPS undoubtedly intends the cooperative mailing rule to prevent for profit entities from using nonprofit rates to market their goods or services to the public. Two evils are prevented by this proper application: first, scarce economic resources are conserved such that only speech properly intended to be subsidized using the nonprofit rates is actually mailed, and second, the for-profit does not obtain an unfair advantage over its competition which properly uses the applicable commercial mailing rates.

It is forbidden, however, for the USPS to sweep the fully-protected speech included in these nonprofit's mailings within the "cooperative" classification to further these goals. Judicial narrowing to prevent application of the cooperative mailings test to a mailing with no "enterprise" is one solution.

## 9. The First Amendment also forbids content-based discrimination against free speech without compelling justification.

The infringement upon fully-protected speech and discrimination against the charities whose speech is involved calls the constitutionality of the cooperative mailing test into question. The cooperative mailings test can only withstand this scrutiny if it is narrowly tailored to further a compelling government purpose. Riley, 487 U.S. at 799.

The government may offer two possible justifications for the rule: first, the application of the cooperative mailing rule to these mailings represents an effort to preserve scarce government resources; and second, the charities could choose to use a different arrangement and thus maintain their nonprofit rates for their solicitations.

Neither of these is a compelling government purpose. As detailed, it is settled law that the scarcity of government resources is not a valid justification for subsidizing some speaker's speech over others'. Rosenberger, supra. Second, the Supreme Court has held that speakers, not

13

government, are entitled to choose both what they say and how they say it; paternalism is not a compelling purpose, either. Riley, supra.

Nor can the government claim that the involvement of the professional fundraiser in the delivery of this mail changes the fully protected nature of this speech thus subjecting the classification to some lesser standard of scrutiny. This argument has been explicitly rejected by the Supreme Court which held in Riley that the commercial nature of a solicitation delivered through a professional fundraiser, if existent at all, was "inextricably intertwined" with the fully-protected message of the nonprofit speaker, thus calling for the highest level of constitutional protection. Riley, 487 U.S. at 796.

The regulation must also be narrowly tailored to further any compelling purpose offered. That is, the classification must further a compelling government purpose without unnecessarily interfering with First Amendment freedoms. Munson, 467 U.S. at 961.

While the USPS may have legitimate reason to limit use of the nonprofit mailing rates when a commercial "enterprise" is being offered to the public through a joint venture between a nonprofit and a commercial concern, the application of the rule to this speech shows that the rule is not narrowly tailored to further this goal. In this situation there is no "enterprise" of a product or service being offered.

An undoubted concern in the cooperative mailing situation is the ability of a for-profit entity to gain an advantage over its competition by using a nonprofit to deliver solicitations for its wares. A bank, for example, could deliver credit card solicitations at substantial savings by using nonprofit "affinity" if it were not subject to the cooperative mailing rule.

**No such concern exists in this situation. There is no "enterprise" of goods or services offered. There is no chance of the fundraiser obtaining a commercial advantage over its competition because the nature of the business is that the fundraiser always is delivering the speech of a nonprofit, not its own. A fundraiser which raises funds without a nonprofit is committing fraud.**

In fact, as this memorandum sets forth, the rule creates the opposite competitive concern by punishing these nonprofits vis a vis organizations that can afford to conduct their campaigns in house.

In Greenberg v. Bolger, the court concluded that a subsidy of mailing rates for some political parties, and a denial of that subsidized rate to others was a content-based infringement of free speech in violation of the First Amendment. 497 F. Supp at 775. The application of the cooperative mailing rule to these solicitations creates exactly the same concerns.

10. Conclusion.

Finally, the government, in general, and the postal service, in particular, may not substitute its own judgment for that of the charities in entering into these arms length

14

agreements. In <u>Riley</u>, the Supreme Court forbid such paternalism holding that "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how they say it." 487 U.S. at 790-791.

It is constitutionally impermissible for the USPS to classify this speech as a cooperative mailing thus burdening the nonprofit speaker for how it chooses to exercise its rights to free speech. The application of the cooperative mailings test to charitable solicitations delivered through professional fundraisers is not narrowly tailored to further a compelling government purpose and as such is unconstitutional.

15