# Reese Brothers, Inc.

---

## Circumstances that mitigate
## in favor of forbearance from collection
## of the claimed revenue deficiency

---

Nonprofit Service Group
Washington, DC
April 28, 2000

# Table of Contents

I.   National Forbearance Policy . . . . .   1

II.   Standard for forbearance:  "Financial hardship"
      v. "any mitigating factors" . . . .   4

A.   Headquarters' articulation of its national for-
     bearance policy v. Lippert's application  .   4

     (1)   Lippert articulation of the national for-
           Bearance policy . . . . .   4

     (a)   Analysis of the experience test:  Lippert's
           application to RBI . . . . .   5

     (b)   Analysis of the notice test:  Lippert's
           application to the RBI case . . .   5

     (i)   Notice:  February 1991 RCSC ruling . .   5

     (ii)  Fundamental differences between the mail
           pieces in the 1990 case and the 1998 case   6

     (iii)  The 1991 contract review signaled a
            problem with only the Privileged Diner
            Card mail piece. . . . . .   7

     (2)   Porras' articulation of the national policy   7

     (a)   Notice . . . . . . .   7

     (b)   Spirit of Porras . . . . .   9

C.   Conclusion . . . . . . .   11

III.   Conflict of Law . . . . . .   13

A.   Overview . . . . . . .   13

B.   Analysis:  Which law should give way? . .   15

     (1)   The stated ends of both rules are legit-
           imate. . . . . . .   16

(2)  Discriminatory means of the federal rule          18

(3)  The Supreme Court's test to determine
     whether a federal or state rule prevails          20

(a)  Is a uniform federal rule necessary?  .           21

(b)  Application of state law would not frustrate
     the federal objective.  .    .    .    .          22

(c)  Application of the federal rule would
     disrupt commercial relationships predicated
     on state law and foreclose charities' speech
     via telemarketing.  .    .    .    .    .          24

(d)  Conclusion    .    .    .    .    .    .           25

(4)  Conflict between two federal agencies   .         25

(5)  Non-discriminatory alternative    .    .          26

IV.  Financial Hardship  .    .    .    .    .    .     29

A.  RBI lost most of its charity-clients.    .    .    29

B.  Lost jobs  .    .    .    .    .    .    .    .     30

C.  Financial hardship to pay the claimed deficiency   30

D.  Conclusion .    .    .    .    .    .    .    .     31

Exhibits

Appendix A

In the case to which the Postmaster General was re-
ferring in his letter to Chairman McHugh, the regulation
that the mailer and its agent violated governed the content
of a card blown into a periodical mailed at the Periodicals
rate. That issue was straightforward: In order to be
eligible for the Periodicals rate, the subject matter of the
card may be only to solicit a subscription to the host
periodical. Anyone who can read should be able to determine
whether a blown-in card pertains to a subscription.

In contrast, when it comes to applying the regulation
at issue, there aren't any standards. It reads as follows:

An organization authorized to mail at the
Nonprofit Standard Mail rates may mail only its
own matter at those rates. An authorized orga-
nization may not delegate or lend the use of
its authorization to mail at the Nonprofit
Standard Mail rates to any other person or or-
ganization.

§E670.5.1 <u>Domestic Mail Manual</u>. This regulation is silent
as to the standards a mailer or its agent should apply in
order to judge what constitutes "its own matter."

One example of how confusing it is to apply this
standard occurred during the decade of the 1990s. Classi-
fication at postal headquarters ruled that it was not a
cooperative arrangement when the mail agent in effect fi-
nanced mail preparation and postage costs as long as the
mailer finally paid or reimbursed those costs. Nonprofit
organizations re-pay their agents from do-nations received
as a result of the mailing that their agents financed. If
one mailing isn't sufficient to pay off the agent, the non-
profit arranges for the agent to finance a second mailing.

In the instant RBI case, RBI and its charity-clients
did just that, yet Classification at headquarters ruled that
the mailings were nonetheless unauthorized cooperative
mailings notwithstanding its own precedents. The purpose of
this paragraph is not to rehash the final agency decision in
the RBI case. It is merely to point out how complex and
con-fusing application of §E670.5.1 is compared with the DMM
regulation in the case to which the Postmaster General was
referring when he advised Chairman McHugh that the standard
for forbearance is "any mitigating factors."

Moreover, it is difficult for the mailer or its agent to learn the standards to apply to a mail piece in order to determine if a mail piece constitutes an unauthorized cooperative mailing. For example, the Postal Service does not compile its decisions. Thus, one cannot go to a directory of USPS decisions and under the rubric, "Unauthorized Cooperative Mailings," read and compare the various standards that Rate and Classification Service Centers ("RCSCs") and headquarters have applied over the years and the circumstances in which they applied a standard.

Further, in the case to which the Postmaster General referred in his letter to Chairman McHugh, there wasn't any overriding consideration, such as conflict of law, as there is in the RBI case. The distinction between the two cases is even greater because the conflict of law issue in the RBI case goes to one of Classification's most important indicia of an un-authorized cooperative mailing, risk.

The fundamental discrepancy between the standard for forbearance as articulated by the Postmaster General on one side and the Philadelphia Field Office on the other demonstrates further just how complex and confusing postal regulations are. This observation is not meant as a criticism but merely recognition of reality. The complexity and confusion inherent in regulating postal rates is no doubt one important reason why the Postal Service's Chief Financial Officer recently articulated a national forbearance policy.

## II.  National Forbearance Policy

RBI's position is that one of the mitigating factors should be the national forbearance policy that was first articulated when M. Richard Porras was Chief Financial Officer.

### A.  Headquarters' articulation of its national forbearance policy v. Lippert's application

Judging from Mr. Lippert's letter dated March 17, 2000 where he claims to have applied the Porras policy, there seems to be a discrepancy between the Chief Financial Officer's articulation of the policy and how his manager in Pittsburgh applied it, at least to RBI.  RBI's contention is that the national forbearance policy as articulated by postal headquarters would stay collection of the revenue deficiency claimed.

#### (1)  Lippert's articulation of the national forbearance policy

Mr. Lippert explained his understanding of the national forbearance policy as follows:

> In order to determine whether a mailer had prior notice of the applicable standard, we consider whether the mailer or its agent received written or verbal rulings or training.  We also consider the experience of the mailer or its agent and if they should have reasonably known that the mail was not eligible for the rates claimed.

Letter from George L. Lippert, Manager Finance, Pittsburgh District, U.S. Postal Service, to Reese Brothers, Inc., March 17, 2000 (hereinafter referred to as "Lippert Letter").  (A true and correct copy of this letter is attached as Exhibit 3.)

With respect to "written or verbal rulings or training," Mr. Lippert asserts as follows:

> Reese Brothers was assessed additional postage in 1990 for mailing cooperative mailings that did not qualify for the non-profit rates.  At that time Reese Brothers was made aware of the eligibility requirements for the non-profit rates of postage.

<u>Id</u>.

(a)  <u>Analysis of the experience test:  Lippert's appli-
cation to RBI</u>

With respect to the experience of the mailer or its
agent, Mr. Lippert points out that "Reese Brothers is/was a
professional mailer with volumes/mailings in 1997 alone of
11,923,963 pieces and $2,001,683 in postage."  <u>Id.</u>

To be precise, RBI is a professional solicitor who, in
this case, delivered mail pieces to Pittsburgh as a mail
agent for its charity-clients.  In a vacuum, it may seem
that 12 million pieces per year with a value in terms of
postage of $2 million is large, but both numbers are mini-
scule in the context of direct mail charities.  For example,
the March of Dimes alone mails more than 100 million pieces
annually.

Even if RBI were genuinely a large mail agent, one
would reasonably expect the national forbearance policy to
apply.  Nowhere in Porras' written or oral public statements
has he specified that he intended his Finance field staff to
apply the national forbearance policy only in cases where
the mailer or its agent accounts for less than 12 million
pieces annually with a postage value of less than $2
million.

(b)  <u>Analysis of the notice test:  Lippert's appli-
cation to the RBI case</u>

(i)  <u>Notice:  February 1991 RCSC ruling</u>

The lead paragraph of the 1991 RCSC decision described
the issue in that case in terms of the decision from which
RBI had appealed in 1990:  "The decision prohibited the
Reese Brothers <u>Privileged Diner Club card</u> to be mailed at
the special bulk third-class rates of postage."  Letter from
Scott Hamel, General Manager, Rates and Classification
Center, Northern Virginia, U.S. Postal Service, February 8,
1991 (hereinafter referred to as 1991 RCSC Decision
Letter)(emphasis added).  (A true and correct copy of this
letter is attached as Exhibit 4.)

The next two paragraphs recite sections from the Do-
mestic Mail Manual.  The fourth paragraph begins:  "A review
of the mailing piece <u>in question</u> . . ."  (emphasis added)

That paragraph goes on to describe that particular mail piece as follows: "Enclosed in the mailing envelope are the following: . . . (2) Attached to this cover page is a wallet size 'Reese Brothers Privileged Diner' identification card which bears the member's name and expiration date."

The fifth paragraph begins: "A review of the letter attached to a contract which explains the intent and understanding of both parties joined in <u>this</u> program states in part, 'Reese Brothers, Inc., sells the Privileged Diner Card to MADD as a donor premium." (emphasis added)

The sixth paragraph states the RCSC's three conclusions all of which are specific to the Privileged Diner Card mail piece. The seventh paragraph states the overall conclusion:

> Based on our review, as mentioned above, since Pennsylvania MADD does not have management control nor are they at risk in <u>this</u> enterprise with Reese Brothers, Inc., this is a joint venture. . . . In view of these facts, I have concluded that <u>this</u> cooperative mailing is ineligible for the special third-class rates. (emphases added)

Thus, from start to finish a plain English reading of the 1991 RCSC Decision Letter is that it pertained to a very specific mail piece and arrangement: the Reese Brothers Privileged Diner Club card program governed by a discrete contract.

### (ii) <u>Fundamental differences between the mail pieces in the 1990 case and the 1998 case</u>

Both the mail pieces and the contractual arrangements at issue in the instant case differ significantly from those described in the 1991 RCSC Decision Letter. A primary difference is the type of solicitation at issue in each case. There are basically two types or categories of charitable solicitations: a "straight" solicitation and a solicitation that uses a technique to induce the prospective donor to contribute, such as a premium.

The Reese Brothers Privileged Diner Club card falls into the second category because it was a product or premium that was offered in conjunction with a solicitation to contribute. In contrast, the mail pieces in the instant case represent a straight solicitation, the first type or cate-

gory of charitable solicitation. The only "enterprise" is
to raise money for the charity-client and to deliver its
message.

RBI's position is that this distinction is a mitigating
circumstance. A plain English reading of the Postal
Service's national forbearance policy supports this po-
sition. (See below "(2) Porras articulation of the na-
tional policy.")

> (iii) **The 1991 contract review signaled a problem with
> only the Privileged Diner Card mail piece**.

RBI's reading of the contracts that the RCSC reviewed
in the 1990 case provide for both types of solicitations, a
straight solicitation and a solicitation that induces a con-
tribution through a premium offer. The contractual ar-
rangement is set forth in Exhibit 5.

The portion of that arrangement that the 1991 RCSC
ruling found to violate the cooperative mailing rule per-
tained to a particular premium, the Privileged Diner Card.
Therefore, RBI concluded that the RCSC in effect approved
the other solicitations and mail pieces that RBI conducted
and prepared pursuant to the contractual arrangement.

Because the RCSC did not raise any other question or
problem until 1995, RBI was under the impression that all
solicitations other than the Privileged Diner Card between
1991 and 1995 complied with the Postal Service's interpre-
tation of congressional intent, namely that an entity
authorized to mail at the nonprofit rate may mail only its
own matter. As discussed below, the issue that the RCSC
raised in 1995 was resolved.

> (2) **Porras' articulation of the national policy**

> (a) **Notice**

In its <u>Memo to Mailers</u>, postal headquarters stated its
national forbearance policy as follows:

> According to Richard Porras, USPS chief finan-
> cial officer and executive vice president, ac-
> ceptance personnel will notify mailers the first
> time they have a preparation problem that should
> have resulted in higher postage. However, 'after

> notice is given and _identified_ problems continue
> to occur, deficiencies will be assessed.'

Memo to Mailers, 33 (March, 2000) at 1 (emphasis added).

This statement is echoed in Mr. Porras' letter to the
industry chair of the Mailers Technical Advisory Committee
("MTAC"):

> We will provide mailers with notice of problems
> and recommend remedies. Deficiencies will not
> be assessed as part of this notice process.
> However, if after notice is given and _identified_
> problems continue to occur, deficiencies will be
> assessed.

Letter from M. Richard Porras, Chief Financial Officer and
Executive Vice President, U.S. Postal Service, to Joseph E.
Schick, Industry Chair, Mailers Technical Advisory
Committee, January 11, 2000 at 2 (emphasis added). (A true
and correct copy of this letter is attached as Exhibit 6.)

It seems clear under Mr. Porras' articulation of the
national policy that the Postal Service will assess a de-
ficiency (1) only after notice is given and (2) only if the
identified problems continue to occur. In the instant case,
RBI acted immediately upon receipt of the 1991 RCSC Decision
Letter, and the problem it identified did _not_ continue to
occur.

The plain English reading is further supported by
Porras' exception to this policy: "Where intentional mis-
conduct is found, the processes we outline here will not be
applicable." _Id_. at 2.

No one at the Postal Service has alleged that RBI in-
tentionally defrauded the Postal Service. Intentional mis-
conduct would have occurred, if RBI had continued to
prepare the identified piece for mailing at the nonprofit rate.
That simply was not the case. Here, the Postal Service
identified a problem; RBI took immediate action upon
issuance of the final agency decision; and the identified
problem has not occurred since.

The absence of any allegation of intentional misconduct
is consistent with the fact that the mail piece in the 1998
case is fundamentally a different type of solicitation. The

facts of the 1998 case are quite different than the facts of
the 1991 case.  That is one basis to conclude that the 1991
RCSC decision does not constitute notice relative to the
1998 mail pieces.

> (b)  <u>Spirit of Porras</u>

On February 2, 2000, at the first meeting of MTAC fol-
lowing Mr. Porras' letter to the MTAC Industry Chair, Porras
advised MTAC members:  "We want to make <u>certain</u> that we're
not giving mailers a bad time."  (emphasis added)  Porras
further stated that his policy could be summed up in six
words:  "Insure equality, fairness, and cooperation, and
[be] proactive and responsive."

In reacting to the national forbearance policy as
Porras articulated it, the MTAC Industry Chair stated that
the mailing industry is ". . . 'pleased with the results.
Now we need to see it put into practice,' he added, saying
that field personnel will be key to the change."  <u>Memo to
Mailers</u>, <u>supra</u> p. 6 at 2.

The MTAC Industry Chair noted further:  "When people
make honest mistakes--especially considering the complexity
of mailing requirements--we want it handled in a fair
manner."  <u>Id.</u>

Also present at the February 2, 2000 MTAC meeting was
Michele Denny, Manager, Marketing Technology, to whom Mr.
Porras deferred during his presentation and question and
answer session with MTAC members.  She pointed out:  "Once
mail is accepted, it's accepted.  Therefore, we'll work with
the customer to get any problem [that's discovered after
acceptance] fixed."

"Some things can only be verified after the fact,"
Denny pointed out.  "We'll give the mailer an opportunity to
fix it."

Thus, Porras and Denny, the CFO and manager of Clas-
sification respectively, were in agreement that the hallmark
of the national forbearance policy was for Finance and Clas-
sification to cooperate with and be fair to mailers, and by
extension their agents, and to be proactive and responsive
when a problem was identified.

In essence, Lippert's position is that the February,
1991 NOVA RCSC decision, that by its own words addressed a
very specific mail piece and contract--the Reese Brothers
Privileged Diner Club identification card and the contract
that covered the Reese Brothers Privileged Diner program--
counts as notice of a problem that the NOVA RCSC did not
identify until seven years later.

The mail piece that RBI was preparing for its charity-
clients in 1998 was identical to the mail piece that the
NOVA RCSC reviewed earlier in 1995 except for several words.
The charity-client changed those few words back in 1995
because the NOVA RCSC had notified the RBI charity-client
that it would cost the charity substantially more in postage
unless it made the word change.

That exercise indicates that in 1995 the NOVA RCSC re-
viewed in minute detail the mail piece that RBI was
preparing for its charity clients.  The charity agreed to
make the word change; RBI did in fact make the change; and
the NOVA RCSC did not assess a postage deficiency.

The problem that the Postal Service "identified" in
1998, seven years after Lippert argues that the Postal
Service gave "notice," entails a mail piece and contracts
that differ markedly from the Reese Brothers Privileged
Diner program.  The Reese Brothers Privileged Diner Club
identification card was a premium, and it fulfilled a
solicitation that used the premium fund raising technique.

In contrast, the mail piece that the same RCSC reviewed
in 1995 and again in 1998 was a straight solicitation.  The
solicitation was oral via the telephone.  The charity client
retained RBI as the charity's professional solicitor to de-
liver the charity's message (e.g. Don't drink and drive.)
and solicit a donation.

Any person who responded to the solicitation by prom-
ising or pledging to donate received a follow-up mail piece,
the one in question in the instant case.  The follow-up mail
piece simply reminded the recipient of the amount of the
pledge and pointed out that the mail piece included a reply
addressed envelope in which to send the donation back to the
charity.

Thus, a straight solicitation simply requests a do-
nation.  The premium technique requests a donation coupled

with an inducement—-whatever the premium may be.  Common
premiums include name and address labels, bookmark, key
chain, tote bag, umbrella, greeting cards, and a package of
seeds.

   Given the fundamental differences between the 1991 mail
piece that induced a contribution with membership in a
diner's club and the 1998 mail piece that was a straight
solicitation, it seems a gigantic leap to argue that notice
with regard to the 1991 mail piece could somehow constitute
notice with regard to a fundamentally different mail piece.
It would seem to give the mailer "a bad time" to argue that
the 1991 RCSC decision constituted notice relative to a 1998
mail piece, particularly after the same RCSC analyzed the
1998 mail piece in minute detail in 1995 and did not raise
any question concerning whether it may be an unauthorized
cooperative mailing.

   Juxtapose that position with the one stated by Denny
and Porras: Denny stated that "[s]ome things can only be
verified after the fact.  We'll give the mailer an
opportunity to fix it."

   If the policy is to be <u>certain</u> that a deficiency as-
sessment is not tantamount to giving the mailer a bad time,
if the policy is to <u>cooperate</u> with the mailer, to be <u>fair</u>,
<u>equitable</u>, and <u>proactive</u>, and to give an opportunity to the
mailer to fix the problem <u>before</u> a deficiency is collected,
then it would make a travesty of that policy to pursue col-
lection of the claimed deficiency on the grounds that a de-
cision eight years earlier relative to a fundamentally dif-
ferent mail piece constitutes notice relative to the 1998
mail piece.

   Given the spirit of national forbearance policy and
Porras' assurance to MTAC members that Finance across the
country would implement the national policy in the spirit
that he described it, both in writing and later orally, and
given the concurrence of the manager who oversees
Classification, one would reasonably expect Finance to grant
forbearance from collection of the claimed deficiency.

C.    <u>Conclusion</u>

   Given the actual words and spirit of the national for-
bearance policy, it would seem only fair that Pittsburgh
Finance now weigh RBI's understanding of the notice factor

in favor of forbearance.  To that should be added the
complex and confusing nature of Classification's risk test.
It is anything but a bright line test.

Classification did not even try to explain it to
mailers with narrative and examples until it published
Publication 417 in October, 1996.  Because publication of
that document that followed the RCSC's 1995 review of the
mail piece of a RBI charity-client, Publication 417 would
not have signaled any problem to RBI.

Finally, in each instance when the RCSC did raise a
question either to RBI or a charity-client about a mail
piece, RBI complied with the RCSC's directive.  There is
nothing in the record that indicates that RBI knowingly or
willfully violated postal regulations, particularly after
notice.

## III. <u>Conflict of Law</u>

### A. <u>Overview</u>

The second group of mitigating circumstances arises from a fundamental conflict of law. The decision of Pittsburgh Business Mail Entry in 1998 conflicted with a number of pre-existing state laws designed to protect consumer-donors.

The 1998 decision, upheld by headquarters in March, 2000, was the first time that the Postal Service applied its "risk" test to a straight solicitation appeal since certain states exercised their constitutionally reserved powers to mandate that professional solicitors assume a minimal amount of risk. (See Appendix A for a listing of such requirements by state.)

These states require a professional solicitor and its charity-clients to structure their contracts so that the charity-client is guaranteed to net at least some minimal portion of funds donated in response to the solicitation. The stated purpose of the guarantee is to protect donors who contribute with the expectation that the charity will spend the donation—or at least some portion of it--for the purpose for which the charity solicited it.

In order for RBI to serve as a professional solicitor in these states and for a charity to solicit residents of these states through a professional solicitor, the charity and the professional solicitor must include the guarantee provision in their contract for fund raising services. Thus, the guarantee is a <u>condition precedent</u> for a professional solicitor and its charity-clients to solicit residents in states with the guarantee requirement.

The Postal Service may well take the position that the state guarantee requirement merely means that charities who wish to rely on professional solicitors will have to pay forty percent more in postage when they send the mail piece that follows up on their earlier telephone solicitation call pursuant to the contract that contains the state-mandated guarantee.

To appreciate the magnitude of the consequences of this position, suffice it to recognize that most charities engage a professional solicitor when the charity uses telemarketing

to solicit donations and deliver its program messages.  As a result, most contracts between professional solicitors and their charity-clients contain the guarantee provision.

To pursue the postage deficiency claim against RBI in full means that the Postal Service has selected RBI exclusively from among all professional solicitors and all their charity-clients that also had a guarantee provision in their respective contracts.  To collect a postage deficiency from only one of the many professional solicitors and charities that complied with a state-mandated guarantee is a blatant form of economic discrimination.

The alternative to assessing only one professional solicitor for back postage is to assess every professional solicitor or the charity-clients of all professional solicitors that had a state-mandated guarantee in their respective contracts.  An analysis of that alternative reveals that it is fatally flawed as well.

In an instance where the federal and state law conflict and each seeks to achieve a legitimate stated purpose, the Court inquires as to the availability of an alternate means. The point of departure in search of a legally acceptable alternative begins with what created this conflict of law situation in the first place.

The problem was caused in 1998 when the Postal Service departed from its usual course and applied its "risk" test to a straight fund raising appeal, that is to an appeal that merely solicits a donation.  The Postal Service uses the "risk" test to determine whether a permit holder mailed its "own matter" at the nonprofit mail rate.  Up until 1998, the Postal Service had applied the risk test only in instances where the mailer offered a product for sale or as part of a fund raising appeal but shifted the risk of loss to the commercial vendor of the product if the mailing failed.

In a conflict of law situation between a state law and federal regulation, the Supreme Court has specified three factors or considerations for the lower courts to take into account in determining which law should prevail:  (1) the need for a uniform controlling federal rule, (2) whether application of state law would frustrate specific objectives of the federal program, and (3) extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

In Part III below, these three factors are applied to the facts of this case.  The result is that the federal risk test should give way to the prior mandate of states when they exercised the powers reserved to them under the Constitution to mandate a minimum guarantee provision.

Had the Postal Service applied its risk test to straight fund raising appeals at the time that states imposed a mandatory guarantee provision in contracts between charities and professional solicitors, there wouldn't have been a revenue deficiency issue.  Charities, their professional solicitors, and the Postal Service would have worked it out one way or another, either at the agency level, legislatively, or through litigation.  How it would have been resolved at that time is immaterial in this context.

The point is that the conflict between the federal agency rule and state laws would have been resolved at that time, and the Postal Service wouldn't have assessed any deficiency for back postage.  The charities might have had to pay the comparable commercial rate going forward, but there wouldn't have been any problem with back postage.

Mailers and professional solicitors cannot reach into the minds of postal regulators or anyone else.  If the federal agency waits to announce its interpretation of its rules until several years after charities and professional solicitors have been complying with state laws, the federal agency may not then take the position that the charities and professional solicitors "should have known."

B.  <u>Analysis:  Which law should give way</u>?

Regulation of charitable solicitation has traditionally been reserved to the states.  The Constitution neither delegates it to the federal government nor prohibits it to the States.  Thus, regulation of charitable solicitation is reserved to the States respectively.

The courts are generally less likely to find federal preemption if a subject matter area has traditionally been reserved to the States.  Thus, if a subject area is usually viewed as "local" rather than "national," preemption is unlikely to be found.

### (1)  The stated ends of both rules are legitimate.

The objectives of both the Postal Service and the states that mandate a guarantee provision in the contracts between a charity and its professional solicitor are legitimate.  The states' objective is to protect the donor or consumers.  These states reason that donors expect some minimal portion of their contributions should be available to be spent for the purpose for which the contributions were solicited.

The Postal Service's objective is to ensure that organizations authorized to mail at the nonprofit rate mail only their own matter at that rate.

Congress has mandated that the Postal Service maintain a separate postal rate for the bulk mail of qualifying nonprofit organizations.  Because of the physical characteristics of the mail pieces that such organizations tend to produce, the cost to process and deliver those pieces tends to be lower than comparable commercial mail pieces.  Today, the differential is approximately 40 percent.

In administering the federal postal statute, Congress was clear that an organization authorized to mail at the nonprofit rates of postage may mail only its own matter at those rates.  From time to time, a question arises whether matter "belongs" to the authorized entity.  When the authorized entity is engaged in a joint venture with an unauthorized entity, the Postal Service deems a mailing that supports the joint venture to be an "unauthorized cooperative mailing," and the otherwise authorized entity must pay the comparable commercial mail rate for those mail pieces.

In 1989, the Postal Service published nine factors that it considered in determining whether mail matter "belongs" to an organization that is authorized to mail at the nonprofit postal rate.  Classification Currents 4 (May 1989) at 3.  In 1996, the Postal Service condensed those nine factors into six.  Nonprofit Standard Mail Eligibility, Publication 417 at 19.  One of the old nine and "new" six factors is risk.  That is, which party bears the risk of the "enterprise" that the mail piece supports if no one makes a contribution or if contributions are insufficient to pay the cost to produce and mail the piece?

RBI included a guarantee provision in its contracts
with charities in order to serve as their professional
solicitor in those states that require such a provision.
When the Postal Service applied its risk test to the RBI
contract, the result was a determination that the mail
pieces were unauthorized cooperative mailings and,
therefore, ineligible for the nonprofit mail rate.

Thus, RBI finds itself in a Catch-22:  To solicit in
the states that mandate the guarantee, RBI and its charity
clients need a guarantee provision in their contract.  To
the Postal Service, however, the guarantee means that the
unauthorized entity, in this case RBI, bears the risk if the
fund raising campaign were to fail and, therefore, owns in
whole or in part the mail piece.

Ironically, these states impose their guarantee re-
quirement because, in their view, the solicitation belongs
to the charity-client.  These states reason that the charity
ought to bank some of the money that consumers donate to the
charity and spend it for the charitable purpose for which it
solicited the donations in the first place.

For its part, the Postal Service disqualified the mail
pieces of RBI's charity-clients on the grounds that they no
longer own them once the state-mandated guarantee is in
place.  Thus, the states impose the guarantee on the grounds
that the charity owns the solicitation, but the Postal
Service interprets the guarantee as dispossessing the RBI
charity-clients of their ownership of the solicitation.

As detailed in RBI's appeal from the RCSC 1999 decision
in this case, the United States Supreme Court would weigh in
on the side of the state position.  "Appeal from the
decision of the Northern Virginia Rates and Classification
Service Center, March 1, 1999," November 19, 1999 at 30-33.

The Supreme Court opined most recently on which party
owns protected speech, pointing out that the solicitation is
characteristically intertwined with informative or
persuasive speech (the message), in in <u>Riley v. National
Federation of the Blind of North Carolina, Inc</u>., 487 U.S.
781 (1988).  The Riley court stated:

> The First Amendment mandates that we presume
> that speakers, not the government, know best
> both what they want to say and how to say it.

(citations omitted) 'The very purpose of the
First Amendment is to foreclose public autho-
rity from assuming a guardianship of the public
mind through regulating the press, speech, and
religion.' (citations omitted)  To this end,
the government, even with the purest of motives,
may not substitute its judgment as to how best
to speak for that of speakers and listeners;
free and robust debate cannot thrive if di-
rected by the government.  We perceive no rea-
son to engraft an exception to this settled
rule for charities.

Id. at 790-91.

Applied to the instant case, the Court prescribes that
government should look to the message, not the messenger.
It is the message, not the messenger, that determines the
rate of postage.

A rule will not pass constitutional muster if it treats
a fully protected message differently depending on which
party sustains the risk that funds raised will be insuf-
ficient to pay all costs.  The financial arrangements to
deliver the message are the purview of the charity.

The Court focused on the message; it is immaterial how
the message is delivered, that is, whether the charity de-
livers it or whether the charity retains a professional
speaker, and it is immaterial how the charity arranges to
pay to have the message delivered.

### (2)  Discriminatory means of the federal rule

As a result of applying its risk test to contracts
between charities and RBI, the Postal Service ruled that the
contracts constitute a joint venture that is not authorized
to mail at the nonprofit postage rate.  The decision of
Pittsburgh Mail Entry in 1998 required the RBI charity-
clients to pay the full commercial rate for their mail
pieces when RBI was their professional solicitor.

Whether RBI declined to serve as professional solicitor
in those states with a guarantee requirement or its charity-
clients had to pay forty percent more in postage, the end
result is the same:  RBI's charity-clients have been se-
lecting other professional solicitors because the Postal

Service is applying its risk test exclusively to RBI contracts.

Since 1998 when the Postal Service first notified RBI that mail pieces it prepared pursuant to its contracts that contained the state-mandated guarantee failed the Postal Service's risk test, the Postal Service has applied its interpretation exclusively to one professional solicitor: RBI. As a result, RBI has lost most of its charity clients. The result was economic hardship for RBI.

Thus, the combination of the state-mandated guarantee and the Postal Service's interpretation that such a guarantee disqualifies the follow-up mail piece from eligibility for nonprofit mail rates has had a blatantly discriminatory effect on RBI.

If the Postal Service were to apply its interpretation evenhandedly, then the agency would preclude charity-clients of all professional solicitors from mailing at the nonprofit postal rate if their contracts contains a guarantee provision. If the Postal Service were to apply its interpretation evenhandedly, however, it would burden charities' use of an important and growing channel of interstate communication, telemarketing.

The reason is that telemarketing involves the use of two channels of interstate communication, U.S. Mail and telephone lines. In the assembly line of steps, a charity first contacts a donor or prospective donor via the telephone.

Usually charities retain a professional solicitor to make the first contact. The professional solicitor trains telephone representatives to deliver the charity's message and solicit a pledge to make a contribution. Charities use professionals because of the expense to acquire and operate the necessary equipment and train and supervise a staff of telephone representatives.

After the initial phone call, the charity follows up with a mail piece that reiterates its message and contains a reply envelope in which to return the contribution pledged during the initial telephone call.

Although the cost of telemarketing has declined as Congress has caused more competition between suppliers of

long distance telephone service, the telephone by itself is a relatively expensive channel of interstate communication. Telemarketing is even more expensive because it involves two media, mail and telephone.

Moreover, there isn't any competition for mail service because Congress granted a monopoly to the U.S. Postal Service to deliver letter mail.  The nonprofit mail rate has made telemarketing more affordable, although still an expensive, channel of communication for charities.  To deny the nonprofit mail rate will effectively preclude use of telemarketing to the large number of charities that use it now or that otherwise would use it in the future.

> (3)  **The Supreme Court's test to determine whether a**
>       **federal or state rule prevails**

The combination of:  (1) the requirement of some states that the contract between a charity and its professional solicitor include a guaranteed amount to the charity and (2) the Postal Service's use of the risk test to determine eligibility of the follow-up mail piece for the nonprofit mail rate has created economic discrimination and concomitant disruption.  Now, the combination of the federal and state rules discriminates exclusively against RBI and its charity-clients.

The question then is which should give way, the states' mandate for a guarantee provision or the Postal Service's use of its risk test as a surrogate for ownership?

In <u>U.S. v. Kimbell Foods, Inc</u>. 440 U.S. 715 (1979), Mr. Justice Marshall delivered the opinion of the Court in which noted as follows:

> Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules. (citations omitted)  Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'  <u>United States v. Standard Oil Co.</u>, 332 U.S. 310 (1947).

<u>Id.</u>, <u>Kimbell</u> at 727-728.

The facts in <u>Kimbell</u> are similar to the RBI case.
<u>Kimbell</u> involved a federal program, federal rules that
governed that program, and conflicting state law in Georgia.
To resolve the conflict between the federal rules and state
law, Mr. Justice Marshall opined as follows:

> [W]e must decide first whether federal or state
> law governs the controversies; and second, if fed-
> eral law applies, whether this Court should fashion
> a uniform priority rule or incorporate state com-
> mercial law. We conclude that the source of law
> is federal, but that a national rule is unneces-
> sary to protect the federal interests underlying
> the loan programs. Accordingly, we adopt state
> law as the appropriate federal rule for estab-
> lishing the relative priority of these competing
> federal and private liens.

<u>Id.</u> at 718.

The Supreme Court applied three factors or consider-
ations to take into account in determining which law should
prevail:  (1) the need for a uniform controlling federal
rule, (2) whether application of state law would frustrate
specific objectives of the federal program, and (3) extent
to which application of a federal rule would disrupt com-
mercial relationships predicated on state law.

<u>Id.</u> at 728-729.

(a) <u>Is a uniform federal rule necessary</u>?

In the case of RBI in particular and professional
solicitors and their charity-clients in general, there is a
need for a uniform <u>result</u>, namely that matter mailed at the
nonprofit Standard A rate should belong to the entity that
is authorized to mail at that rate of postage; however, to
suspend the Postal Service's risk test when the professional
solicitor and charity-client are compelled to include it in
their contract as a condition precedent to soliciting res-
idents of a state would not change the uniform character of
the nonprofit mail rate program.

The intent of the state-mandated guarantee is to
protect consumers who donate in response to an initial call
by the professional solicitor. The state merely seeks to

ensure that the charity which retained the professional will
spend at least some minimal portion of the consumer's
donation for the purpose for which it solicited the
donation.

Because the guarantee is mandated rather than bargained
for, it would be unfair to view the guarantee as a back door
approach for a professional solicitor to gain an ownership
interest in the solicitation or the follow-up mail piece.
Many professional solicitors opposed the state-mandated
guarantee and would much prefer to be out from under a cap
on their fees or reimbursable expenses.

For the Postal Service to withhold applying its risk
test when a state has mandated a guarantee provision in the
contract would leave the uniform character of the federal
nonprofit mail rate program intact.  The remaining five
factors of its six-part test would be unaffected.

The Postal Service's risk test itself would remain
except with respect to a state-mandated guarantee.  The
burden would otherwise still be on the parties to demon-
strate that ownership of matter mailed at the nonprofit mail
rate belongs to the nonprofit permit holder.

   (b)  **Application of state law would not frustrate the
        federal objective**.

To forego the Postal Service's risk test in states that
mandate a guarantee by law would not frustrate the federal
objective.  Neither the intent nor the effect of any one of
the state-mandated guarantee provisions is to transfer own-
ership from the permit holder to the unauthorized profes-
sional solicitor.

The reason why there is a guarantee in the contracts
between professional solicitors and their charity-clients is
that the solicitation does in fact belong to the charity-
client.  If the follow-up mail piece belonged to the pro-
fessional solicitor, the states with the guarantee re-
quirement would be unable to convince the professional so-
licitor to give up any portion of revenue generated by the
one-two punch of the initial telephone call and the follow-
up mail piece.

States that have the guarantee requirement do so to
protect donors.  The concerns of these states run to the

level of a professional solicitor's fees and costs relative
to donations; for these states, it's not a question of which
party owns the follow-up mail piece.  These states simply
want the professional solicitor to forgo some its fees in
order that the charity-client will retain a portion of
aggregate contributions to spend for the charitable purpose.

The economics of telemarketing and the interplay of
exogenous events over which neither the charity-principal
nor solicitor-agent has control mean that the charity's
ownership of the telemarketing program may not confer any
net revenue to it.  If donations received are insufficient
for the charity to pay fund raising fees and other costs in
full and have funds left over to spend for the charitable
purpose, the policy of states that mandate a guarantee is
that the charity should spend some minimal amount of do-
nations for the charitable purpose rather than pay its
professional solicitor in full.

In contrast, the Postal Service wants the charity-
client to be liable at all times for 100 percent of RBI's
fees and fund raising costs, however much they may turn out
to be.  Given the intent of these states, to limit a char-
ity's liability for its professional solicitor's fees and
reimbursement of fund raising costs is not necessarily tan-
tamount to loss of ownership or even a joint venture.

Thus, the Postal Service needs to take several consid-
erations into account when it analyzes an arrangement
between a charity, exercising its First Amendment speech
rights, and a professional solicitor.  Chief among these are
the Supreme Court pronouncements in Riley and state laws.
Under Riley, the financial terms of the arrangement that the
charity negotiates with its professional solicitor do not
change the character of the speech:  It's fully protected,
and it belongs to the charity.

The Postal Service's risk test as a surrogate for
ownership or a joint venture is untenable in those states
that mandate a guarantee provision in a contract between a
professional solicitor and its charity clients.  The state
requirement does not cause ownership to shift; that would be
the last result that a state regulator would want to effect.

(c)  **Application of the federal rule would disrupt commercial relationships predicated on state law and foreclose charities' speech via telemarketing.**

By selecting RBI exclusively from all professional solicitors and charities that have entered into contracts under state law with the state-mandated guarantee, the Postal Service has adversely impacted the relationship between RBI and many of its charity-clients created under state law. "Adversely impact" and "disrupt" are mild descriptors of the disastrous economic consequences that have befallen RBI as a result of the Postal Service's arbitrary application of its rule.

By selecting RBI exclusively for application of its risk test relative to state-mandated guarantees, the Postal Service completely disabled RBI from competing with other professional solicitors in the states that mandate guarantees. Another professional solicitor may not be as good as RBI in speaking for a particular charitable cause, but the loss of the nonprofit mail rate made it easy for most former RBI charity-clients to abandon RBI and retain one of RBI's competitors in that state.

The economics of charitable fund raising are such that when a charity faces an increase in its cost to raise funds, even a modest three or five percent, the charity is unable to ask consumers to increase their respective donations by an additional like amount. Now consider the impact on a charity that faces an increase of forty percent in postage.

In speaking for a charity-client, it is inconceivable that a professional solicitor is so good that consumers to whom it delivers the charity's message would contribute forty percent more to the charity than they otherwise would have. That is precisely the situation that RBI found itself in after Pittsburgh Business Mail Entry applied the Postal Service's risk test in 1998 to contracts that contained the state-mandated guarantee.

If a charity and RBI agreed to include the state-mandated guarantee in their contract, the transaction between RBI and the charity could go forward smoothly under state law. Application of the federal postal agency's risk test to RBI exclusively has so disrupted its relationships entered into under state law that RBI currently serves as professional solicitor for only five of the thirty-three

charities that Pittsburgh identified in its 1998 decision.
By fall, most likely only four of the thirty-three will
remain as RBI charity-clients.

### (d) Conclusion

A national rule is unnecessary to protect the federal
interests underlying the nonprofit mail rate program.  The
character of that federal program would remain intact if the
Postal Service were precluded from applying its risk test to
contracts between RBI and charities that contain state-
mandated guarantees.  That is because the intent of the
state law would not alter ownership of the matter that the
charities seek to mail at the nonprofit rate.  Thus, the
specific objective of the federal program would not be
frustrated.  Equally important, RBI would have an
opportunity to try to rise from the disruption that
application of the Postal Service's risk test has caused
between RBI and its former charity-clients.

### (4) Conflict between two federal agencies

It is interesting to note at this point how the United
States Court of Appeals for the District of Columbia Circuit
dealt with a similar conflict.  Ralph J. Galliano v. United
States Postal Service, 836 F.2d 1362 (1988).

In that case there was a conflict between two federal
agencies, the Federal Election Commission ("FEC") and the
Postal Service.  The Court of Appeals described that
conflict and postal agency's position as follows:

> Based on this array of authority, the Postal
> Service maintains that it may find a solicitation
> for political contributions to be a false repre-
> sentation under 39 U.S.C. @ 3005 (1982) even if the
> FEC finds the solicitation to have met the re-
> quirements of 2 U.S.C. @@ 432(c)(4), 441d(a)(3)
> (1982).  The Postal Service takes this position
> without qualification.  The Service sees no need to
> accommodate or adjust to any FECA prescription or
> FEC ruling.  It may proceed under section 3005, the
> Service believes, totally on the basis of its own
> assessment of a mailing like APG's, and may find
> fraudulent name identification and disclaimers that
> meet FEC standards.  Any other approach, the Postal
> Service concludes, would constitute a partial repeal

of section 3005 by implication.  Because repeals by
implication are strongly disfavored, [citations
omitted], the Postal Service asserts that appellants'
and the FEC's position cannot be credited.

Id. at 1369.

The Court of Appeals held " . . . that the Postal
Service's no-repeal-by-implication argument . . . is
properly turned around."  Id. at 1371  The Court returned
the case to district court with instructions to remand the
matter to the Postal Service for reconsideration.

Thus, it would seem worthwhile for the Postal Service
to consider in this forbearance case the advisability of
whether to ignore the interests and objectives of state
regulatory authority.  Whether it is a state interest or the
interest of another federal agency, it is not automatic that
the Postal Service's interpretation of its statutory
authority always takes precedence.

(5)  **Non-discriminatory alternative**

Because of the important objective that the state seeks
to further--consumer protection, the Postal Service could
use an alternative means to gauge ownership, one that
neither imposes selective exclusivity on RBI nor a heavy
burden on interstate communication.

Instead of exclusive selectivity, if the Postal Service
were to apply its interpretation of mail ownership evenhand-
edly to all professional solicitors and their charity-
clients, then the combination would impose a heavy burden on
interstate commerce, from the point of view of the profes-
sional solicitors, and on interstate communication in
exercising their First Amendment speech rights, from the
point of view of the charities.

Applied to all professional solicitors, what the
combination of the state-mandated guarantee provision and
the Postal Service's risk test will do is to preclude most
charities that use a professional solicitor from using a
channel of interstate communication, if the Postal Service
were to apply its risk test evenhandedly.

In telemarketing, the follow-up mail pieces go hand in
hand with the initial telephone solicitation.  To most

charities that use telemarketing to deliver their messages
to consumers, a forty percent increase in the cost to mail
the follow-up mail pieces would effectively bar them from
speaking over the telephone lines.

To use the telephone lines without a professional so-
licitor is not an option for most charities.  The industry
rule of thumb is that a professional solicitor is far more
effective than a volunteer.

Just to contemplate the volunteer option, a charity
would need access to a sufficient number of volunteers to
conduct telemarketing without a professional.  Few charities
are in that position.

Even the relatively few charities with access to an
army of volunteers face constraints.  Because of the high
turnover rate of telephone solicitors, a telemarketing
operation really consists of two parts:  first, a never-
ending employment agency complete with a training program
and, second, the calling program itself which, in turn,
requires supervisors, computers, telephone equipment,
software, and a large space in which to house them all.

For a charity to commit to telemarketing on its own
without the services of a professional solicitor is an
expensive and daunting challenge.  Always there are the
nagging questions whether it actually costs less to do it
in-house and whether volunteers are as effective as profes-
sionals.  For these reasons, most nonprofit organizations
engage a professional solicitor.

Thus, if the Postal Service were to apply its risk test
evenhandedly, it would disrupt commercial relationships
between professional solicitors and their charity-clients
across the country, and it would preclude most charities
from using the telephone lines to exercise their First
Amendment speech rights.

The burden that the Postal Service's risk test imposes
is excessive in relation to the putative benefit.  Applied
exclusively to only one professional solicitor, the Postal
Service's rule is discriminatory on its face.  Nor has it
achieved the avowed purpose.  It has merely driven former
RBI charity-clients to enter into contracts with other
professional solicitors that contain the state-mandated

guarantee, or it has precluded them altogether from using telemarketing to deliver their fully protected speech.

Applied to all professional solicitors and their charity-clients with state-mandated guarantees in their contracts, it will disrupt commercial relationships predicated on state law and preclude charities that rely on the telephone lines from using telemarketing to deliver their First Amendment-protected messages, unless the charity possesses the rare combination of resources that would enable it to conduct telemarketing in-house.

It is discriminatory on its face that a charity with the wherewithal to conduct telemarketing in-house may use the nonprofit mail rate, but the same charity, if it relies on a professional solicitor and complies with a state-mandated guarantee, may not use the nonprofit rate even though its speech is identical.

The putative benefit of such disruption and discrimination is that it would maintain the integrity of the nonprofit mail rate program. Such discriminatory treatment and disruption, however, is not required in order to achieve the avowed purpose, that is to ensure that otherwise eligible nonprofit organizations mail only their own matter at the nonprofit postal rate.

The foregoing analysis showed how ownership rested with the nonprofit before the parties agreed to incorporate the state-mandated guarantee, and the state intended its guarantee to protect consumers not to create a joint venture or in any way undermine the charity-client's control of its own solicitation campaign.

The wrong answer is to try to extract such a steep price from charities that rely on telemarketing to deliver their message and raise funds. The better answer is to forego from the collection of the postage deficiency assessed exclusively against only one solicitor-mail agent, RBI.

LAW DEPARTMENT
PHILADELPHIA FIELD OFFICE


**UNITED STATES**
**POSTAL SERVICE**

SENT VIA EXPRESS MAIL
AND FAX 202-223-2775

March 31, 2000

George E. Miller, Esquire
Nonprofit Service Group
Suite 400
1250 24th Street, N.W.
Washington, DC  20037-1124

RE:    REESE BROTHERS REVENUE DEFICIENCY

Dear George:

This letter will confirm our agreement of Wednesday, March 29, 2000, regarding the
time frame Reese Brothers has been granted to file a request for the mitigation of a
postage deficiency which is now due for payment to the United States Postal
Service.

As you know, the postage deficiency originally assessed against your client was
appealed and it has now been administratively exhausted.  Therefore, Reese
Brothers is indebted to the U.S. Postal Service in the total amount  $3,600,067.94.
This figure represents the difference between the Nonprofit Standard Mail rate of
postage and the regular Standard A rates of postage for improper cooperative
mailings entered into the Postal Service's mailstream in the Pittsburgh, Pennsylvania
area.   The figure represents postage due in the amount of $3,223,580.99 for
improper cooperative mailings made during the period of January 1993 through the
end of 1997, and $376,487.24 for improper cooperative mailings entered during the
period of January 1998 through June 1, 1998.

At this stage of the administrative process, in accordance with the Management
Instruction that governs the assessment and collection of deficiencies in postage or
fees, Reese Brothers has the right to request the Manager of Finance, Pittsburgh,
Pennsylvania, to reduce or waive the deficiency based upon financial hardship.  In
our meeting on Wednesday, you and Ms. Emigh indicated that Reese Brothers'
believes that other factors should be considered as well.

Based on your representation that your client believes there are additional significant
factors that should be taken into considered by the Manager, Finance, we agreed to

P. O. Box 40595
PHILADELPHIA, PA 19197-0595
215-931-5070
FAX: 215-931-5092

- 2 -

provide Reese Brothers with a thirty (30) day period to present a detailed statement articulating each of these factors and the degree to which your client believes mitigation of the debt should occur because of each factor. You were reminded, however, that the Finance Manager will not revisit the issue of the mail classification decision already rendered by the Manager of Mail Preparation and Standards as your client has already received the U.S. Postal Service's final agency decision on that issue.

Therefore, your request to mitigate the deficiency should include both a narrative as to the reasons why your client seeks mitigation, as well as a statement of the amount Reese Brothers requests the deficiency should be reduced. This request must be received by the Manager, Finance, Pittsburgh District, by no later than Friday, April 28, 2000. Because you expressed a concern that someone other than the Pittsburgh District Office review your request, you may also forward a copy of your request to the Manager of Finance for the Allegheny Area.

Please address your request to:

> George Lippert
> Manager, Finance
> Pittsburgh District
> 1001 California Avenue
> Pittsburgh, PA 15290-9996

If you choose, you may also forward a copy of your request to:

> Kathy Ainsworth
> Manager, Finance
> Allegheny Area
> One Marquis Plaza
> 5315 Campbells Run Road
> Pittsburgh, PA 15277-7000

Of course, you should feel free to contact me with any questions or concerns that you may have at 215-931-5018.

Sincerely,

Helen R. Grant
Attorney



UNITED STATES
POSTAL SERVICE

August 17, 1999

Honorable John M. McHugh
Chairman, Subcommittee on the Postal Service
Committee on Government Reform
House of Representatives
Washington, DC 20515-6246

Dear Congressman McHugh:

This responds to your July 16 letter on behalf of                         , regarding the assessment
of a revenue deficiency in connection with the organization's Nonprofit Standard rate mailings.

I appreciate your interest in ensuring that this matter receives appropriate consideration. We
recognize that an organization's officials may not agree with a revenue deficiency assessment
of a local postmaster. Consequently, in our established process, we have provided review
procedures through which an organization may appeal to knowledgeable postal managers who
have no personal involvement in the situation. However, I want to emphasize that the Postal
Service has an obligation to ensure that the laws and regulations related to mailing rates are
properly, uniformly, and fairly enforced for all postal customers.

The Nonprofit Service Group, on behalf of                     , submitted an appeal to the
October 2, 1998, revenue deficiency assessment decision of the Mattoon, Illinois, postmaster.
I am enclosing a copy of the May 14 letter from Alixe M. Johnson, manager of our Illinois Rates
and Classification Service Center, that shows the issues raised in that appeal were thoroughly
reviewed. However, based on the requirements for mailing at the Nonprofit Standard rates,
the original revenue deficiency decision was upheld. I have reviewed Ms. Johnson's letter and
want to note that it provides a detailed response to both the technical points of the appeal and
the matters raised in your correspondence. It also advised the Nonprofit Service Group that
                should make arrangements to pay the deficiency to the Mattoon postmaster
within 15 days of receipt of the letter, or contact the postmaster if it was necessary to arrange
a payment plan.

Both the Mattoon postmaster and Central Illinois District Finance Manager John Canning, who
has administrative jurisdiction for the settlement of the deficiency payment, report that neither the
Nonprofit Service Group nor                       have made any contact with reference to payment.
Mr. Canning would be pleased to consider any mitigating factors, submitted in writing by
                regarding the payment of this revenue deficiency. Correspondence can be sent to
Mr. Canning at the following address:

MANAGER FINANCE
CENTRAL ILLINOIS DISTRICT
6801 W 73rd ST
SOUTH SUBURBAN IL 60499-9995

708/563-7800

7995 (Mr. Canning)

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-0010
202-268-2500
FAX 202-268-4860

- 2 -

I would also like to address your comments that solicitations for volunteer participation cannot be included in mailings made at the special nonprofit Periodicals rate. This is certainly not true. I am enclosing a copy of Section C200.1.3 from the *Domestic Mail Manual* explaining the conditions for enclosing such First-Class or Standard (A) mailings. However, such enclosures must be paid for under those appropriate rate schedules, as we are requiring all our Periodicals customers, including                to do.

I am also enclosing Section C200.1.4 of the *Domestic Mail Manual*, which shows regulations for mailing a loose enclosure at the Periodicals rate. These regulations clearly stipulate the limited types of enclosures that can be included by a mailer who desires to use the Periodicals rate. It appears that Ducks Unlimited was aware of these regulations and the fact that their card did not qualify, since they advised you that their intention was to attach the cards to the magazine bindings. If             has any issues with the actions of the printing company that did not prepare the mailings according to their instructions and our regulations, they may wish to contact that company directly. Nevertheless, I would encourage             to contact Mr. Canning so that they can work toward a resolution of this matter with the Postal Service.

Thank you for writing. Please contact me if I can be of assistance with other postal issues.

Sincerely,

William J. Henderson



**FINANCE**
**UNITED STATES**
**POSTAL SERVICE**

March 17, 2000

Reese Brothers Inc.
925 Penn Avenue
Pittsburgh PA 15222-3806

CERTIFIED # 169 830 845

$3,600,068.23
Certified Z 275 347 452- 6/1/98
Certified Z 469 696 310-8/20/98
Pittsburgh PA 15290

On January 11, 2000, the USPS announced a new direction for it's revenue assurance process. Under the new policy, revenue deficiencies will not be assessed in the future unless the customer had "prior notice" of the applicable mailing standards. It was also determined that pending assessments would be reviewed to determine whether they should be forgiven under this new policy.

Based on our review of the circumstances of your pending assessment, we have determined that the deficiency will not be forgiven. In order to determine whether a mailer had prior notice of the applicable standard, we consider whether the mailer or its agent received written or verbal rulings or training. We also consider the experience of the mailer or its agent and if they should have reasonably known that the mail was not eligible for the rates claimed. Listed below is the basis for a determination not to waive your deficiency.

1.  Reese Brothers is/was a professional mailer with volumes/mailings in 1997 alone of 11,923,963 pieces and $2,001,683 in postage.

2.  Reese Brothers was assessed additional postage in 1990 for mailing cooperative mailings that did not qualify for the non-profit rates. At that time Reese Brothers was made aware of the eligibility requirements for the non-profit rates of postage.

In the future, similar mailings must be entered at the rates required by postal standards. If you have questions concerning future mailings, please request a written classification decision and assistance from your local Manager, Business Mail Entry.

George J. Lippert
Manager Finance, Pittsburgh District

cc: Mike Brose, District Manager
    Ron Lincoln, Postmaster Pittsburgh
    Kathy Ainsworth, Manager Finance, Allegheny Area
    Don Klodowski, Manager Business Mail Entry
    M Susan Rape, Manager Accounting Operations
    Bruce Wagenhofer, Postal Inspector Western Allegheny Division, Pittsburgh Headquarters
    William R Gilligan Jr., Managing Counsel, Philadelphia Field Office
    Christine Taylor, Civil Practice Section
    File

1001 CALIFORNIA AVENUE, ROOM 2389
PITTSBURGH PA 15290-9995

UNITED STATES POSTAL SERVICE
SUITE 500
5004 RICHMOND HWY
ALEXANDRIA VA 22303-2795

NORTHERN VIRGINIA RATES AND
CLASSIFICATION CENTER
February 8, 1991

Mr. Ralph H. Reese
Vice President
Reese Brothers, Inc.
925 Penn Avenue, Sixth Floor
Pittsburgh, PA 15222-3883

Dear Mr. Reese:

This is in further response to your correspondence dated
September 25, 1990, and December 10, 1990, appealing the
decision rendered by the Manager, Mailing Requirements,
Pittsburgh, PA. The decision prohibited the Reese Brothers
Privileged Diner Club card to be mailed at the special bulk
third-class rates of postage.

Section 625.51, Domestic Mail Manual (DMM) states: "An
organization authorized to mail at special bulk rates mail
mail only its own matter at those rates. An organization may
not delegate or lend the use of its permit to mail at the
special bulk rates to any other person or organization."

Section 625.52, DMM states: "Cooperative mailings may be made
at the special rates only when each of the cooperative
organizations is individually authorized to mail at the
special bulk rates at the post office where the mailing is
deposited. Cooperative mailings involving the mailing of any
matter in behalf of or produced for an organization not
itself authorized to mail at the special bulk rates at the
post office where the mailing is deposited must be paid at
the applicable regular rate."

A review of the mailing piece in question shows that the
physical dimensions of the mailpiece and envelope fall within
the flat-size mail processing category. Enclosed in the
mailing envelope are the following: (1) a single sheet cover
page acting as a label carrier, which contains a delivery and
return address. The return address 925 Penn Avenue, Sixth
Floor, Pittsburgh, PA, is that of Reese Brothers, Inc. (2)
Attached to this cover page is a wallet size "Reese Brothers
Privileged Diner" identification card which bears the
member's name and an expiration date. (3) Finally, enclosed
is a "Member's Guide" for the Detroit, Michigan area which
provides rules, restrictions and tips concerning the
Privileged Diner Club card program for restaurants located in
this area.



A review of the letter attached to a contract which explains the intent and understanding of both parties joined in this program, states in part, "Reese Brothers, Inc., sells the Privileged Diner Cards to MADD as a donor premium. The cost to MADD for the item is nominal in the context of the donation received to obtain it. Donors may elect not to receive a premium from MADD for their donation. When they do so, the cost of the services we provide to MADD is only reduced by the amount of the direct charge for the donor premium."

The facts and discussion presented above cause us to conclude:

1. The mailing piece was produced and sold as a fundraiser to Pennsylvania MADD and other organizations.

2. Pennsylvania MADD has nothing at stake should a recipient elect not to participate in the Privileged Diner Club program, since Reese Brothers, Inc., reduces the cost of their services by the amount of the direct charge for the donor premium.

3. Reese Brothers Inc., and not Pennsylvania MADD maintains management control over the joint venture by (1) requiring that the mail-in coupon to join the club be forwarded to Reese Brothers, Inc., 925 Penn Ave., Pittsburgh, PA, and (2) Reese Brothers, Inc., prepares the mailpiece, addresses, stuffs envelopes, pays the applicable postage and delivers the mailing to the post office.

Based upon our review, as mentioned above, since Pennsylvania MADD does not have management control nor are they at risk in this enterprise with Reese Brothers, Inc., this is a joint venture. It is also clear that the mailing piece was produced for and mailed in behalf of an organization beyond Pennsylvania MADD. In view of these facts, I have concluded that this cooperative mailing is ineligible for the special bulk third-class rates.

This is the final Postal Service decision concerning this matter.

A copy of the cited sections of the Domestic Mail Manual is attached.

Sincerely,

Scott Hamel
General Manager
Rates and Classification Center

CERTIFIED - RETURN RECEIPT REQUESTED

cc:    Field Director
       Marketing and Communications
       Pittsburgh, PA  15290-9651

America's Best-Selling Coupon Book!

Case 1:06-cv-00434-RMU    Document 1-9    Filed 03/...    Page ... of ...

COUPON POWER! ®

Exhibit 5

March 15, 1988

MADD, Bucks-Montgomery County Chapter
2420 Old Bristol Road
Holland, Pennsylvania 18966

MADD, Bucks-Montgomery County Chapter, (hereinafter, "ORGANIZATION") wishes COUPON POWER, INC. to create and execute a program to educate members of the public in Bucks and Montgomery Counties about its goals, its methods of achieving its goals, and its services to the public.

ORGANIZATION is a private, non-profit organization dedicated to the prevention and elimination of drunk driving in Bucks and Montgomery Counties.  ORGANIZATION has extensive experience in conducting community programs and public education programs related to the problem of drunk driving.

Fundamental to ORGANIZATION'S achieving its goals are: educating the public about the seriousness of drunk driving; locating and easing the pain of families by providing support services to victims and survivors of drunk driving crashes; working for stricter enforcement of drunk driving laws.  ORGANIZATION believes that it is only through massive education and continued awareness of the public at large that drunk driving can be prevented and eliminated in Bucks and Montgomery Counties.

ORGANIZATION has found that individuals are often reluctant to take the initiative in raising questions about drunk driving, because of the disturbing nature of the problem, which can cause one of the most terrible tragedies that can occur.  The helplessness of the victim, the life long trauma that can be suffered by victims, and the frequent disruption of entire families when confronted by the problem make it truly imperative to bring the problem into the open and to provide a stimulus for individuals to seek a means to locate help.

ORGANIZATION has found that many individuals have a great interest in learning about how drunk driving can be prevented and eliminated in Bucks and Montgomery Counties and in helping to achieve this goal when given the chance

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

*America's Best-Selling Coupon Book!*

COUPON POWER!

ORGANIZATION has found that personal contacts (particularly those that offer the individual an opportunity to ask questions in privacy and with no stigma) tend to elicit requests for both information and assistance (especially from people who want to be helped but who cannot take the first step of seeking information about how and where they may be helped).

Accordingly, ORGANIZATION has determined that a massive public telephone campaign, properly conceived and executed will be an effective means of achieving its goals. ORGANIZATION has also found that written program and educational materials provided as a follow-up to such personal contacts are far more effective and likely to be read and studied than educational materials sent on a broad-scale basis without previous contact.

ORGANIZATION believes that even the best service programs will fail in their efforts to prevent and eliminate drunk driving, unless broad-based public understanding about the nature of drunk driving can be achieved and unless victims and perpetrators of drunk driving can be found and encouraged to utilize available services and help. ORGANIZATION also believes that such community outreach and public education services constitute the single most important element in its program service activity and that its other program efforts can succeed only in proportion to the effectiveness of its community outreach and public education program.

Therefore, ORGANIZATION desires to commit a portion of its program service budget to its community outreach and public education program; and ORGANIZATION desires to retain the services of COUPON POWER, INC. to assist in conducting its community outreach program.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

*America's Best-Selling Coupon Book!*

**COUPON POWER!** ®

COUPON POWER, INC. desires to be so retained; now, therefore, the parties agree that ORGANIZATION under this agreement shall employ COUPON POWER, INC. to:

1. Assist in carrying out its program of community outreach and public education. Activities shall include but not be limited to:

a. Providing information about drunk driving.
b. Eliciting and answering questions about the prevention of and elimination of drunk driving.
c. Locating victims of drunk driving.
d. Offering assistance and services.
e. Stimulating interest in follow-up, written educational material.
f. Encouraging participation in ORGANIZATION.

2. Develop and execute a telephone script. Calls will be made within the ORGANIZATION'S chartered area, to members of the public whom COUPON POWER, INC. determines to be most receptive to telephonic dissemination of ORGANIZATION'S message. Calls may be concluded with a request for donations to the ORGANIZATION. ORGANIZATION will be given a copy of the script for approval and will subsequently provide information to correct or update the script in the event that this is necessary.

3. Develop and create a brochure and other written materials that explain the goals and services of ORGANIZATION and further these goals and services. ORGANIZATION will be provided a proof of the brochure approval prior to printing.

4. Provide data services to support and maintain the educational program, including: data entry, list maintenance, and data storage. Upon request, mailing labels will be provided to ORGANIZATION for use in its own mailings, when these mailing have an exclusively educational purpose, and for meeting notices.

5. Refer directly to ORGANIZATION all membership inquir.es, requests for speakers, and other requests pertaining directly to ORGANIZATION.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100


6. COUPON POWER, INC. will produce upon ORGANIZATION's request, up to three (3) organizational newsletters per year. ORGANIZATION will be responsible for providing all photos and writing to be included in the newsletter. ORGANIZATION agrees to assume all responsibility for proofreading the newsletter prior to printing and assumes all liability for the consequences of publication as publication, including but not limited to copyrights, libel, and the limitations of ORGANIZATION's charter.

COUPON POWER, INC. agrees to typeset, design, provide proofs of and print ORGANIZATION's newsletter. Each newsletter may contain from four to twelve (4-12) pages; the printed quantity of each newsletter will be determined by ORGANIZATION and will not exceed the number of annual donors expected or information requests obtained in the educational campaign by more than 20%. In those instances when ORGANIZATION desires to mail the newsletter, COUPON POWER, INC. will also prepare the mailing and deliver it to the Post Office at no charge. Whenever ORGANIZATION chooses to mail the newsletter, ORGANIZATION will pay all freight and postage costs for delivery of newsletters in bulk or individually.

7. COUPON POWER, INC. may conduct surveys for ORGANIZATION to determine people's concerns and feelings regarding the drinking and driving problem. Survey questions must be of a "yes" or "no" type.

8. When a telephone presentation results in a request for information, COUPON POWER, INC. will include with each packet a form that instructs the recipient how to volunteer and/or help MADD.

ORGANIZATION will provide COUPON POWER, INC. information necessary to prepare all scripts and materials and to instruct telephone communicators regarding the goals and services of ORGANIZATION, so that callers may provide information and respond to basic questions regarding the ORGANIZATION in conducting the educational campaign. COUPON POWER, INC. may make minor changes to scripts and printed materials during the course of the campaign without the prior approval of ORGANIZATION for the purposes of improving the clarity and effectiveness of these communications.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

**America's Best-Selling Coupon Book!**

COUPON POWER!®

It is understood between the parties that ORGANIZATION does not have large asset reserves or regular sources of income which can be accurately determined in advance and, therefore, that its program services must be paid for from current income as such income is received. It is further acknowledged that, although the primary purpose of the community outreach program is to conduct the education and outreach activities described herein, a program of fundraising can be effectively implemented at minimal additional expense by simultaneous utilization of the facilities and personnel required for the community outreach programs. Therefore, it is agreed between the parties that such a fundraising program will be implemented.

Nothing in this contract shall be construed or interpreted to create a partnership or joint venture between the parties hereto. It is specifically agreed that the community outreach workers shall not be employees of ORGANIZATION.

Coupon Power, Inc. agrees to hold ORGANIZATION harmless from all claims, actions, suits, and liability arising under or relating to the conduct by COUPON POWER, INC. or its employees pursuant to this agreement including without limitation any suits, actions or claims predicated on or alleging that any person has had his or her privacy wrongfully invaded. ORGANIZATION similarly agrees to save and hold harmless COUPON POWER, INC. from all claims, actions, suits and liability arising under or relating to the content of information provided by ORGANIZATION pursuant to this agreement.

The term of this agreement shall be until the last day of the program. In no case will the term of the agreement be longer than one year from date of execution. It may be renewed by mutual consent of both parties in writing for an additional period of one year. But no matter when the agreement is terminated, ORGANIZATION will pay SOLICITOR for all services rendered by it prior to termination, in the manner describeed under "remuneration of services" above.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100



*merica's Best-Selling Coupon Book!*

For the above enumerated services and materials the ORGANIZATION
agrees to pay COUPON POWER, INC. in the following manner:

| PLEDGE AMOUNT | EDUCATIONAL SERVICES AND MATERIALS COST |
|---|---|
| $0       - $ 7.49 | $ ----- |
| $ 7.50   - $19.99 | $  4.65 |
| $20.00   - and up | $  9.30 |

Coupon Power, Inc.

By: _____ , President    3/29/88
    Barry S. Reese                              Date

MADD, Bucks-Montgomery County Chapter

By: _Martha G Brauer_ _President_    3-18-88
    Name              Title             Date

By: _Mary Brauden_ _Treasurer_    3-18-88
    Name              Title             Date

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

THE REESE BROTHERS

**merica's Best-Selling Coupon Book!**

COUPON POWER! ®

March 15, 1988

MADD, Bucks-Montgomery County Chapter
2420 Old Bristol Road
Holland, Pennsylvania 18966

This letter sets forth the agreement by which COUPON POWER, INC.
(hereinafter, "SOLICITOR") will provide solicitation and
telemarketing services to raise funds for MADD, Bucks and
Montgomery Counties (hereinafter "ORGANIZATION"), so that
ORGANIZATION may further its purposes and goals.  What follows
is an outline of our services and the fee structure attendant to
those services.

SOLICITOR will design and execute a telefundraising program for
ORGANIZATION in Bucks and Montgomery Counties.  Services to be
rendered include:

1.  Development of a universe of names to be called.

2.  Development of a fundraising caller script acceptable to
ORGANIZATION that achieves the purposes of the telefundraising
program.  Although ORGANIZATION recognizes SOLICITOR's
expertise and desires its advice, it is understood by the
parties that the caller script must be acceptable to
ORGANIZATION.  The caller script, once established, can be
changed wih ORGANIZATION's approval during the conduct of the
program.  In addition to its own regular monitoring activities,
SOLICITOR will, upon request, permit ORGANIZATION to monitor a
reasonable number of calls to ensure that the callers follow
the agreed script and to see first-hand the manner in which the
telefundraising program is conducted, so that there will be no
confusion among members of public.

3.  Development and production of written materials explaining
ORGANIZATION's fundraising campaign.

4.  Development and production of written materials to be used
for the collection of pledges: pledge vouchers, envelopes, etc.
Vouchers will instruct persons to make payment to ORGANIZATION.

5.  All written materials and scripts are subject to final
approval by ORGANIZATION before use.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

6. Record keeping pertinent to the program

7. SOLICITOR shall pay for all costs of telephoning, sending out pledge response mail, printing, stationery, phone charges postage, and office space incurred to execute this program.

All contributions received as a result of this program, shall be made payable to ORGANIZATION and mailed directly to ORGANIZATION by auditable means (certified or express mail, courier service, etc.) for deposit in ORGANIZATION's own bank account. It is ORGANIZATION's responsibility to manage all funds, once they are received for deposit. ORGANIZATION will designate a representative or representatives to whom the funds may be delivered for deposit.

SOLICITOR agrees to prepare all monies for deposit. The monies will be counted, organized, endorsed, and prepared for deposit by the SOLICITOR. SOLICITOR agrees to process all monies received in a prompt manner and to forward prepared deposits to ORGANIZATION on a regular basis. Within seven (7) days after receipt of the deposit, ORGANIZATION will pay SOLICITOR agreed upon fee enumerated below.

In remuneration of the solicitation services and materials provided by SOLICITOR, ORGANIZATION shall pay SOLICITOR 25% of the total moneys, pledges or other property raised or received by reason of this program. "Total moneys, pledges or other property raised or received" shall be computed by first deducting therefrom the actual cost to the charitable organization of inducements provided to the public in connection with the soliciting of contributions. SOLICITOR shall only receive the above-described 25% remuneration on the first $20 of any individual paid pledge.

Pursuant to the telefundraising campaign, ORGANIZATION wishes to offer inducements to those solicited. The inducements will be mutually agreed upon by SOLICITOR and ORGANIZATION and will be provided to ORGANIZATION by SOLICITOR. Price of inducements will be approved by ORGANIZATION prior to purchase. Inducements will not be presented to the public as items or services offered for sale per se. Rather, inducements will be used to motivate people to make pledges, raise the value of their pledges, secure payment of pledges, broaden the pledge base, and leave a residual good feeling with persons who pledge

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100

**THE REESE BROTHERS**
**COUPON POWER!** ®

*America's Best-Selling Coupon Book!*

Both ORGANIZATION and SOLICITOR recognize the value of the goodwill associated with their respective names, emblems, marks, and other symbols and the secondary meaning that these names, emblems, marks and symbols have in the mind of the public. Each party also recognizes and agrees that all rights and goodwill shall belong exclusively to ORGANIZATION in the case of its names and symbols and to SOLICITOR in the case of its names and symbols and that neither party shall, by virtue of this agreement, or the program it provides for, obtain or acquire any right or interest in the names, symbols, marks, or goodwill of the other and that neither party will, during the conduct of the program provided for by this Agreement or thereafter, attach title or right of the other in or to its names or symbols, marks, or goodwill.

The ORGANIZATION shall be entitled to a list of donors compiled by SOLICITOR in Bucks and Montgomery Counties to be furnished upon request. Said list is to be used exclusively for educational purposes.

SOLICITOR agrees to hold ORGANIZATION harmless from all claims, actions, suits, and liability arising under or relating to the conduct by SOLICITOR or its employees pursuant to this agreement including without limitation any suits, actions or claims predicated on or alleging that any person has had his or her privacy wrongfully invaded. ORGANIZATION similarly agrees to save and hold harmless SOLICITOR from all claims, actions, suits and liability arising under or relating to the content of information provided by ORGANIZATION pursuant to this Agreement SOLICITOR agrees to conduct a six (6) week test of the program, after which ORGANIZATION may cancel the program by so notifying SOLICITOR by certified mail within fourteen (14) of the completion of the test. In the event ORGANIZATION elects to cancel the program during the fourteen-day period, SOLICITOR may continue conducting the program for an additional thirty (30) days after which time the program will be terminated.

The term of this agreement shall be until the last day of the program. In no case will the term of the agreement be longer than one year from date of execution. It may be renewed by mutual consent of both parties in writing for an additional period of one year. But no matter when the agreement is terminated, ORGANIZATION will pay SOLICITOR for all services rendered by it prior to termination, in the manner described under "remuneration of services" above.

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 992-2200 • IN PITTSBURGH CALL: (412) 765-0100

THE REESE BROTHERS
**COUPON POWER!** ®

**America's Best-Selling Coupon Book!**

This Agreement shall be interpreted under the laws of the State of Pennsylvania.

COUPON POWER, INC.

By _____, President   3 29 88
    Barry S. Reese                        Date

MADD, Bucks-Montgomery County Chapter

By _Martha G Brown_   _President_   3-18-88
   Name            Title           Date

By _Mary Branden_   _Treasurer_   3-18-88
   Name          Title          Date

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 000-0000 • IN PITTSBURGH CALL: (412) 000-0000

**America's Best-Selling Coupon Book!**

COUPON POWER!®

This Agreement shall be interpreted under the laws of the State of Pennsylvania.

COUPON POWER, INC.

By _____   President ___3/29/88___
   Barry S. Reese                              Date


MADD, Bucks-Montgomery County Chapter

By __Martha G Brown__  __President__   __5-18-88__
   Name              Title              Date

By __Mary Branden__  __Treasurer__   __3-18-88__
   Name              Title              Date

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3200 • IN PITTSBURGH CALL: (412) 765-3100



## America's Best-Selling Coupon Book!

March 15, 1988

MADD Bucks-Montgomery County Chapter
2420 Old Bristol Road
Holland, Pennsylvania 18966

MADD, Bucks-Montgomery County Chapter (hereinafter,
"ORGANIZATION") wishes Coupon Power, Inc. to provide donor
inducements concomitant to ORGANIZATION'S fund raising campaign
in Bucks and Montgomery Counties.

DESCRIPTION OF INDUCEMENT FEES, SERVICES  AND MATERIALS:

   Pursuant to its fundraising campaign in Bucks and Montgomery
   Counties, the ORGANIZATION wishes to purchase inducement
   items.

2. For pledges between $7.50 and $15, donors shall receive
   an inducement item of lesser value.  For pledges equal to or
   exceeding $15, donors shall receive an inducement item.

3  Cost of inducements shall include all the following: the
   inducement item(s), postage, envelopes, addressing and
   stuffing, delivery to post office.

For the above enumerated fees, services and materials described
under the heading "Description of Inducement Fees, Services, and
Materials", the ORGANIZATION agrees to pay Coupon Power, Inc. in
the following manner:

| PLEDGE AMOUNT | TOTAL INDUCEMENT COST |
|---|---|
| $ 0     -  $ 7.49 | $ no inducement |
| $ 7.50  -  $19.99 | $  .60 |
| $20.00  -  And Up | $ 1.20 |

Coupon Power, Inc.

By _____ , President ____2____ __88__
      Barry S. Reese                              Date

MADD, Bucks-Montgomery County Chapter

By _____ __President__ __18 88__
                        Title        Date

_____ __Treasurer__ __18 88__
                        Title        Date

CLEVELAND • PITTSBURGH • PHILADELPHIA • ST. LOUIS • WASHINGTON, D.C.

COUPON POWER, INC. • CARLTON CENTER/SIXTH FLOOR • 925 PENN AVENUE • PITTSBURGH, PA 15222
CALL TOLL FREE: 800-245-4540 • IN PA CALL: (800) 892-3300 • IN PITTSBURGH CALL: (412) 765-3100





January 11, 2000

Mr. Joseph E. Schick
Industry Chairman
Mailers Technical Advisory Committee
16555 W. Rogers Drive
New Berlin, Wisconsin 53151-2223

Dear Mr. Schick:

I would like to thank you for your participation in the December 21, 1999, meeting regarding our revenue assurance process. We value our partnership with MTAC and welcome feedback from your organization on issues critical to our mailers.

I would like to stress that we are dedicated to working with our mailing partners to resolve issues as they arise and this will be the primary focus of our revenue assurance reviews in the future. Following is a summary of the initiatives we are undertaking to resolve the issues raised during our last meeting.

**Quality Charter** – In conjunction with our mailing partners, we will develop a quality charter to ensure, to the greatest extent possible, that quality assurance problems are resolved at the point of entry or soon thereafter without delaying the acceptance of mail. The focus will be on looking forward to proactively address quality issues versus looking at the past. As part of our commitment to this charter, we will employ a variety of quality tools to identify the root cause of problems when they arise. Once the underlying cause is identified, we will work to resolve the problem. Based on past experience, we have found that most problems arise from policy, training, or communication issues, and we will place added emphasis on each of these areas. The Mail Quality Assurance Program is an example of our continuing efforts to instill quality in our processes.

**Communications** – The ongoing two-way communications with our mailing partners through MTAC will be continued. Through this process we will develop quality initiatives, review policies, and discuss issues as they arise. We will provide feedback on mail-quality trends we discover in the industry. Should we decide to perform system-wide reviews of compliance with particular requirements, the industry will be fully informed prior to the start of such reviews.

**Training** – Postal management is committed to a standardized mail acceptance criterion. To ensure consistent application of the standards and application of the acceptance tools, we are focusing on enhanced training. These tools will be available to postal personnel as well as the mailing community.

475 L'Enfant Plaza SW
Washington DC 20260-5000
202-268-5272
Fax: 202-268-4364

- 2 -

**Evaluation Criteria** —We continue to work on systems that will standardize and streamline the acceptance and verification and mail quality review processes. As part of our work on these issues, we are committed to communicating with mailers at the earliest possible phase of these processes so that problems can be identified and remedied to our mutual benefit. To further this work, our Bulk Mail acceptance and Rates and Classification Service Center (RCSC) personnel will work with our customers when and where mailing problems are identified. We will provide mailers with notice of problems and recommend remedies. Deficiencies will not be assessed as part of this notice process. However, if after notice is given and identified problems continue to occur, deficiencies will be assessed. Of course in those rare circumstances where warranted, the Postal Service will continue to protect itself and the overwhelmingly honest community of mailers from the few that engage in misconduct. Where intentional misconduct is found, the processes we outline here will not be applicable.

**Appeals Process** — We expect that these policies will significantly decrease the need to assess revenue deficiencies. In those instances where deficiencies are assessed, the appeal process will remain available. Appeals concerning classification concerns or the calculation of the deficiency may be made to the RCSCs. Where a deficiency is upheld on appeal and the mailer believes there are valid reasons to waive it, in whole or part, District and Area Finance managers are authorized to forgive or settle the claim in a manner that is equitable to the Postal Service and the mailer.

In summary, we have heard the collective voice of the industry and we are responding. We are shifting our attention to prevention by proactively resolving problems in conjunction with our mailing partners. In the spirit of this cooperative effort, our staff will review outstanding assessed deficiencies and make a final determination based on the items mentioned above. Again, thank you for your assistance. We look forward to working with you throughout this process.

Sincerely,

M. Richard Porras

cc: MTAC Members

AN OVERVIEW OF STATE CONTRACT REQUIREMENTS
REGARDING THE PERCENTAGE OF CONTRIBUTIONS
THAT A CHARITABLE ORGANIZATION SHALL RECEIVE
AS THE RESULT OF A SOLICITATION CAMPAIGN

ALABAMA             No % requirement

ALASKA              Alaska Statutes Chapter 68.
                    Charitable solicitations

        Section 45.68.020. Contract required. (a) a
paid solicitor may not solicit contributions on behalf of a
charitable organization unless the paid solicitor executes
a written contract with the charitable organization that
clearly states the respective obligation of the paid
solicitor and the charitable organization, including…(3)
the percentage of the gross contributions that the
charitable organization is to receive.

ARIZONA             No % requirement

ARKANSAS            No % requirement

CALIFORNIA          No % requirement

COLORADO            No % requirement

CONNECTICUT         Connecticut Solicitation of Charitable
                    Funds Act

Section 21a-190f.Paid solicitors. Registration. Fees. Bond.
Filing of contracts. Solicitation notice. Contract
requirements. Disclosures at point of solicitation.
Prohibited practices. Records. Deposit of funds.

        (d) A contract between a paid solicitor and a
charitable organization shall … state the minimum amount
which the charitable organization shall receive as a result
of the solicitation campaign, which minimum amount shall be
state as a percentage of the gross revenue.  Such minimum
shall not include any amount which the charitable
organization is to pay as expensed of the solicitation
campaign.

DELAWARE            No % requirement

DC            No % requirement

FLORIDA       Solicitation of Contributions Act
              Chapter 496, Florida Statutes, 1991
              s.212.08(7)(o)2.d, Florida Statutes and
              s.5J-7.004, Florida Administrative Codes

              Section 496.410 (7) Each contract or
              agreement between a professional solicitor and an
              charitable organization or sponsor for each
              solicitation campaign must be in writing…and
              contain all of the following provisions:

                            ***

              (c) A statement of the guaranteed minimum
              percentage of the gross receipts from
              contributions which will be remitted to the
              charitable organization or sponsor, if any, or,
              if the solicitation involves the sale of goods,
              services, or tickets to a fundraising event, the
              percentage of the purchase price which will be
              remitted to the charitable organization or
              sponsor, if any.  Any state percentage shall
              exclude any amount which the charitable
              organization or sponsor is to pay as fundraising
              costs.

GEORGIA     Georgia Charitable Solicitations Act of 1988
            O.C>G.A. Section 43-17-3(e)(1)

            Paid solicitors are required to file a copy of
the contract which states the respective obligations of the
paid solicitor and charitable organization and states the
amount of gross revenue from the solicitation campaign the
charitable organization will receive.

HAWAII      Hawaii Revised Statues Section 467B-6 Filing of
            agreements.

            (b) Every contract between a professional solicitor
                and a charitable organization that provides for a
                percentage compensation shall be filed with the
                department not more than ten days after the

contract is signed by the charitable organization.
The contract shall disclose the percentage
distribution between the parties to the contract of
all funds to be raised or received as a result of the
agreed upon solicitation activity.

IDAHO      No % requirement.

ILLINOIS   Illinois Charitable Organization Laws –
           Solicitation for Charity Act, 225 ILCS 460/1,
           ch 23, par. 5100 et seq., as amended by
           P.A. 90-469, effective August 17, 1997

           Professional Fundraiser Contracts
           (ch. 23.par.5107)
           Section 7 (b)

     Any contract between a trust or charitable
organization and a professional fund raiser must
contain an estimated reasonable budget disclosing the
target amount of funds to be raised over the contract
Period, the type and amount of projected expenses
related thereto, and the amount projected to be paid
to the charitable organization….If the contract
provides that the professional fund raiser will retain
or be paid a state percentage of the gross amount
raised, an estimate of the gross amount to be raised
and to be paid to charity shall be stated in the
contract.

INDIANA    Professional Fundraiser Consultant
           and Solicitor Registration Act 23-7-8-2

           (e)  Before a professional solicitor engages in a
                solicitation, the professional solicitor
                must have a contract which is filed with the
                division.  This contract must specify the
                percentage of gross contributions which the
                charitable organization will receive or the
                terms upon which a determination can be made
                as to the amount of the gross revenue from
                the solicitation campaign that the
                charitable organization will receive.  The

amount that the charitable organization will
receive must be expressed as a fixed percentage
of the gross revenue or as a reasonable estimate
of the gross revenue.

IOWA        No % requirement

KANSAS      No % requirement

KENTUCKY    Charitable Solicitations KRS 367.653
            CONTRACTS;REQUIREMENTS;FILING OF CONTRACT AND
            PROMOTION REGISTRATION STATEMNET;VIOLABILITY OF
            CONTRACT WITH UNREGISTERED PARTY

            (1)  A contract between a charitable organization
                 and a professional solicitor or a charitable
                 organization and a fundraising consultant
                 shall be in writing.   ***

            (2)  The contract shall clearly state:

                          ***
                 (b)The percentage of the gross revenue from
                 the campaign that the charitable
                 organization will receive;

LOUISIANA   No % requirement

MAINE       Contracts must be in writing and must state
            what amount of money raised goes to the
            charitable organization.  If there is a
            minimum percentage guaranteed it must be
            part of the contract.

MARYLAND    No % requirement

MASSACHUSETTS  No % requirement

MICHIGAN    No % requirement

MINNESOTA          Section 309.531 REGISTRATION OF PROFESSIONAL
                   FUND RAISER; BOND REQUIRED
                   Subdivision 2(c) the professional fund
                   raiser shall also include, as part of the
                   registration statement, a copy of the
                   contract between the charitable organization
                   and the professional fund raise.   The
                   contract shall:

                                    ***

          (3)   if the professional fund raiser or any
                person the professional fund raiser employs,
                procures, or engages, directly or
                indirectly, solicits in this state, the
                contract shall disclose the percentage or a
                reasonable estimate of the percentage of the
                total amount solicited form each person
                which shall be received by the charitable
                organization for charitable purposes.


MISSISSIPPI     UNKNOWN

MISSOURI        UNKNOWN

MONTANA         No % Requirement

NEBRASKA        No % requirement

NEVADA          No % requirement

NEW HAMPSHIRE   No % requirement

NEW JERSEY      Charitable Registration and Investigation
                Act — Title 45:17A-27(e)

                The contract for a fund raising counsel or
                independent paid fund raiser either of whom
                at any time has or intends to have custody,

-control, or access to a charitable organization's money, shall contain the following:

\*\*\*

(4) A statement as to the guaranteed minimum percentage of the gross receipts from contributions which will be remitted to the charitable organization, if any,....

NEW MEXICO          No % requirement

NEW YORK            No % requirement

NORTH CAROLINA      No % requirement

NORTH DAKOTA        No % requirement

OHIO                Section 1716.08 contracts with professional solicitors; disclosure at point of solicitation; representations as to donations to other charities; donated tickets; annual report and file of attorney general.

(A) every contract entered into by any professional solicitor with any charitable organization shall... contain the percentage of the gross revenue from the solicitation campaign that the charitable organization will receive.

OKLAHOMA            No % requirement

OREGON              No % requirement

PENNSYLVANIA    Solicitation of Funds for
                Charitable Purposes Section 9(f)

                There shall be a written contract between a
                charitable organization and a professional
                solicitor… .  The contract shall contain all
                of the following provisions:

                    (4)  A statement of the guaranteed
                minimum percentage of the gross receipts
                from contributions which will be remitted to
                or retained by the charitable organization,
                if any…


RHODE ISLAND    No % requirement

SOUTH CAROLINA  Solicitation of Charitable Funds Act
                Chapter 56
                Section 33-56-70
                            ***

                Every contract filed under this section must
                disclose the amount of compensation the
                professional fundraising counsel or
                solicitor will receive, or if there is no
                flat fee, the percentage of collected
                revenues the professional fund-raising
                counsel or solicitor will receive.
                            ***

SOUTH DAKOTA    No % requirement

TENNESSEE       No % requirement

TEXAS           No % requirement

UTAH            No % requirement

VERMONT         No % requirement

VIRGINIA        No % requirement

WASHINGTON      Unknown

WEST VIRGINIA   Solicitation of Charitable Funds Act
                Section 29-19-7. Filing of solicitation
                contracts.
                                    ***
     (c)   Each statement must clearly provide the amount,
           percentage or other method of compensation to be
           received by the professional solicitor or
           professional fund-raising counsel as a result of
           the contract or arrangement.

WISCONSIN       No % requirement

WYOMING         No % requirement