Federal Register / Vol. 68, No. 196 / Thursday, October 9, 2003 / Rules and Regulations    58273

21.197 and 21.199) to operate the airplane to a location where the requirements of this AD can be accomplished.

**Incorporation by Reference**

(d) The actions shall be done in accordance with Boeing Special Attention Service Bulletin 727–25–0298, dated February 13, 2003. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies may be obtained from Boeing Commercial Airplane Group, P.O. Box 3707, Seattle, Washington 98124–2207. Copies may be inspected at the FAA, Transport Airplane Directorate, 1601 Lind Avenue, SW., Renton, Washington; or at the Office of the Federal Register, 800 North Capitol Street, NW., suite 700, Washington, DC.

**Effective Date**

(e) This amendment becomes effective on November 13, 2003.

Issued in Renton, Washington, on October 2, 2003.

**Vi L. Lipski,**
*Manager, Transport Airplane Directorate, Aircraft Certification Service.*
[FR Doc. 03–25490 Filed 10–8–03; 8:45 am]
**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

[Docket No. 2000–NE–47–AD; Amendment 39–13318; AD 2003–19–15]

**RIN 2120–AA64**

**Airworthiness Directives; Pratt & Whitney PW4000 Series Turbofan Engines; Correction**

**AGENCY:** Federal Aviation Administration, DOT.
**ACTION:** Final rule; correction.

**SUMMARY:** This document makes a correction to Airworthiness Directive (AD) 2003–19–15, applicable to Pratt & Whitney PW4000 series turbofan engines. AD 2003–19–15 was published in the **Federal Register** on September 30, 2003 (68 FR 56143). In the amendatory language, under § 39.13 [Amended], the amendment number of the new action was inadvertently omitted. This document corrects that omission. In all other respects, the original document remains the same.
**EFFECTIVE DATE:** October 9, 2003.
**FOR FURTHER INFORMATION CONTACT:** Diane Cook, Aerospace Engineer, Engine Certification Office, FAA, Engine and Propeller Directorate, 12 New England Executive Park, Burlington, MA 01803–5299; telephone (781) 238–7133; fax (781) 238–7199.

**SUPPLEMENTARY INFORMATION:** A final rule airworthiness directive, FR Doc. 03–24486, applicable to Pratt & Whitney PW4000 series turbofan engines, was published in the **Federal Register** on September 30, 2003 (68 FR 56143). The following correction is needed:

■ On page 56145, in the second column, under § 39.13 [Amended], in the sixth line, add "Amendment 39–13318." after "Pratt & Whitney:".

Issued in Burlington, MA, on October 3, 2003.

**Jay J. Pardee,**
*Manager, Engine and Propeller Directorate, Aircraft Certification Service.*
[FR Doc. 03–25577 Filed 10–8–03; 8:45 am]
**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 347**

[Docket No. 78N–021A]

**RIN 0910–AA01**

**Skin Protectant Drug Products for Over-the-Counter Human Use; Astringent Drug Products; Final Monograph; Direct Final Rule; Confirmation of Effective Date**

**AGENCY:** Food and Drug Administration, HHS.
**ACTION:** Direct final rule; confirmation of effective date.

**SUMMARY:** The Food and Drug Administration (FDA) is confirming the effective date of October 27, 2003, for the final rule that appeared in the **Federal Register** of June 13, 2003 (68 FR 35290). The direct final rule amends the regulation that established conditions under which over-the-counter (OTC) skin protectant astringent drug products are generally recognized as safe and effective and not misbranded. This action revises some labeling for astringent drug products to be consistent with the final rule for OTC skin protectant drug products (68 FR 33362, June 4, 2003) and adds labeling for certain small packages (styptic pencils). This document confirms the effective date of the direct final rule. This action is part of FDA's ongoing review of OTC drug products.
**DATES:** Effective date confirmed: October 27, 2003.
**FOR FURTHER INFORMATION CONTACT:** Gerald M. Rachanow, Center for Drug Evaluation and Research (HFD–560), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–2307.
**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of June 13, 2003 (68 FR 35290), FDA solicited comments concerning the direct final rule for a 75-day period ending August 27, 2003. FDA stated that the effective date of the direct final rule would be on October 27, 2003, 60 days after the end of the comment period, unless any significant adverse comment was submitted to FDA during the comment period. FDA did not receive any significant adverse comments.

**Authority:** 21 U.S.C. 321, 351, 352, 353, 355, 360, 371.

Accordingly, the amendments issued thereby are effective.

Dated: October 3, 2003.

**Jeffrey Shuren,**
*Assistant Commissioner for Policy.*
[FR Doc. 03–25648 Filed 10–8–03; 8:45 am]
**BILLING CODE 4160–01–S**

---

**POSTAL SERVICE**

**39 CFR Part 111**

**Eligibility Requirements for Certain Nonprofit Standard Mail Matter**

**AGENCY:** Postal Service.
**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Postal Service adopts an amendment to Domestic Mail Manual standards that expands eligibility for Nonprofit Standard Mail rates by exempting certain matter soliciting monetary donations from application of the cooperative mail rule.
**EFFECTIVE DATE:** November 13, 2003.
**FOR FURTHER INFORMATION CONTACT:** Jerome M. Lease, Mailing Standards, United States Postal Service, 703–292–4184.
**SUPPLEMENTARY INFORMATION:** In a proposed rule published in the **Federal Register** on May 6, 2003 (68 FR 23937–23939), the Postal Service proposed to expand the eligibility for Nonprofit Standard Mail rates by exempting certain fundraising mailings from the application of the cooperative mail rule. For the reasons explained herein, the Postal Service adopts the proposal, with minor modifications.

The proposal provided background concerning Nonprofit Standard Mail eligibility; the traditional role of Congress in expansion of eligibility for these rates; the history of the cooperative mail rule and its application to fundraising mailings; recent concerns

**58274**   Federal Register / Vol. 68, No. 196 / Thursday, October 9, 2003 / Rules and Regulations

raised by nonprofit representatives concerning application of the cooperative mail rule on fundraising mail and potential effects on nonprofit organizations; and proposed legislation to exempt certain fundraising mail from application of the rule. The proposal also explained the Postal Service's reluctance to propose a rulemaking on these issues since expansion of eligibility for nonprofit rates has traditionally been accomplished through legislation. Nevertheless, as the proposal discussed, the Postal Service determined to embark upon this rulemaking with the understanding that it represented the consensus of parties with an interest in nonprofit issues, including bipartisan Congressional support, representatives of both nonprofit organizations and professional fundraisers, and the Postal Service; that it was needed to assist nonprofit organizations in obtaining support necessary to fund their programs; and that this result could be accomplished more quickly administratively than legislatively.

The Postal Service received 67 comments concerning its proposal, including one that was received late but was considered. The commenters were diverse, including nonprofit organizations and organizations representing such organizations; professional fundraisers and organizations representing these commercial entities; Congressional representatives; private individuals; and an organization representing state officials that regulate charities. The comments also presented a broad range of views. A significant majority of the comments urged the Postal Service to adopt the rule as proposed. A small number of comments, concerned with potential abuses, recommended limitation of the proposed rule. Of these commenters, a small number recommended that the Postal Service withdraw the proposal, while the remainder recommended that it be adopted with additional restrictions. In contrast, a lesser number of comments recommended that the exemption from application of the cooperative mail rule be expanded even further. Additionally, several comments recommended that the rule should be retroactive.

One of the comments that urged withdrawal of the rule argued that the rule would primarily benefit commercial fundraisers, rather than nonprofit organizations, while the other spoke more generally of potential abuse. If the former assertion were proven to be true, it would give the Postal Service reason to consider withdrawing the proposal. That is, the Postal Service understands that the primary concern of Congress and the nonprofit industry in seeking changes in this area was to benefit nonprofit organizations. Admittedly, the Postal Service does not have independent knowledge to verify the accuracy of the commenter's claims, since the Postal Service does not monitor or regulate the business relationships between nonprofit organizations and professional fundraisers. The comment did not provide evidence to substantiate its claim. Moreover, both nonprofit organizations and associations representing them, who obviously have an interest in this question, urge adoption of the proposal or a modified version of it. This suggests, and some of these comments specifically state, that the change will benefit at least some nonprofit organizations. Accordingly, the Postal Service does not find it appropriate to reject the proposal, as urged by this comment.

The comments that urge the imposition of restrictions narrowing the proposed exemption from the cooperative mail rule do so for reasons related to those raised by comments seeking withdrawal of the proposal. That is, although they do not urge rejection of the new policy, these comments express concern that some professional fundraisers may use the new rules to take advantage of inexperienced or unsophisticated nonprofit organizations.

At the outset, it should be noted that the proposed rule does not dictate the terms of the relationship between nonprofit organizations and fundraisers. If anything, it increases the options available to the parties. For instance, it does not prevent nonprofits from entering the type of principal-agent relationship with fundraisers contemplated by the cooperative mail rule. And, as urged by the numerous parties that sought the Postal Service rulemaking in this area, it allows the nonprofits to consider other relationships to retain the services of professional fundraisers.

The Postal Service does not doubt that the proposed change in its standards will provide individual nonprofit organizations the freedom to enter agreements that, in hindsight, at least a few will conclude to have been unwise. However, the Postal Service does not believe that this provides the justification, at least at this time, to adopt the additional restrictions urged by some comments. Those proposals recommend that the Postal Service require nonprofits and fundraisers to adhere, and certify their compliance, to a variety of conditions concerning their relationship. The conditions suggested include: (1) A restriction against any officer, director, principal, or fiduciary of the party that is ineligible to mail at nonprofit rates (hereafter "ineligible participant") or a corporate affiliate or close relative of the ineligible participant serving as an officer, director, or key employee of the nonprofit; (2) a requirement that the arrangement between the nonprofit and ineligible participant be governed by a written contract, and that this contract be signed by a board member or officer of the nonprofit; (3) a requirement that the donations be deposited in a bank account under the nonprofit's exclusive control; (4) a requirement that the ineligible participant have no ownership or control over the list of donors responding to the solicitation, beyond a limited contingent security interest; (5) a requirement that the ineligible participant not retain ownership rights to intellectual property in the fundraising package developed at the nonprofit's expense; (6) a requirement that, in instances where the ineligible participant extends credit to the nonprofit, the credit terms are not conditioned upon the continued employment of the ineligible participant; and (7) a requirement that the mailing not constitute an excess benefit transaction as defined by the Internal Revenue Service. As explained, the Postal Service has determined to adopt the fourth suggestion, in part. Other than that item, for the reasons discussed below, the Postal Service has determined not to adopt the restrictions suggested by these commenters.

First, based on comments received by the Postal Service, it is clear there is significant disagreement as to whether any, much less these, additional restrictions should be adopted. As discussed above, and in the earlier **Federal Register** notice, the Postal Service proposed its rule change reluctantly, based on an understanding there was a broad consensus among interested parties supporting it. Although there appears to remain a general consensus in support of the proposal, there is no consensus supporting any of the suggested additional restrictions.

Second, even if the Postal Service found it appropriate to consider additional postal standards in this area, it is not convinced that the standards suggested are necessarily appropriate. The Postal Service understands the nonprofit universe to be diverse. For example, nonprofits may be large or small, well-established or relatively new, relatively well-funded or not well-funded, run by a permanent paid staff

or all-volunteer. It seems to us difficult to impose a set of restrictions that should be universally applied to all of these organizations. However, that is what the comments suggest.

Third, even if the terms suggested by the commenters are reasonable, the need to impose them by regulation is not clear to the Postal Service. That is, although the need to ensure that nonprofit organizations are not subject to abuses by commercial entities is a laudable objective, it might be accomplished, or at least attempted, through alternatives to regulation. For example, education or training of nonprofits may prove to be sufficient, particularly if it is true that adherence to the suggestions is financially beneficial for the nonprofit. There are a number of interested entities that might provide this education and training: associations representing nonprofit organizations; associations representing fundraisers; and government entities that regulate professional fundraisers and nonprofits. The Postal Service encourages these associations and government agencies to undertake efforts to educate nonprofit organizations and to take other appropriate measures to protect nonprofits from potential abuses. We also encourage nonprofit organizations to utilize these resources and to review their existing and proposed fundraising arrangements and consider whether the terms of those arrangements are in their best interests. The Postal Service will be happy to assist, as appropriate, in these efforts.

Fourth, the Postal Service also has doubts that the procedures suggested by some of the comments are administratively feasible. The comments did not appear to suggest that the Postal Service undertake the difficult task of independently verifying mailers' compliance with the proposed conditions. Rather, they suggested that the parties each sign the postage statements certifying compliance with the new standards and that the Postal Service rely upon these statements. However, the Postal Service does not require all parties to sign the postage statement at this time and, when analogous proposals have been raised in the past, mailers have pointed out the logistical problems they would face if required to sign postage statements for mail prepared and entered by their agents. Moreover, even if it is not contemplated by the commenters that the Postal Service will seek to enforce the suggested conditions beyond ensuring that the parties sign the postage statement, it is unlikely that the Postal Service can avoid all other enforcement activity. For instance, if it is alleged that parties are not in compliance, despite mailing at the nonprofit rates while certifying they did comply, it is likely that the Postal Service would be expected to investigate the assertions. Unlike violations of the current cooperative mail rule, which often can be determined by examination of the parties' contractual arrangements, some of the proposed conditions would likely require a more extensive investigation. For example, the restriction against officers and others with close ties to the ineligible participant (including the close relatives of these individuals) serving as officers, directors, or key employees of the nonprofit would require an exhaustive examination of the organization charts and employment rolls of each organization. Determining whether there is a violation of the IRS excess benefit transaction standard would require Postal Service employees to develop expertise in these standards and to obtain the information needed to apply them. Given the possibility of IRS investigations of the parties under the same standard, this requirement would create the risk of duplicative government efforts.

There is also the likelihood that the proposed conditions will create practical, administrative hardships for some nonprofits. For example, the requirement that the donated funds be deposited in a bank account controlled exclusively by the nonprofit could prove difficult for nonprofits that, because of size or other concerns, are ill-equipped to handle such accounts. Similarly, the requirement that the board members or officers sign fundraising agreements could create difficulties for organizations that delegate these responsibilities to other parties. As the Postal Service is aware from its own purchasing procedures, it is not unusual for employees that are not officers to be given authority to sign contracts.

Adoption of the proposed conditions also could work to the financial detriment of some nonprofits. The proposed rule provides additional options for nonprofits, thereby giving them additional choices in their efforts to find the arrangement that will maximize the benefit to the nonprofit. For instance, it may be beneficial for some nonprofits to consider arrangements concerning donor lists, intellectual property rights, and credit terms beyond those that would be permitted under the proposed conditions. Limiting the choices available to nonprofits might, in some instances, take away the option that would be best for some organizations. Of course, it could be argued that increasing the options available to nonprofits will increase the likelihood that some, particularly the least sophisticated, will make the wrong choice. However, as observed above, the appropriate safeguard against this possibility would seem to be the education of nonprofits to make the best choices in their particular circumstances, rather than eliminating options that might be prove to be the best choice for some of them.

Finally, the Postal Service is concerned that adoption of the proposed conditions may create conflicts with state or federal statutes and that, if such conflicts occur, mailers would be placed in the untenable position of determining whether to comply with the statutes or with postal regulations. Indeed, as discussed in the notice announcing the proposed rule in 65 FR 23939, ensuring that our customers "do not unintentionally violate the laws of those states that regulate the financial arrangements between nonprofits and certain types of professional fundraisers" was one of the motives underlying the rulemaking. The Postal Service is aware that all states have agencies with oversight over charitable solicitations, including state Attorney Generals; Secretaries of State; and Departments of Consumer Protection, Consumer and Regulatory Affairs, Agriculture and Consumer Services, Commerce, Commerce and Consumer Protection, Professional and Financial Regulation, Business Regulation, or Regulation and Licensing, or a combination of such state agencies. The Postal Service is aware also that most states have laws regulating the relationship between professional fundraisers and their nonprofit clients. At the present time, it appears that at least 28 states have enacted some type of financial distribution requirement on charitable fundraisers and, if anything, we understand that the trend toward such state oversight is increasing. Additionally, there are a number of federal agencies with the authority and expertise to enact and enforce standards concerning these relationships, such as the Federal Trade Commission, Internal Revenue Service, and Department of Justice. Under an exemption of fundraising mailings from the cooperative mail rule, the states and federal agencies will be able to adopt and enforce their standards without concern that such action might be in conflict with postal rules.

As alluded to above, the Postal Service has determined to adopt a condition concerning donor lists (*i.e.*,

the lists of persons contributing donations in response to the solicitation). Under this condition, the exemption from application of the cooperative mail rule will apply only where the nonprofit organization is given a list of the donors, contact information for those persons, and the amount of their donations. Based on past reviews of fundraising agreements, the Postal Service believes that this condition is already generally followed in the fundraising industry. Moreover, compliance with this condition generally can be determined by postal officials from review of the agreement between the fundraiser and the nonprofit. Finally, to guard against the possibility that some nonprofits will be better served financially if not subject to this condition, postal standards will allow them to waive the receipt of this listing, as long as that is done in writing.

Based on these considerations, the Postal Service has determined not to adopt at this time the remaining restrictions suggested by some comments. Nevertheless, they do raise significant concerns and the Postal Service's Consumer Advocate will monitor implementation of the rule to determine whether abuses are occurring. As promised in the proposal, if such abuses or other unintended consequences occur after the rulemaking, the Postal Service will consider a further rulemaking or other administrative actions.

Several commenters, although in favor of the proposal, assert that the rulemaking did not go far enough. They assert that the exemption from the cooperative mail rule should also cover the sale of products and services, at least those of nominal value, as well as a variety of documents including brochures, thank you letters, letters confirming the amount of donations, newsletters, and "chase" letters. The Postal Service understands the latter to refer to letters that follow up on telemarketing fundraising campaigns and remind donors that their pledges have not been paid. Assuming that understanding of "chase" letters is correct, the Postal Service considers them to be a solicitation for monetary donations within the proposal. Accordingly, as long as they do not contain other disqualifying material, such letters would be exempt from application of the cooperative mail rule.

The Postal Service has determined not to expand the proposal to provide that pieces promoting the sale of products and services also be exempted from application of the cooperative mail rule. As explained in the proposal, the exemption is strictly limited to fundraising mailings seeking monetary donations and does not apply to mailings promoting any goods or services. The suggestion goes beyond the consensus agreement that led to the rulemaking. Moreover, as the Postal Service explained in the notice discussing the proposal, adoption of the suggestion would create significant potential for abuse by commercial organizations and may place small businesses and other for-profit organizations who sell similar goods and services at a competitive disadvantage. The suggestion that the proposal be expanded to cover only products and services of nominal value does not alter these considerations; if anything, it could create concerns in administering what is included within that standard.

The Postal Service also has determined not to expand this rulemaking to cover the other documents (e.g., thank you letters, newsletters, confirmations of donations) identified in the comments. These suggestions are beyond the scope of the rulemaking as well as the consensus favoring the exemption of certain fundraising mailings from application of the cooperative mail rule. Moreover, the need for a rulemaking to address these documents is unclear. The Postal Service is not aware of any general concern regarding its policies involving these documents. Some of them may, in fact, be generally sent as First-Class Mail, and thereby they are not eligible for Nonprofit Standard Mail rates in any case.

Finally, several commenters suggest that the proposed policy be made retroactive. The Postal Service has determined not to do so and, as explained in its proposal, the change in policy is prospective only, effective on the date of enactment. A retroactive change could open the Postal Service to an undetermined number of refund claims.

For these reasons, the Postal Service adopts the rule as proposed but, in addition to the condition described above, makes three minor changes. First, the proposed revision was to apply only to nonprofit organizations authorized to mail at the nonprofit rates. The rule is changed to apply to all customers authorized to mail at Nonprofit Standard Mail rates. Second, the proposed rule is revised to make clear that the exception from application of the cooperative mail rule applies only where the monetary donations solicited are for the entity authorized to mail at nonprofit rates. Finally, the language is revised to make clear that the exception is prospective only.

**List of Subjects in 39 CFR Part 111**

Administrative practice and procedure, Postal Service.

**PART 111—[AMENDED]**

■ 1. The authority citation for 39 CFR part 111 continues to read as follows:

   Authority: 5 U.S.C. 552(a); 39 U.S.C. 101, 401, 403, 404, 414, 3001–3011, 3201–3219, 3403–3406, 3621, 3626, 5001.

■ 2. Add the following to Domestic Mail Manual section E670.5.3: "Exception: effective November 13, 2003, this standard no longer applies to mailings by an organization authorized to mail at Nonprofit Standard Mail rates soliciting monetary donations to the authorized mailer and not promoting or otherwise facilitating the sale or lease of any goods or service. This exception applies only where the organization authorized to mail at Nonprofit Standard Mail rates is given a list of each donor, contact information (e.g., address, telephone number) for each, and the amount of the donation or waives in writing the receipt of this list."

An appropriate amendment to 39 CFR part 111 to reflect these changes will be published.

**Stanley F. Mires,**
*Chief Counsel, Legislative.*
[FR Doc. 03–25643 Filed 10–8–03; 8:45 am]
**BILLING CODE 7710–12–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[NM–46–1–7615a; FRL–7571–1]**

**Approval and Promulgation of Implementation Plans; New Mexico; Revision to Motor Vehicle Emission Budgets in Bernalillo County, New Mexico Carbon Monoxide Air Quality Maintenance Plan Using MOBILE6**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Direct final rule.

**SUMMARY:** The EPA is taking direct final action approving the State Implementation Plan (SIP) revisions for Bernalillo County, New Mexico, which is a carbon monoxide maintenance area. This SIP revision was submitted to EPA by the Governor of New Mexico on May 15, 2003. More specifically, EPA is approving the county's revised Motor Vehicle Emissions Budget (MVEB) for carbon monoxide (CO) for 1996, 1999, 2002, 2005 and 2006. This budget was developed using EPA's latest emissions