## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **REESE BROTHERS, INC.,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 06-0434 (RMU)** |
| **UNITED STATES POSTAL SERVICE,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |
| | ) | |

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Defendant/Counterclaim Plaintiff, the United States Postal Service, by its undersigned counsel, represents as follows:

### INTRODUCTION

1.      This is an action brought by Defendant/Counterclaim Plaintiff, the United States Postal Service ("Postal Service"), against Counterclaim Defendant, Reese Brothers, Inc. ("Reese") and Third-party Defendants, Reese Teleservices, Inc. ("Reese Teleservices"), and The Resources Group (TRG Holdings, LLC) to collect on the debt incurred by Reese for violating the Postal Service's regulations prohibiting cooperative mailings. *See* 39 C.F.R. §§ 111.1-111.5, 211.2(a)(2).

### Jurisdiction and Venue

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1339, 3001 and 39 U.S.C. §§ 409(a), 2601(a), 2605 and 3626(k).

3.      Venue is proper in this Court under 28 U.S.C. § 1391(e).

1

## The Parties

4.    Defendant/Counterclaim Plaintiff is the United States Postal Service, an independent establishment of the executive branch. 39 U.S.C. § 201.

5.    Counterclaim Defendant, Reese Brothers, Inc., is a corporation organized under the laws of Pennsylvania, doing business at 925 Penn Avenue, Pittsburgh, PA 15222.

6.    Third-party Defendant, Reese Teleservices, Inc., is a corporation organized under the laws of Pennsylvania doing business at 925 Penn Avenue, Pittsburgh, PA 15222. On information and belief, Reese Teleservices acquired Reese in December 2002. *See* *http://www.reeseteleservices.com/about_us/history.html.* Reese Teleservices continues the operations of Reese including its telemarketing fundraising for nonprofit organizations in the United States. *See* *http://www.resgrp.com/04112005pr.html.*

7.    Third-party Defendant The Resources Group does business in the United States as TRG Holdings, LLC. TRG Holdings, LLC, is a limited liability company organized under the laws of the state of Delaware, doing business at 1700 Pennsylvania Avenue, NW, Washington, DC. On information and belief, The Resources Group acquired a controlling interest in Reese Teleservices on or about April, 2005. *See* http://www.resgrp.com/04112005pr.html.

## The Cooperative Mail Rule

8.    Since 1951, Congress has authorized reduced rates for postage for a limited number of types of nonprofit organizations. *See* 65 Stat. 672 (1951); former 39 U.S.C. § 4452 (1964) (superseded).

9.    In 1975, the Postal Service issued Postal Service Manual ("PSM") § 134.57, a regulation containing restrictions on the use of the Nonprofit Standard Mail rate (then called the

"special bulk third-class rate"), including the prohibition on "cooperative mailings." *See* 40 Fed. Reg. 37,209 (Aug. 26, 1975). *See also National Retired Teachers Assoc. v. United States Postal Service*, 593 F.2d 1360, 1361-62 & n.2 (D.C. Cir. 1979) (tracing the history of the cooperative mail regulation).

10.    PSM § 134.57 "defines the conditions under which nonprofit organizations qualified for special third-class mailing privileges under § 300.221 of the Domestic Mail Classification Schedule (DMCS) may receive the lower [nonprofit rate] for matter mailed by them." *National Retired Teachers Assoc.*, 593 F.2d at 1361.

11.    DMCS § 300.221 provides: The nonprofit bulk rate is available for bulk rate third-class mail mailed by qualified nonprofit organizations. A qualified nonprofit organization is a religious, educational, scientific, philanthropic, agricultural, labor, veteran's or fraternal organization or association that is not organized for profit and none of the net income of which inures to the benefit of any private stockholder or individual. Before being entitled to mail at the nonprofit bulk rate, the organization shall furnish proof of its qualifications to the Postal Service. *Id.* at n.2.

12.    PSM § 134.57 provides in full:

An organization authorized to mail at the special bulk third-class rates for qualified nonprofit organizations may mail *only* its own matter at these rates. An organization may not delegate or lend the use of its permit to mail at special third-class rates to any other person, organization or association. Cooperative mailings may not be made at the special bulk third-class rates for qualified nonprofit organizations if one or more of the cooperating persons or organizations is not entitled itself to the special rates. Cooperative mailings involving the mailing of matter in behalf of or produced for an organization not authorized to mail at the special bulk third-class rates for qualified nonprofit organizations must be paid at the applicable regular rate. If customers disagree with a postmaster's decision that the regular rate of postage applies to a particular mailing,

the procedures in 146.14 may be followed. (Emphasis in original).

A copy of PSM 134.57 is attached as DAC Exhibit 1.

13.    The substantive language of PSM § 134.57 has remained the same since its inception; the relevant provisions have been divided and renumbered by the Postal Service at various times over the years. The changes in the language of the regulation over the years are non-material -- for example, as noted above, the nomenclature for the nonprofit rate has changed from "special bulk third-class" to "Nonprofit Standard Mail rates."

14.    The PSM was replaced by the Domestic Mail Manual ("DMM"), and the language of PSM § 134.57 was placed in the DMM without substantive change.

15.    The DMM is adopted as a Postal Service regulation and incorporated by reference in the Code of Federal Regulations. *See* 39 C.F.R. §§ 111.1-111.5, 211.2(a)(2).

16.    For purposes of this counterclaim, the government refers to the cooperative mail regulation as found in DMM Issue 50, July 1, 1996, the pertinent pages of which are attached as DAC Exhibit 2.

17.    DMM § E670.5.3 provides, in a section entitled "Cooperative Mailings":

Cooperative mailings may be made at the [nonprofit rate] only when each of the cooperating organizations is individually authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited. Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the [nonprofit rate] at the post office where the mailing is deposited must be paid at the applicable regular rate.

18.    Postal regulations also contain additional restrictions regarding use of the nonprofit rate. The regulations provide that (i) an organization authorized to mail at the nonprofit rate "may mail only its own matter at those rates," (ii) an organization "may not

4

delegate or lend the use of its authorization to mail at the [nonprofit rate] to any other person or organization," and (iii) no person or organization "may mail, or cause to be mailed by contractual agreement or otherwise, any ineligible matter at the [nonprofit rate]." DMM §§ E670.5.1 and 5.2.

19.    In 1989, the Office of Classification and Rates Administration of the Postal Service issued Postal Service Customer Support Ruling PS-209 ("CSR 209"), entitled "Cooperative Mailings," to provide postal employees and customers with guidance regarding the prohibition on cooperative mailings.

20.    CSR 209 has been widely distributed. It has been updated to reflect changes in the DMM numbering system; but the substance of PS-209 has not changed over the years. A copy of CSR 209 from 1996 is attached as DAC Exhibit 3.

21.    CSR 209 interprets Postal Service regulations regarding cooperative mailings. CSR 209 begins by noting that "[t]he term 'Cooperative Mailing' refers to mailings made at the [nonprofit rate] in which one or more parties 'cooperate' with the authorized nonprofit organization."

22.    CSR 209 provides: "A cooperative mailing may be considered proper if the authorized organization uses a for-profit entity (or other unauthorized entity) as an agent."

23.    CSR 209 states that mailings involving a for-profit entity and a nonprofit entity are permitted at the nonprofit rates only if they are the product of a legitimate principal/agent relationship:

> The mailer must be able to show, however, that the relationship is a legitimate principal/agent relationship in order to use the [nonprofit rates]. Mailings may not be sent at the special rates if made in conjunction with or in support of a venture

5

of an unauthorized entity or a joint venture between authorized and unauthorized entities even if it is claimed that the mail matter itself is 'owned' by the authorized entity.

24.    CSR 209 states:

When a nonprofit and for-profit organization enter into a joint business venture, the joint business venture is not entitled to mail at the [nonprofit rates]. Typically both parties put something in (a list of names and use of [nonprofit rate] authorization for the nonprofit party, and payment of printing and mailing costs by the for-profit organization) and both parties take something out (a share of the proceeds/profits).

25.    The purpose of CSR 209 is to ensure that, consistent with the Postal Service's statutory and regulatory mandate, only nonprofit organizations benefit financially from use of the significantly reduced nonprofit rates. In furtherance of this goal, CSR 209 stresses the prohibition on use of the nonprofit rates when the mailings are the product of a cooperative venture between a nonprofit entity and a for-profit company in which the for-profit company has a financial stake in the success or failure of the mailing.

26.    The Postal Service has determined that when a for-profit company has a financial stake in a venture, the venture ceases to be a truly nonprofit endeavor and mailings supporting it are ineligible for the nonprofit rate.

27.    To determine if a mailing involving an authorized party and an unauthorized party is a prohibited cooperative mailing, CSR 209 states that "it is necessary to determine the relationship between all of the participating entities." The ruling advises that "[t]his requires a review of all contracts executed by the parties, as well as other documents that may demonstrate the relationship between them."

28.    CSR 209 cautions that "[p]rovisions in these documents showing that the parties

6

are not engaged in a joint venture or that the unauthorized party is the agent of the authorized

nonprofit entity are relevant, but are not determinative evidence of the relationship between the

parties, particularly if other evidence demonstrates a different relationship between the parties."

    29.    CSR 209 sets forth the following factors that "may be considered" in determining

whether a mailing is the product of a legitimate principal/agent relationship or a joint venture:

- The identity of the party that devised, designed, prepared, and paid for the mailpiece;

- The identity of the party which directly or indirectly paid the postage for the mailing;

- How the unauthorized parties are compensated;

- How the profits and revenues from the enterprise supported by the mailing are divided;

- What risks are entailed in the enterprise supported by the mailing, and whether the parties share the risk;

- How managerial decisions are made concerning the content of the mailings or the enterprise it supports, and who makes those decisions;

- The contribution each participant makes toward the enterprise supported by the mailing (e.g., money, service, managerial decision making, etc.);

- The intent and interests of the participants; and

- Any other evidence that may be relevant to the standards discussed above.

    30.    In April 1990, the Postal Service published Postal Service Publication 417,

*Special Bulk Third-Class Rates*, concerning eligibility restrictions on use of the nonprofit rate.

Publication 417 contains a cover letter to "Postal Customer[s]" explaining that the nonprofit rate

is a privilege based on congressional legislation and stating that the information contained in

Publication 417 is based on the DMM.

    31.    Publication 417 stated that, for each nonprofit mailing, the organization must sign

a "mailing statement" which certifies that, among other things, the mailing does not violate

DMM standards and the mailing is not a cooperative mailing with other persons or organizations

that are not entitled to the nonprofit rate.

32.    In addition, Publication 417 stated that if the mailing statement is signed by a

mailing agent, the agent's signature certifies that: (1) it is authorized to sign on behalf of the

nonprofit; (2) the certifications on the mailing statement bind both the nonprofit and the mailing

agent; and (3) both the nonprofit and the mailing agent will be liable for and agree to pay any

postage deficiency assessed on the mailing. Publication 417 was distributed throughout the

nonprofit mailing community and was available at local post offices.

33.    In April 1990, the Postal Service published Postal Service Publication 417A,

*Customer Guide to Cooperative Mailings*, concerning the prohibition on cooperative mailings.

In a section entitled "What is a cooperative mailing?," Publication 417A stated that a

"cooperative mailing" is designed to serve the uses of or benefit a party other than the authorized

nonprofit permit holder. Further, it specified that in a cooperative mailing one or more parties

"cooperate" with an authorized nonprofit organization to share the cost, risk, or benefits of the

mailing. It counseled that cooperative mailings may be made at the nonprofit rate only when all

of the cooperating parties are authorized to mail at the nonprofit rate at the post office where the

mailing is entered.

34.    Publication 417A listed many of the same factors as CSR 209 for determining

whether an arrangement is a principal/agent relationship or a joint venture. For example,

Publication 417A stated that some of the factors that are used to determine whether a mailing is

eligible for the nonprofit rate include, among others, how the profits and revenues are divided

8

and what risks are entailed, and are they shared.

35.    Publication 417A was distributed throughout the nonprofit mailing community and made available at local post offices.

36.    In October 1995, the Postal Service issued Publication 417, *Special Bulk Third-Class Eligibility*, which combined and updated the 1990 Publications 417 and 417A, and distributed it throughout the nonprofit mailing community and made available at local post offices. The publication was again updated and reissued in 1996 under the title Publication 417, *Nonprofit Standard Mail Eligibility*.

37.    The Postal Service has long held that an arrangement between a nonprofit entity and a for-profit company violates the DMM's prohibition on cooperative mailings if the for-profit entity has a financial stake in the success or failure of the program (i.e., if the for-profit shares in the costs, risks, or benefits of the program).

## The Revenue Deficiencies

38.    During the period January 1, 1993 through December 31, 1997, Reese made mailings for various nonprofit entities at the nonprofit rates. These mailings were made based on contracts between Reese and the nonprofit entities. Based on review of the contracts, the Postal Inspection Service believed that the mailings violated the cooperative mail rule.

39.    The Postal Inspection Service review of the relevant contracts showed among other things that the various mailings were made at no risk to the nonprofit entities, e.g., if the mailings failed to generate sufficient revenue to pay the costs associated with the mailings, then the nonprofit was under no obligation to pay for the shortfall. A copy of the May 28, 1998 Postal Inspection Service report and a spreadsheet identifying the nonprofit entities for which Reese

made the relevant mailings and showing the calculation of a revenue deficiency in the amount of

$3,223,580.99 for the period ending December 31, 1997 regarding these mailings is attached to

the Complaint in this matter as Tab A.

40.    By letter dated June 1, 1998, the Manager, Business Mail Entry, in Pittsburgh,

Pennsylvania, found that the Reese mailings were cooperative mailings ineligible for entry at the

nonprofit rates, and issued a revenue deficiency in the amount of $3,223,580.99 based on the

May 28, 1998 Postal Inspection Service report.  The revenue deficiency letter contained a copy of

the May 28, 1998 Postal Inspection Service report and a spreadsheet showing the calculation of

the revenue deficiency.  A copy of the June 1, 1998 letter from the Manager, Business Mail

Entry, to Reese is attached to the Complaint as Tab A.

41.    During the period January 1, 1998 through June 1, 1998, Reese made additional

mailings for various nonprofit entities at the nonprofit rates.  These mailings were made based on

contracts between Reese and the nonprofit entities.  Based on review of the contracts, the Postal

Inspection Service believed that the mailings violated the cooperative mail rule.

42.    On July 31, 1998, the Postal Inspection Service issued a report and accompanying

spreadsheet identifying the nonprofit entities for which Reese made the relevant mailings and

showing the calculation of a revenue deficiency in the amount of $376,487.24.  A copy of the

July 31, 1998 Postal Inspection Service report is attached to the Complaint as Tab B.

43.    By letter dated August 20, 1998, the Manager, Business Mail Entry, in Pittsburgh,

Pennsylvania, found that the Reese mailings were cooperative mailings ineligible for entry at the

nonprofit rates and issued a revenue deficiency in the amount of $376,487.24 based on the July

31, 1998 Postal Inspection Service report.  The letter contained a copy of the July 31, 1998 Postal

10

Inspection Service report and a spreadsheet showing the calculation of the revenue deficiency. A copy of the August 20, 1998 letter from the Manager, Business Mail Entry, to Reese is attached to the Complaint as Tab B.

44.    As allowed under Postal Service regulations, Reese appealed the revenue deficiencies assessed by the Pittsburgh, Pennsylvania Manager, Business Mail Entry. Through each stage of the appeals process, which took a number of years, the revenue deficiencies were upheld. The total amount of the revenue deficiencies is $3,600,068.23.

45.    In an effort to resolve the revenue deficiencies, the Postal Service offered to accept a payment of $1,646,277.95 as a fair and equitable compromise of the debt, if made by March 30, 2001. A copy of the Postal Service February 15, 2001 offer to compromise the debt is attached as Tab I of the Complaint.

46.    Reese refused the February 15, 2001 Postal Service offer to compromise, and to this day has not made any payment to the Postal Service.

### Count 1: Judgment on a Claim for Debt

47.    The Postal Service repeats and realleges each allegation set forth above in paragraphs 1 through 46 of the Counterclaim as if set forth fully herein.

48.    The Federal Debt Collection Procedure Act, 28 U.S.C. § 3001 *et seq.* (hereinafter, "FDCPA"), provides a procedure for the United States "to recover a judgment on a debt." 28 U.S.C. § 3001. The term "debt" is defined as "an amount that is owing to the United States" on account of, *inter alia*, a fee, service, restitution, damages, "or other source of indebtedness to the United States." 28 U.S.C. § 3002(3). Unpaid postage supports a claim under the FDCPA.

11

*Raymond & Whitcomb*, 53 F.Supp.2d 446, 443 (SDNY 1999).

49.    By making mailings at the nonprofit rate in violation of the cooperative mail rule, Reese has paid less than it was legally obligated to pay.

50.    As a result, Reese is indebted to the Postal Service for the revenue deficiency which totals $3,600,068.23.

51.    The United States has demanded payment of this debt from Reese, and Reese has refused payment.

52.    Third-party defendant Reese Teleservices acquired Reese in December of 2002, and is successor in interest or otherwise liable to the Postal Service for the unpaid debt of Reese of $3,600,068.23, plus interest accruing from the date of each underpayment.

53.    Third-party defendant TRG Holdings, LLC, acquired a controlling interest in Reese Teleservices on or about April, 2005, and is liable to the Postal Service for the unpaid debt of Reese of $3,600,068.23, plus interest accruing from the date of each underpayment.

54.    The Postal Service is entitled to payment of this debt, plus interest accruing from the date of each underpayment.

## Count II: Unjust Enrichment

55.    The Postal Service repeats and realleges each allegation set forth above in paragraphs 1 through 46 of the Counterclaim as if set forth fully herein.

56.    By making improper mailings at the nonprofit rate, Reese has paid less for the mailings than it was legally obligated to pay.

57.    The Postal Service was not properly paid for the service of delivering the Reese

12

mailings at issue in this matter. Based on principles of *quantum meruit*, the United States claims "the value of services rendered, which is appropriate when there was no properly agreed-upon payment amount for agreed-upon provision of goods or services." *Raymond & Whitcomb*, 53 F.Supp.2d 436, 444 (S.D.N.Y. 1999)(citations omitted). As in *Raymond & Whitcomb*, "the Postal Service's provision of mailing services for [Reese], without proper payment, satisfies all *quantum meruit* elements." *Id.*

58.    In this way, Reese has kept for itself at least $3,600,068.23 that should have been paid to the Postal Service.

59.    As a result, Reese has been unjustly enriched.

60.    The Postal Service is entitled to recover from Reese the full amount of the revenue deficiency plus interest accruing from the date of each underpayment.

61.    Third-party defendant Reese Teleservices acquired Reese in December of 2002, and is successor in interest or otherwise liable to the Postal Service for the unpaid debt of Reese of $3,600,068.23 plus interest accruing from the date of each underpayment.

62.    Third-party defendant TRG Holdings, LLC, acquired a controlling interest in Reese Teleservices on or about April, 2005, and is liable to the Postal Service for the unpaid debt of Reese of $3,600,068.23 plus interest accruing from the date of each underpayment.

## Claim For Relief

WHEREFORE, the Postal Service demands judgment jointly and severally against the Counterclaim Defendant Reese and Third-party Defendants Reese Teleservices, Inc. and TRG Holdings, LLC, as follows:

(a) on Count I, judgment jointly and severally against the Counterclaim Defendant Reese and Third-party Defendants Reese Teleservices, Inc. and TRG Holdings, LLC, for $3,600,068.23, pre- and post-judgment interest, and any such further relief as the Court deems appropriate; and

(b) on Count II, judgment jointly and severally against the Counterclaim Defendant Reese and Third-party Defendants Reese Teleservices, Inc. and TRG Holdings, LLC, for $3,600,068.23, pre- and post-judgment interest, and any such further relief as the Court deems proper.

Respectfully submitted,

KENNETH L. WAINSTEIN, D.C. BAR #451058
United States Attorney
District of Columbia

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

MARIAN L. BORUM, D.C. BAR #435409
Assistant United States Attorney
555 Fourth Street, N.W., Civil Division
Washington, D.C. 20005
202-514-6531

14

Of Counsel:

Harold Durham
Attorney
United States Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C.  20260-1127

## CERTIFICATE OF SERVICE

I hereby certify that on this *27th* day of June, 2006, I caused the foregoing to be served as follows:

by certified mail upon-                    Reese Teleservices, Inc.
                                           925 Penn Avenue
                                           Pittsburgh, Pennsylvania 15222

by certified mail upon-                    TRG Holdings, LLC
                                           1700 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20006

by via the Court's ECF e-mail system -     Charles H. Nave Esq.
                                           Charles H. Nave, P.C.
                                           1225 Third Street, S.W.
                                           Roanoke, Virginia 24016


MARIAN L. BORUM
Assistant United States Attorney

16