# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
| )
**REESE BROTHERS, INC.,** | )
| )
    **Plaintiff /Counterclaim Defendant,** | )
| )
    **v.** | )    **Civil Action No. 06-0434 (ESH)**
| )
**UNITED STATES POSTAL SERVICE,** | )
| )
    **Defendant/Counterclaim Plaintiff/** | )
    **Third-Party Plaintiff f,** | )
| )
    **v.** | )
| )
**REESE TELESERVICES, INC. &** | )
**THE RESOURCES GROUP, LLC d/b/a/** | )
**TRG HOLDINGS, INC.,** | )
| )
    **Third-Party Defendants.** | )
_____ )

## MEMORANDUM OPINION

Plaintiff Reese Brothers, Inc. ("RBI") brings this action against the United States Postal Service ("Postal Service" or "USPS") seeking to set aside a final agency decision that assessed a revenue deficiency against RBI in excess of $3.5 million for improper use of the nonprofit mailing rate ("Final Agency Decision"). RBI also seeks damages for the injury to its business allegedly caused by that decision. The Postal Service filed a counterclaim against RBI to collect the unpaid deficiency, and a third-party claim based on a theory of successor liability against Reese Teleservices, Inc. ("RTI"), which acquired RBI in December 2002, and The Resources Group, LLC (d/b/a TRG Holdings, Inc.) ("TRG"), which now has a controlling interest in RTI.

Before the Court are the parties' cross-motions for summary judgment on all claims.[1]

These include: (1) RBI's motion for partial summary judgment on its complaint against the

Postal Service (partial only in that it does not include damages) ("RBI Mot."); (2) the Postal

Service's cross-motion for summary judgment on RBI's complaint, on its counterclaims against

RBI, and also on its third-party complaint against RTI and TRG ("PS Mot."); and (3) RTI and

TRG's joint motion for summary judgment on the Postal Service's third-party complaint

("RTI/TRG Mot.").[2]  For the reasons stated herein, RBI's motion will be granted in part and

denied in part; the Postal Service's motion will be granted in part and denied in part; and

RTI/TRG's motion will be denied.  The Final Agency Decision will be upheld except as to the

amount of the assessed deficiency, which will be set aside.

## BACKGROUND

## I.  STATUTORY AND REGULATORY BACKGROUND

### A.  Origins of Reduced Rates for Mail Sent by Qualified Nonprofit Organizations (the "Nonprofit Rate")[3]

Congress adopted the first statutory mail classification providing a reduced rate for

certain mail sent by qualified nonprofit organizations in 1951.  *See* Act of Oct. 30, 1951, Pub. L.

No. 233, § 6, 65 Stat. 672, 673 (1951) (codified at 39 U.S.C. § 4452 (1964)); *see also Nat'l*

---

[1] This case was originally before the Honorable Ricardo Urbina.  It was transferred to the undersigned on April 20, 2012, upon his retirement.

[2] For purposes of this opinion, a citation to the motion refers to the memorandum filed in support thereof.  All parties have filed oppositions and replies, which are cited as "RBI Opp.," "PS Opp.," "RTI/TRG Opp.," "RBI Reply," "PS Reply," and RTI/TRG Reply."

[3] Over the years the Postal Service has used different terms to describe this reduced rate, including "Nonprofit Third Class," "nonprofit Standard A," "Nonprofit Standard Mail," "Nonprofit Standard Mail (A)," and "special bulk third-class rate."  To avoid confusion, the Court will use the term "nonprofit rate" throughout this Memorandum Opinion.

*Retired Teachers Ass'n v. U.S. Postal Serv.*, 593 F.2d 1360, 1361 n.2 (D.C. Cir. 1979).  When

the Postal Reorganization Act ("PRA") was enacted in 1970, establishing the United States

Postal Service as "an independent establishment of the executive branch of the Government of

the United States," it provided that qualified nonprofit organizations would continue to be

eligible for a reduced rates.[4]  Postal Reorganization Act, Pub. L. No. 91-375, §§ 201, 3626, 84

Stat. 719, 720, 762-63 (1970) (codified at 39 U.S.C. §§ 201, 3626).  The mail classification

schedule the Postal Service thereafter adopted included the following provision:[5]

> *The nonprofit bulk rate is available for bulk rate third-class mail mailed by qualified nonprofit organizations*.  A qualified nonprofit organization is a religious, educational, scientific, philanthropic, agricultural, labor, veteran's or fraternal organization or association that is not organized for profit and none of the net income of which inures to the benefit of any private stockholder or individual.  Before being entitled to mail at the nonprofit bulk rate, the organization shall furnish proof of its qualifications to the Postal Service.

---

[4] Although the PRA continued to allow nonprofit mailers to pay a reduced rate, "one of the purposes of the Postal Reorganization Act was to reduce the subsidy given these preferred mailers so that the revenue generated by nonprofit third-class mail would eventually cover all its direct and indirect costs."  *Nat'l Easter Seal Soc'y v. U.S. Postal Serv.*, 656 F.2d 754, 761 (D.C. Cir. 1981).

[5] The PRA "effectively repealed all *statutory* mail classifications, and created a new procedure for *administrative* determination of mail classifications."  *Nat'l Retired Teachers*, 593 F.2d at 1361 n.2 (emphasis added) (citing 39 U.S.C. § 3623(a) (1976)).  The new procedure entailed a three-step process:  first, the Postal Service "request[s] a recommended decision from the Postal Rate Commission" ("PRC"); next, the PRC "make[s] a recommended decision, taking into account the policies of the Act and certain enumerated factors"; and "[f]inally, the Board of Governors may approve, allow under protest, reject, or modify a recommended decision of the PRC."  *See Nat'l Retired Teachers*, 593 F.2d at 1363; *see also* 39 U.S.C. §§ 3623(a), 3625 (1976).  Initially, the Postal Service was to request a recommended decision from the PRC within two years of the applicable effective date of the PRA.  *See Nat'l Retired Teachers*, 593 F.2d at 1361 n.2.  The Board of Governors formally adopted the first "Domestic Mail Classification Schedule" ("DMCS") in 1976.  *See id.*; *see also* Decision of the Governors of the United States Postal Service on Establishing a Mail Classification Schedule (June 2, 1976); Postal Rate Commission, Docket No. MC73-1, Opinion and Recommended Decision 128 (April 15, 1976).

DMCS § 300.221 (emphasis added).

**B.      Postal Service Regulations re Use of the Nonprofit Rate**

The PRA authorized the new Postal Service "to adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of this title."  39 U.S.C. § 401(2) (1970).  It also exempted the Postal Service from chapters 5 and 7 of the Administrative Procedure Act ("APA").  *Id.* § 410(a) ("no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including the provisions of chapters 5 and 7 of title 5, shall apply to the exercise of the powers of the Postal Service").  Chapter 5 of the APA, entitled "Administrative Procedure," generally sets forth the procedural requirements for administrative decision-making, including rulemaking and adjudication.  Chapter 7, entitled "Judicial Review," generally sets forth the requirements for and scope of judicial review of administrative decisions.

In 1975, the Postal Service issued a regulation that "define[d] the conditions under which nonprofit organizations qualified for special third-class mailing privileges under [DMCS §] 300.221."  *Nat'l Retired Teachers*, 593 F.2d at 1361; *see* 40 Fed. Reg. 37,209 (Aug. 26, 1975). In relevant part, that regulation provided:

> An organization authorized to mail at the [nonprofit] rates for qualified nonprofit organizations may mail only its own matter at these rates.  An organization may not delegate, or lend the use of its permit to mail at [nonprofit] rates to any other person, organization, or association.  Cooperative mailings may not be made at the [nonprofit] rates for qualified nonprofit organizations if one or more of the cooperating persons or organizations is not entitled itself to the special rates. Cooperative mailings involving the mailing of matter in behalf of or produced for an organization not authorized to mail at the [nonprofit] rates for qualified nonprofit organizations must be paid at the applicable regular rate. . . .

Postal Service Manual § 134.57.  In 1979, the Court of Appeals for the District of Columbia Circuit upheld this regulation as "a valid exercise by [the Postal Service] of its authority to

interpret the mail classification schedule established by the PRC," specifically the requirement

that the mail matter be "mailed by qualified nonprofit organizations." *Nat'l Retired Teachers*,

593 F.2d at 1361 n.2, 1364.[6]

The regulation was carried over without substantive change to the Domestic Mail Manual

("DMM"),[7] although it was subdivided into two parts within a subsection entitled "Eligible

Matter." *See* DMM § 625.5.  The first part, entitled "Matter of Eligible Organizations," stated:

> An organization authorized to mail at the [nonprofit] rates may mail only its own matter at these rates.  An organization may not delegate, or lend the use of its authorization to mail at the [nonprofit] rates to any other person or organization.

DMM § 625.51.  The second part, entitled "Cooperative Mailings," stated:

> Cooperative mailings may not be made at the [nonprofit] rates for qualified nonprofit organizations if one or more of the cooperating persons or organizations is not entitled itself to the special rates.  Cooperative mailings involving the

---

[6] In *Nat'l Retired Teachers*, the Court explained:

> We believe USPS validly exercised its interpretative discretion in concluding . . . that the "mailed by" language of the governing provisions contained, by fair implication, limitations on the use of the nonprofit rate.  Congress, in enacting the statutory classification, and the PRC, in adopting it following passage of the Act, established certain criteria for qualification for the nonprofit rate.  Chief among them was the requirement that an organization be a "religious, educational, scientific, philanthropic, agricultural, labor, veterans or fraternal" organization. The USPS interpretation reflects a conclusion that Congress and the PRC contemplated that the nonprofit rate would be used for the purposes of the listed organizations, and not for other purposes such as commercial activities inconsistent with the grant of qualification.  Viewed in this light, s[ection] 134.57's limitations are eminently reasonable as effectuating the implicit purpose of the provisions.

*Id.* at 1364 (footnotes omitted).

[7] The DMM was adopted in 1979, *see* 44 Fed. Reg. 39,851 (July 6, 1979), and it is incorporated by reference into the Code of Federal Regulations.  *See* 39 C.F.R. § 111.1.  It is a part of a "detailed statutory and regulatory scheme to govern this country's vast postal system."  *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122-23 (1981).

> mailing of matter in behalf of or produced for an organization not authorized to mail at the [nonprofit] rates for qualified nonprofit organizations must, be paid at the applicable regular rate. . . .

DMM § 625.52.  In 1981, the Postal Service amended DMM § 625.52 "to clarify that a cooperative mailing may be made at the [nonprofit] rates by two or more nonprofit organizations *only* when each of the cooperating organizations is authorized to mail at the special rates at the post office where the cooperative mailing is deposited."  46 Fed. Reg. 25,090 (May 5, 1981) (emphasis added).[8]  Thereafter, and throughout the time period relevant to this case, DMM § 625.52 provided:

> Cooperative mailings may be made at the special bulk rates only when each of the cooperating organizations is individually authorized to mail at the [nonprofit] rates at the post office where the mailing is deposited.  Cooperative mailings involving the mailing of any matter in behalf of or produced for an organization not itself authorized to mail at the [nonprofit] rates at the post office where the mailing is deposited must be paid at the applicable regular rates. . . .

---

[8] Initially, the amended rule provided that "[c]ooperative mailings containing any matter *prepared by*, in behalf of, or produced for an organization not itself authorized to mail at the special bulk rates at the post office where the mailing is deposited must be paid at the applicable regular rate."  46 Fed. Reg. 6940, 6941 (Jan. 22, 1981) (emphasis added).  On May 5, 1981, the Postal Service deleted the "prepared by" language in order "to avoid a possible misunderstanding of the new language which would make many proper mailings ineligible for special rates.  To insure that no erroneous interpretations are made, the amended final rule restores the original language . . . which describes cooperative mailings ineligible for the special bulk third-class rates."  46 Fed. Reg. 25,090 (May 5, 1981).  As explained by the Postal Service in the Federal Register notice, it made this change because:

> An authorized nonprofit mailer has pointed out to the Postal Service that the phrase "prepared by" as used in that description might be interpreted to apply to profit making companies that print and prepare mailing materials for nonprofit organizations at the expense of the nonprofit organization. The mailer objected to such an interpretation because it would disqualify many otherwise permissible mailings from eligibility for the special rates.

46 Fed. Reg. 25,090.

DMM § 625.521.[9]

### C.     Responses to Perceived Misuse of the Nonprofit Rate

####      1.     Postal Service

In 1989 and 1990, the Postal Service issued several lengthy interpretive rulings to further define its "cooperative mailing" regulation.[10]  First, in July 1989, the Postal Service issued Customer Support Ruling, PS-209.[11]  (*See* PS Mot., Ex. H ("PS-209").)  In relevant part, PS-209 provided:

> The term "Cooperative Mailing" refers to mailings made at the [nonprofit rate] in which one or more parties "cooperate" with the authorized permit holder.  . . .

> Under [the applicable rules], the mailing must be owned by the authorized nonprofit entity at the time of mailing in order to be mailed at the special rates.  A cooperative mailing may be considered proper if the authorized organization uses a for-profit entity (or other unauthorized entity) as an agent.

> The mailer must be able to show, however, that the relationship is a legitimate principal/agent relationship in order to use the special rates.  Mailings may not be sent at the special rates if made in conjunction with or in support of a venture of an unauthorized entity or a joint venture between authorized and unauthorized entities even if it is claimed that the mail matter itself is "owned" by the authorized entity.

> An examination of the mailing piece is not sufficient for a determination that the cooperative mailing is not acceptable at the special rate.  Instead, it is necessary to determine the relationship between all of the participating entities.  This requires a review of all contracts executed by the parties, as well as other documents which may demonstrate its relationship between them.  Provisions in these documents showing that the parties are not engaged in a joint venture or that the unauthorized

---

[9] For purposes of this case, DMM issue 45 (Dec. 20, 1992) is the relevant version of the DMM, so the numbering in effect at that time will be used throughout.

[10] These rulings have the force of law pursuant to 39 C.F.R. § 211.2(a)(3), since they qualify as "other regulatory issuances and directives of the Postal Service."  (RBI Mot. at 14 n.41.)

[11] PS-209 was updated in 1993 and 1996 to reflect changes in the DMM numbering system, but otherwise the substance of the ruling was unchanged.  (PS Facts ¶ 61 & n.2.)

party is the agent of the authorized nonprofit entity are relevant, but are not determinative evidence of the relationship between the parties.

Determining Factors

Factors that may be considered in determining whether a mailing is cooperative include the following:

- The identity of the party that devised, designed, prepared, and paid for the mailpiece;

- The  identity of the party which directly or indirectly paid the postage on the mailing;

- How the unauthorized parties are compensated;

- How the profits and revenues from the enterprise supported by the mailing are divided;

- What risks are entailed in the enterprise supported by the mailing, and whether the parties share the risk;

- How managerial decisions are made concerning the content of the mailings or the enterprise it supports, and who makes those decisions;

- The contribution each participant makes toward the enterprise supported by the mailing (e.g., money, service, managerial decision making, etc.);

- The intent and interests of the participants; and,

- Any other evidence that may be relevant to the standards discussed above.

Joint Business Venture

When a nonprofit and for-profit organization enter into a joint business venture, the joint business venture is not entitled to mail at the special rates. Typically both parties put something in (a list of names and use of special rate permit for the nonprofit party, and payment of printing and mailing costs by the for-profit organization) and both parties take something out (a share of the proceeds/profits).  . . .

(PS-209, at 1-2.)

8

Shortly thereafter, in August 1990, the Postal Service issued Publication 417, "Special Bulk Third-Class Rates," and Publication 417A, "Customer Guide To Cooperative Mailings," "to remind mailers concerning the types of organizations which may be authorized to mail at the [nonprofit] rates, and what restrictions exist on matter which may be mailed at those rates."  55 Fed. Reg. 33,793 (Aug. 17, 1990).  As explained by the Postal Service, the impetus for issuing these additional publications was that "[a] recent investigation by the Postal Inspection Service has documented what appears to be the proliferation of improper cooperative mailings made at the [nonprofit] rates."  *Id.*  The Postal Service further explained that:

> Instead of relying chiefly on "after-the-fact" investigations, the Postal Service wants to remind the nonprofit mailing community of the cooperative mailing rules and encourage improved compliance by providing information to help mailers determine whether planned mailings are cooperative. The information in publications 417 and 417A is designed to assist organizations in avoiding cooperative mailing problems.  Nonprofit organizations should consider the factors explained in those publications when deciding whether or not to enter into specific fund-raising programs with commercial firms.
>
> The Postal Service encourages mailers who review the information found in publications 417 and 417A, and have questions concerning whether or not mailings they are considering as part of a fundraising program will be eligible for the special rates, to submit a sample of the mailpiece or pieces, as well as a copy of the contracts and all other documentation affecting the relationship between the parties, to the appropriate field division manager of mailing requirements for review.

*Id.*[12]  In relevant part, these new publications stated (RBI Appendix, Jan. 31, 2012 ("RBI App."), Tab B ("Publication 417/417A")):[13]

---

[12] According to the Postal Service,

> [t]his investigation explored the often complex nature of the contractual relationships which underlie several types of cooperative mailing arrangements. Primarily, the activities investigated promoted the sale of "affinity" credit cards, group insurance, and travel plans to the members of nonprofit organizations.  As a result of this investigation, many improper cooperative mailings have been

5-1     OVERVIEW

A cooperative mailing is a mailing produced by an authorized organization that "cooperates" with one or more organizations to share the cost, risk, or benefit of the mailing.  Cooperative mailings may not be entered at the [nonprofit] rates unless all cooperating organizations are authorized to mail at these rates at the post office of mailing.  Furthermore, the cooperative mail rule prevents authorized organizations from sharing their authorizations with others who are not authorized.  The rule restricts [nonprofit] mailings to the authorized organizations' own mail.

5-2     ELIGIBLE MAILINGS

5-2.1   Eligibility Factors

> For determining whether a mailing is eligible for the Nonprofit Standard Mail rates, the Postal Service evaluates the answers to these questions:

> - Who devised, designed, and paid for the mailpiece?

> - Who paid the postage on the mailing, either directly or indirectly?

> - How are the profits and revenues divided from the mailing or an enterprise it supports?

---

detected and a number of postage deficiencies have been disclosed.  In light of these events, the Postal Service has chosen to increase its efforts to inform mailers as a means to reduce the number of cooperative mailings.  Based upon the experience discussed above, it is clear that there are many cooperative mailings entered into the postal system at the [nonprofit] rates which are actually improper mailings and should be required to be mailed at the regular bulk rates instead.  Detecting these mailings, however, is no simple matter.  The procedure used to investigate a particular cooperative mailing is tedious and often must be undertaken after-the-fact because such mailings often appear, on their face, to be the mail of the nonprofit organization and only come into question as a result of further investigation after their acceptance at the special rates.  The procedure requires an examination not only of the characteristics of the mailpiece, but also of the underlying business arrangements between the nonprofit organization and the commercial firm.

55 Fed. Reg. 33,793.

[13] The quoted language is from the 1996 version of Publication 417, which combined Publications 417 and 417A.

- What risks are entailed with the mailing or with an enterprise it supports and who bears these risks?

- Who makes managerial decisions about the content of the mailing or the enterprise it supports?

- What are the participants' intentions and interests?

5-2.2   Commercial Mailing Agent

An authorized organization may use a commercial mailing agent (or other unauthorized entity) if the organization can show that the relationship is a legitimate principal-agent relationship. If a question arises whether a mailing is eligible for the [nonprofit] rates, the authorized organization must provide, on request, documentation of the relationship that includes all contracts between the organization and other parties to the mailing.[14]

5-3 INELIGIBLE MAILINGS

---

[14] Publication 417/417A gave the following as an example of an "[a]cceptable principal-agent relationship[]":

Authorized organization O hires commercial mailing agent C at a fixed fee to print and mail organization O's newsletter at the [nonprofit] rates. Organization O's name and return address appear on the envelope containing the newsletter. The envelope shows agent C's permit imprint number (identified with "Nonprofit Organization," "U.S. Postage Paid," etc.).  This arrangement is considered an acceptable principal-agent relationship.

(Publication 417/417A at 20.)  It gave the following as an example of an "[i]neligible cooperative mailing:

Authorized organization B and grocery store G agree to prepare mailpieces for distribution to organization B's members. Organization B provides its membership list and uses its [nonprofit] authorization to enter the mailpieces at the [nonprofit] rates. Grocery store G pays the postage and donates to organization B two percent of the sales to organization B's membership during a 1-year period. Because grocery store G pays the cost of the mailing and benefits accrue to it, this improper cooperative mailing is ineligible for the [nonprofit] rates.

(*Id.*)

> Mail matter associated with joint enterprises between an authorized
> organization and a commercial enterprise (or other unauthorized mailer) is
> ineligible for the [nonprofit] rates.  Typically, ineligible cooperative mailings
> are arranged as follows:
>
> - Both parties contribute something to the mailing:
>
>   – A list of names and use of the [nonprofit] authorization by the
>   authorized organization.
>
>   –  Payment of printing or mailing costs by the commercial enterprise.
>
> - Both parties take something out of the mailing (a share of the proceeds or
>   profits).

(Publication 417/417A at 19-20.)[15]

### 2.      Congress

Congress shared the Postal Service's "concerns about what it considers to be abuses in

the [use of the nonprofit rate] which place the use of subsidies for legitimate mailings in

jeopardy."  *See, e.g.*, S. Rep. No. 101-411 (1990).  In 1990, it indicated that as part of "its annual

statutory oversight hearings concerning the Postal Service," one of the issues to "be explored"

was "so-called cooperative mailings in which nonprofit permit holders team with commercial

vendors to market products or services through use of the nonprofit permit, and the Postal

Service's stepped up actions to restrict such mailings."  H.R. Rep. No. 101-419 (1990).

Ultimately, Congress amended § 3626 of the PRA to expressly exclude several types of mail

from the nonprofit rate, first in 1990 and then again in 1993.  *See* Postal Service Appropriations

Act, 1991 ("1991 Appropriations Act"), Pub. L. 101-509, § 1, 104 Stat. 1389 (1990) (codified at

---

[15] For purposes of this Memorandum Opinion, any reference to the Postal Service's Cooperative
Mailing Rules or "CMR" should be read as a collective reference to the relevant sections of the
DMM, PS-209 and Publication 417/417A.

39 U.S.C. § 3626(j)(1)(A)-(C)); Revenue Forgone Reform Act, Pub. L. 103-123, § 705, 107 Stat.

1267 (1993) (codified at 39 U.S.C. § 3626(j)(1)(D)).

In 1990, Congress added subsections (j)(1)(A)-(C) which excluded from the nonprofit

rate, subject to certain conditions, "mail which advertises, promotes, offers, or, for a fee or

consideration, recommends, describes, or announces the availability of

> (A) any credit, debit, or charge card, or similar financial instrument or account, provided by or through an arrangement with any person or organization not authorized to mail at the [nonprofit] rates . . . ;

> (B) any insurance policy, unless the organization which promotes the purchase of such policy is [a qualified nonprofit organization], the policy is designed for and primarily promoted to the members, donors, supporters, or beneficiaries of the organization, and the coverage provided by the policy is not generally otherwise commercially available; or

> (C) any travel arrangement, unless the organization which promotes the arrangement is [a qualified nonprofit organization], the travel contributes substantially (aside from the cultivation of members, donors, or supporters, or the acquisition of income or funds) to one or more of the purposes which constitutes the basis for the organization's authorization to mail at such rates, and the arrangement is designed for and primarily promoted to the members, donors, supporters, or beneficiaries of the organization.

39 U.S.C. § 3626(j)(1)(A)-(C).  In addition, Congress added subsection (k), which provided that

"[n]o person or organization shall mail, or cause to be mailed by contractual agreement or

otherwise, at the [nonprofit rate], any matter to which those rates do not apply," "authorized the

Postal Service to "assess a postage deficiency in the amount of the unpaid postage against any

person or organization which violates paragraph (1) of this subsection," and established an

administrative appeal process for challenging a deficiency assessment.[16]  *See* 39 U.S.C. §

---

[16] Subsection (k)(2) further provided:

> This assessment shall be deemed the final decision of the Postal Service, unless the party against whom the deficiency is assessed appeals it in writing within

3626(k)(1)-(3)).  Subsection (k) also directed the Postal Service to "maintain procedures for the prompt collection of postage deficiencies" and authorized it to "in its discretion, follow[ing] the issuance of a final decision regarding a deficiency . . . deduct the amount of that deficiency incurred during the previous 12 months from any postage accounts or other monies of the violator in its possession."  *Id.* § 3626(k)(3).

In 1993, Congress added subsection (j)(1)(D), which additionally excluded from the nonprofit rate "mail which advertises, promotes, offers, or, for a fee or consideration, recommends, describes, or announces the availability of . . .

> (D) *any product or service* (other than any to which subparagraph (A), (B), or (C) relates), if—
>
>> (i) the sale of such product or the providing of such service is not substantially related (aside from the need, on the part of the organization promoting such product or service, for income or funds or the use it makes of the profits derived) to the exercise or performance by the organization of one or more of the purposes constituting the basis for the organization's authorization to mail at such rates; or
>>
>> (ii) *the mail matter involved is part of a cooperative mailing (as defined under regulations of the Postal Service) with any person or organization not authorized to mail at the [nonprofit] rates*;

39 U.S.C. § 3626(j)(1)(D) (emphasis added).

---

thirty days to the postmaster of the office where the mailing was entered.  Such an appeal shall be considered by an official designated by the Postal Service, other than the postmaster of the office where the mailing was entered, who shall issue a decision as soon as practicable.  This decision shall be deemed final unless the party against whom the deficiency was assessed appeals it in writing within thirty days to a further reviewing official designated by the Postal Service, who shall issue the final decision on the matter.

39 U.S.C. § 3626(k)(2).

After each set of amendments, the Postal Service amended the DMM to implement the changes, but it did not alter the existing "Cooperative Mailing Regulation." *See* 56 Fed. Reg. 46,551, 46,554-55 (Sept. 13, 1991) (amending DMM § 625.52); 59 Fed. Reg. 23,158 (May 5, 1994) (same). Both when it proposed and when it adopted the new regulations, the Postal Service expressly stated its view that the new statutory restrictions were "supplementary to, rather than a change to or replacement for, the existing postal regulations which restrict cooperative mailings" and that "mailings which are not third-class matter or which are 'cooperative' under existing rules are ineligible to be entered at the special rates, regardless of whether or not they violate the new restrictions." 56 Fed. Reg. 11,537 (proposed Mar. 19, 1991); *see also* 56 Fed. Reg. 46,551 (Sept. 13, 1991) (same); 58 Fed. Reg. 64,918 (proposed Dec. 10, 1993) (same); 59 Fed. Reg. 23,158, 23,159 (May 5, 1994) (same). A number of comments to the first proposed rule objected to the Postal Service's interpretation, contending that "the Postal Service should consider only the new criteria expressly stated in the new law in determining whether a mailing involving either travel or insurance programs is eligible for the special rates." 56 Fed. Reg. 46,551. The Postal Service disagreed, noting that:

> After careful review of the comments and the legislation, the Postal Service remains of the opinion that the new rules are supplementary to the existing rules that a qualified nonprofit organization may mail only its "own" matter at the special rates, and may not send matter "in behalf of or produced for" an ineligible person or organization. These criteria have been upheld in Federal court as a valid rule limiting the use of the special rates to the material Congress intended to subsidize under 39 U.S.C. 3626. *National Retired Teachers Association v. U.S. Postal Service*, 593 F.2d 1360 (DC Cir. 1979), *affirming* 430 F. Supp. 141 (D.D.C 1977). Indeed, the district court noted that these common sense restrictions prevent a nonprofit organization from acting as the special-rate mailing agent of a commercial enterprise, and stated that the failure to stop such practices "would have been an egregious breach of (the Postal Service's) statutory duty." 430 F. Supp. at 147. *Nothing in the text or history of new section 3626(j) appears to be at odds with these existing criteria. Significantly, the legislation does not amend the existing subsections that were the basis for those rules, or provide any*

*indication that the rules would not apply to certain mailings. Instead, the legislation simply added a further restriction to the existing laws, in the form of new subsection (j).* The Service also notes as additional support of its position, that the Postal Rate Commission in its Report To The Congress: Third-Class Nonprofit Mail Study, PRC Docket No. SS91-1 (July 8, 1991), stated, at page 30 of that Report, that "we fully agree with the Service's position that the new regulations supplement longstanding postal regulations restricting cooperative mailings." Consequently, the final rule which is adopted here will be considered by the Postal Service to be supplementary to existing regulations.

56 Fed. Reg. 46,551 (emphasis added).

There is no indication in the text or legislative history of the 1993 amendments or thereafter that Congress disagreed with the Postal Service's interpretation of § 3626(j) as supplemental to, rather than a replacement for, its existing Cooperative Mailing Rules.

## II.    FACTS[17]

### A.    RBI

RBI is a Pennsylvania corporation that was founded by two brothers, Barry Reese and Ralph Reese. (RBI Mot. at 4; PS Statement of Material Facts Not in Genuine Dispute ("PS Facts") ¶ 1; PS Mot., Exs. A, B, V.) During the relevant time period, a significant part of its business was fundraising for nonprofit organizations. (RBI Mot. at 4.) Pursuant to contracts

---

[17] "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *See* LCvR 7(h)(1). Accordingly, the facts included in the Postal Service's statement of undisputed material facts are assumed to have been admitted, except for the facts in paragraphs 22-27, 32, 43, 58-59, 67-69, 70, 73-78, 83-84, and 152-53, which RBI has either disputed or qualified. (*See* RBI Opp. at 1-6.) Neither RBI nor RTI/TRG filed separate statements of material facts to support their motions for summary judgment. The Postal Service, nonetheless, filed separate responses to the facts that each included within its motion. *See* PS Response to RBI's Statement of Undisputed Facts as Contained in RBI's Motion for Summary Judgment ("PS Resp. to RBI Facts"); PS Response to RTI/TRG's Statement of Undisputed Facts as Contained in Their Motion for Summary Judgment. ("PS Resp. to RTI/TRG Facts".)

with its nonprofit clients, RBI raised money by contacting potential donors by telephone,[18] soliciting charitable donations, and then mailing a "pledge notice" to collect the promised donation.[19]  (RBI Mot. at 4; PS Facts ¶¶ 7, 8; PS Mot., Exs. C-G; *see also* PS Facts ¶¶ 18-21 (describing sample contract).)  (RBI refers to this process as "telefundraising"; the Postal Service refers to it as "outbound telemarketing").[20]  After sending the initial pledge notice, RBI would send subsequent mailings depending on the terms of the contract and whether the pledge to donate was immediately fulfilled.  (PS Facts ¶ 13.)  Generally, RBI's contracts provided that its invoices would only be paid if the fundraising campaign generated sufficient funds to cover the costs RBI incurred in conducting the telemarketing and mailing – a so-called "breakeven guarantee."  (PS Facts ¶¶ 28-31.)[21]  RBI would typically send the pledge notice at the first-class mailing rate, but subsequent mailings (which could be as many as six if the pledge was not fulfilled) at the nonprofit rate.  (RBI Mot. at 5; PS Facts ¶¶ 12, 13, 17.)

---

[18] Depending on the terms of the contract, RBI would use either its own or the nonprofit's calling lists to make the initial contact.  (PS Facts ¶ 10.)

[19] The pledge notice would also seek further donations, often provide other information about the nonprofit and sometimes includes a promotional gift of nominal value.  (RBI Mot. at 4-5; PS Facts ¶ 11.)

[20] RBI's business also included outbound telemarketing for commercial clients (PS Facts ¶ 93) and an inbound calling business solely for commercial clients that it operated through a Utah-based, wholly owned subsidiary Communications and Commerce, LLC ("CommComm").  (PS Facts ¶¶ 9, 93, 95.)

[21] (*See, e.g.*, PS Mot., Ex. E (Agreement between RBI and "Just Say No" Int'l, Inc. ¶ 9(d)) ("JSN shall not be obligated to pay [RBI's] invoices unless [the campaign's products and services] generate sufficient Available Funds to pay such invoices.  If Available Funds are insufficient, such unpaid invoices or portions of invoices shall be the sole and exclusive responsibility of [RBI] pursuant to the terms contained herein."); *id.*, Ex. F (Agreement between RBI and Vanished Children's Alliance, Inc. ¶ 10(d)) (same).)

**B.      RBI's Use of the Nonprofit Mailing Rate**

In order to send mail at the nonprofit rate, RBI had to deliver the mailing, which it would have printed, assembled, and pre-sorted, to a special Postal Service facility (known as a Business Mail Entry Unit ("BMEU")), accompanied by a "Statement of Mailing" (Postal Service Form 3602) on which would be recorded the date of the mailing, the number of pieces in the mailing, and the postage charged.  (RBI Mot. at 5-6 & Ex. 1, Tab 2.)  The form, which would be signed by the permit holder[22] or agent, certified that

> (1) the mailing does not violate DMM § 625; (2) only the mailer's matter is being mailed; (3) this is not a cooperative mailing with other persons or organizations that are not authorized to mail at [nonprofit] rates at this office; (4) this mailing has not been undertaken by the mailer on behalf of or produced for another person or organization not authorized to mail at [nonprofit] rates at this office; and (5) it will be liable for and agrees to pay, subject to appeals prescribed by postal laws and regulations, any revenue deficiencies assessed on this mailing, whether due to a finding that the mailing is cooperative or for other reasons.

(*Id.*, Ex. 1, Tab 2.)  After "examination of the mailing and the accompanying postage statement [the Form 3602]," the mailing would be "accepted" and the Form 3602 date-stamped and marked "accepted."  (RBI Mot. at 6 & Ex. 1, Tab 2.)  Although the Postal Service employee who accepts the mailing has to certify that the "mailing had been inspected concerning: 1) eligibility for the rate of postage claimed; 2) proper preparation (and presort where required); 3) proper completion of the statement of mailing; and 4) payment of the required annual fee" (RBI Mot., Ex. 1, Tab 2), the "employee's signature on the postage statement and the subsequent acceptance of the mailing do not constitute verified accuracy of that statement, and do not limit the ability of the [Postal Service] to demand proper payment after acceptance when it becomes apparent such payment

---

[22]*See* DMM § 626 ("Applying for Special Bulk Rates") (organization seeking authorization to mail at nonprofit rate must file an "application for authorization . . . at each post office where the organization wishes to deposit mailings at the [nonprofit] rate").

was not made." DMM § G020.2.2 (1998).  It is RBI's mailings from 1993-1998 at the nonprofit

rate that are at issue in this litigation.

### C.      Postal Service's Assessment of a Revenue Deficiency Against RBI

In 1997, a Postal Service Revenue Assurance Analyst decided to investigate RBI's

posting of millions of pieces of mail at the nonprofit rate.  (RBI Mot. at 6; PS Facts ¶¶ 79, 80.)

After an initial review of the mailpieces, he enlisted the assistance of a Postal Inspector to

subpoena and review RBI's contracts with its nonprofit clients and its Form 3602s.  (RBI Mot. at

6; PS Facts ¶ 81.)

On June 1, 1998, the Postal Service notified RBI that the Revenue Assurance Analyst and

Postal Inspection Service had completed their joint review of RBI's mailings at the nonprofit rate

from January 1, 1993, through December 31, 1997, and determined "that certain nonprofit

mailings presented by [RBI] were ineligible for the nonprofit rates claimed."  (RBI App., Tab A,

at 1938 ("Deficiency Letter").)  For these ineligible mailings, the Postal Service assessed a

"revenue deficiency" against RBI in the amount of $3,223,580.99, "the difference between the

nonprofit rate claimed and the regular rate."  (*Id*.)  In addition, RBI was advised that it "must

immediately discontinue mailing at the nonprofit . . . rate, or give us an opportunity to review

your contracts with the nonprofit permit holders to determine that each contract meets the

eligibility requirement for this rate."  (*Id*.)

A more detailed explanation for the Postal Service's decision was set forth in its

"Preliminary Investigative Summary Report," which it included with the June 1, 1998 letter.  (PS

Mot., Ex. J, at 1 ("Investigative Report").)  According to the Investigative Report, the review

looked at RBI's "PS Form 3602, 'Statement of Mailing,'" "actual contracts made between [RBI]

and certain nonprofit organizations," and the "rules, regulations and customer support rulings

governing cooperative nonprofit mailings." (*Id.*)  In explaining the decision, though, the Report focused on RBI's contracts and its determination based on those contracts that "a relationship exists between [RBI] and certain nonprofit organizations that is indicative of the relationship found in ineligible cooperative nonprofit mailings." (*Id.* at 2.)

The Investigative Report included a table that showed "the discounted postage claimed by RBI, the actual postage owed to the USPS, and the difference between the two amounts." (*Id.* at 3.)  On July 6, 1998, Ralph Reese sent a letter to the Postal Service requesting "an exact copy of each signed mail receipt for items on the spreadsheets detailed in the exhibits." (RBI Mot., Ex. 2.

The Deficiency Letter further advised RBI that its nonprofit mailings between January 1, 1998, and June 1, 1998 would also be reviewed and that it would "be notified of the revenue deficiency which is due for these mailings." (Deficiency Letter at 1.)  On July 31, 1998, the Postal Service issued a "Supplemental Investigative Summary Report," covering that time period and adding $376,487.24 to the assessed deficiency.  (PS Mot., Ex. K, at 2 ("Supp. Report").)  In a letter dated August 20, 1998, the Postal Service directed RBI to pay this additional deficiency by September 20, 1998, unless it exercised its right to file an administrative appeal.  (PS Mot., Ex. L, at 1.)

### D.       Administrative Appeals of Assessed Deficiency

On August 27, 1998, RBI notified the Postal Service that it would appeal the assessed deficiency.  (PS Mot., Ex. BB.)

### 1.       Initial Agency Decision

In its initial appeal to the Northern Virginia Rates and Classification Service Center, RBI challenged both the conclusion that RBI's mailings were "cooperative mailings" under the

Cooperative Mailing Rules and the calculation of the deficiency amount.[23]  RBI's appeal was

rejected on March 1, 1999.  (PS Mot., Ex. CC ("Initial Agency Decision.)  The Initial Agency

Decision gave a lengthy explanation for why the Postal Service concluded that RBI's mailings

were "cooperative mailings," the relevant portions of which are set forth here:

> [RBI], a for-profit entity, is not authorized to mail at the [nonprofit] rate.  The basis for the revenue deficiency is [RBI's] impermissible use of the [nonprofit] rate for its mailings in cooperation with various organizations set forth in Enclosure A hereto.  The deficiency assessed represents the difference between the [nonprofit] rate claimed and the regular rate for Standard A postage.

> . . . [T]he Domestic Mail Manual (DMM) generally provides that "cooperative mailings" such as those at issue in this revenue deficiency assessment, may be made at the [nonprofit] rate only when each of the cooperating organizations is individually authorized to mail at those rates at the post office where the mailing is deposited.  Cooperative mailings involving the mailing of any matter on behalf of or produced for an organization not itself authorized to mail at the [nonprofit] rates where the mailing is deposited must be paid at the applicable regular rates.

> The postal term "cooperative mailing" refers to mailings made at the [nonprofit] rates in which one or more of the parties "cooperate" with the authorized Nonprofit organization.  A cooperative mailing can be defined as a mailing produced by an authorized organization that "cooperates" with one or more organizations to share the cost, risk, or benefit of the mailing.  Pursuant to . . . the DMM, an organization that is authorized to mail at the [nonprofit] rates may only mail its own matter at those rates, and the organization may not delegate or lend the use of its authorization to mail at the [nonprofit] rates to any other person or organization.  For that reason, cooperative mailings that are made on behalf of or produced for any organization that is not itself authorized to mail at the [nonprofit] rates must be paid at the applicable regular rate.

> Under the rules, the mailing must be owned by the authorized Nonprofit entity at the time of the mailing in order to be mailed at the special rates, and, for that reason, as the [RBI's] appeal points out, a cooperative mailing can be proper if the authorized organization uses a for-profit entity as an agent to mail matter which

---

[23] According to RBI, "[a]s soon as the deficiency was assessed [it] was concerned as to whether all of the mailings that the USPS had included within the deficiency were properly attributable to the contracts with 'break-even guarantees,'" and, "to that end, [it] asked for copies of the Forms 3602 used in compiling the deficiency as early as 7/6/98."  (RBI Mot. at 46-47; *see* RBI Mot., Ex. 2.)

21

the Nonprofit organization owns.  However, the mailer must be able to show that the relationship is a legitimate principal/agent relationship in order to use the [nonprofit] rate, and mailings may not be sent at the [nonprofit] rates if the mailing is made in support of a venture of an unauthorized entity or a cooperative enterprise between authorized and unauthorized entities, even if it is claimed that the mail matter itself is "owned" by the authorized entity.  Ordinarily, a legitimate agent will not bear the risk of a venture that it is handling on behalf of a principal. Excellent guidance concerning the rules relating to cooperative mailings is set forth in Customer Support Ruling PS-209 and Chapter 5 of Publication 417, copies of which have been furnished to you.

In order to determine whether a cooperative mailing is acceptable at the [nonprofit] rate, an examination of the mailpiece is usually not sufficient, because it is necessary to determine the relationship between all of the participating entities.  For this reason, we undertook a review of all the contracts that were furnished to us by [RBI] as evidence of the relationship between the parties which produced the mailings that are at issue here.

Generally, when a Nonprofit and a for-profit organization enter into a cooperative business venture, mail generated by the cooperative business venture is not eligible for the [nonprofit] rates.  The crucial elements used to analyze cooperative mail ventures are the allocation of the risk, and division of profits and management control.  Factors to be considered include the identities of the party that devised, designed, prepared and paid for the mailpiece, and the party that directly or indirectly paid the postage on the mailings; the manner in which the unauthorized parties are compensated, the profits and revenues from the enterprise supported by the mailing are divided, the risks associated with the enterprise supported by the mailing are shared, and the managerial decisions are made concerning the content of the mailings or the enterprise it supports; the contribution which each participant makes towards the enterprise supported by the mailing; and the intent and interest of the participants in the mailings.

All of the contracts furnished to us by [RBI] relating to this revenue deficiency bear evidence of the type of cooperative venture which is not authorized to mail at the [nonprofit] rate.  This is so particularly in light of the allocation of risk and the division of profits and management control associated with the endeavors between the parties. All of the contracts contain some form of a so-called "break-even guaranty."  This means that [RBI] will get paid only if the fundraising efforts which are the basis of the cooperative venture are successful.

Furthermore, [RBI] maintains partial management control; because the parties are required to cooperate and to agree on changes to the materials which the cooperative venture prepares, and/or because the caging agent utilized to handle the funds generated by the endeavor is subject to approval by the parties.  Another example of shared management control is [RBI's] right to continue collecting on

22

pledges after the period of contract performance, including the mailing of dunning notices.

As further evidence of a cooperative venture, some of the contracts contain an explicit division of profits which sets forth a percentage split of any revenues generated by the endeavors and/or for a minimum guaranteed amount to be paid to the Nonprofit entity.  This latter term ensures that if the fundraising effort generates no donations, it is [RBI], not the Nonprofit entity, which will absorb the loss.  Finally, in some of the agreements, [RBI] has and/or retains rights to the donor files/lists compiled and used in the solicitation efforts.

While it is true that some of the contracts set forth a fee schedule under which [RBI] is paid a specific amount for each of the specific types of services which it has agreed to perform, this is not the type of "fee-for-service" arrangement recommended by the Postal Service to avoid implicating the cooperative venture prohibition on use of the [nonprofit] rate.  This is so because these contracts also provide that the Nonprofit is not obligated to pay the invoices from [RBI] unless the fundraising efforts of the cooperative venture generate sufficient funds to pay them.  Once again, it is this sharing of risk between the Nonprofit and for-profit entities that renders the mailings ineligible for the [nonprofit] rate.

(Initial Agency Decision at 1-3.)  However, the Initial Agency Decision did not address RBI's contention that even if the Cooperative Mailing Rules were properly applied, the deficiency amount was too high because some of the mailings were not pursuant to RBI's contracts with its nonprofit clients, but rather were pursuant to simple purchase orders.

### 2.      Final Agency Decision

RBI appealed the Initial Agency Decision to the Business Mail Acceptance Manager, at USPS Headquarters, again challenging both the application of the Cooperative Mailing Rules and the calculation of the deficiency amount.[24]  On March 13, 2000, the Postal Service issued its

---

[24] RBI's counsel argued that "the newsletter mailings unequivocally belong to the authorized organizations. They paid the postage and a fee-for-service to RBI to prepare and mail the newsletters.  It was incorrect for [the USPS] to include postage for MADD chapters' newsletters in the deficiency assessment."  (RBI Mot. at 46 (citing RBI App., Tab A, at 2076).)  RBI included with its appeal a copy of a sample signed purchase order for MADD newsletters from RBI's files and a 3602 for a newsletter mailing to demonstrate that 3602s for newsletters could

Final Agency Decision, upholding the "mail classification ruling underlying the deficiency and calculation of the amount [of the deficiency]." (PS Mot., Ex. DD, at 1.) The Postal Service concluded that RBI's mailings on behalf of its nonprofit clients were "cooperative mailings" and, therefore, not eligible for the nonprofit mailing rate because:

> Some of the crucial elements the Postal Service uses to analyze cooperative mail ventures are allocation of risk, division of profits and management control. Other factors we consider include identity of the parties who devised, designed, prepared and paid for the mailpiece, and the parties who directly or indirectly paid postage on the mailings. We must also consider how each cooperating party is compensated, how the profits and revenues are divided and the risks associated with the enterprise supported by the mailing are shared.
>
> The contracts RBI provided relating to the postage deficiency bear evidence of the type of cooperative venture that is not authorized to mail at the [nonprofit] rates. This is especially true when considering the allocation of risk and division of profits and management control between the parties. Each contract contains some form of "break-even guaranty," meaning RBI receives payment from its nonprofit clients only if its fundraising efforts on their behalf are successful. This is the essence of the type of cooperative venture that cannot enter its matter at the [nonprofit] rate.

(Final Agency Decision at 1.) As for the other issues raised by RBI on appeal, the final agency decision referred back to the Initial Agency Decision and stated that the Postal Service "concurs with those responses and believes they were fully and accurately explained."[25] (*Id.*) The Final Agency Decision, however, did not address RBI's contention that the deficiency amount was too high because it included mailings of newsletters pursuant to purchase orders and eligible for the nonprofit rate.

---

be distinguished from other 3602s because they included the telltale newsletter notation in the upper right corner. (*Id.* (citing RBI App., Tab A, at 2171-72).)

[25] The Final Agency Decision did address other arguments, but its analysis of those issues is irrelevant to the present litigation either because the RBI has not objected to the Postal Service's position or because, as is the case with constitutional claims, this Court's review is *de novo*.

On March 17, 2000, the Postal Service notified RBI that although it had "announced a new direction for it's[sic] revenue assurance process," whereby "revenue deficiencies will not be assessed in the future unless the customer had 'prior notice' of the applicable mailing standards," the deficiency against RBI would "not be forgiven" because RBI was a "professional mailer with volumes/mailings in 1997 alone of 11,923,963 pieces of mail and $2,001,683 in postage" and because RBI had been "assessed additional postage in 1990 for mailing cooperative mailings that did not qualify for the non-profit rates," and it had been made aware "at that time . . . of the eligibility requirements for the non-profit rates of postage."[26]   (PS Mot., Ex. EE, at 1.)

Thereafter, the Postal Service and RBI reached an agreement "regarding the time frame" within which RBI could "file a request for the mitigation of [the] postal deficiency," with the Manager of Finance, in Pittsburgh, Pennsylvania, who had the authority to reduce or waive the deficiency, but could not revisit the mail classification decision.   (RBI Mot., Ex. 4, at 1-2; *see also* PS Mot., Ex. FF ("Mitigation Decision") ("mail classification issues . . . are outside the scope of this review").)   RBI submitted its request for mitigation on or about April 27, 2000. (Mitigation Decision at 1.)   On February 15, 2001, the Postal Service granted the request in part, forgiving the portion of the debt "that resulted from mailings before June 1996."   (*Id.*)   The Finance Manager explained that he thought it "reasonable" to forgive that portion of the debt,

---

[26] In 1991, the Postal Service had issued a final decision finding that RBI had misused the nonprofit rate by mailing "Privileged Diner Club" cards and restaurant "Member's Guide[s]" as "donor premiums" included in materials it produced for the Pennsylvania chapter of Mothers Against Drunk Driving ("MADD").   (PS Facts ¶¶ 76-78; PS Mot., Ex. I .)   That decision did not concern the application of the Cooperative Mailing Rules to charitable solicitations, but it did address what types of business relationships the Postal Service viewed as cooperative mailings. (PS Mot., Ex. I, at 2 (explaining that because the nonprofit "does not have management control nor are they at risk in the enterprise with [RBI], this is a joint venture" pursuant to which mailpieces could not lawfully be mailed at the nonprofit rate).)

because, although "the Management Instruction governing the assessment and collection of revenue deficiencies did not set forth any timeframe for assessing postage owed the agency as a result of past mailings," he "ha[d] determined that deficiencies assessed against other mailers were often limited to a two-year period." (*Id.*) Applying that adjustment, the Postal Service recalculated RBI's debt to be $1,646,277.95, and the amount forgiven to be $1,953,790.28.[27] (*Id.* at 2.) RBI was instructed to submit payment by March 30, 2001. (*Id.*) The Postal Service informed RBI that its forbearance decision was the "final agency response" concerning the revenue deficiency. (*Id.* at 1.)

### E.    Developments After the Final Agency Decision

#### 1.    RBI's Sale of Assets to RTI

In the early 2000s, RBI started to experience financial difficulties.[28] Eventually, after first selling its major subsidiary and engaging in a significant restructuring, on December 31, 2002, RBI entered into an "Asset Purchase Agreement" with RTI, pursuant to which RTI

---

[27] Attached to the Postal Service's letter was a chart listing 25 nonprofit clients and the amount of the deficiency attributable to each for the period from June 2, 1996, through June 1, 1998. (Mitigation Decision at 3.)

[28] The reasons for RBI's financial difficulties are varied and, to some extent, disputed. One undisputed cause, however, was that in 2001, VoiceStream Wireless Corporation withdrew its business and sued CommComm and its parent corporation, RBI, alleging breach of contract and fraudulent billing statements to VoiceStream. (PS Facts ¶ 101; PS Mot., Ex. M.) As a result, "CommComm terminated hundreds of employees, shuttered call centers, was unable to perform on its leases for computers, telephone switching equipment, and telephone lines, and teetered on the brink of default with its landlords." (PS Facts ¶ 102; PS Mot., Ex. O.) "As part of a forbearance agreement with its bank lender, RBI was required to sell CommComm." (PS Facts ¶ 106.) RBI retained a financial advisor, Charles O'Hanlon, to assist it (PS Facts ¶ 106), and CommComm's assets were sold in August 2002. (PS Facts ¶ 107.) Other negative events included the September 11, 2001 terrorist attacks (PS Facts ¶ 108) and the creation of the National Do Not Call Registry. (PS Facts ¶ 109; PS Mot., Ex. N.)

purchased certain assets and assumed certain liabilities from RBI for a one-time payment of

$10,000.00.[29]  (PS Mot., Ex. U, at 1 & ¶¶ 1-2 ("Asset Purchase Agreement"); PS Facts ¶ 129.)

When the Asset Purchase Agreement was executed, the corporate structures of both RBI

and RTI were altered.  RTI had been incorporated in October 2002 by RBI's Executive Vice-

President, Chris Ungarino, who was initially its sole owner and 100% shareholder.  (PS Mot.,

Ex. Q; PS Fact ¶ 123.)  Prior to the sale, as had been the case since RBI's formation, Barry and

Ralph Reese were equal 50/50 shareholders in RBI, equal partners in running the company, and

the only members of RBI's Board of Directors.  (PS Facts ¶ 1; PS Mot., Ex. W.)  Barry Reese

was RBI's Chairman, President and Treasurer (PS Facts ¶ 2; PS Mot., Ex. W), while Ralph

Reese was RBI's Vice President and Secretary.  (PS Facts ¶ 3; PS Mot., Ex. W)  The day the

Asset Purchase Agreement was executed, Barry Reese resigned as President and Chairman of the

Board, leaving Ralph Reese as the sole officer while James Epstein became RBI's President.

(PS Facts ¶¶ 124-25, 139.)  RTI was restructured to split its stock among Barry Reese (49%),

Ungarino (47%), and Charlie O'Hanlon (4%), who also comprised the RTI's Board of Directors.

(PS Facts ¶¶ 123, 125, 139; PS Mot., Ex. R; PS Mot., Ex. W.)  Ungarino became RTI's

President, while Barry Reese became Chairman of the Board, and its Secretary and Treasurer.

(PS Facts ¶¶ 140-43; PS Mot., Ex. W.)

Pursuant to the Asset Purchase Agreement, RTI, which had no existing assets or business,

acquired "substantially all of the assets used or held in connection with the [RBI's] [b]usiness"

---

[29] Attached to the Asset Purchase Agreement was RBI's balance sheet as of November 30, 2002, which showed total assets of approximately $16.1 million (including approximately $750,000.00 in cash, $4.4 million in accounts receivable, $7.9 million in "long-term investments," and $2.8 million in property, physical plant, and equipment) and total liabilities of approximately $29 million.  (Asset Purchase Agreement, Ex. B; PS Facts ¶ 131.)

of "outbound telemarketing services to nonprofit and commercial customers." (Asset Purchase Agreement at 1; PS Mot., Ex. Q; PS Facts ¶ 112, 132.) These assets included RBI's entire business operation, and all of its employees (with the exception of Ralph Reese and James Epstein), its clients, physical plants, computers, call centers, and office space. (Asset Purchase Agreement ¶ 1; *see also* PS Facts ¶ 133, 137.) The assets RBI expressly retained[30] included "domain names" and "fictitious business names," trademarks, service marks, and copyrights, publishing agreements; rights to certain tax refunds, sundry office furniture; RBI's ownership interests in CommComm and its overseas calling operation in the Philippines; RBI's proprietary telemarketing management software (known as the Reese Brothers Information Management System or "RIMS"); and RBI's database of information pertaining to the then current charitable donors including names, addresses, telephone numbers, history and frequency of giving. (Asset Purchase Agreement, Schedule 1; PS Facts ¶ 134.) Eventually, the software was also sold to RTI. (PS Facts ¶ 135.) As for liabilities, the Asset Purchase Agreement specifically identifies the liabilities expressly assumed by RTI. (Asset Purchase Agreement, Schedule 3 ("Assigned Liabilities").) The "assigned liabilities" did not include RBI's liability for the postal deficiency. (*Id.*; RTI/TRG Mot. at 2.) In addition, RTI entered into a Non-Competition, Non-Solicitation and Confidentiality Agreement with Ralph Reese, under which it paid him the sum of $500,000.00 in monthly installments. (Asset Purchase Agreement ¶ 10 & Ex. C; RTI/TRG Mot. at 9.)

---

[30] Schedule 1 of the Asset Purchase Agreement identifies a 27-point list of assets that were "excluded" from the sale to RTI and retained by RBI. (Asset Purchase Agreement, Schedule 1.)

### 2. RTI's Sale of Stock to TRG

Several years later, on April 6, 2005, RTI sold 73% of its stock to TRG for a "net equity value" of $14,800,000, giving TRG a controlling interest in RTI.[31]  (PS Mot., Ex. Z; PS Facts ¶ 148.)  At that time, Barry Reese and O'Hanlon resigned their positions with RTI.[32]  (PS Mot., Ex. AA; PS Facts ¶ 148.)  Ungarino continued on with RTI as its President and CEO and retained a 27% stock ownership, while also becoming TRG's new president and chief executive officer.  (PS Facts ¶ 148.)  Barry Reese also entered into a Non-Competition/Non-Solicitation Agreement with RTI and Ralph Reese renewed his existing Non-Competition Agreement.  (PS Mot., Ex. Z.)

## III.  PROCEDURAL HISTORY

In 2006, more than five years after the Postal Service issued its forbearance decision, RBI filed this action, seeking "to set aside the [Postal Service's] final agency decision affirming the postal deficiency and forbearance decision."  (Compl. ¶ 59, June 6, 2006.)  RBI's complaint includes claims that the Postal Service's Cooperative Mailing Rules are unconstitutional (Compl. ¶¶ 39-48 (Counts 1-10)), contrary to congressional intent (*id.* ¶ 50 (Count 12)) and arbitrary and capricious (*id.* ¶ 51 (Count 13), and claims that the Postal Service's decision applying the Cooperative Mailing Rules to RBI and the deficiency assessment were arbitrary and capricious (*id.* ¶¶ 52-55 (Counts 14-17)).[33]  The Postal Service filed a counterclaim against RBI seeking to

---

[31] Immediately prior to the sale of stock to TRG, Barry Reese gifted 12% of the outstanding RTI stock to Ralph Reese, so RTI's stockholders at the time of the sale were Barry Reese, Ungarino, Ralph Reese and O'Hanlon.  (RTI/TRG Mot. at 11.)

[32] Three new directors were added to RTI's Board.  (PS Mot., Ex. AA; PS Facts ¶ 149.)

[33] After filing its complaint, RBI decided not to pursue its claim (Count 11) that the Postal Service's application of the CMR to RBI was "ultra vires."  (RBI Opp. at 27 n.88.)

collect the full amount of the assessed deficiency ($3,600,068.23), along with a third-party

complaint against RTI and TRG to collect the debt based on a theory of successor liability.

(Counterclaim and Third-Party Compl., June 27, 2006.)

Now before the Court are the parties' cross-motions for summary judgment. [34]  RBI seeks

summary judgment on all of its claims against the Postal Service, except for its potential claim

for damages.  The Postal Service seeks summary judgment on RBI's claims against it, on its

claims against RBI, and on its claims against RTI and TRG.  RTI and TRG seek summary

judgment on the Postal Service's claims against them.

## ANALYSIS

The pending motions for summary judgment present two overarching questions: (1)

should the Postal Service's Final Agency Decision be set aside as to liability and/or the

deficiency; (2) and, if not, are RTI and/or TRG jointly and severally liable along with RBI for

the deficiency.

## I.    REVIEW OF THE FINAL AGENCY DECISION

RBI challenges the Final Agency Decision on the following grounds:  (1) that the

Cooperative Mailing Rules exceed the Postal Service's delegated authority because they are

inconsistent with congressional intent; (2) that the Cooperative Mailing Rules – facially and as

applied to RBI -- are unconstitutional; and (3) the Postal Service's determination that RBI's

---

[34] Before this matter was reassigned, the Honorable Ricardo Urbina denied RTI's motion to
dismiss the third-party complaint for lack of subject matter jurisdiction, lack of personal
jurisdiction and failure to state a claim (*see* Mem. Op. & Order, Mar. 5, 2007) and ruled that RBI
had standing to raise the constitutional claims of its former nonprofit clients.  (*See* Mem. Op.,
Jan. 23, 2008.)

mailings were ineligible for the nonprofit mailing rate and that it owed a deficiency in excess of

$3.5 million was arbitrary and capricious

A.      **Challenge to the Cooperative Mailing Rules as Contrary to Congressional Intent**

RBI claims that the Cooperative Mailing Rules exceed the Postal Service's delegated

authority insofar as they exclude from the nonprofit rate, cooperative mailings that do not

involve the advertisements of "products and services."  (RBI Mot. at 10.)  "An agency

construction of a statute cannot survive judicial review if a contested regulation reflects an action

that exceeds the agency's authority."  *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d

1166, 1174 (D.C. Cir. 2003).  RBI bases its argument on 39 U.S.C. § 3626(j)(1)(D)(ii), which

was added to the PRA in 1993 and provides that the nonprofit rate:

> shall not apply to mail which advertises, promotes, offers, or, for a fee or
> consideration, recommends, describes, or announces the availability of . . .
>
> (D) any product or service . . . if—
>
> . . . (ii) the mail matter involved is part of a cooperative mailing (as defined under
> regulations of the Postal Service) with any person or organization not authorized
> to mail at the [nonprofit] rates . . . .

§ 3626(j)(1)(D)(ii).  RBI asserts that Congress' clear intent in enacting this subsection was to

establish that the only cooperative mailings that could be excluded from the nonprofit rate were

those described in § 3626(j)(1)(D)(ii).  Accordingly, RBI argues, the Cooperative Mailing Rules

exceed the Postal Service's authority because they exclude mailings (such as RBI's mailings on

behalf of its nonprofit clients) that are not within the parameters of subsection (D)(ii).

The two-step *Chevron* analysis applies when the question is whether the Postal Service's

construction of a statute and regulations promulgated thereunder are contrary to congressional

intent.  *See Aid Ass'n for Lutherans*, 321 F.3d at 1174 (citing *Chevron USA, Inc. v. Nat'l Res.*

31

*Def. Council, Inc.*, 467 U.S. 837 (1984)).  At *Chevron* step one, the reviewing court must

determine "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467

U.S. at 842; *AAL*, 321 F.3d at 1174.  "If a court, employing traditional tools of statutory

construction, ascertains that Congress had an intention on the precise question at issue, that

intention is the law and must be given effect."  *Chevron*, 467 U.S. at 843 n.9.  However, "if the

statute is silent or ambiguous with respect to the specific issue, the question for the court is

whether the agency's answer is based on a permissible construction of the statute."  *Chevron*,

467 U.S. at 843.

Here, the "precise question at issue" is whether the only cooperative mailings that can be

excluded from the nonprofit rate are those encompassed by the prohibition in subsection (D)(ii).

RBI maintains that the answer to that question is yes.  (RBI Mot. at 9-10 (Congress clearly

intended that "to be excluded from the nonprofit rate . . . mail must *both* 'advertise, promote,

offer [etc. . . . a] product or service' *and* run afoul of the USPS's cooperative mailing rule."

(quoting § 3626(j)(1)(D)(ii)).)  The Court does not agree.  Considering the text, structure and

legislative history, Congress's intent in enacting subsection (j)(1)(D)(ii) is not clear.  First, when

in 1990 and 1993, Congress added express exclusions to the PRA as to what type of mail could

be mailed at the nonprofit rate, *see* (A)-(C) (1990 Amendments); *id*. (D) (1993 Amendments), it

was against the backdrop of the existing Cooperative Mailing Rules and the Court of Appeals'

decision in 1979 upholding those rules as a proper exercise of the Postal Service's authority.

Yet, nowhere in the text does it explicitly state that the subsection (D)(ii) exclusion is the "only"

type of cooperative mailing that is excluded from the nonprofit rate.  Indeed, with the single

exception of the reference in subsection (D)(ii) to "cooperative mailings" as being "defined

under regulations of the Postal Service," there is no other reference in the PRA to cooperative

32

mailings.  Nor is there anything in the legislative history to support RBI's position.  To the contrary, Congress' most clearly expressed concern related to the overuse or abuse of the nonprofit rate.  *See, e.g.*, S. Rep. No. 101-411; H.R. Rep. No. 101-419.  In addition, after the 1990 amendments, when the Postal Service, as part of its adoption of implementing regulations, announced its view that those amendments had no effect on preexisting restrictions on the use of the nonprofit rate, including the Cooperative Mailing Rules, there is no indication in the legislative record thereafter and leading up to the 1993 amendments that Congress disagreed with that view.  Nor did it respond or express disagreement when the Postal Service indicated its view that the 1993 amendments did not alter or replace its existing Cooperative Mailing Rules.

　　　RBI relies heavily on the Court of Appeals' decision in *Aid Ass'n of Lutherans*, but that case is distinguishable.  In *Aid Ass'n of Lutherans*, plaintiff challenged the Postal Service regulations that implemented subsection (j)(1)(B) of the 1990 amendments.  *See Aid Ass'n of Lutherans*, 321 F.3d at 1167 (citing 57 Fed. Reg. 28,464, 28,466 (June 25, 1992)).  The statute provided generally that insurance policies could not be sent at the nonprofit rate, but recognized an exception where "the coverage provided by the policy is not generally otherwise commercially available."  39 U.S.C. § 3626(j)(1)(B).  Thus, Congress had expressly identified a subset of insurance policies that a qualified nonprofit *would be allowed* to mail at the nonprofit rate.  The challenged regulations narrowed the exception by providing that the nonprofit rate would be limited to instances where the "type of insurance" (*e.g.*, life, automobile, health) was not generally otherwise commercially available.  The Court held that the Postal Service had exceeded its delegated authority by limiting the exception because Congress clearly intended to allow use of the nonprofit rate for the insurance policies described in subsection (B).  *See Aid Ass'n for Lutherans*, 321 F.3d at 1168 (quoting § 3626(j)(1)(B) (emphasis added)) ("statute

permits the agency to regulate solely with respect to '*coverage* provided by [an insurance] policy'" ).  In contrast, in subsection (D)(ii), Congress expressly identified a certain type of cooperative mailing as *excluded* from the nonprofit rate.  The Cooperative Mailing Rules, which were in place long before subsection (D)(ii) was enacted, do not narrow this statutory exclusion, but rather, they enlarge the universe of cooperative mailings barred from using the nonprofit rate.  Thus, unlike the regulations in *Aid Ass'n for Lutherans*, the Cooperative Mailing Rules do not directly conflict with any statutory provision.

Given the above, although there is no question that subsection (D)(ii) expressly proscribes use of the nonprofit mailing rate for advertisements of "products and services" in "cooperative mailings," the Court is not persuaded that by enacting this provision, Congress clearly intended to significantly narrow the existing Cooperative Mailing Rules.  Accordingly, as the statute is silent or ambiguous "on the precise question at issue," the inquiry must proceed to *Chevron* step two.

At *Chevron* step two, if the agency's "choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," a court will not disturb that choice "unless it appears from the statute or legislative history that the accommodation is not one that Congress would have sanctioned."  *Chevron*, 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382-83 (1961)); *see United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) (*Chevron* step two entails evaluation of agency action "in light of the language, policies and legislative history of the Act.").  The Cooperative Mailing Rules easily satisfy this standard.

First, the Court of Appeals has previously held that an earlier, but substantially similar, version of the Cooperative Mailing Regulation was a proper exercise of the Postal Service's

authority.  *See Nat'l Retired Teachers*, 593 F.2d at 1363-64.  Admittedly, that case came before

the enactment of the 1990 or 1993 amendments to the PRA, but, as noted above, neither set of

amendments directly or by implication altered the existing Cooperative Mailing Rules or

overruled *Nat'l Retired Teachers Ass'n*.  As the Court in *Nat'l Retired Teachers Ass'n*

emphasized, the "practical reality [is] that a classification schedule can only define general

outlines," so the Postal Service "must retain some flexibility and discretion to interpret the

general provisions of the mail classification schedule in day-to-day implementation."  *Id*. at

1363.  The Court further held that the Postal Service "need not rely solely on case-by-case

interpretation.  It may choose to exercise its rulemaking power by an interpretative rule.  Such an

interpretative rule is general, in the sense that it guides all postal officials in applying a mail

classification and assures that they will provide a consistent and uniform interpretation, but the

rule remains one of interpretation of the classification."  *Id*.  As for the Cooperative Mailing

Regulation specifically, the Court held that that Postal Service had "validly exercised its

interpretative discretion in concluding . . . that the 'mailed by' language [in the classification

schedule] contained, by fair implication, limitations on the use of the nonprofit rate."  *Id*. at

1364.  Accordingly, the Court held that the Cooperative Mailing Regulation was "eminently

reasonable as effectuating the implicit purpose of the [classification schedule]" to ensure that

"that the nonprofit rate would be used for the purposes of the listed organizations, and not for

other purposes such as commercial activities inconsistent with the grant of qualification."  *Id*.

Second, it is apparent that at the time Congress adopted subsection (j)(1)(D)(ii), it was

deeply concerned about the costs associated with the use and abuse of the nonprofit rate.  *See,*

*e.g*., S. Rep. No. 101-411.  Given that concern, as other courts have determined, it is

unreasonable to conclude that while enacting specific exclusions from the nonprofit rate,

Congress would simultaneously nullify the Postal Service's existing Cooperative Mailing Rules. *See, e.g.*, *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 441 n.4 (S.D.N.Y. 1999) (§ 3626(j)(1)(C) "in no way broadens the right to use the non-profit rate for travel mailings that otherwise would be ineligible *cooperative* mailings"); *U.S. Postal Serv. v. University Pub. Corp.*, 835 F. Supp. 489, 491 (S.D. Ind. 1993) ("The USPS definition of 'cooperative mailing' is reasonable and the Court will not disturb it."); *United States ex rel. Saklad v. Lewis*, Civ. Act. No. 97-10052-MLW (D. Mass. Mar. 5 2004) (unpub.) ("It was permissible for the Postal Service to interpret [39 U.S.C. § 3626] as leaving it the discretion to apply the cooperative mail rule to other schemes" not explicitly set forth in the statute.)

Accordingly, the Court concludes that the Cooperative Mailing Rules are not contrary to Congress's intent but rest comfortably within the Postal Service's delegated authority.

## B.    Constitutional Challenges

### 1.    Due Process Vagueness

RBI argues that the Cooperative Mailing Rules are unconstitutionally vague under the Fifth Amendment's Due Process Clause because they are "so vague that [they] deprived RBI, and everyone else, of the Fifth Amendment Due Process rights to comprehensible laws." (RBI Mot. at 52.) "A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 740 (1970) (citing *United States v. Cardiff*, 344 U.S. 174, 176 (1952)); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2718 (2010) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "Two principal concerns undergird the

36

requirement that governmental enactments be sufficiently precise: first, that notice be given to those who may run afoul of the enactment and, second, that the enactment channel the discretion of those who enforce it." *United States v. Thomas*, 864 F.2d 188, 194 (D.C. Cir. 1988). "[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Holder*, 130 S. Ct. at 2719 (quoting *Hoffman Estates v. Flipside, Hoffman Estates*, Inc., 455 U.S. 489, 499 (1982)); *see Thomas*, 864 F.2d at 194 ("When an enactment is challenged as vague in its application in a First Amendment context . . . the court must focus instead upon whether the enactment provided fair notice that the defendant's contemplated conduct fell within the legitimate scope of the prohibition.")  Nonetheless, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Holder*, 130 S. Ct. at 1719 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989))).  As explained by the Court of Appeals in *Thomas*:

> At the same time, we cannot forget that language is unavoidably inexact, and that statutes cannot, in reason, define proscribed behavior exhaustively or with consummate precision.  These inherent limitations obtain in a speech-laden, First Amendment setting as in any other. . . .  For this reason, courts do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription.  Rather, even in this sensitive area the Due Process Clause requires that the enactment be drafted with reasonable specificity sufficient to provide fair notice.

*See Thomas*, 864 F.2d at 195 (internal citations omitted).

According to RBI, the Cooperate Mailing Rules are fatally vague because they include two different sets of relevant factors and do not indicate "how those factors would be evaluated

or their relative importance." (RBI Mot. at 13.)  RBI's claims of vagueness lack merit.  As the

Supreme Court has recognized:

> [T]here are limitations in the English language with respect to being both specific
> and manageably brief, and it seems to us that although the prohibitions may not
> satisfy those intent on finding fault at any cost, they are set out in terms that the
> ordinary person exercising ordinary common sense can sufficiently understand
> and comply with, without sacrifice to the public interest.

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 578–79 (1973).  Unlike

statutes that have been struck down in the past, the Cooperative Mailing Rules do not rely on

terms that require "'wholly subjective judgments without statutory definitions, narrowing

context, or settled legal meanings.'"  *See Holder*, 130 S. Ct. at 2709 (quoting *Williams*, 553 U.S.

at 306 (striking down a statute "that tied criminal culpability to whether the defendant's conduct

was 'annoying' or 'indecent'")).  Indeed, the Cooperative Mailing Rules rely on terms that are

certainly no more vague than those which were upheld in *Holder.  See Holder*, 130 S. Ct. at 2720

("Applying the statutory terms in this action – 'training,' 'expert advice or assistance,' 'service,'

and 'personnel' – does not require similarly untethered, subjective judgments.")  Accordingly,

the Cooperative Mailing Rules are not impermissibly vague.

### 2.      First Amendment

RBI's primary First Amendment claim is that the Cooperative Mailing Rules violate its

nonprofit clients' First Amendment right to freedom of speech because they exclude charitable

solicitations from the nonprofit rate if those solicitations were pursuant to a cooperative mailing

with an unauthorized organization, such as RBI.  Or, in other words, RBI contends that its

nonprofit clients have a First Amendment right to send all charitable solicitations at the nonprofit

rate.

It is well-established that solicitation of charitable donations is "speech protected by the First Amendment." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ("solicitation of charitable contributions is protected speech"); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) (charitable solicitations "involve a variety of speech interests . . . that are within the protection of the First Amendment"); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 (1984) ("a direct restriction on the amount of money a charity can spend on fundraising activity" is "a direct restriction on protected First Amendment activity").

Deciding that the speech is protected "merely begins [the] inquiry," for "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property." *Cornelius*, 473 U.S. at 799; *see Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1305 (D.C. Cir. 2005). The next step is identify the "forum" and determine whether it is public or nonpublic. *Cornelius*, 473 U.S. at 800. To define the forum, the Supreme Court has held that the critical question is the "the access sought by the speaker." *Id.* at 801. Thus, "[w]hen speakers seek general access to public property, the forum encompasses that property," but "[i]n cases in which limited access is sought," courts should take a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Id.* Nor must a forum be physical property. *Id.* at 801 (forum can be the "particular means of communication" speaker seeks access to); see *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 53 (1983) (defining forum as school's internal mail system); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 300 (1974) (defining forum as advertising spaces on city-owned buses). Once the forum is defined, the next

question is whether it is "nonpublic or public in nature," because "the extent to which the

Government may limit access depends on whether the forum is public or nonpublic." *Cornelius*,

473 U.S. at 802.  The Supreme Court has "identified three types of fora:  the traditional public

forum, the public forum created by government designation, and the nonpublic forum."

*Cornelius*, 473 U.S. at 802 (citing *Perry*, 460 U.S. at 45).  "Traditional public fora are those

places which by long tradition or by government fiat have been devoted to assembly and debate,"

such as "public streets and parks."  *Id.* (internal citations and quotations omitted).  "In addition . .

. , a public forum may be created by government designation of a place or channel of

communication for use by the public at large for assembly and speech, for use by certain

speakers, or for the discussion of certain subjects."  *Id.*  "Not every instrumentality used for

communication, however, is a traditional public forum or a public forum by designation."  *Id.*

(citing *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 130, n.6 (1981)).

Nor does the government "create a public forum by inaction or by permitting limited discourse,

but only by intentionally opening a nontraditional forum for public discourse."  *Id.*

"If a forum does not fit into either of the two public categories, it is a nonpublic forum."  *See*

*Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004); *see also Int'l Soc'y for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).

Applying these principles to this case, the Court concludes that the relevant forum is the

nonprofit mailing rate and that, because it is neither a traditional public forum nor a designated

public forum, it must be considered a nonpublic forum.  *See, e.g.*, *Cornelius* (charitable

fundraising effort in federal offices is not a designated public forum because "neither [the

government's] practice nor its policy is consistent with an intent to designate the CFC as a public

forum open to all tax-exempt organizations").

Having determined that the Cooperative Mailing Rules limit access to a nonpublic forum, the next question is whether the regulations are "content neutral." "In general, the 'principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Time Warner Entertainment Co. v. United States,* 211 F.3d 1313, 1316 (D.C. Cir. 2000) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Cooperative Mailing Rules are content-neutral because whether a charitable solicitation is excluded from the nonprofit rate depends solely on the relationship between the nonprofit and the unauthorized organization and not the content of the mailing.

A content-neutral regulation that restricts speech by denying access to a nonpublic forum is constitutional so long as the "justifications for exclusion . . . satisfy the reasonableness standard." *See Cornelius* , 473 U.S. at 797; *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 679 ("Limitations on expressive activity conducted [in nonpublic forums] must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view."); *see also IRI*, 417 F.3d at 1306 ("The state may reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.") The Cooperative Mailing Rules satisfy this standard. In providing for a nonprofit rate, Congress intended to benefit "qualified nonprofit organizations." The Cooperative Mailing Rules, by denying access to the nonprofit rate for charitable solicitations that are part of cooperative mailings, are a reasonable attempt to ensure that the benefits of the nonprofit rate are limited only to qualified nonprofit organizations. In addition, the burden on

41

the nonprofit's protected speech is minimal because the option of mailing at the nonprofit rate

remains available as long as the mailing is not a "cooperative mailing."

Accordingly, the Court concludes that the Cooperative Mailing Rules do not violate the

First Amendment by excluding certain charitable solicitations from the nonprofit mailing rate.[35]

### C.    "Arbitrary and Capricious" Review

RBI's next set of claims challenge the Postal Service's final agency decision as "arbitrary

and capricious."  RBI's arguments fall into three categories: (1) a challenge to the Cooperative

Mailing Rules as promulgated; (2) challenges to the Postal Service's conclusion that under the

Cooperative Mailing Rules, RBI's contracts with its nonprofit clients rendered its mailings

ineligible for the nonprofit rate; and (3) a challenge to the Postal Service's calculation of the

deficiency amount.

### 1.    Availability and Scope of Judicial Review

As RBI must recognize, the Postal Service's actions are exempt from the APA's general

mandate of judicial review of agency actions.  *See* 39 U.S.C. § 410(a); *Carlin v. McKean*, 823

F.2d 620, 622 (D.C. Cir. 1987) ("Apart from two very limited exceptions [which do not apply

here], however, the APA is not applicable to the exercise of the powers of the Postal Service.");

*see also Nat'l Easter Seal Soc'y v. U.S. Postal Serv.*, 656 F.2d 754. 766 (D.C. Cir. 1981) (the

"language of [§ 410(a)] indicates that the Postal Service is not bound by . . . the [administrative

procedure and judicial review] chapters of [the APA]"); *Northern Air Cargo v. U.S. Postal Serv.*,

674 F.3d 852, 858 (D.C. Cir. 2012) ("the Postal Service is exempt from review under the

---

[35] Given this conclusion, RBI's remaining constitutional claims are meritless because its
overbreadth, time, place, manner, prior restraint and equal protection arguments all depend on
the Court deciding that excluding charitable solicitations that are part of cooperative mailings
from the nonprofit rate violates the First Amendment.

Administrative Procedure Act").  Nonetheless, RBI argues that there is still a residual, non-APA

based judicial of administrative agency action.  (RBI Mot. at 41-42; RBI Reply at 6.)  The Postal

Service counters that "arbitrary and capricious" review of its decision is entirely "foreclosed" by

the APA exemption in the PRA.[36]  (PS Mot. at 34-35.)  Thus, before turning to RBI's specific

"arbitrary and capricious" arguments, the Court must decide whether judicial review is available

and, if it is, what is its scope.

As a general rule, courts are reluctant to find that an agency action is unreviewable absent

evidence that such was Congress's intent.  *Carlin*, 823 F.2d at 623.  "Congress'[s] intent to

foreclose review must be shown by 'clear and convincing evidence,' or at least must be 'fairly

discernible in the statutory scheme.'"  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141

(1967) and *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (other internal quotations

omitted)); *see also Nat'l Ass'n of Postal Supervisors v. U. S. Postal Service*, 602 F.2d 420, 430

(D.C. Cir. 1979) ("Nonreviewability is not to be casually inferred.")  "Congress need not say

flatly that review is precluded; an examination of several factors may be sufficient to convince

the courts that Congress intended that."  *Carlin*, 823 F.2d at 623.  For example, "if judicial

interference would imperil the policies underlying the lawmakers' decision to delegate the

discretion, if the nature of the administrative discretion is such that the conventional tools of

judicial analysis are unsuited to an examination of its exercise, then a court is not at liberty to

disregard those limitations and proceed to substitute its own judgment for that of the

---

[36] The Postal Service recognizes (*see* PS Mot. at 34-35) that there is judicial review where there are statutory exceptions to nonreviewability, constitutional challenges, or a claim that the Postal Service has acted outside the scope of its delegated authority.  *See also Aid Ass'n for Lutherans*, 321 F.3d at 1172 ("Postal Service concedes that this Court has found a narrow exception to [§ 410's] preclusion of review, allowing a court to determine whether an agency was acting outside the scope of its statutory authority.").

administrative agency." *Nat'l Ass'n of Postal Supervisors*, 602 F.2d at 430*; see also Block*, 467 U.S. at 345 ("Whether and to what extent a particular statute precludes judicial review of agency action is determined not only from its express language but also from the structure of statutory scheme, its objectives, its legislative history, and the nature of administrative action involved."). In short, the "crucial inquiry . . . is whether the Postal Act's statutory scheme and the history of its evolution compel judicial restraint" or allow judicial review of the challenged action. *Nat'l Ass'n of Postal Supervisors*, 602 F.2d at 430.

In this particular case, RBI seeks review of two distinct types of administrative actions: (1) review of the substance of the Postal Service's Cooperative Mailing Rules; and (2) review of the Postal Service's application of the Cooperative Mailing Rules to RBI's mailings and calculation of the deficiency amount. Whether Congress intended to foreclose judicial review must be addressed with respect to each type of action. *See Block* , 467 U.S. at 345 (court must consider "nature of the administrative action involved").

> **a.      Judicial Review of Challenge to Cooperative Mailing Rules as Promulgated**

The text, structure and legislative history of the PRA, along with other court decisions, persuade the Court that Congress intended to preclude judicial review of Postal Service regulations as promulgated. First, the PRA expressly delegates to the Postal Service the power to promulgate rules and regulations to implement the statute. 39 U.S.C. § 401. Second, although the PRA generally exempts the Postal Service from APA review, it also explicitly provides for certain exceptions to that exemption, suggesting that where Congress wanted there to be judicial review, it said so. *See, e.g*., 39 U.S.C. § 503 (APA review applies to Postal Regulatory

Commission's promulgation of rules, regulations and establishment of procedures).[37]  Third, the legislative history of the PRA indicates that Congress intended to create an efficient and modern Postal Service free to operate without the impediments that constrain typical agency action.  *See, e.g.*, H.R. Rep. No. 91–1104 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3649, 3650, 3654–3655; s*ee also* 116 Cong. Rec. 21,709 (1970) (Sen. McGee) ("Delivering the mail . . . is an essential, business-oriented service.  The committee has no intention of establishing any postal system which does not have a direct and continuing responsibility to the people and to Congress, but we do believe that its role can be fulfilled with a greater degree of efficiency if it is removed from the ordinary channels, administrative controls, and legislative restrictions of other agencies in the executive branch.")  Finally, although it has never directly addressed the question, the D.C. Circuit has cautioned against any assumption that absent APA review there is a residual review of Postal Service actions under other administrative law principles.  *See Carlin*, 823 F.2d at 623 (D.C. Cir. 1987) ("It has often been stated that the presumption of reviewability was a firmly rooted principle of administrative law even before the APA was enacted.  That does not mean, however, that courts should continue to indulge a presumption of reviewability under the old administrative law principles when Congress has explicitly exempted an agency from the APA's coverage." (internal citations omitted)).

---

[37] *See also* 39 U.S.C. § 3001 (APA review applies to proceedings concerning the mailability of matter under the chapter on "nonmailable matter"); 39 U.S.C. § 3012 (APA review applies to civil penalties imposed for nonmailable matter); 39 U.S.C. § 3663 (APA review by Court of Appeals available to a person "adversely affected or aggrieved by a final order or decision of the Postal Regulatory Commission"); *see also* 39 U.S.C. § 3661(c) (APA requirement for hearing on the record applies to PRC opinions; 39 U.S.C. § 3663 (APA review by Court of Appeals available to a person "adversely affected or aggrieved by a final order or decision of the Postal Regulatory Commission").

Considering this background, the Court agrees with the other courts that have concluded that Congress clearly intended to preclude arbitrary and capricious judicial review of the substance of Postal Service regulations, policies and procedures.  *See, e.g.*, *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15 (D.D.C. 1998) ("On its face, then, the language of the statute is clear.  No [f]ederal law, including the APA, shall apply to the Postal Service's exercise of power.  The court holds that this proscription encompasses judicial review of the promulgation and substance of the 1995 CMRS regulations."); *Currier v. Potter*, 379 F.3d at 725 ("Given this statutory backdrop, we are satisfied that the PRA evinces Congress's general intent to withdraw judicial scrutiny of postal regulations."); *Caldwell v. Bolger*, 520 F. Supp. 626, 628 (E.D.N.C. 1981) (no judicial review of Postal Inspection Service's "career path policy"); *see also Carlin*, 823 F.2d at 623 (observing that "Congress intended affirmatively to preclude judicial review of the Governors' decisions to appoint and remove the Postmaster General"); *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 (5th Cir. 1975) (deletion of provisions regarding administrative procedures and judicial review from early versions of the PRA implies that Congress intended to give the Postal Service broad management authority and discretion over procedures).  Accordingly, the Court will not consider RBI's contention that the Postal Service's Cooperative Mailing Rules as promulgated are arbitrary and capricious.

### b.  Judicial Review of Challenge to Application of Cooperative Mailing Rules

The Court reaches a different conclusion with respect to the question whether Congress clearly intended to preclude judicial review of the Postal Service's decision as to RBI's mailings. Section 3626(k), the statutory subsection that authorizes the Postal Service to assess a revenue deficiency for improper use of the nonprofit rate, was added to the PRA in 1990.  39 U.S.C. §

3626(k)(2).  It expressly provides for administrative review and the issuance of a final agency

decision, but makes no mention of judicial review.  There is no pertinent legislative history.  The

fact that subsection (k) provides for an administrative appeals process could be read as evidence

that Congress intended that the only review would be administrative, but that reading is not

necessarily warranted.  It might also mean that Congress never considered the question.  In

addition, the "nature of the administrative action" – the issuance of a final agency decision

assessing a deficiency in excess of $3.5 million – requires the Court tread cautiously in deciding

to foreclose judicial review.  *See, e.g., Block.*, 467 U.S. 340 at 351; *Nat'l Ass'n of Postal*

*Supervisors*, 602 F.2d at 430.  Finally, although one of Congress's goals in enacting the PRA in

1970 was to ensure that the Postal Service be freed from some of the constraints that apply to a

typical administrative agency in order to allow it to operate more like a business, *see, e.g*.,

*Franchise Tax Bd. v. U.S. Postal Serv*., 467 U.S. 512, 519-20 (1984); *U.S. Postal Serv. v.*

*Flamingo Indus.*, 540 U.S. 736, 740 (2004); *Governors of the U.S. Postal Serv. v. U.S. Postal*

*Rate Comm'n*, 654 F.2d 108, 109 (D.C. Cir. 1981); H.R. Rep. No. 91–1104, at 5–6 (1970), U.S.

Code Cong. & Admin. News at 3649, 3654–3655; S. Rep. No. 91–912, at 4–5 (1970), it is not

apparent that allowing limited judicial review of a deficiency assessment that has been the

subject of an administrative appeal and issued as a final agency decision would undermine that

purpose.  As the D.C. Circuit has cautioned, "in conducting th[is] inquiry, courts must be careful

not to transform a congressional intent to restrict the scope of judicial review into a finding that

no review is appropriate at all."  *Nat'l Ass'n of Postal Supervisors*, 602 F.2d at 430.

Accordingly, having considered the "express language," "the structure of statutory scheme, its

objectives, its legislative history, and the nature of administrative action involved," *Block*, 467

U.S. at 345, and "the capacity of the courts to resolve the issues presented them," *Nat'l Ass'n of*

*Postal Supervisors*, 602 F.2d at 430, the Court is not convinced that Congress clearly intended to entirely preclude judicial review of a Postal Service final agency decision assessing a deficiency. *Cf. Orchestra, Inc. v. U.S. Postal Serv.*, 716 F. Supp. 47. 48-49 (D.D.C. 1989) (reviewing application of regulations concerning administrative appeals); *Lutz v. U.S. Postal Serv.*, 538 F. Supp. 1129, 1134-35 (E.D.N.Y. 1982) (reviewing challenge to application of merit hiring and advancement policies to see if policies were in fact applied, but no review of claim that Postal Service "abused its discretion" in applying the policies).

That said, it is also clear from the text and legislative history that Congress did not intend that the full panoply of rights under the APA should apply. *See* 5 U.S.C. §§ 701-706; *cf. Lutz,* 538 F. Supp. at 1134-35 (no review of claim that Postal Service "abused its discretion" in applying merit hiring and advancement policies); *Orchestra, Inc*, 716 F. Supp. at 48 (review of Director's action limited to determining if the decision was "clearly wrong"). That leaves the question of what the precise standard of review should be.

RBI suggests that the proper standard for judicial review may be found in as case from the D.C. Circuit, where the Court reviewed an action of the Federal Communications Commission outside of the context of the APA. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970). In *Greater Boston*, the Court set forth at great length the scope of its non-APA review, which, distilled to its essence, limited that review to a requirement that an administrative agency engage in "reasoned decision-making."[38] That standard comports with

---

[38] As explained in *Greater Boston*:

> Assuming consistency with law and the legislative mandate, the agency has latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest. *The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues.*

this Court's view that the scope of any review of a deficiency assessment must be limited and far

less intrusive than is required under the APA. *See, e.g.*, *Sierra Club v. U.S. Postal Serv.*, 549

F.2d 1199, 1201 (9th Cir. 1976) ("scope of review is extremely limited" and there is a "strong

presumption in favor of a Postal Service determination" that "Sierra Club is not an educational

organization and is thus not entitled to preferential postal rates"); *id.* ("Traditionally, the courts

have overturned a Postal Service determination of mailing rate status only when the

determination is "clearly wrong," amounting to an abuse of discretion."); *Bates & Guild Co. v.*

*Payne*, 194 U.S. 106, 109-110 (1904) (reviewing decision by the Postmaster General to treat

---

This calls for insistence that the agency articulate with reasonable clarity its
reasons for decision, and identify the significance of the crucial facts, a course
that tends to assure that the agency's policies effectuate general standards, applied
without unreasonable discrimination.

. . .

Its supervisory function calls on the court to intervene not merely in case of
procedural inadequacies, or bypassing of the mandate in the legislative charter,
but more broadly if the court becomes aware, especially from a combination of
danger signals, that the agency has not really taken a 'hard look' at the salient
problems, and has not *genuinely engaged in reasoned decision-making. If the*
*agency has not shirked this fundamental task, however, the court exercises*
*restraint and affirms the agency's action even though the court would on its own*
*account have made different findings or adopted different standards. . . . If*
*satisfied that the agency has taken a hard look at the issues with the use of*
*reasons and standards, the court will uphold its findings, though of less than ideal*
*clarity, if the agency's path may reasonably be discerned, though of course the*
*court must not be left to guess as to the agency's findings or reasons.*

. . .
*Generally, however, the applicable doctrine that has evolved with the enormous*
*growth and significance of administrative determination in the past forty or fifty*
*years has insisted on reasoned decision-making.*

*Greater Boston*, 444 F.2d at 852 (emphasis added).

monthly musical publication as a periodical publication, entitled to second-class rates, and noting

"where the decision of questions of fact is committed by Congress to the judgment and discretion

of the head of a department, his decision thereon is conclusive; and that even upon mixed

questions of law and fact, or of law alone, his action will carry with it a strong presumption of its

correctness, and the courts will not ordinarily review it").

###     2.     Arbitrary and Capricious Arguments As to Application of Cooperative Mailing Rules to RBI's Mailings

RBI puts forth four reasons why the Postal Service's application of the Cooperative

Mailing Rules to RBI's mailings was arbitrary and capricious.  Given the limited scope of

judicial review, the question for the Court is not whether it would have analyzed RBI's mailings

differently or reached a different conclusion, but rather, whether the Postal Service engaged in

reasoned decision-making.  Having reviewed the record and considered each of RBI's

arguments, the Court is satisfied that this standard has been met. [39]

First, RBI argues that the Final Agency Decision should be set aside as arbitrary and

capricious because the Postal Service failed to follow its own rules, specifically that it considered

only one of the nine factors set forth in PS-209 – "whether the parties share the risk" – in

deciding that RBI's mailings were ineligible cooperative mailings.  Even if the Postal Service's

failure to follow its own rules could constitute a failure to engage in reasoned decision-making,

the record does not support such a challenge as a factual matter.  First, the Postal Service's Final

Agency Decision, which incorporated by reference the Initial Agency Decision, addressed more

than just the "risk" factor.  (*See* Final Agency Decision at 1 ("[s]ome of the crucial elements the

---

[39] Despite asserting that *Greater Boston* provides the appropriate standard of review, RBI often relies on APA cases to make its arguments.  (*See, e.g.* RBI Mot. at 22 n.66.)  As the APA review standards are not applicable, the Court will not address arguments that rely on those standards.

Postal Services uses to analyze cooperative mail ventures are allocation of risk, division of profits and management control"); Initial Agency Decision at 2 (same).)  In addition, even if risk had been the only factor considered, that alone would not establish that the Postal Service failed to follow its own rules.  PS-209 sets forth the "determining factors" for deciding whether a mailing is an ineligible "cooperative mailing," or whether it is qualifies for the exception the Postal Service has recognized for "legitimate principal-agent" relationships.  PS-209 does not, however, require that in making a determination in a particular case, the Postal Service must consider all nine factors or that it must perform some type of balancing test.  Absent any suggestion in the regulations that there is such a balancing requirement, the Postal Service's reliance on the "risk" factor cannot be considered a failure to follow its own rules.  Indeed, as other courts have recognized, the "risk" factor is of "critical" importance to the cooperative mailing analysis.  *See, e.g., Raymond*, 53 F. Supp. 2d at 442 ("Risk-sharing is critical because to the extent that a for-profit entity substantively participating in a venture with a non-profit entity has a sizeable financial stake in the venture, that venture ceases to be a truly non-profit endeavor eligible for the non-profit rate.  Rather, the venture becomes a cooperative endeavor, even if the non-profit entity retains final decision-making control over the venture. Mailings for a project involving a for-profit entity and a non-profit entity therefore generally are not eligible for the non-profit rate when the for-profit entity "shares in the costs, risks, and benefits of the mailing," such as when the for-profit entity's "revenues are linked to the success of the mailings."); *U.S. Postal Serv. v. Univ. Publ'g Corp.*, 835 F. Supp. at 490–91 (mailings did not qualify for nonprofit rate where the "for-profit corporation and the nonprofit organizations shared in the cost, risk, and benefits of these mailings).

RBI's second argument is that the Final Agency Decision should be set aside as arbitrary and capricious because the Postal Service erroneously found that "RBI shared risk with its charity-clients." (RBI Mot. at 28.) According to RBI, "there was no risk to share," since "RBI, because of its long experience with this fundraising method and its thorough and rigorous analysis of past response rates, knew which donors to mail so they could fulfill their telephonic pledge, when to mail them, how often to mail them, and most importantly, when to stop mailing them to eliminate any risk of loss and to maximize donations and the number of 'paid donors' so that the overall campaign would not lose money and that losses that occurred in the telemarketing phase were recouped in the mailing phase." (RBI Mot. at 29.) Successfully managing risk, which is what RBI describes, is not the same as the absence of risk. As the Postal Service points out, "[a]lthough the campaigns may ultimately have been successful, even RBI's explanation reveals that there were losses, and therefore risk, involved and that RBI bore the risk." (PS Opp. at 5.) In addition, the question is whether the record shows that the Postal Service's conclusion that RBI "shared risk" with its nonprofit clients is the product of reasoned decision-making, which the Court concludes that it does. Given the facts, that standard is easily satisfied.

RBI's third argument is that the Final Agency Decision should be set aside because the Postal Service "misunderstood the law," specifically the legal meaning of a "legitimate principal/agent relationship." (RBI Mot. at 37.) The failure to correctly apply controlling law might be grounds for finding a lack of reasoned decision-making, but RBI's premise is flawed. Contrary to RBI's assumption, the Postal Service's exception to its Cooperative Mailing Rules for legitimate principal-agent relationships is "not entirely coextensive with pure agency law

considerations." *Raymond*, 53 F. Supp. 2d at 442.[40]  Accordingly, the Postal Service's departure

from a "pure" agency law analysis does not show an absence of reasoned decision-making.

RBI's fourth argument is that the Final Agency Decision should be set aside because the

Postal Service "changed its policy without warning and only enforced its new policy against

RBI."  (RBI Mot. at 40.)  Such a claim, if true, could well establish a lack of reasoned decision-

making.  However, RBI has not shown that the deficiency assessment was "so inconsistent with

[Postal Service] precedents as to constitute arbitrary treatment amounting to an abuse of

discretion."  *See, e.g.*, *Crosthwait v. F.C.C.*, 584 F.2d 550, 556 (D.C. Cir. 1978).  First, RBI has

not identified a single Postal Service decision applying a different standard.  *Cf. LeMoyne-Owen*

*Coll. v. N.L.R.B.*, 357 F.3d 55, 61 (D.C. Cir. 2004) (under the APA, when "a party makes a

*significant* showing that analogous *cases* have been decided differently, the agency must do more

than simply ignore that argument" (emphasis added)).  The failure to assess deficiencies against

other mailers who were using the nonprofit rate while operating pursuant to similar contracts

does not pose the same problem as agencies generally have broad discretion in the exercise of

---

[40] As persuasively set forth in *Raymond*,

> The cooperative mailing inquiry certainly looks to traditional agency principles. [T]raditional indicia of an agency relationship include '(1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; and (4) control by the principal.' " However, in agency law, control by the principal often is the most critical consideration, while in the cooperative mailing inquiry, "absence of gain or risk to the agent" often is more important, and various other factors are relevant as well.
>
> . . .
>
> Various other factors relating to not only risk-sharing, but also participation in the endeavor, distinguish the cooperative mailing inquiry from a pure agency law analysis.

*Raymond*, 53 F. Supp. 2d at 441-42 (internal quotations and citations omitted).

their enforcement powers.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985) ("If [Congress]

has indicated an intent to circumscribe agency enforcement discretion, and has provided

meaningful standards for defining the limits of that discretion, there is 'law to apply' under [the

APA], and courts may require that the agency follow that law; if it has not, then an agency

refusal to institute proceedings is a decision 'committed to agency discretion by law' within the

meaning of [the APA]."); *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1033

(D.C. Cir. 2007) (because the statute did not "give any indication that violators must be pursued

in every case, or that one particular enforcement strategy must be chosen over another" and

"provide[d] no meaningful guidelines defining the limits of [the agency's] discretion," the

challenger had failed to rebut the presumption that the enforcement decision was "committed to

the discretion of the agency").  Second, RBI claims that the Postal Service changed its policy

without warning, but it is not clear what "policy" it is referring to.  As noted, after the 1990 and

1993 amendments to the PRA, the Postal Service made clear that it did not view those

amendments as changing its existing Cooperative Mailing Rules.  And, there is nothing in those

rules that limits their application to mailings that advertise products and services.  Thus, the

criteria for evaluating cooperative mailings had been in place for years before the investigation

of RBI began.  Third, the Postal Service had advised mailers that if they were unsure whether

they were eligible to use the nonprofit rate, they could seek an opinion from the Postal Service.

PS 417/417A ("The Postal Service encourages mailers who . . . have questions concerning

whether or not mailings they are considering as part of a fundraising program will be eligible for

the special rates, to submit a sample of the mailpiece or pieces, as well as a copy of the contracts

and all other documentation affecting the relationship between the parties, to the appropriate

field division manager of mailing requirements for review.").  Finally, Postal Service Form 3602,

which was submitted with every mailing, clearly stated that acceptance of the mail did not

constitute a decision by the Postal Service that the mailing was eligible for the nonprofit rate.

Given these facts, RBI's contention that the Postal Service changed its policy and singled it out

without warning is not persuasive.

> ### 3.     Arbitrary and Capricious Challenge to Review of Deficiency Calculation

RBI's final argument is that the Final Agency Decision should be set aside as arbitrary

and capricious because the Postal Service "failed to conduct a proper review of the deficiency

during the administrative appeals process." (RBI Mot. at 44.)  According to RBI, the review

process was "fatally shoddy in three regards":  (1) the deficiency calculation was overinclusive

because it included newsletters mailed pursuant to direct purchase orders and not the problematic

contracts; (2) the Postal Service "never examined the mailpieces"; and (3) there was a lack of

"fundamental fairness" in the forbearance phase.  (*Id*. at 44-45.)

These arguments can easily be disposed of.  RBI faults the Postal Service for failing to

look at actual mailpieces, but an examination of the mailpieces would not have altered the

outcome (even RBI does not suggest that it would have), as the Postal Service's decision was

based exclusively on the terms of RBI's contracts with its nonprofit clients.  Thus, any error in

the Postal Service's failure to look at the mailpieces was harmless.  *See Greater Boston*, 444

F.2d at 852 ("Nor will the court upset a decision because of errors that are not material, there

being room for the doctrine of harmless error.").  As for the alleged lack of fundamental fairness

in the forbearance phase, the question of forbearance clearly lies within the Postal Service's

discretion.

That leaves RBI's contention that the deficiency assessment was overinclusive because it included mailings that were pursuant to direct purchase orders.  As explained by RBI, the Postal Service

> assumed that all mailings entered at BMEUs near RBI facilities and entered under nonprofit rate permits issued to RBI clients were necessarily mailings produced under the contracts listed in the original deficiency assessment.  Yet this was not the case.
>
> In addition to its telefundraising campaigns, RBI also acted as a printing and mailing agent for many of its charity-clients' newsletters and other mailings. While some of the fundraising contracts specifically contemplated the newsletter mailings, most did not because the parties wished to handle them separately. Instead, such newsletter mailings and other mailings were handled through standard purchase orders.

(RBI Mot. at 45.)

As the Postal Service does not disagree that such newsletters were eligible for the nonprofit rate, RBI has established that the amount of the assessed deficiency is based on a flawed assumption that appear to have resulted in a significantly inflated deficiency.[41]  It has thus established that the amount of the assessed deficiency is not based on "reasoned decision-making."

Nonetheless, the Postal Service argues that the deficiency assessment should be upheld either because (1) it is RBI's responsibility to pinpoint any specific problems with the deficiency assessment, which it has not done (*see* PS Mot. at 38 (RBI has "waived all such claims" because

---

[41] According to RBI, it has "conducted a detailed analysis of a segment of the deficiency to determine the extent of this error" by "review[ing] the deficiency spreadsheets for one client in one year: Mothers Against Drunk Driving ("MADD") in 1993."  (RBI Mot. at 47-48.)  After "locating and matching 3602s to each line of the deficiency spreadsheet for that year, [it] found that at least 40% of this segment of the deficiency was for mailings done under purchase orders and therefore should never have been included in the deficiency."  (*Id*. at 48.)  This has not been rebutted by the Postal Service.

it has never "specifically enumerated the improperly assessed postal charges"); or (2) because

the Postal Service's "mitigation" decision ensures that the deficiency is not in fact higher than it

should be.  (*Id.* ("any arithmetical errors or otherwise improper assessments in the revenue

deficiency are more than compensated for by the [Postal Service's] voluntary forbearance").)

Neither argument is convincing.  RBI's only burden in seeking to set aside the deficiency amount

is to show a lack of reasoned decision-making.[42]  Nor can the Postal Service rely on the fact that

deficiency was significantly reduced during the forbearance phase of proceedings.  A decision to

mitigate does not fix the flaws in the underlying decision or render those errors harmless.[43]  (*See*

Mitigation Decision at 1 ("mail classification issues . . . are outside the scope of this review").)

    Thus, even though the Court has rejected RBI's facial challenge to the Cooperative

Mailing Rules and its challenge to the Postal Service's application of the Cooperative Mailing

Rules to RBI, the Court concludes that  RBI's claim as to the deficiency amount is meritorious

and that aspect of the decision will be vacated and remanded for recalculation.

## II.    JOINT AND SEVERAL LIABILITY OF RTI/TRG FOR THE DEFICIENCY

    Both the Postal Service and RTI/TRG seek summary judgment on the Postal Service's

claim that RTI, as RBI's "corporate successor," and TRG, as RTI's majority shareholder, are

jointly and severally liable along with RBI for the unpaid deficiency.  The Postal Service proffers

two independent legal theories for its contention that RTI is liable for the unpaid deficiency: (1)

RTI is the "corporate successor in interest" to RBI; and (2) the transfer of assets from RBI to RTI

---

[42] RBI raised the overinclusiveness issue in a timely fashion during the administrative
proceedings.  *See supra* n.24.

[43] Moreover, in its counterclaim and third-party complaint, the Postal Service seeks to recover
the entire deficiency, so any argument regarding forbearance has been rendered irrelevant.
(Counterclaim and Third-Party Compl. ¶ 50.)

was actually and constructively fraudulent.  (PS Mot. at 40-41.)  According to the Postal Service, the undisputed facts establish liability as a matter of law under both theories.  RTI/TRG, on the other hand, contends that the undisputed facts establish the absence of liability as a matter of law. In the alternative, RTI/TRG contends that there are genuine disputes as to material facts that preclude summary judgment.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In this case, there is a disagreement as to whether the applicable substantive law is federal law, Pennsylvania law, or District of Columbia law, but that disagreement is immaterial because no matter what substantive law applies, there are genuine issues as to material facts that preclude entering summary judgment as to RTI and TRG's liability.

### A.   Liability Based on Corporate Successor in Interest Theory[44]

Under federal law, the test for liability as a corporate successor is whether RTI is a "substantial continuation" of RBI.  *See United States v. Davis*, 261 F.3d 1, 53 (1st Cir. 2001).[45]

---

[44] The Postal Service also argues that the doctrine of collateral estoppel precludes RTI from arguing that it is not the corporate successor-in-interest to RBI.  The Court does not agree that a decision under the Pennsylvania Unemployment Compensation Law on the transfer of an unemployment contribution rate and experience record, *see Reese Teleservices, Inc. v. Dep't of Labor & Industry*, 975 A.2d 600 (Pa. Cmwlth. Ct. 2009), is determinative of the question of successor corporate liability.

[45] Eight factors have been identified as relevant to this inquiry:

1.   retention of the same employees [by the buyer];
2.   retention of the same supervisory personnel;
3.   retention of the same production facilities in the same location;
4.   production of the same product;
5.   retention of the same name;
6.   continuity of assets;
7.   continuity of general business operations; and
8.   whether the buyer holds itself out as a continuation of the divesting corporation.

Similarly, under both Pennsylvania and District of Columbia law, there is an exception to the

general rule of no successor liability if "the purchasing corporation is merely a continuation of

the selling corporation." *Dawejko v. Jorgenson Steel Co.*, 290 Pa. Super. 15, 18 (1981);

*Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89 (D.C. 1994).[46]  Even though

the potentially applicable laws are not identical, genuine issues of fact preclude the entry of

summary judgment no matter which law applies.  For instance, the terms of the Asset Purchase

Agreement are not in dispute, but RTI/TRG maintains that RBI "retained its most valuable

---

*See United States v. Davis*, 261 F.3d 1, 53 (1st Cir. 2001) (quoting *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837-38 (4th Cir. 1992)).

[46] To determine whether a successor entity is a mere continuation of the predecessor entity under Pennsylvania law, the relevant factors are:

1. There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations;

2. There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;

3. The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

4. The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Berg Chilling*, 435 F.3d at 468-69 (citing *Philadelphia Electric*, 762 F.2d at 310).  Similarly, District of Columbia law looks at (1) whether there is a "common identity of officers, directors, and stockholders in the purchasing and selling corporations"; (2) "the sufficiency of the consideration passing from one entity for the sale of its interest in another"; (3) whether the transferring entity "failed to arrange to meet its contractual obligations"; and (4) "whether there is a continuation of the corporate entity of the seller."  *Bingham*, 637 A.2d at 92.

assets" including its software, database, and the potential litigation against the Postal Service, and "continued to operate a business for many years, taking in revenues in excess of $2 million." (RTI/TRG Mot. at 3, 8, 9.)  In contrast, the Postal Service contends that RBI "transferred substantially all of its assets of any value" and that "RBI functionally ceased to exist as a going concern."  (PS Mot. at 43; PS Facts ¶¶ 122, 133, 136.)  As both RTI and the Postal Service have identified evidence that could support their position, there is a genuine issue as to this material fact.  Similarly, while there is no dispute as to the corporate structures of RBI and RTI before and after the asset sale, different plausible inferences can be drawn from those facts.  RTI contends that the "shareholders, directors, and officers or RTI were materially different from the shareholders, directors, and officers [of RBI], with the only overlap being that both companies shared a common shareholder and director, Barry Reese."  (RTI/TRG Mot. at 3.)  The Postal Service, on the other hand, sees a "continuity of shareholders" (PS Mot. at 47) and a virtually "identical" "senior management structure."  (PS Facts ¶¶ 139-42.)  There is also a dispute as to the nature and extent of Barry Reese's role at RTI after the asset sale.  Again, there are underlying facts that are not in dispute such as Barry Reese's position at RTI (Chairman of the Board), his stockholdings (49%) and the number of hours he worked per week at RTI (20), but without further information, the Court is unable to conclude either that he "retained extensive control over RTI's operations" (PS Facts ¶ 140) or was a "figurehead" with no substantial involvement in RTI.  (RTI/TRG Mot. at 10-11.)  Moreover, RTI concedes that "it essentially continued the business attaching to the assets it purchased from [RBI]."  (RTI/TRG Mot. at 23.)

        In addition, in a case such as this where the substantive law requires application of a multi-factored test, and the factors themselves are not determinable with mathematical certainty, it would be a rare case where a court could determine as a matter of law how the underlying facts

(even if they are undisputed) fit into the applicable multi-factored test, and then evaluate the factors in relation to one another in order to reach a conclusion.  *See, e.g.*, *Washington Post Co. v. U.S. Dep't of Health & Human Services*, 865 F.2d 320 (D.C. Cir. 1989) ("Factual issues [that require inherently speculative findings] are rarely susceptible to definitive proof.  Rather, factual issues that involve predictive facts almost always require a court to survey the available evidence, to credit certain pieces of evidence above others, and to draw cumulative inferences until it reaches a judgmental conclusion.  In the end, the court makes its best assessment about what is most likely to happen in the future.  In such an inquiry, the ultimate facts in dispute are most successfully approached when all relevant evidentiary underpinnings are fully developed," not on summary judgment.)

### B.    Liability Based on Fraudulent Transfer Theory

There are also material facts in dispute that preclude summary judgment on the question of whether the transfer of assets from RBI to RTI was actually or constructively fraudulent no matter which law applies.  Under federal, Pennsylvania, or DC law, an asset transfer will be set aside if it is actually or constructively fraudulent.  *See* 28 U.S.C. § 3304; 12 Pa. Cons. Stat. Ann. § 5104(a); D.C. Code § 28-3104.[47]  Under any of the potentially applicable laws, there are

---

[47] Actual fraud exists where the transfer is made "with actual intent to hinder, delay, or defraud a creditor."  28 U.S.C. § 3304(b)(A); *see* 12 Pa. Cons. Stat. Ann. § 5104(a)(1) (same); D.C. Code § 28-3104(a)(1) (same).  To determine actual fraudulent intent, a court looks to various "badges of fraud," including whether

1.    the transfer or obligation was to an insider;
2.    the debtor retained possession or control of the property transferred after the transfer;
3.    the transfer or obligation was disclosed or concealed;
4.    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5.    the transfer was of substantially all the debtor's assets;

genuine issues as to material facts.  For example, there is a genuine dispute as to whether the

value of the consideration received by the debtor (RBI) was reasonably equivalent to the value of

the asset transfer.   RTI contends that the purchase price of $10,000 "was in excess of what could

be obtained on the open market" (RTI/TRG Mot. at 3) while the Postal Service, citing the

testimony of Barry Reese, argues that RTI acquired RBI's assets for a "song."  (PS Facts ¶ 129.)

Other material disputes include whether the transfer to RTI was to an "insider," whether the

debtor (RBI) retained possession or control of the property, whether the transfer was of

substantially all the debtor's (RBI's) assets, and whether the debtor (RBI) was insolvent.

---

6.      the debtor absconded;

7.      the debtor removed or concealed assets;

8.      the value of the consideration received by the debtor was reasonably
        equivalent to the value of the asset transferred or the amount of the
        obligation incurred;

9.      the debtor was insolvent or became insolvent shortly after the transfer was
        made or the  obligation was incurred;

10.     the transfer occurred shortly before or shortly after a substantial debt was
        incurred; and

11.     the debtor transferred the essential assets of the business to a lienor who
        transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b)(2)(A)-(K); *see* 12 Pa. Cons. Stat. Ann. § 5104(b)(1)-(11) (same); D.C. Code
28-3104(b)(1)-(11) (same).  Constructive fraud exists under federal law if: (1) that the transfer
was made after the debt to the United States arose; (2) the debtor made the transfer "without
receiving reasonably equivalent value in exchange" for the asset; and (3) the debtor was
insolvent at the time the transfer was made or became insolvent as a result of the transfer.  *See* 28
U.S.C. § 3304(a)(1)(A)-(B).  Similarly, under Pennsylvania and District of Columbia law, a
transfer is constructively fraudulent, "if the debtor made the transfer . . . (2) without receiving a
reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was
engaged or was about to engage in a business or a transaction for which the remaining assets of
the debtor were unreasonably small in relation to the business or transaction; or  (ii) intended to
incur, or believed or reasonably should have believed that the debtor would incur, debts beyond
the debtor's ability to pay as they became due."  12 Pa. Cons. Stat. Ann. § 5104(a)(2); D.C. Code
28-3104(a)(2).

Moreover, again the applicable legal standard is a multi-factored test that, unless the evidence is completely one-sided, is not amenable to decision as a matter of law but rather it is for the trier of fact to decide.

## CONCLUSION

Having decided that the amount of the assessed deficiency is arbitrary and capricious, but rejecting the remainder of RBI's challenges, the Court will affirm the Final Agency Decision except as to the amount of the deficiency, which will be set aside.   Accordingly, RBI's motion for summary judgment on its complaint will be granted in part and denied in part.  The Postal Service's motion for summary judgment on RBI's complaint will also be granted in part in denied in part.  Its motion for summary judgment on its counterclaim against RBI to collect the full deficiency amount will be denied without prejudice to its renewal after the deficiency is recalculated.  As for the Postal Service's motion for summary judgment on its claims against RTI/TRG and RTI/TRG's cross-motion for summary judgment against the Postal Service, those motions will be denied as there are genuine disputes as to material facts.  A separate Order accompanies this Memorandum Opinion.  A status conference to address further proceedings will be scheduled for December 18, 2012, at 10:00 a.m.


_____   /s/   _____
ELLEN SEGAL HUVELLE
United States District Judge

Date:  November 27, 2012